Kristen G. Simplicio (Bar No. 263291)
Anna Haac (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW,
Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 919-5852
Facsimile: (202) 973-0950
ksimplicio@tzlegal.com
ahaac@tzlegal.com

Sabita J. Soneji (Bar No. 224262)
Cameron R. Partovi (Bar No. 319589)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
ssoneji@tzlegal.com
cpartovi@tzlegal.com

Annick M. Persinger (Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024
Telephone: (213) 425-3657
apersinger@tzlegal.com

Eric Rothschild (*pro hac vice*)
**NATIONAL STUDENT LEGAL
DEFENSE NETWORK**
1701 Rhode Island Avenue Northwest
Washington, District of Columbia 20036
Telephone: (202) 734-7495
eric@defendstudents.org

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| IOLA FAVELL, SUE ZARNOWSKI, and MARIAH CUMMINGS, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA and 2U, INC.,<br><br>Defendants. | Case No. 2:23-cv-00846-SPG-MAR<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS**<br><br>Judge: Hon. Sherilyn Peace Garnett<br>Date: May 31, 2023<br>Time: 1:30 P.M.<br>Place: Courtroom 5C |

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................... 1

II. FACTUAL BACKGROUND ................................................................... 2

    A. Defendants Seize a Moneymaking Opportunity and Develop Online Degree Programs at USC Rossier ........................................ 2

    B. Defendants' Fraudulent Advertising Scheme ................................... 3

        1. The Manipulation of the US News Rankings ........................... 3

        2. USC Repeatedly Acknowledged the Importance of US News' Best Education Schools Rankings to Prospective Education Graduate Students. ................................................... 5

        3. Defendants Aggressively Marketed USC Rossier's US News Rankings to Prospective Students for Over a Decade. ............................................................................................ 6

III. ARGUMENT ........................................................................................... 8

    A. Legal Standard ................................................................................... 8

    B. The Complaint Plausibly and Adequately Alleges that Reasonable Consumers Were Misled by the Fraudulent Rankings Scheme. ........................................................................... 9

        1. Whether Consumers Were Deceived Is a Question of Fact, Not Law. ........................................................................... 9

        2. Defendants Engaged in a Long-Term Rankings-Centered Advertising Campaign Precisely Because They Knew They Were Material to Reasonable Consumers. ..................................................... 10

        3. USC's Deceptive Advertising Is Not Puffery. ............................... 16

    C. Plaintiffs Sufficiently Plead an Economic Injury-In-Fact to Establish Standing ............................................................................ 20

        1. California Supreme Court Precedent, Ignored by Defendants, is Dispositive in Showing Plaintiffs Established Economic Injury. .......................................... 20

        2. Common Sense Supports Finding an Injury Based on Defendants' Misrepresentations. ..................................... 23

    D. The CLRA Claim is Not Barred By the "Educational Malpractice" Doctrine. ............................................................... 24

IV. CONCLUSION ..................................................................................... 25

i

PLAINTIFFS' OPPOSITION TO UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS
*Favell, et al., v. University of Southern California, et al.*, No. 2:23-cv-00846-SPG-MAR

# TABLE OF AUTHORITIES

**CASES**

*Anschutz Corp. v. Merrill Lynch & Co., Inc.,*
   785 F. Supp. 2d 799 (N.D. Cal. Mar. 27, 2011) ................................ 17, 18

*Ariix, LLC v. NutriSearch Corporation,*
   985 F.3d 1107 (9th Cir. 2021) ........................................................17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................8

*Aviation Charter, Inc. v. Aviation Research Group/US,*
   416 F.3d 864 (8th Cir. 2005) ...........................................................18

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) .......................................................................8

*Beyer v. Symantec Corp.,*
   2019 WL 935135 (N.D. Cal. Feb. 26, 2019) ...................................... 21, 22

*Beziganyan v. BMW of N. Am., LLC,*
   562 F. Supp. 3d 633 (C.D. Cal. 2021) ..............................................16

*Bridget McCarthy v. Loyola Marymount Univ.,*
   2021 WL 268242 (C.D. Cal. Jan. 8, 2021) .........................................25

*Cahen v. Toyota Motor Corp.,*
   717 F. App'x 720 (9th Cir. 2017) ................................................... 21, 22

*Capaci v. Sports Research Corp.,*
   445 F. Supp. 3d 607 (C.D. Cal. 2020) ..............................................9

*Casey v. Fla. Coastal Sch. of Law, Inc.,*
   2015 WL 10096084 (M.D. Fla. Aug. 11, 2015) ...................................15

*Chamberlan v. Ford Motor Co.,*
   369 F. Supp. 2d 1138 (N.D. Cal. 2005) ...........................................9

*Charbonnet v. Omni Hotels & Resorts,*
   2020 WL 7385828 (S.D. Cal. Dec. 16, 2020) ....................................22

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
   173 F.3d 725 (9th Cir. 1999) ........................................................16

*Colgan v. Leatherman Tool Grp., Inc.,*
   135 Cal. App. 4th 663 (2006) ........................................................9

*Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc.,*
   911 F.2d 242 (9th Cir. 1990) ........................................................16

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018) ...................................................................................21

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016) ...................................................................................12

*Fowler v. University of Phoenix, Inc.*,
    2019 WL 1746576 (S.D. Cal. Apr. 18, 2019) ..........................................................18

*Gardiner v. Walmart, Inc.*,
    2021 WL 4992539 (N.D. Cal. July 28, 2021) ..........................................................21

*Gomez-Jimenez v. N.Y. Law Sch.*,
    943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012) ........................................................ 15, 16

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013) ........................................................................ 20, 21

*In re Anthem, Inc. Data Breach Litig.*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) ..........................................................22

*In re Century 21-RE/MAX Real Estate Advertising Claims Litigation*,
    882 F. Supp. 915 (C.D. Cal. 1994) ...........................................................................19

*In re Intel Corp. CPU Marketing, Sales Practices & Products Liability Litig.*,
    2020 WL 1495304 (D. Or. Mar. 27, 2020) ..............................................................22

*In re SAIC, Inc. Secs. Litig.*,
    2013 WL 5462289 (S.D.N.Y. Sept. 30, 2013) ..........................................................19

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ...............................................................................................11

*In re Univ. of San Diego Tuition & Fees COVID-19 Refund Litig.*,
    2022 WL 959266, at *3 (S.D. Cal. Mar. 30, 2022) ........................................... 24, 25

*In re Univ. of Southern California Tuition and Fees COVID-19 Refund Litig.*,
    2021 WL 3560783 (C.D. Cal. Aug. 6, 2021) ............................................................25

*Kashmiri v. Regents of Univ. of California*,
    156 Cal. App. 4th 809 (2007) ...................................................................................25

*Kim v. Benihana, Inc.*,
    2021 WL 1593248 (C.D. Cal. Feb. 24, 2021) ..........................................................10

*Kwikset Corp. v. Superior Ct.*,
    51 Cal. 4th 310, 246 P.3d 877 (2011) ..................................................20, 21, 22, 23

*LightMed Corp. v. Ellex Med. Pty., Ltd.*,
    2014 WL 12586075 (C.D. Cal. May 20, 2014) ........................................................19

*Lindner v. Occidental Coll.*,
   2020 WL 7350212 (C.D. Cal. Dec. 11, 2020) ................................................24

*Linear Tech. Corp. v. Applied Materials, Inc.*,
   152 Cal. App. 4th 115 (2007) ......................................................... 10, 11

*Makaeff v. Trump Univ., LLC*,
   2010 WL 3988684 (S.D. Cal. Oct. 12, 2010) ................................................24

*Miller v. Peter Thomas Roth LLC*,
   2020 WL 363045 (N.D. Cal. Jan. 22, 2020) ................................................21

*Moore v. Mars Petcare US, Inc.*,
   966 F.3d 1007 (9th Cir. 2020) ....................................................................9

*Opperman v. Path, Inc.*,
   84 F. Supp. 3d 962 (N.D. Cal. 2015) ........................................................11

*People v. Webb*,
   74 Cal. App. 4th 688 (1999) ....................................................................20

*Phillips v. DePaul University*,
   19 N.E.3d 1019 (Ill. App. 2014) ..............................................................23

*PhotoMedex, Inc. v. Irwin*,
   601 F.3d 919 (9th Cir. 2010) ...................................................................19

*Ransom v. M. Patel Enters., Inc.*,
   859 F. Supp. 2d 856 (W.D. Tex. 2012) ....................................................16

*Rhine v. Loyola Univ. of Chicago*,
   1998 WL 456550 (N.D. Ill July 31, 1998); ..............................................16

*Saroya v. Univ. of the Pac.*,
   503 F. Supp. 3d 986 (N.D. Cal. 2020) ....................................................24

*Smallman v. MGM Resorts Int'l*,
   2022 WL 16636958 (D. Nev. Nov. 2, 2022) ............................................22

*Souter v. Edgewell Personal Care Co.*,
   2022 WL 485000 (S.D. Cal. Feb. 16, 2022) ............................................12

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ..................................................................9

*Sultanis v. Champion Petfoods USA Inc.*,
   2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) ............................................15

*Thailight Semiconductor Lighting (HK) Co., Ltd.*,
   2023 WL 3150079 (C.D. Cal. Mar. 21, 2023) ............................................8

*Theranos, Inc. v. Fuisz Pharma, LLC,*
  876 F. Supp. 2d 1123 (N.D. Cal. 2012) ........................................................8

*ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.,*
  648 F. App.'x 609 (9th Cir. 2016)..............................................................19

*Usher v. City of Los Angeles,*
  828 F.2d 556 (9th Cir. 1987) .......................................................................8

*Viggiano v. Hansen Natural Corp.,*
  944 F. Supp. 2d 877 (C.D. Cal. 2013) .......................................................10

*Walling v. Beverly Enters.,*
  476 F.2d 393 (9th Cir. 1973) .......................................................................8

*Williams v. Gerber Prods. Co.,*
  552 F.3d 934 (9th Cir. 2009) ........................................................... 9, 10, 14

*ZL Technologies, Inc. v. Gartner, Inc.,*
  709 F. Supp. 2d 789 (N.D. Cal. May 3, 2010)...........................................18

**STATUTES**

Consumer Legal Remedies Act, Cal. Civ. Code § 1750 ........................... 2, 8, 9

**RULES**

FED. R. CIV. P. 12(b)................................................................................. 8, 9, 10

## I.   INTRODUCTION

This action arises from misrepresentations made by Defendants University of Southern California ("USC") and 2U, Inc. ("2U") (collectively, "Defendants") for over a decade regarding the USC Rossier School of Education's standing in U.S. News & World Report's ("US News") annual ranking of the United States' Best Education Schools. Beginning in 2008, to foster increased enrollment in Defendants' newly created online degree programs, USC intentionally submitted false data to US News designed to exploit US News' ranking methodology and boost USC Rossier's standing in the rankings. This data manipulation resulted in a big jump in the rankings, and Defendants jointly marketed this fraudulently obtained ranking to prospective students because they knew these students would rely on USC Rossier's US News ranking when deciding where to attend school.

Despite USC's persistent efforts to exploit students' reliance on the US News rankings for ***over a decade***, it now argues in its Motion to Dismiss that "reasonable consumers"—USC's own students—should have known better than to trust what USC and 2U were saying about the school. This argument is unsustainable given how vigorously defendants promoted the unearned rankings to those very consumers. This argument also fails because empirical evidence alleged in Plaintiffs' First Amended Complaint ("FAC") demonstrates that prospective students commonly rely on US News rankings when deciding to attend school—an obvious proposition to anyone who has applied to a competitive college or shepherded a child through that process— and because case law makes clear that prospective students were entitled to rely on USC's false advertising statements without digging for other less publicized rankings that Defendants themselves ignored. USC's related argument—that the US News rankings are "puffery" that reasonable consumers would not consider to be an actionable statement of fact—fails because the rankings are the result of a measurable methodology and identifiable data inputs. And USC can still be held liable for disseminating an opinion that it does not honestly believe.

1

USC also claims Plaintiffs failed to allege an economic injury-in-fact for purposes of statutory standing under the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* But Plaintiffs allege they paid a premium as a result of the fraudulently procured rankings and related deceptive advertising. That is exactly what is required; authority from the California Supreme Court and the Ninth Circuit, which USC ignores, permits claims to proceed with misrepresentation claims where the misrepresentations at issue caused plaintiffs to purchase a product that they otherwise would not have bought or spend more money on a product than they otherwise would, regardless of whether the court views the product as advertised and the product as delivered as basically equivalent.

Finally, USC invokes the educational malpractice doctrine. That fails also, because the doctrine does not apply to claims premised on a school's misrepresentations, and Plaintiffs' claims alleged in the FAC do not require the Court to wade into the quality of the education Defendants provided.

For these reasons, discussed further below, USC's Motion to Dismiss should be rejected in its entirety.

## II.   FACTUAL BACKGROUND

### A.   Defendants Seize a Moneymaking Opportunity and Develop Online Degree Programs at USC Rossier

USC, a private non-profit university, offers graduate education programs through the USC Rossier School of Education. First Amended Complaint ("FAC") ¶ 21. In or around 2008, USC began its business relationship with 2U, a nascent online program manager ("OPM") for whom USC was its first client, to develop an online Master of Arts in Teaching ("MAT") program—the first of USC Rossier's online degree programs—which went live in June 2009. *Id.* ¶ 22.

Defendants' October 29, 2008 contract ("Services Agreement") provided that 2U would obtain a percentage of tuition revenue – estimated to be around 60% -- from students enrolled in USC Rossier's online degree programs in exchange for providing

2

Plaintiffs' Opposition to University of Southern California's Motion to Dismiss
*Favell, et al., v. University of Southern California, et al.*, No. 2:23-cv-00846-SPG-MAR

support for the programs, and for creating and executing "marketing and promotional strategies" to attract students to the online programs. FAC ¶¶ 26-27, 43.

When launching USC Rossier's first online degree program, 2U and USC each recognized that online education programs had a negative reputation and that maintaining USC's reputation as an "elite" school despite its online degree offerings was crucial to maximizing tuition revenue. FAC ¶¶ 41-43. Defendants' Services Agreement specifically contemplated that the online MAT program (then the only online degree program) would be "promote[d] . . . in a manner comparable to the promotion of [USC] Rossier's in-classroom MAT program." FAC ¶ 42 & *id.*, Ex. A § 2(A). Under the Services Agreement, 2U was even allowed to use USC's intellectual property in marketing efforts to ensure that the online degree programs were seen as the same as the rest of USC Rossier. FAC ¶ 42 & *id.*, Ex. A § 4(C).

## B.    Defendants' Fraudulent Advertising Scheme

### 1.    *The Manipulation of the US News Rankings*

Plaintiffs allege that Defendants needed to build trust in USC Rossier's online degree programs to increase student enrollment and tuition revenue, and that need prompted the multi-year scheme to fraudulently manipulate USC Rossier's US News rankings and market USC Rossier's gamed ranking to prospective online degree program students.

US News calculates its annual Best Education Schools rankings using data sent by graduate education schools who choose to participate in the rankings. FAC ¶ 54. US News provides instructions to participating schools to ensure that they collect and report data in a consistent manner. *Id.* The data that schools supply in their US News survey responses is largely nonpublic because the Department of Education does not require schools to publish data regarding their individual graduate programs. *Id.* ¶ 52.

US News employs a precise methodology to rank schools, basing each rank on metrics assigned a different weight based on their perceived importance to determining academic quality. *Id.* ¶ 55. "Student selectivity" is weighted to 18% of the education

3

PLAINTIFFS' OPPOSITION TO UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS
*Favell, et al., v. University of Southern California, et al.*, No. 2:23-cv-00846-SPG-MAR

school's total score and is comprised of three objective sources of admittance data: (1) the school's doctoral acceptance rate (6%); (2) mean GRE quantitative scores (6%); and (3) mean GRE verbal scores. *Id.* US News' methodology does not distinguish between data relating to a school's in-person and online degrees. *Id.* ¶ 56. Throughout the period relevant to this action (2008 through 2021), US News has required schools to submit data, including student selectivity data, from **all** of the school's education doctoral programs. *Id.* ¶ 59.

The fraud targeted at least US News' "student selectivity" metrics. From the outset of their business relationship, USC intentionally only provided admittance data regarding its PhD program (which, at that time, admitted only around 15 students per year), while omitting admittance data relating to its significantly less competitive Doctorate in Education ("EdD") programs (which admitted hundreds of students per year), even though US News' survey instructions clearly called for admittance data regarding PhD *and* EdD programs. FAC ¶¶ 58-59, 61, 66.

The plan worked. In the 2009 edition of the Best Education Schools ranking—which used data submitted by USC Rossier prior to the start of its business relationship with 2U—USC Rossier was ranked #38, and its "doctoral acceptance rate" was 50.7%. FAC ¶¶ 58-60. In the 2010 edition of the rankings—which used data submitted by USC in Fall 2008, ***at around the same time that USC and 2U entered into their original Services Agreement***—USC soared to #22, and its doctoral acceptance rate plummeted to ***10.5%***. *Id.* ¶¶ 57-60. By continuing, from then on, to mislead USNews about its selectivity, USC consistently finished in the top 20 schools in US News' Best Education Schools rankings from 2009 through 2021, reaching a high of #10 in 2018. *Id.* ¶ 57.

At the same time, Defendants largely ignored US News' separate ranking of the less-publicized specialty ranking of the Best Online Education Schools after it threatened to expose the lower standards of the online program. FAC ¶ 68.  USC Rossier was #44 in 2013 in that ranking, which is the only public record of its

4

PLAINTIFFS' OPPOSITION TO UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS
*Favell, et al., v. University of Southern California, et al.*, No. 2:23-cv-00846-SPG-MAR

participation in this ranking. *Id.* Defendants never published that ranking on the main Rossier webpage, or the landing page for the online program. FAC ¶ 86.

> 2.   *USC Repeatedly Acknowledged the Importance of US News' Best Education Schools Rankings to Prospective Education Graduate Students.*

The importance of US News' annual rankings to academic decision-making—and to a reasonable student's decision to attend a particular school—is beyond dispute. The updating of rankings each year has been described as "a marquee event in higher education," and the rankings are so important to students that an increase in the rankings by only one point will raise the number of applicants to the school by nearly one percent. FAC ¶¶ 51, 53. Further, prospective graduate students are even more reliant on US News rankings than undergraduate students because the Department of Education does not require universities to publish data specific to their graduate programs. FAC ¶ 52. And USC emphasized the importance of the Best Education Schools ranking to its business strategy.

**First**, just by choosing to participate in the Best Education Schools ranking before and during the Class Period, USC demonstrated its understanding that the rankings are important to prospective students' decisions regarding which school to attend. FAC ¶ 53.

**Second**, USC Rossier's intentional decision to exclude EdD data from USC Rossier's survey submissions to US News for over a decade confirms that USC understood how central these rankings are to prospective students' decision-making, and therefore to USC's ability to enroll more students in its online degree programs. FAC ¶ 92. To that end, statements made by USC Rossier's representatives underscore the need to perpetuate this scheme to maintain and improve USC Rossier's ranking:

- In March 2016, then-USC Rossier Dean Karen Symms Gallagher expressed concern that, if USC Rossier were to provide accurate data regarding its EdD programs, the school would "drop like a rock in the rankings" (FAC ¶ 66);

5

PLAINTIFFS' OPPOSITION TO UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS
*Favell, et al., v. University of Southern California, et al.*, No. 2:23-cv-00846-SPG-MAR

- A USC Rossier employee explained that Gallagher "wanted online EdD programs excluded because [she] thought that they would affect the School's selectivity score" in the Best Education Schools rankings (FAC ¶ 67); and

- In early 2021, Pedro Noguera—who replaced Gallagher as USC Rossier's Dean—was told by others at USC Rossier that the school excluded EdD data from its survey submissions to US News "to increase the School's ranking." (FAC ¶ 71).

**Third**, the decision by USC—together with 2U—to heavily promote USC Rossier's inflated US News rankings during the class period demonstrates the importance of these rankings to prospective students. FAC ¶ 93.

### 3. *Defendants Aggressively Marketed USC Rossier's US News Rankings to Prospective Students for Over a Decade.*

Understanding the significance of US News rankings to prospective students, and to Defendants' ability to increase student enrollment in their online programs, Defendants aggressively advertised USC Rossier's fraudulently obtained Best Education Schools ranking to prospective online degree program students.

Defendants reached the class through at least the following methods from 2009 through 2021: (1) by simply securing USC Rossier's high ranking in the Best Education Schools rankings, Defendants ensured that prospective online students—who regularly consult US News rankings when deciding where to apply and attend—would see the ranking; (2) 2U used paid online advertising, including the use of Google search terms, display ad networks, and cookies embedded on USC Rossier's webpages, so that 2U could ensure that advertisements regarding USC Rossier's US News ranking were shown to students searching for graduate education programs; (3) USC has regularly issued news releases touting USC Rossier's US News rankings; (4) USC Rossier has repeatedly celebrated its rankings via social media; (5) USC, which operates the website rossier.usc.edu ("Rossier Website"), has repeatedly displayed USC Rossier's ranking on

the website's homepage; and (6) 2U has repeatedly displayed USC Rossier's ranking on the website rossieronline.usc.edu, which 2U operates ("Rossier Online Website"). FAC ¶¶ 75-87.

Because of Defendants' fraudulent scheme to climb the US News rankings and aggressively market them, hundreds of students enrolled in Defendants' online degree programs every year between 2009 and 2021. FAC ¶ 95.

All three named plaintiffs—Iola Favell, Sue Zarnowski, and Mariah Cummings—saw multiple advertisements highlighting USC Rossier's US News ranking in different locations and in different periods of time. Each plaintiff saw the ranking displayed prominently on the Rossier Website homepage. FAC ¶¶ 106 (Ms. Favell, in early 2020); 117 (Ms. Zarnowski, between April and June 2018); 130 (Ms. Cummings, in late 2018 or early 2019). And both Ms. Zarnowski and Ms. Cummings saw targeted advertisements displaying USC Rossier's US News ranking, caused by 2U's purchase of tracking tools designed to broadly distribute them. *Id.* ¶¶ 115-116, 118, 131-132.

Members of the proposed class had no reasonable basis to discover that USC Rossier's US News ranking was the product of fraud. While prospective students were inundated with false advertisements touting USC Rossier's Best Education Schools ranking, they had no practicable way of learning that USC's survey submissions to US News were false, or that USC Rossier' doctoral acceptance rate and mean GRE scores were significantly less competitive than what Defendants represented to US News. FAC ¶ 52 (the Department of Education does not require publication of data relating to individual graduate programs); ¶ 85 ("Defendants consistently omitted information about its lower (or non-existent) position in US News'" rankings of the "Best Online Education Schools"); ¶ 86 (Defendants did not disclose on their websites any information pertaining to USC Rossier's "selectivity score"); ¶ 108 (even after Ms. Favell disclosed to a 2U employee her reliance on USC Rossier's US News ranking, the employee said nothing of how the ranking was obtained).

Plaintiffs, just like other prospective students and individuals working in the higher education industry, each placed significant weight on USC Rossier's US News ranking in deciding to apply to and attend the school's online degree programs and were therefore deceived by Defendants' scheme. FAC ¶¶ 95-96, 105, 110, 112, 120, 129, 133, 134. None of the plaintiffs would have attended their respective online degree programs and paid the lofty tuition and fees that USC Rossier charged for its online degree programs had USC Rossier been ranked in a lower position. FAC ¶¶ 112, 124, 134.

Because of Defendants' deceptive conduct, Plaintiffs brought this action, individually and on behalf of a similarly situated class of USC Rossier online degree students from 2009 through 2021, alleging causes of action under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, for monetary damages in the amount of their tuition paid. FAC ¶¶ 147-153.

## III.   ARGUMENT

### A.   Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must only plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In determining whether sufficient facts are stated such that the claim is plausible, the court must presume all factual allegations are true and draw all reasonable inferences in favor of Plaintiff." *Theranos, Inc. v. Fuisz Pharma, LLC*, 876 F. Supp. 2d 1123, 1136 (N.D. Cal. 2012) (citing *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678; *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). "Any ambiguities must be resolved in favor of the pleader." *Thailight Semiconductor Lighting (HK) Co., Ltd.*, 2023 WL 3150079, at *2 (C.D. Cal. Mar. 21, 2023) (citing *Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir. 1973)). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's

complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

The CLRA claim at issue in this action—premised on Defendants' unfair and deceptive conduct—is replete with factual issues and unsuitable for resolution at the pleading stage. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2009) ("[W]hether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer."); *see also Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020) (same).

**B.  The Complaint Plausibly and Adequately Alleges that Reasonable Consumers Were Misled by the Fraudulent Rankings Scheme.**

USC first argues that the CLRA claim should be dismissed because it is implausible that reasonable consumers were deceived by its inflated US News rankings that were touted by Defendants in their marketing for years. Specifically, it asserts the misrepresentations at issue are "puffery" and not information that reasonable students would rely upon in making decisions about where to enroll.  USC's arguments are legally and factually meritless.

*1.  Whether Consumers Were Deceived Is a Question of Fact, Not Law.*

The CLRA broadly prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale . . . of goods or services to any consumer. . . ." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 679-80 (2006). To state a claim under the CLRA, Plaintiffs need only allege that USC's acts and/or statements were likely to deceive a reasonable consumer. *Id*.; *accord Capaci v. Sports Research Corp.*, 445 F. Supp. 3d 607, 620 (C.D. Cal. 2020); *see also Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (noting that a CLRA claim does not need to fulfill "all of the elements of a fraud tort claim.").

"The 'reasonable consumer' is 'an ordinary consumer acting reasonably under the circumstances, who is not versed in the art of inspecting and judging a product, [or]

9

in the process of its preparation or manufacture. . . ." *Kim v. Benihana, Inc.*, 2021 WL 1593248, at *3 (C.D. Cal. Feb. 24, 2021) (quoting *Viggiano v. Hansen Natural Corp.*, 944 F. Supp. 2d 877, 885 (C.D. Cal. 2013)). "Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer." *Williams*, 552 F.3d at 938 (citing *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134-35 (2007)). A finding on a rule 12(b)(6) motion that as a matter of law, a practice is not deceptive is only warranted in "rare situation[s]." *Williams*, 552 F.3d at 939.

Here, Plaintiffs have alleged facts that are more than sufficient to show that Defendants' scheme to deceive members of the public, and in fact did deceive members of the public. Specifically, the FAC describes both the way in which the rankings were manipulated, and the extensive, multi-year advertising campaign through which Defendants promoted those inflated rankings to Plaintiffs and other prospective online graduate students. *See, e.g.,* FAC ¶¶ 57-74 (detailing US News' Best Education Schools methodology and USC Rossier's submission of false survey data to US News to further Defendants' scheme of boosting the school's standing in the rankings); ¶¶ 75-87 (detailing 2U and USC's relentless marketing of the Best Education Schools rankings to prospective students); ¶¶ 88-94 (explaining that Defendants knew that prospective students relied on these rankings); ¶¶ 95-134 (explaining that prospective students, including Plaintiffs, were deceived by Defendants' fraudulent advertisements regarding USC Rossier's US News ranking). And the FAC identifies examples of the specific advertising, disseminated as part of this broader campaign, that misled each Plaintiff. *Id.* ¶¶ 106, 115-17, 118, 130-32. These allegations are more than sufficient to survive a Rule 12(b)(6) motion.

            2.    *Defendants Engaged in a Long-Term Rankings-Centered Advertising Campaign Precisely Because They Knew They Were Material to Reasonable Consumers.*

USC acknowledges that each Plaintiff pleads reliance on certain specific advertisements and statements pertaining to the rankings, USC Br. at 7 (citing FAC ¶¶

105-06, 116-18, 129-131). But in claiming that reasonable consumers would not have been misled by its false advertising campaign, USC argues that this Court should "disregard" the advertisements for which there are no allegations that any Plaintiff saw or relied on them. But the purpose of the numerous allegations in the Complaint describing the long-term rankings-centered advertising campaign, *see, e.g.,* FAC ¶¶ 75-87, is to show that the misrepresentations on which Plaintiffs relied were part of a comprehensive and years-long scheme. Where a plaintiff alleges exposure to a long-term advertising campaign, allegations pertaining to advertising carrying similar messaging are properly included in a complaint, even if the plaintiff does not allege particularly reliance on each and every advertisement. *See, e.g., Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 977-983 (N.D. Cal. 2015) (allowing CLRA claim to proceed where class members were exposed to different ads that contained similar messaging about a consistent theme) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009)); *see also Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134 (2007) ("[A] plaintiff need not plead the exact language of every deceptive statement; it is sufficient for [the] plaintiff to describe a scheme to mislead customers, and allege that each misrepresentation to each customer conforms to that scheme.").

In any event, the specified advertising on which the Plaintiffs relied is identical to the advertising Defendants aggressively disseminated for thirteen years. As discussed below, USC's argument that "reasonable consumers" "would not rely on the representations" made by Defendants, which they broadly disseminated to thousands of students over this thirteen-year period is factually unfounded and legally baseless. USC Br. at 10-13.

**First**, the FAC cites empirical data that prospective students commonly rely on US News' annual school rankings in deciding where to attend. FAC ¶ 51 (an increase in the US News rankings by one point raises the number of applicants to the school by 0.9%) (citing Michael Luca & Jonathan Smith, Salience in Quality Disclosure: Evidence from the U.S. News College Rankings, 22 J. Econ & Mgmt. Strategy 58, 59 (2013)); *id.*

11

¶ 52 (prospective graduate students in particular heavily rely on US News rankings because other graduate program-level data that graduate students could use to compare schools is often not available). The higher education industry knows this. *See id.* ¶ 53 (the updating of US News' annual rankings is "a marquee event in higher education," and schools develop marketing strategies "around the rankings"). These allegations are sufficient to establish that "reasonable consumers" would rely on advertising statements regarding US News rankings. *See Souter v. Edgewell Personal Care Co.*, 2022 WL 485000, at *7 (S.D. Cal. Feb. 16, 2022) ("The reasonable consumer test requires a probability that a 'significant portion of the general consuming public of targeted consumers, acting reasonably in the circumstances, could be misled.'") (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)).[1]

**Second**, USC's argument rings hollow given that its conduct since the inception of the fraudulent scheme in 2008—much of which was revealed in the Jones Day Report that first publicized information regarding this scheme—tells the opposite story. FAC ¶¶ 57-94.

To begin, USC Rossier voluntarily decided to participate in US News' Best Education Schools ranking, year after year, both prior to and during the Class Period. FAC ¶ 53. This demonstrates that, contrary to its current position that US News rankings are "relatively unpersuasive" and "notoriously questionable," USC Br. at 11, USC clearly understood that prospective graduate education students relied on the Best Education Schools rankings. Why else would USC participate in these rankings if not

---

[1] For the reasons discussed in this paragraph, USC's observation that entities other than US News also publish school rankings does not support its argument. USC Br. at 11 n.5. US News is "the dominant source of college rankings for schools, students, and news outlets." FAC ¶ 51 (citing Michael Luca & Jonathan Smith, Salience in Quality Disclosure: Evidence from the U.S. News College Rankings, 22 J. Econ & Mgmt. Strategy 58, 59 (2013)). A reasonable consumer would not hunt down comparator rankings from lesser-known entities, and USC does not expressly argue otherwise.

1  to attract prospective graduate students who were reviewing the rankings to determine

2  which graduate education program to attend?

3       Indeed, the FAC plausibly alleges that USC knew that the Best Education

4  Schools rankings were so critical to prospective graduate education students that it

5  decided that submitting fraudulent data to US News to boost USC Rossier's standing

6  in the rankings was the key to enrolling more students in its online degree programs.

7  Statements by USC Rossier's representatives underscore their desperation to keep

8  submitting fraudulent data in order to maintain or increase the School's US News

9  ranking and to consequently attract more students to the School's online degree

10  programs. FAC ¶ 66 (Dean Gallagher warned that submitting accurate data to US News

11  would cause USC Rossier to "drop like a rock in the rankings"); ¶ 67 (Gallagher "wanted

12  online EdD programs excluded because [she] thought that they would affect the

13  School's selectivity score" in the Best Education Schools rankings); ¶ 71 (Dean Noguera

14  was told by others at USC Rossier that the School submitted false data to US News "to

15  increase the School's ranking"). In fact, rankings were so material to graduate students

16  that USC's partner 2U told its investors that "any decline in the ranking of one of our

17  clients' programs or other impairment of their reputation, could have a disproportionate

18  effect on our business." FAC ¶ 47.

19       Further, throughout the Class Period, USC—together with 2U—relentlessly

20  marketed USC Rossier's fraudulently obtained Best Education Schools ranking to

21  prospective online degree students through press releases, social media posts, posts on

22  USC Rossier's webpages, and targeted advertisements because it knew that USC

23  Rossier's high ranking would attract these prospective students to the School's online

24  degree programs. *See* FAC ¶¶ 75-94.

25       Given USC's tireless efforts to use the Best Education Schools rankings to attract

26  students to USC Rossier's online degree programs throughout the class period, and the

27  myriad ways in which it acknowledged that prospective students relied on these

28

rankings, USC's "reasonable consumer" challenge is not only unpersuasive, but also disingenuous and audacious.

*Third*, USC speculates that "reasonable consumers" considering attending USC Rossier's online degree programs would have consulted other sources of information. Specifically, USC claims that because US News published a separate, specialty Best Online Education Schools rankings, reasonable consumers of online educational degrees would have consulted that, and not the Best Education Schools rankings in which its inflated rank appeared. There are several problems here.

First, the complaint alleges that the Best Online Education Schools ranking was not well publicized, FAC ¶ 68, unlike the Best Education Schools ranking. And the complaint pleads that the broader Best Education Schools rankings "are intended to be a measure of an institution's overall graduate education offerings," and these rankings incorporate data submitted for both "a school's in-person and online degrees." FAC ¶ 56; *see id.* ("Indeed, US News refers to the ranking as "the overall Best Education Schools ranking."). It was therefore reasonable for Plaintiffs to rely on USC Rossier's standing in this "overall" rankings list, as they understood that this ranking also reflected the quality of the online degree programs that they eventually attended.

More importantly, USC advertised to Plaintiffs and the class the inapplicable Best Education Schools rankings, not the Best Online Education Schools ranking. It inundated prospective students with marketing concerning USC Rossier's Best Education Schools ranking, confirming to these prospective students that the rankings were indeed relevant to the quality of the School's online degree programs. FAC ¶¶ 75-87. Faced with this relentless marketing, a reasonable consumer was not required to seek out other metrics to confirm whether USC Rossier was similarly highly ranked in the "not well known" (likely unknown) and less "sought out" online school rankings. FAC ¶ 85; *see Williams*, 552 F.3d at 939-40 (disagreeing that "reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box," and

14

stating that "reasonable consumers expect that" the back of the box would simply "confirm[] other representations on the packaging"); *Sultanis v. Champion Petfoods USA Inc.*, 2021 WL 3373934, at *10 (N.D. Cal. Aug. 3, 2021) (stating that "whether a reasonable consumer read . . . inconspicuous disclaimers that" clarified allegedly misleading statements on product packaging "is, at the very least, a question of fact").

**Fourth**, USC's reasonable consumer challenge relies primarily on two out-of-circuit decisions that dismissed consumer protection claims (not CLRA claims) brought by law school graduates against their former law schools concerning the schools' self-reported post-graduate employment data. USC Br. at 10-13 (citing *Gomez-Jimenez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834, 843 (N.Y. Sup. Ct. 2012); *Casey v. Fla. Coastal Sch. of Law, Inc.*, 2015 WL 10096084, at *15 (M.D. Fla. Aug. 11, 2015)). These cases are inapposite, holding only that relying solely on the law school's employment figures was unreasonable because factors outside the schools' control—such as widespread economic downturns—could impact whether plaintiffs would secure post-graduate employment. *Gomez-Jimenez*, 943 N.Y.S.2d at 846-47; *Casey*, 2015 WL 10096084, at *15. No such external factors bear on the reasonableness of the decision by Plaintiffs and putative class members in this action to believe that USC Rossier deserved to be ranked as highly as USC Rossier was telling them.

Moreover, both cases found that the students were required to exercise more diligence to verify allegedly favorable employment statistics reported by their law schools because these schools **were not highly ranked**. *See Gomez-Jimenez*, 943 N.Y.S.2d at 844-45; *Casey*, 2015 WL 10096084, at *2, 13. *Gomez-Jimenez* went a step further in acknowledging the importance of US News' school rankings to prospective students, stating that "reasonable consumers" would consult US News' law school rankings, and that a reasonable prospective student "is more likely to appreciate the

nexus between higher law school rankings and commensurate employment and earning expectations." 943 N.Y.S.2d at 844-45. [2]

### 3.    USC's Deceptive Advertising Is Not Puffery.

USC relatedly argues that US News' Best Education Schools rankings are "subjective opinions regarding which schools are superior" to other schools and are therefore unactionable opinions. USC Br. at 8-10. This argument, which yet again largely hinges on USC's assertion that reasonable consumers would not rely on Defendants' representations, is both irrelevant and wrong.

USC's argument misconstrues the FAC's theory of liability. Whether US News rankings are an "opinion" held by US News is irrelevant. The FAC alleges that USC and 2U implemented a fraudulent scheme that caused USC Rossier's standing in the Best Education Schools rankings to skyrocket. USC Rossier's published standing in the rankings—which Defendants then deceptively touted to prospective students in their advertising campaign—is "a statement of fact capable of being proved false" and is therefore plainly actionable. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (citing *Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990)). USC's "opinion" or "puffery" challenge should be rejected on this basis alone.

While some courts have suggested that "opinions" are not actionable, these tend to involve claims such as "truly exceptional" and other immeasurable statements. *See, e.g., Bezirganyan v. BMW of N. Am., LLC*, 562 F. Supp. 3d 633, 643 (C.D. Cal. 2021). Here, these rankings are not the product of subjective reviews provided by US News' editors but are instead the product of a precise methodology that calculates rankings

---

[2] USC also selectively quotes from two cases that mention the credibility of US News rankings, but these are stray remarks in opinions that did not address whether a reasonable consumer could rely on US News rankings, and where the credibility of US News was not directly at issue. USC Br. at 11 (citing *Rhine v. Loyola Univ. of Chicago*, 1998 WL 456550, at *3 n.4 (N.D. Ill July 31, 1998); *Ransom v. M. Patel Enters., Inc.*, 859 F. Supp. 2d 856, 860 (W.D. Tex. 2012)).

based in large part on data inputs provided by participating schools. FAC ¶¶ 54-56. Regardless of the extent to which the design of the ranking methodology was borne out of US News' opinion as to the relevant data points and their weight, the critical inquiry here is measurability. Like most certifications, ratings, or rankings, the existence of the methodology, and the inputs and outputs are all measurable. For instance, in *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, the court found that a AAA rating assigned to a trust by a securities rating agency could constitute an actionable misrepresentation because there was no indication that the methodology by which the rating was selected relied on "such inherently subjective sources" as, e.g., "the rater's view of how a particular market will develop." 785 F. Supp. 2d 799, 823 & n.23 (N.D. Cal. Mar. 27, 2011).

Nevertheless, USC claims that the mere act of assessing which criteria to use renders the rankings unactionable. USC Br. at 9. When this absurd argument is taken to its logical conclusion, any business that submits false information to get a certification, such as a school seeking accreditation, an appliance company seeking an Energy Star certification, or a cosmetics company seeking a cruelty-free label, could not be held liable because each of those certifications would have at their core a methodology based on an opinion as to which data points should be considered. That is not the law, and USC cites no case holding as much.

The main case USC does cite, *Ariix, LLC v. NutriSearch Corporation*, 985 F.3d 1107 (9th Cir. 2021), does not support this proposition. USC Br. at 9. While the court found that the reviews in that case were not actionable, the case was against the entity doing the ranking, not against a ranked company advertising fraudulent rankings for its own benefit, and the claim stemmed from "troubling allegations" that "plausibly suggest that the Guide is more like a sophisticated marketing sham rather than a product review guide," because the defendant allegedly "falsely claim[ed] to be independent, rig[ged] the ratings in exchange for compensation, and then profit[ed] from that perceived objectivity. . . ." *Id.* at 1118. Plaintiffs do not similarly suggest that US News' rankings are so untrustworthy and biased. Rather, Plaintiffs allege that US News

17

1    unwittingly published rankings that favored USC Rossier because of Defendants'
2    decision to submit sham survey responses.

3        USC's reliance on *ZL Technologies, Inc. v. Gartner, Inc.* and *Aviation Charter, Inc. v.*
4    *Aviation Research Group/US* is similarly misplaced. USC Br. at 9 n.4. Again, these cases
5    were against the ranking entities, not the ranked businesses. And unlike the rankings at
6    issue here, which ranks schools based on straightforward inputs, the rankings in *ZL*
7    *Technologies* sought to evaluate IT vendors on nebulous qualities such as their "ability to
8    execute" and "completeness of vision." 709 F. Supp. 2d 789, 791-92 (N.D. Cal. May 3,
9    2010). The defendant's review in which the rankings were published even
10   acknowledged, "The *opinions* expressed herein are subject to change without notice." *Id.*
11   at 797 (emphasis in original). These admitted opinions "were determinations based
12   primarily on the rater's view of how a particular market will develop, which itself was
13   based upon interviews with customers and vendors." *Anschutz Corp.*, 785 F. Supp. 2d at
14   823 n.23 (discussing *ZL Techs*). Similarly, the defendant's "interpretation" of the
15   plaintiff's "safety record" at issue in *Aviation Charter, Inc.* was expressly predicated on
16   the defendant's analysts' "independent judgments" and could be modified based on
17   "caucus[ing]" among the analysts based on their "belie[f] that a drastic variation from
18   the computer assigned score is warranted." 416 F.3d 864, 870 (8th Cir. 2005).

19       Finally, USC relies on other distinguishable cases where courts analyzed
20   statements that were not predicated on any objective metrics but were instead
21   unfettered subjective value judgments. For example, in *Fowler v. University of Phoenix, Inc.*,
22   the court unremarkably found that the university's "statements of high-quality
23   education and increased earning potential . . . are not actionable representations of fact
24   for purposes fact for purposes of fraud or misrepresentation." 2019 WL 1746576, at
25   *12 (S.D. Cal. Apr. 18, 2019). In *In re Century 21-RE/MAX Real Estate Advertising Claims*
26   *Litigation*, the court found that a statement that "RE/MAX [was] #1 in the United
27   States—and the World" was an opinion, noting that the statement did not even mention
28   "the category in which RE/MAX is" purportedly #1. 882 F. Supp. 915, 928 (C.D. Cal.

18

1994). The court similarly found that a statement in a separate article that "RE/MAX is now widely thought to hold" "the No. 1 position" was not actionable, given that the article "specifically state[d] that 'it's *impossible* to absolutely *confirm* the No. 1 position[]'. . . . ." *Id.* (emphasis in original). Similarly, in *In re SAIC, Inc. Secs. Litig.*, the Court found that *Fortune* Magazine's ranking of "the World's Most Admired Companies"—which did not purport to rely on any objective criteria—was an opinion. 2013 WL 5462289, at *12-13 (S.D.N.Y. Sept. 30, 2013).[3]

       **Third**, USC ignores the well-settled principle that an opinion is still actionable if made "by a speaker who lacks a good faith belief in the truth of the statement." *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, 648 F. App.'x 609, 614-15 (9th Cir. 2016) (quoting *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010)). Plaintiffs have alleged that USC advertised USC Rossier's US News rankings to prospective students while knowing that the rankings were fraudulently obtained, therefore lacking a "good faith belief in the truth of the statement." Accordingly, even if US News rankings, by themselves, are statements of opinion regarding a school's quality, USC's advertisements regarding these rankings are still actionable. *See PhotoMedex, Inc.*, 601 F.3d at 922, 931 (while statement predicting "the anticipated date [Defendants'] laser would be available for purchase" was an opinion, defendants "may be liable for misrepresentation if [Defendants] . . . knew that it would not or could not actually be available until a substantially later date"); *LightMed Corp. v. Ellex Med. Pty., Ltd.*, 2014 WL 12586075, at *5 (C.D. Cal. May 20, 2014) (statements that company "would have provisional rights upon the issuance of a patent . . . can constitute actionable

---

[3] USC also states that the defendant in *In re SAIC* relied on the ranking when it "knew [the ranking] was not accurate." USC Br. at 10. But the plaintiffs there only alleged that the defendants knew that they should not have "reference[d] [their] high ranking" on *Fortune*'s inherently subjective list because defendants were "knowingly engaged in an overbilling fraud scheme," and presumably should not be "[a]dmired." *Id.* at *13. The plaintiffs in *SAIC* did not allege, as here, that the defendants intentionally submitted false data to obtain a ranking that was based on objective inputs.

19

misrepresentations" because they were alleged to have been "made in bad faith"); *People v. Webb*, 74 Cal. App. 4th 688, 694 (1999) (appellant's statements "that he experienced intense pain and was unable to perform even the most basic personal hygiene tasks," though an opinion, "support[ed] fraud liability" because "appellant did not honestly hold the opinions he expressed").

## C.   Plaintiffs Sufficiently Plead an Economic Injury-In-Fact to Establish Standing.

USC argues that Plaintiffs cannot plead an economic injury-in-fact, necessary to establish statutory standing under the CLRA. USC Br. at 13-18. But "[t]here are innumerable ways in which economic injury from unfair competition may be shown." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323, 246 P.3d 877, 885 (2011); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013), as amended on denial of reh'g and reh'g en banc (July 8, 2013) ("The *Kwikset* Court explained precisely what a plaintiff must allege when he wishes to satisfy the economic injury requirement in a case involving false advertising."). "For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset*, 51 Cal. 4th at 329 (emphasis in original). That's *exactly* what Plaintiffs allege.

### 1.   *California Supreme Court Precedent, Ignored by Defendants, is Dispositive in Showing Plaintiffs Established Economic Injury.*

In *Kwikset*—which USC ignores—the California Supreme Court established that economic injury is sufficiently pleaded when misrepresentations lead consumers "to part with more money than [they] otherwise would have been willing to expend" or purchase a product "that he or she would not have bought." *Kwikset*, 51 Cal. 4th at 330. The holding in *Kwikset* applies to all of California's consumer protection laws, including the CLRA; as the Ninth Circuit explained in a false advertising case with CLRA claims,

20

"[t]o properly plead an economic injury, a consumer must allege that she was exposed to false information about the product purchased, which caused the product to be sold at a higher price, and that she 'would not have purchased the goods in question absent this misrepresentation.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 966 (9th Cir. 2018) (quoting *Hinojos*, 718 F.3d at 1105).

Here, Plaintiffs all plead that they would not have attended the school, or would not have paid as much, had they known the truth about its rankings. FAC ¶¶ 112, 124, 134. These allegations are squarely in line with the holding in *Kwikset*. In *Kwikset*, the plaintiffs there alleged they would not have purchased or would have paid less for locks falsely represented to be "[m]ade in [the] U.S.A." 51 Cal. 4th at 329-30. The court explained: "Simply stated: labels matter. . . . [C]onsumers will choose one product over another similar product based on its label and various tangible and intangible qualifies they may come to associate with a particular source." *Id.* at 328. **So too with rankings.** In either circumstance, consumers are injured even if the "marketplace would continue to value the product as highly as the amount the consumer paid for it," *id.* at 330, 332-33 (likening the injury to those who value food that is kosher, halal, or organic and purchase such food based on misrepresentations), or the consumer was "generally satisfied" but paid an undue price premium because of the misrepresentation. *Miller v. Peter Thomas Roth LLC*, 2020 WL 363045, at *6 (N.D. Cal. Jan. 22, 2020). That's plainly true for the education that Plaintiffs paid for in this case.

Rather than address the well-established, directly relevant *Kwikset* standard for damages available to a plaintiff misled into a purchase by fraudulent advertising, USC resorts to a handful of cases arising from products' data security vulnerabilities. USC Br. at 14-16 (citing *Gardiner v. Walmart, Inc.*, 2021 WL 4992539, at *5 (N.D. Cal. July 28, 2021); *Beyer v. Symantec Corp.*, 2019 WL 935135, at *4 (N.D. Cal. Feb. 26, 2019); *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723-24 (9th Cir. 2017)). These are essentially product liability cases, lacking the express false advertisement element of *Kwikset* or this

case.[4] They discuss injuries unique to the data security context, where defendants were able to fix the deficiency by issuing a "patch," *see, Beyer v. Symantec Corp.*, 2019 WL 935135, at *4 (N.D. Cal. Feb. 26, 2019) ("Plaintiffs' claims here rest on a purported *past* risk of harm that has never been alleged to manifest and presumably never will, given that the vulnerabilities were patched in 2016-17 and Plaintiffs had stopped using the software long before that") (emphasis in original). They depend on market dynamics— like the resale of vehicles—that do not exist in the education context.  *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723-24 (9th Cir. 2017) (noting the impact on the Kelley Bluebook value of the car and that all cars on the market had similar vulnerabilities).

Even then, other courts in this Circuit considering similar data security allegations have rejected the restrictive view of economic injury advocated by USC. *See*, *e.g.*, *Smallman v. MGM Resorts Int'l*, 2022 WL 16636958, at *5 (D. Nev. Nov. 2, 2022) ("[r]equiring allegations of a particular sum of the purchase price being explicitly allocated for data security… is requiring too much") (citing *In re Intel Corp. CPU Marketing, Sales Practices & Products Liability Litig.*, 2020 WL 1495304, at *8 (D. Or. Mar. 27, 2020)); *see also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *13 (N.D. Cal. May 27, 2016).

USC also argues that because Plaintiffs paid "for an education" and received one, they were not injured, even though they were persuaded to enroll at USC Rossier—and pay its exorbitant tuition—by the fraudulent ranking-centered advertising. USC Br. at 15-16. This argument is also foreclosed by *Kwikset*, which made clear that it did not matter that plaintiffs "had spent money[ and] 'received locksets in return,'" or that the plaintiffs did not allege the product purchased was "defective, overpriced, or of inferior

---

[4] *Charbonnet v. Omni Hotels & Resorts*, 2020 WL 7385828 (S.D. Cal. Dec. 16, 2020), cited by USC for the general proposition that Plaintiffs must plead an economic injury in fact to establish standing under the CLRA, involved allegations of a misrepresentation, but not actual ones. The plaintiff alleged that Omni Hotels misrepresented the cost of a hotel room, but the court found that the cost was made fully available to the Plaintiffs *before* they made their purchase. *Charbonnet*, 2020 WL 7385828, at *1, 5.

quality." *Kwikset*, 51 Cal. 4th 310 at 331. *See also Davidson*, 889 F.3d at 966 (finding economic injury where plaintiff alleged she overpaid for wipes were falsely advertised as "flushable" despite no damage to her plumbing). If a consumer was "deceived by misrepresentations into making a purchase," the "economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent." *Kwikset*, 51 Cal. 4th 310 at 329.

### 2. *Common Sense Supports Finding an Injury Based on Defendants' Misrepresentations.*

USC argues that it defies "common sense" that Plaintiffs attached value to the US News ranking. USC Br. at 16-18. *This argument* defies common sense. To paraphrase *Kwikset*, "[s]imply stated: [**rankings**] matter." Certainly, 2U understood consumers attached value to the US News ranking when it repeatedly told investors that 2U's revenue would decline if rankings (or relatedly, USC's reputation) declined. FAC ¶¶ 5, 47, 63. As described above, it is well documented that US News rankings play an important role in students' decisions to enroll in a college or graduate program. *See e.g.,* FAC ¶ 51, 53. This is especially true for graduate programs, where relatively less information is available, as "the Department of Education does not require universities to publish data regarding the university's individual graduate programs." *Id.* ¶ 52.

And "common sense" tells us that if US News rankings weren't important to students, Defendants would not have prominently displayed them on the program's website, posted about it on social media, issued press releases noting the ranking, and purchased ads promoting the ranking. FAC ¶¶ 75-87. And they certainly wouldn't have provided the wrong data to US News to improve the rankings. *Id.*, *passim.*

Finally, *Phillips v. DePaul University* is wholly distinguishable. USC Br. at 17-18. That court dismissed plaintiffs' claims because of their theory of damages, which relied on estimating lost future wages. 19 N.E.3d 1019, 1033-35 (Ill. App. 2014). Here, Plaintiffs do not seek damages based on lost future earnings, and don't contend that through its manipulated US News rankings, Defendants implicitly promised specific

23

1  employment outcomes. Instead, Plaintiffs contend they would not have attended USC

2  Rossier if they knew that the US News rankings were fraudulently obtained or would

3  have paid less. *See e.g.,* FAC ¶¶ 112, 124, 134.

### D. The CLRA Claim is Not Barred By the "Educational Malpractice" Doctrine.

6  Plaintiffs' claims are not barred by the "educational malpractice" doctrine, which

7  courts developed to avoid intervening in student instruction, not to abstain from all

8  cases against schools. Courts have consistently rejected this doctrine applying to claims

9  that focus on fraud, misrepresentations, consumer protection and false advertising, as

10  Plaintiffs have pleaded in this case. *See, e.g., In re Univ. of San Diego Tuition & Fees COVID-*

11  *19 Refund Litig.*, 2022 WL 959266, at *3 (S.D. Cal. Mar. 30, 2022) (rejecting the doctrine's

12  application to plaintiffs' UCL, breach of contract, unjust enrichment, conversion and

13  CLRA claims); *Makaeff v. Trump Univ., LLC*, 2010 WL 3988684, at *2-3 (S.D. Cal. Oct.

14  12, 2010) ("Even if the educational malpractice bar were to apply . . . Plaintiffs' contract,

15  tort, and consumer claims do not implicate this doctrine").

16  USC cites two cases, neither of which support applying this doctrine. USC Br. at

17  18-19 (citing *Lindner v. Occidental Coll.*, 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020);

18  *Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 995 (N.D. Cal. 2020)). In *Saroya*, the

19  district court rejected the application of the doctrine because plaintiffs' claims, which

20  focused on defendant's broken promises, did not require the court to inquire into the

21  quality of the university's education. *Saroya*, 503 F. Supp. 3d at 995-96. In *Lindner*,

22  plaintiffs' claims did not relate to misrepresentation; instead, they focused on the impact

23  to educational quality when a college transitioned to online learning during the COVID

24  pandemic. *Lindner*, 2020 WL 7350212. (Even if *Lindner* was applicable, most California

25  district courts have taken a different approach, finding the doctrine inapplicable to

26  similar, COVID-related, claims.[5])

---

[5] *See, e.g., Bridget McCarthy v. Loyola Marymount Univ.*, 2021 WL 268242 (C.D. Cal. Jan. 8,

1    Plaintiffs' claims do not "require an inquiry into the nuances of educational
2    processes and theories. . . ." *Bridget McCarthy v. Loyola Marymount Univ.*, 2021 WL 268242,
3    at *3 (C.D. Cal. Jan. 8, 2021) (quoting *Kashmiri v. Regents of Univ. of California*, 156 Cal.
4    App. 4th 809, 826 (2007)) (quotation omitted). They don't require an inquiry into
5    plaintiffs' education at all. USC argues that the fact finder would have to determine
6    whether the school should have been ranked 10th or 12th. USC Br. at 22-23. That's not
7    the jury's job—it was USNWR's job, but USC deprived it of the information it needed
8    to do it. As a result, USC induced students to enroll using information it knew to be
9    false—the exact type of behavior that courts have consistently recognized is not
10   implicated by the educational malpractice doctrine.

11   **IV.    CONCLUSION**

12       For the foregoing reasons, the Court should reject 2U's Motion to Dismiss in its
13   entirety.

14                                   Respectfully submitted,

15   Date: May 5, 2023              */s/ Kristen G. Simplicio*
16                                   Kristen G. Simplicio (Bar No. 263291)
                                     Anna Haac (*pro hac vice*)
17                                   **TYCKO & ZAVAREEI LLP**
                                     2000 Pennsylvania Avenue NW,
18                                   Suite 1010
                                     Washington, District of Columbia 20006
19                                   Telephone: (202) 919-5852
                                     Facsimile: (202) 973-0950
20                                   *ksimplicio@tzlegal.com*
                                     *ahaac@tzlegal.com*

21                                   Annick M. Persinger (Bar No. 272996)
22                                   **TYCKO & ZAVAREEI LLP**
                                     10880 Wilshire Blvd., Suite 1101
23                                   Los Angeles, CA 90024
                                     Telephone: (213) 425-3657
24                                   *apersinger@tzlegal.com*

25                                   Sabita J. Soneji (Bar No. 224262)
                                     Cameron R. Partovi (Bar No. 319589)
26                                   **TYCKO & ZAVAREEI LLP**

27   2021); *In re Univ. of Southern California Tuition and Fees COVID-19 Refund Litig.*, 2021 WL
28   3560783 (C.D. Cal. Aug. 6, 2021); *In re Univ. of San Diego Tuitiion & Fees COVID-19 Refund Litig.*, 2022 WL 959266, at *3 (S.D. Cal. Mar. 30, 2022).

25

1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
*ssoneji@tzlegal.com*
*cpartovi@tzlegal.com*

Eric Rothschild (*pro hac vice*)
**NATIONAL STUDENT LEGAL
DEFENSE NETWORK**
1701 Rhode Island Avenue Northwest
Washington, District of Columbia 20036
Telephone: (202) 734-7495
*eric@defendstudents.org*

*Counsel for Plaintiffs*