# EXHIBIT 2

**Exhibit 2**
**105**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 2 of 402    Page
ID #:2857
Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3
          IOLA FAVELL, SUE ZARNOWSKI,   )
4         MARIAH CUMMINGS, and AHMAD    )
          MURTADA, on behalf of         )
5         themselves and all others    )No.2:23-cv-
          Similarly situated,           )00846-GW-MAR
6                                       )
                        Plaintiffs,     )
7                                       )
                   vs.                  )
8         UNIVERSITY OF SOUTHERN        )
          CALIFORNIA and 2U, INC,       )
9                                       )
                        Defendants.     )
10        ----------------------------

11

12

13

14             REMOTE VIDEOTAPED DEPOSITION OF

15                   JOHN CHANDLER, Ph.D.

16                  Thursday, August 1, 2024

17

18

19

20

21

22        Reported by:

23        LISA M. MURACO

24        JOB NO. 31630

25

1

2                                    Thursday, August 1, 2024

3                                    10:00 a.m. Central

4                                    11:00 a.m. Eastern

5

6

7              REMOTE Deposition of JOHN CHANDLER,

8        Ph.D., held VIA ZOOM, before LISA M.

9        MURACO, a Notary Public of the State of New

10       York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          A P P E A R A N C E S:

2          (REMOTE)

3

4               NATIONAL STUDENT LEGAL DEFENSE NETWORK

5               Attorneys for Plaintiff

6                    1015 15th St NW #600

7                    Washington, DC 20005

8          BY:   CHRIS BRYANT, ESQ.

9

10

11              SHOOK HARDY & BACON L.L.P

12              Attorneys for Defendants

13                   2121 Avenue of the Stars

14                   Suite 1400

15                   Los Angeles, California 90067

16         BY:   MARK CAMPBELL, ESQ.

17               HOLLY SMITH, ESQ.

18

19

20

21

22         ALSO PRESENT:

23         Legal Video Specialist, Paul D'Ambra

24

25
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 5 of 402    Page
ID #:2860
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

```
 1            IT IS HEREBY STIPULATED AND AGREED
 2        by and between the attorneys for the
 3        respective parties herein, that filing and
 4        sealing be and the same are hereby waived.
 5            IT IS FURTHER STIPULATED AND AGREED
 6        that all objections, except as to the form
 7        of the question, shall be reserved to the
 8        time of the trial.
 9            IT IS FURTHER STIPULATED AND AGREED
10        that the within deposition may be sworn to
11        and signed before any officer authorized
12        to administer an oath, with the same
13        force and effect as if signed and sworn
14        to before the Court.
15
16
17
18
19                      - oOo -
20
21
22
23
24
25
```

```
 1              THE VIDEOGRAPHER:  We are on the

 2         record.  Today's date is August 1, 2024.

 3         The time is 10:03 a.m. Central.

 4              This is the recorded video

 5         deposition of John Chandler, Ph.D., being

 6         taken in the matter of Iola Favell, et al.

 7         versus University of Southern California

 8         and 2U, before the United States District

 9         Court, Central District of California.

10         Case No. 2:23-cv-00846-GW-MAR.

11              I'm Paul D'Ambra, the video

12         technician.  Our court reporter today is

13         Lisa Muraco.  We are both from Everest

14         Court Reporting.

15              All counsel appearing today will be

16         noted on the stenographic record.

17              Will the court reporter please

18         proceed.

19              *              *              *

20    J O H N   C H A N D L E R, called as a witness,

21    having been duly sworn by a Notary Public, was

22    examined and testified as follows:

23    EXAMINATION BY

24    ATTORNEY CAMPBELL:

25         Q.    Thank you.
```

**Exhibit 2**    Page: 5
**110**

```
 1                            Good morning, Dr. Chandler.

 2            A.    Good morning.

 3            Q.    Have you had your deposition taken

 4      before?

 5            A.    I have.

 6            Q.    On how many prior occasions?

 7            A.    I have given five depositions before

 8      this.

 9            Q.    Five, okay.

10                  And when was the most recent?

11            A.    Last night.

12            Q.    Okay.

13                  And what was the matter for which

14      you gave testimony last night?

15            A.    Oh, it was a deposition for a

16      supplemental report in the State of Alaska

17      versus Juul Labs.

18            Q.    Okay.

19                  And I notice from -- and we'll look

20      more closely at your CV, but I think from your

21      CV I noted that you were deposed, at least

22      listed, two prior depositions?

23            A.    There were three total depositions

24      in some Juul cases and then the Alaska one.

25      So, I guess, four.
```

Favell, et al. v. University of Southern California and 2U Inc.

```
 1              Q.    Okay.

 2                    So let's make sure the record is

 3     clear.

 4                    You've testified before today four

 5     other times?

 6              A.    I apologize.  The -- so I had three

 7     depositions in the Juul case, in one of the

 8     Juul cases.

 9                    I had a deposition, a full-length

10     deposition in State of Alaska versus Juul Labs.

11     And then I just did that short one last night.

12                    So five before today.

13              Q.    Got it.  I think I understand.

14                    But I'm going to recap it to make

15     sure I fully understand.

16                    There are two Juul cases for which

17     you are serving as an expert, correct?

18              A.    That is correct.  Although the first

19     one I referred to -- and I'm unclear on some of

20     the legal specificities, but there was an MDL

21     case sort of generally.

22                    And then there was a government

23     entities case or a bellwether school districts

24     case that I think was separate.  And those were

25     the three -- those together make up the three
```

1    depositions on that.

2          Q.    Were those all depositions given

3    from matters that are within the State of

4    California, if you know?

5          A.    The Juul cases were all in the

6    Northern District of California court.  But I

7    think I furnished the case numbers.  But

8    obviously, I'm a little unclear on some of the

9    -- which court details.

10          Q.    Okay.

11                I think what I saw in your testimony

12    experience was two cases listed.  And I could

13    be wrong about that.

14                One was the Alaska case.

15                That's the action that you mentioned

16    was brought by the State of Alaska, correct?

17          A.    That's correct.

18          Q.    Okay.

19                And the other one you listed In RE:

20    Juul Labs marketing, sales practices, and

21    products litigation.

22                And then you gave case number for

23    that.  And you just listed one case.

24                But is it your testimony that within

25    that one case, there are sort of three

 1          components for which you provided testimony?

 2              A.    I did three reports in that case and

 3          was deposed three times.

 4              Q.    Okay.

 5                    Got it.  Fair enough.

 6                    And, in fact, you list the dates of

 7          your depositions in that case as July 21st,

 8          October 21st, and May 22nd, correct?

 9                    And that case I'm talking about the

10          one in the Northern District of California,

11          right?

12              A.    I would need the year numbers to

13          fully recall.  But I believe that that's

14          correct.

15              Q.    Okay.  Perfect.

16                    So even though you had five prior

17          depositions, I'm going to go through some of

18          the ground rules just to make sure that you and

19          I are on the same page.  Every lawyer is a

20          little different in their approach to a

21          deposition.  So I just want to make sure you

22          and I have a clear understanding of how today

23          will proceed.

24                    So like every deposition, I will ask

25          you questions and you'll be expected to give me

**Exhibit 2**
Page: 9
**114**

1    a truthful and accurate response.

2                Do you understand that?

3        A.    I do.

4        Q.    Okay.

5                And if for any reason you don't know

6    the answer to a question, it's -- it's

7    unhelpful to any of us here for you to guess or

8    speculate.  If you don't know or don't recall,

9    simply say so.

10                Is that understood?

11        A.    Yes.

12        Q.    Okay.

13                Our court reporter here today is

14    taking down everything that's said during the

15    course of this deposition.  My questions, your

16    answers, any objections by Mr. Bryant.

17                And so, it's really important that

18    you and I follow best practices.  And that is

19    you wait for me to finish my question before

20    you start your answer.  And I will do my best

21    to wait for you to finish answering before I

22    start my next question.

23                From time to time, inevitably, you

24    and I will violate those rules, and the court

25    reporter will remind us, or I might remind you.

**Exhibit 2** Page: 10
**115**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 12 of 402    Page
ID #:2867
Deposition of John Chandler, Ph.D.                                    Favell, et al. v. University of Southern California and 2U Inc.

1    And we're doing it not to be rude.  We just

2    need to make sure that there's a clear

3    transcript.

4              And when multiple people are

5    talking, it's impossible to get an accurate and

6    complete record.

7              Do you understand that?

8        A.    I do.

9        Q.    Okay.

10             And from time to time, again,

11   counsel may object to the form of my question.

12             If counsel objects, you're still

13   expected to answer the question unless you get

14   a specific instruction not to answer the

15   question.

16             Do you understand that?

17       A.    I do.

18       Q.    Okay.

19             So I would -- I would urge you not

20   to get too caught up in the objections.

21   Sometimes witnesses forget the question because

22   they're so focused on what the lawyer's saying.

23             If you can just keep the question in

24   mind, it'll make today's process much smoother,

25   okay?

**Exhibit 2** Page: 11
**116**

1      A.    Okay.

2      Q.    What did you do to prepare for your

3   deposition today?

4      A.    I reviewed my report.  And I had a

5   meeting with counsel yesterday to discuss the

6   deposition.

7      Q.    Okay.

8            How much time did you spend

9   reviewing your report?

10     A.    I'd say about an hour and a half.

11     Q.    Okay.

12           And then how much time did you spend

13   meeting with counsel?

14     A.    A little bit more than three hours.

15     Q.    And who specifically, when you say

16   counsel, did you meet with?

17     A.    I met with Chris.  I met with

18   Kristen Simplicio.  And Eric, whose last name

19   I'm forgetting.

20           ATTORNEY BRYANT:  Rothschild.

21           THE WITNESS:  Rothschild.  Thank

22     you.

23   BY ATTORNEY CAMPBELL:

24     Q.    Okay.

25           And were all three present during

```
 1            the entire -- I think you mentioned roughly

 2            three hours?

 3                 A.    Yes, I believe so.

 4                 Q.    Okay.

 5                       Was there anyone else present during

 6            the course of that meeting yesterday?

 7                 A.    No.

 8                 Q.    Was that meeting in person or was

 9            that meeting over Zoom or telephone or some

10            other means?

11                 A.    Via Zoom.

12                 Q.    Okay.

13                       And where you currently located?

14                 A.    Right now, I'm in Minneapolis,

15            Minnesota.

16                 Q.    Is there anyone else present with

17            you?

18                 A.    No.

19                 Q.    Okay.

20                       Are you at a residence?

21                 A.    Yes, I'm at home.

22                       So my partner is downstairs, and my

23            dog will inevitably try to break in at some

24            point.  But I will keep her out.

25                 Q.    Okay.  Sound good.
```

```
 1                   Was a -- you said you had a chance
 2         to rereview your -- the report that you
 3         drafted.
 4                   Was there anything in your report
 5         that you would like to change or correct?
 6              A.    No, I don't believe so.
 7              Q.    Okay.
 8                   And does your report set forth all
 9         of your opinions in this matter?
10              A.    Yes.
11              Q.    Okay.
12                   Have you been asked to perform any
13         other work in this case?
14              A.    I have not.
15              Q.    Okay.  Great.
16                   Have you taken any medication or
17         consumed any alcohol in the last 24 hours that
18         would impair your ability to recall
19         information?
20              A.    I have not.
21              Q.    Okay.
22                   Have you ever been convicted of a
23         felony?
24              A.    I have not.
25              Q.    Okay.
```

Favell, et al. v. University of Southern California and 2U Inc.

```
 1                    We ask that question for a reason.

 2                    I expect the answer to be no, but

 3          you never know, right?

 4               A.    I didn't feel accused.

 5               Q.    Okay.

 6                    Have you -- strike that.

 7                    Are you aware of whether there's any

 8          other experts in this matter?

 9               A.    I am aware that there are other

10          experts.  I have heard plaintiff's counsel

11          mention their existence, although I don't know

12          who they are, and I have not reviewed any of

13          their materials.

14               Q.    You answered my two follow-up

15          questions.  That's great.  Thank you.

16                    And is one of the documents you

17          reviewed the complaint or the document that was

18          filed initiating the lawsuit in this matter?

19               A.    I have reviewed that, although not

20          recently.

21               Q.    Okay.

22                    And the complaint is -- was brought

23          by parties that are called the plaintiffs.

24                    And have you met or interviewed any

25          of the plaintiffs in this case?
```

**Exhibit 2** Page: 15
**120**

1      A.    I have not.

2      Q.    Okay.

3            Have you read any of their

4   deposition testimony in this case?

5      A.    I believe that I have looked at some

6   of perhaps Favell's deposition.  And perhaps I

7   have done some word searches on others.

8            But I have not -- I have not done a

9   thorough reading of all of the depositions for

10  the plaintiffs.

11     Q.    Okay.

12           Neither of those statements you made

13  give me a lot of confidence or certainty of

14  what you did.  You said maybe and perhaps.

15           Do you specifically remember looking

16  at excerpts from Ms. Favell's deposition?

17     A.    I remember looking at Ms. Favell's

18  deposition.

19     Q.    Okay.

20           And with respect to the other

21  plaintiffs, do you recall doing -- looking at

22  or doing word searches in those?

23     A.    I can't recall with precision.

24     Q.    Okay.

25           I note in your report -- and again,

Favell, et al. v. University of Southern California and 2U Inc.

| | |
|---|---|
| 1 | if I'm misremembering, you can correct me. |
| 2 | But I think the only deposition you |
| 3 | listed as a case document that you looked at |
| 4 | was the deposition of someone named Joanna |
| 5 | Gerber. |
| 6 | ATTORNEY BRYANT:  Objection. |
| 7 | BY ATTORNEY CAMPBELL: |
| 8 | Q.    The question wasn't quite out, so |
| 9 | let me ask the question and then Mr. Bryant can |
| 10 | jump in. |
| 11 | He's anxious to object to my |
| 12 | questions today.  I can tell already. |
| 13 | So in your report, you list |
| 14 | depositions that were part of the materials you |
| 15 | considered, correct? |
| 16 | A.    That's correct.  In my report, I |
| 17 | list my -- the materials I relied on to reach |
| 18 | my opinions. |
| 19 | Q.    Okay. |
| 20 | In fact, the section of the report |
| 21 | is called Materials Considered. |
| 22 | And so, considered, relied upon, |
| 23 | these are the things you looked at as part of |
| 24 | reaching the conclusions in this case, correct? |
| 25 | A.    That's correct. |

```
 1            Q.    And the only transcript you listed

 2      was the transcript of Ms. Gerber, correct?

 3                  ATTORNEY BRYANT:   Object to --

 4            object.

 5            A.    I believe that to be correct.

 6      Although I would need to review the list to

 7      verify it.

 8            Q.    Okay.

 9                  We'll look at the report shortly and

10      we'll go to that list and take a look at it.

11                  Do you remember listing any other

12      transcripts besides the transcript of

13      Ms. Gerber?

14            A.    I don't.  But I can't recall what's

15      specifically on that list.

16            Q.    Fair enough.

17                  We'll take a look at it.  And we'll

18      get to the bottom of that once we've marked

19      your report.

20                  Have you looked at the testimony,

21      whether in a cursory fashion or otherwise, of

22      any USC employee?

23            A.    I have looked at the deposition

24      of -- I believe her last name is Courtney.

25                  The 30(b)(6) witness for USC.
```

1    Q.    You're talking about Tabitha

2    Courtney?

3    A.    Yes.

4    Q.    Okay.

5         And when you say you looked at, what

6    does that mean?

7    A.    I opened up the PDF document.  I

8    scrolled through the pages looking at what was

9    being discussed in the deposition.  I looked at

10   some of the -- is it Ms. Courtney?

11   Q.    Mh-hm.

12   A.    Ms. Courtney's replies.

13        Yes, that's what I did to look at

14   it.

15   Q.    Is it fair to characterize that as a

16   cursory review of her transcript?

17   A.    I think that is fair.

18   Q.    Okay.

19        Were there any other transcripts of

20   USC employees that you looked at besides

21   Tabitha Courtney?

22   A.    I don't believe so.

23   Q.    Okay.

24        And were there any other transcripts

25   of 2U employees that you looked at?

1      A.    None other than Dr. Gerber's.

2      Q.    Okay.

3            And then, Dr. Chandler, do you --

4      having read the complaint, and I think one of

5      the other documents you listed was the Jones

6      Day report, did you understand that one of the

7      -- well, strike that.

8            That the former dean of the USC

9      Rossier School of Education was someone by the

10     name of Dean Gallagher.

11           Do you remember that name?

12     A.    I do remember that name.

13     Q.    Okay.

14           Are you aware of whether she was

15     deposed in this case or not?

16     A.    I believe that she was deposed, but

17     I am not certain.

18     Q.    Okay.

19           Is it fair to say, though, that

20     you've never seen or reviewed in any fashion

21     her testimony?

22     A.    I don't recall reviewing any of her

23     testimony.

24     Q.    Okay.  Fair enough.

25           Let's go ahead and we'll put up the

```
1              first exhibit.

2                        This is just a formality.

3                        This is the notice of deposition,

4         which is Exhibit 1074.

5                        (Exhibit 1074, Notice of Deposition,

6                 marked for identification.)

7                        ATTORNEY CAMPBELL:   1074.

8                        (Document review.)

9         BY ATTORNEY CAMPBELL:

10             Q.    Exhibit 1074 is the Notice of

11        Videotaped Deposition of Plaintiff's Expert

12        John Chandler, Ph.D., and Request for

13        Production of Documents.

14                        Have you seen this document before?

15             A.    I have.

16             Q.    And then if you scroll down the

17        document, you'll see there's a list of

18        documents requested.

19                        ATTORNEY CAMPBELL:   Paul, do I have

20                 control over it?

21                        Okay.   There we go.

22                        (Document review.)

23                        THE WITNESS:   You achieved control

24                 over the document much faster than I did

25                 when Paul was teaching me how to do it.
```

```
 1          BY ATTORNEY CAMPBELL:
 2               Q.    I've done this once or twice before.
 3                     Dr. Chandler, there's a Schedule A
 4          that lists documents that were requested of
 5          you.
 6                     Did you review the schedule?
 7               A.    I've read it.
 8               Q.    Okay.
 9                     And did you do anything to gather
10          documents to produce in response to this
11          request for documents?
12               A.    I answered some questions from Ms.
13          Simplicio about the billing records and
14          invoices.  And then I asked to what extent were
15          the other items listed considered work product.
16                     And it is my understanding that I
17          don't have anything that falls into nonwork
18          product for these other items.
19               Q.    That -- that hasn't already been
20          produced?
21               A.    Correct.
22               Q.    Okay.  Got it.
23                     Now, let's go ahead and take a look
24          at the next exhibit in order, 1075.
25                     (Exhibit 1075, Contract Agreement,
```

1          marked for identification.)

2      BY ATTORNEY CAMPBELL:

3          Q.    Dr. Chandler, do you recognize this

4      document?

5          A.    I do.

6          Q.    And what is it?

7          A.    This is my sort of contract

8      agreement for this type of work.

9          Q.    Okay.

10         A.    Specifically as the one with Tycko &

11     Zavareei.

12         Q.    Great.

13               And Tycko & Zavareei is the

14     plaintiff's firm that retained you?

15         A.    That is correct.

16         Q.    Okay.

17               And this is dated as of January 16,

18     2024.

19               Do you see that?

20         A.    I do.

21         Q.    When were you first contacted by

22     anyone about this matter?

23         A.    I'm not certain.  I would -- I would

24     be guessing if I tried to answer.  I'm happy to

25     speculate, but I'm not certain.

```
 1              Q.    I don't want you to speculate or

 2        guess.

 3                    What I am entitled to is your best

 4        recollection.  And so, let's see if we can

 5        narrow it down a little bit.

 6                    Given that this was signed on

 7        January 16th of 2024, do you think that your

 8        first contact with anyone about this matter was

 9        more than a month before January 16th of 2024?

10              A.    I would guess that it was about two

11        months before January 16th of 2024.

12              Q.    Okay.

13                    And do you remember who contacted

14        you?

15              A.    Ms. Simplicio.

16              Q.    Okay.

17                    Had you worked with Ms. Simplicio

18        before?

19              A.    My understanding is that she worked

20        on that first Juul case, although I don't have

21        any recollection of working with her on that

22        case.

23              Q.    Okay.

24              A.    And so, that's how she found me.

25              Q.    Okay.
```

```
 1                         Have you worked with the Tycko &

 2          Zavareei firm before?

 3                 A.     I have not.

 4                 Q.     Okay.

 5                         Have you worked with any of the

 6          other lawyers in this case before?

 7                 A.     I have not.

 8                 Q.     Okay.

 9                         And specifically, what were you

10          asked to do in this case?

11                 A.     My assignment is in my report.

12                         But in broad terms, I was asked to

13          explain sort of modern marketing practices, the

14          marketing funnel, the way in which marketing is

15          used by higher education institutions to

16          acquire students.

17                         And then to look at the marketing

18          performed by USC and 2U to understand the ways

19          in which ranking information was used in the

20          marketing.

21                         And ultimately, to estimate the

22          proportion of matriculated students who

23          would've been exposed to the ranking

24          information.

25                 Q.     When you say how ranking was used in
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 27 of 402    Page
ID #:2882
Deposition of John Chandler, Ph.D.                Favell, et al. v. University of Southern California and 2U Inc.

1      the marketing, what do you mean by that?

2              A.    The way in which the rankings of

3      USC's Rossier School of Education were

4      incorporated into marketing -- what we would

5      call marketing creatives.  So the marketing

6      that actually is delivered to prospective

7      students via advertisements, e-mail, earned

8      media and things like social media, print

9      marketing, that sort of thing.

10             Q.    Okay.

11             When you say you looked at how the

12     rankings was used -- and I don't mean this in a

13     way to undermine what you did or to cast

14     aspersions on what you did.

15             But effectively, what you did is you

16     just looked at the marketing materials and

17     said, okay, they put it in an e-mail or they

18     put it on their social media or whatever,

19     correct?

20             ATTORNEY BRYANT:  Objection.

21             A.    I would probably not agree with that

22     statement.

23             I was also evaluating the ways in

24     which, for instance, people at 2U -- trying to

25     -- I think the way they sort of talked about

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 28 of 402   Page ID #:2883

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1         the marketing.

2                    For instance, Dr. Gerber, you know,

3         talked about the ranking being a key

4         differentiator.

5                    And so, I'm not only looking at the

6         outcome of the decisions made by the marketers,

7         which would be what you're describing, the --

8         the ads and the materials created.

9                    But I'm also trying to understand

10        the way in which the people who were doing the

11        marketing were thinking about the rankings and

12        how they were -- how effective they were at

13        influencing prospective students.

14              Q.    Okay.  Great.

15                    We'll get into that when we look at

16        your report.

17                    In this agreement, which is

18        Exhibit 1075, there are four individuals listed

19        and hourly rates for each of those people.

20                    Do you see that?

21              A.    I do.

22              Q.    Did each of these four people play

23        some role in assisting you in preparing your

24        report?

25              A.    I don't believe that Ben Wood did

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 29 of 402   Page
ID #:2884

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1       any work on this report.  But he is my business

2       partner.  He's a data engineer.  And so, if we

3       had been dealing with large data, he might

4       have.

5               But I don't believe he did any work.

6       Q.    And what about Dr. Elliot?

7       A.    Dr. Elliot did do work on this

8       report.  Dr. Elliot is an editor for me.

9       Q.    Okay.

10              And help me to understand the way

11      you use the term editor.

12              Is it that you do first the draft

13      and then she reviews it and edits it for you?

14      A.    Yes, you know, there is some

15      collaboration on things like the outline, where

16      I will read the complaint, start looking at

17      materials, produce an initial outline for the

18      report.

19              Have her read it, suggest

20      modifications either to make it more clear or

21      more persuasive, and then I will draft the

22      report.

23              And then she edits it for things

24      like grammatical errors, word choice, my

25      inability to do citations properly, that sort

```
 1            of thing.

 2                   Q.    Did she draft any original content

 3            in the report?

 4                   A.    No.  Sorry.

 5                         No, she did not draft any original

 6            content in the report.

 7                   Q.    Okay.

 8                         And what about Jamie Robertson?

 9                         What, if any, role did Jamie play in

10            this case?

11                   A.    Jamie Robertson is a researcher for

12            us.  And so, she had access to the document

13            repository that I did, and I had that access as

14            well.

15                         And so, I came up with a -- what I

16            call sort of the shopping list for materials

17            that I'm interested in unearthing from the

18            40,000 or so documents that are in this

19            repository.

20                         And so, Jamie did work looking for

21            those documents alongside me.

22                   Q.    Okay.

23                         And the repository you're talking

24            about is a program called Relativity?

25                   A.    That's correct.
```

 1          Although I was being cagey because I

 2     can never remember if it's Reveal or

 3     Relativity.

 4          Q.    Okay.

 5          And so, you were given access to

 6     Relativity.

 7          How much time did you spend going

 8     through the 40,000 or so documents of

 9     Relativity?

10          A.    I would say roughly 10 to 20 hours.

11          Q.    And were there particular keywords

12     that you were searching in Relativity?

13          A.    Yes.  There were many keywords that

14     I was searching for.  So a wide variety of

15     keywords related to marketing at all stages of

16     the marketing process.

17          So planning, campaigns, you know,

18     when marketing campaigns are being planned.

19     Discussions about those.

20          The execution of the campaigns to

21     try and understand what marketing ran and when

22     and the volume and what ads were shown.

23          The post campaign time period where

24     the marketing is being evaluated.

25          And then there were keywords that

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 32 of 402    Page
ID #:2887

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1       were sort of more specifically related to

2       matters in the complaint, like rankings.  And

3       so, looking for materials related to how the

4       rankings were being discussed, how they were

5       being deployed in marketing, that sort of

6       thing.

7                   I'm happy to start attempting to,

8       like, recall the keywords.  But that's the

9       general idea.

10          Q.    Let me ask you this question.

11                Did you keep a list or maintain a

12      list of the keywords that you searched?

13          A.    I don't believe so.  I think there

14      are probably some private communications where

15      I conveyed these in written form.

16                But I don't have a separate list of

17      keywords.

18          Q.    When you say private communications,

19      what do you mean by that?

20          A.    For instance, an e-mail to

21      Ms. Robertson about the shopping list, as I

22      call it.

23          Q.    Okay.

24                What makes it private?

25                I guess that's the thing I'm

1      struggling with.

2                  ATTORNEY BRYANT:  Objection to form.

3          A.    To me, it is part of the work

4      product.  So this is part of our process of

5      generating an expert report.

6          Q.    But it -- these communications with

7      Ms. Robertson have nothing to do with counsel,

8      correct?

9          A.    I don't know what it means to have

10     nothing to do with counsel.

11         Q.    Well, let me ask it differently.

12               Was counsel involved in these

13     communications where you were deciding on the

14     keywords to search?

15         A.    At -- sometimes counsel was

16     involved, although there were times where

17     Ms. Robertson and I communicated about keywords

18     without counsel present.

19         Q.    Okay.

20               And typically, you would communicate

21     in the form of e-mail?

22         A.    E-mail or Slack messages.

23         Q.    What's a Slack message?

24         A.    Slack is a collaboration tool that

25     allows instant messaging capabilities within an

Favell, et al. v. University of Southern California and 2U Inc.

```
 1        organization.  So that's what we use the data
 2        insights for internal communications.
 3             Q.    Are Slack communications kept in the
 4        ordinary course of your business?
 5             A.    We do have our Slack communications,
 6        yes.
 7             Q.    Okay.
 8                   And what's your e-mail retention
 9        policy?
10             A.    We retain our e-mails.
11             Q.    Okay.
12                   So if it turns out that these
13        communications between you and Ms. Robertson
14        about which keywords to search or documents
15        related to your report are discoverable, you
16        would still have the e-mails and the Slack
17        messages between the two of you reflecting your
18        discussion about those keywords, true?
19             A.    Anything that was in writing, I
20        would have access to.
21                   There were also --
22                   (Multiple speakers.)
23             Q.    Okay.
24             A.    -- meetings where we talked about
25        these things.  And I don't have a transcript or
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 35 of 402    Page
ID #:2890
Deposition of John Chandler, Ph.D.                Favell, et al. v. University of Southern California and 2U Inc.

```
 1            contemporaneous notes of those.
 2                 Q.    Okay.
 3                      Let's move on to Exhibit 1076.
 4                      (Exhibit 1076, Invoices, marked for
 5                 identification.)
 6       BY ATTORNEY CAMPBELL:
 7                 Q.    And what I've done is I've taken
 8       your four invoices you produced and called them
 9       1761, 1762 -- excuse me, 10763, and 10764.
10                      So I've marked them all as Exhibit
11       1076 with just an underscore 1, 2, 3, 4, to
12       make it a little bit easier.
13                      I'm not sure I accomplished that,
14       but...
15                      ATTORNEY CAMPBELL:  Paul, would you
16            mind opening all of them.
17                      And then we'll just go through all
18            of the 1076 exhibits at one time.
19                      THE VIDEOGRAPHER:  Counsel, they're
20            combined in this file.
21                      ATTORNEY CAMPBELL:  Other.
22                      Wonderful.  You're too good.
23       BY ATTORNEY CAMPBELL:
24                 Q.    Okay.
25                      Can you tell me -- I'll scroll
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 36 of 402    Page
ID #:2891

Deposition of John Chandler, Ph.D.                                    Favell, et al. v. University of Southern California and 2U Inc.

 1          through it for you just so you can quickly see

 2          it, and then I will ask some specific

 3          questions.

 4                    (Document review.)

 5          Q.    Can you tell me what Exhibit 1076

 6          is.

 7          A.    These are the invoices that I sent

 8          to -- and I'm not sure how to say this law

 9          firm's full name -- Tycko & Zavareei.

10                    Is that -- sorry.  It's the invoices

11          I sent to plaintiff's counsel.

12          Q.    Okay.

13                    The first time you said the firm

14          name, you were so confident that I thought I

15          was the only one who didn't know how to say it.

16          A.    You said it differently.

17                    So was, like, oh, I'm screwing up.

18          Q.    No, I don't know how to say it.  So

19          I was -- I was doing my best.

20                    Anyway, we'll call it the Tycko

21          firm.

22                    How is that?

23          A.    That's fine.

24          Q.    And does this reflect all of the

25          work performed from the beginning of the

Deposition of John Chandler, Ph.D.                          Favell, et al. v. University of Southern California and 2U Inc.

```
 1            engagement through the last invoice, which is
 2            on page 4 of 1076, which is issued on July 1st
 3            of 2024?
 4                 A.    It does.
 5                       And if we look at that first one, I
 6            can now answer with precision when my work
 7            began on this case.
 8                 Q.    Okay.
 9                       So we're on the first page of
10            Exhibit 1076.
11                       And looking at that, when
12            specifically can you tell me you first started
13            -- you were first contacted in this case?
14                 A.    I believe my first work on this case
15            was on December 14, 2023.
16                 Q.    Okay.
17                       I note that these invoices don't
18            break it down by timekeeper.  In other words, I
19            can't tell who is doing what.
20                       Looking at the invoices, are you
21            able to decipher for me who was doing what work
22            in any particular invoice?
23                 A.    I have that information, but it will
24            be hard to tease apart.  For instance, that
25            second row on this page, the meetings, that is,
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 38 of 402    Page
ID #:2893
Deposition of John Chandler, Ph.D.                Favell, et al. v. University of Southern California and 2U Inc.

 1          you know, you see an unusual unit price there,

 2          which is a blended rate between myself, Dr.

 3          Elliot, and Ms. Robertson.

 4                    So I can certainly -- if it is

 5          discoverable, I'm happy to look up specifically

 6          who did what piece of work.  But I can't tell

 7          from here.

 8                    Anything that is marked with a sort

 9          of clean unit price, I can tell you.

10                    So, for instance, the research

11          there, point five, is Ms. Robertson.

12               Q.    Okay.

13                    And that's the last entry on the

14          first page of Exhibit 1076, which is the USC

15          rankings case research.

16                    And you can tell based on the unit

17          price; is that right?

18               A.    That's correct.

19               Q.    Okay.

20                    And then similarly, then the entry

21          just above that, project management, the unit

22          price is 750.

23                    That's your billing rate, correct?

24               A.    That's correct.

25               Q.    Okay.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 39 of 402    Page
ID #:2804

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

```
 1                    So that's -- fair to say that you

 2          were the sole person performing the case --

 3          excuse me, the project management?

 4               A.    In that month, I was the sole person

 5          doing project management on this.

 6               Q.    Okay.

 7                    So -- so for your first bill, the

 8          total was $3,987.75; is that right?

 9               A.    That's correct.

10               Q.    Was there any time that you wrote

11          off or wrote down?

12               A.    No.

13               Q.    Okay.

14                    And then going to the second page of

15          Exhibit 1076, there's an entry there for just

16          general, and the quantity is 1.12.

17                    1.12 hours, is that what that

18          reflects?

19               A.    That's correct.

20               Q.    Okay.

21                    And how do you track your time?

22               A.    We use an application called

23          Harvest.

24               Q.    Okay.

25                    And does Harvest do any rounding or
```

1    does it just give you the exact time spent on a

2    particular project or projects?

3         A.    It rounds to the closest minute, I

4    believe.

5         Q.    Okay.

6               And so, this invoice on page 2 is an

7    invoice issued on March 30th of 2024.

8               Do you see that?

9         A.    I do.

10        Q.    Okay.

11              So it covers the period January 1,

12   2024, through March 30, 2024, true?

13        A.    Yes, that's correct.

14        Q.    Okay.

15              So not a lot of work was being done

16   between January 2024 to the end of March.

17              Is that fair?

18        A.    That's fair.

19        Q.    Okay.

20              Then we go to the third page of

21   Exhibit 1076.  Which is -- I should have been

22   noting this, but it's Chandler 004.  That's the

23   Bates number at the bottom.

24              And this is invoice 396 issued on

25   May 1, 2024.

```
1                        And if you look below, it looks like

2            it covers the month of April, correct?

3                    A.    That's correct.

4                    Q.    And in the month of April, you

5            billed $2,056.50?

6                    A.    That's correct.

7                    Q.    Moving to the third page, which is

8            Chandler 5, invoice 409, this seems to cover

9            the period of May 1st through June 30th of

10           2024, correct?

11                   A.    That's correct.

12                   Q.    And in this month, it looks like you

13           picked up a little bit of steam, began to do a

14           little more work.

15                       The total invoice is $15,015.60,

16           correct?

17                   A.    That's correct.

18                   Q.    What was going on during this

19           May-June time period, if you recall, in terms

20           of your work?

21                   A.    We were beginning to receive

22           production that was relevant to my report.  We

23           were meeting to discuss the structure of the

24           report.

25                       We were beginning assemble the
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 42 of 402    Page
ID #:2897

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

 1          report, you know, that outline process I was

 2          describing where I produced the outline, Dr.

 3          Elliot reviewed it.

 4                    We revised and began to kind of

 5          assemble the bones of the report.  That's

 6          primarily what happened here.

 7          Q.    I note there's a note on the bottom

 8          that says invoice 386 for $773.40 is past due.

 9                    Was that invoice ever paid?

10          A.    Yes, I believe it's been paid.

11          Q.    Okay.

12                    And then we'll move to the last page

13          of Exhibit 1076 -- oh, that was the last page

14          of Exhibit 1076.  Excuse me.

15                    Were all the invoices reflected in

16          Exhibit 1076 paid?

17          A.    I would have to check to see if I

18          have received payment for all of them.

19          Q.    Okay.

20                    Now, you issued your report on

21          July 19th of 2024, correct?

22          A.    Yes.

23          Q.    Have you -- have you issued a bill

24          for the work you performed in issuing that

25          report?

1          A.    Yes, I issued an invoice last night

2     to bill for July.

3          Q.    Okay.

4                And do you recall the total amount

5     of that invoice?

6          A.    My recollection is it was a little

7     bit more than $53,000.

8          Q.    Okay.

9                ATTORNEY CAMPBELL:  We would just --

10          this is not so much for you, Mr. Chandler.

11               But we'll make a request of counsel

12          to produce that one as well.

13               ATTORNEY BRYANT:  Noted.

14     BY ATTORNEY CAMPBELL:

15          Q.    And that covers the entire month of

16     July?

17          A.    That's correct.

18          Q.    Okay.

19                Do you know who specifically is

20     paying these bills?

21          A.    I am sending them to Ms. Simplicio

22     and her paralegal.  But I don't know -- I don't

23     know where the checks are coming from.

24          Q.    Okay.  Great.

25                Let's move on to Exhibit 1077.

**Exhibit 2** Page: 42
**147**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 44 of 402   Page
ID #:2800
Deposition of John Chandler, Ph.D.                                   Favell, et al. v. University of Southern California and 2U Inc.

```
 1                    This is your CV.
 2                    (Exhibit 1077, CV, marked for
 3              identification.)
 4                    (Document review.)
 5         BY ATTORNEY CAMPBELL:
 6              Q.    Dr. Chandler, this was the CV that
 7         was submitted along with your expert witness.
 8                    I'm scrolling through it so you can
 9         see it all.
10                    (Document review.)
11              Q.    Is this CV that we're looking at,
12         Exhibit 1077, complete and accurate?
13              A.    Yes, it was complete and accurate at
14         the time I submitted it.
15                    I have submitted one additional
16         paper since then.
17              Q.    Okay.
18                    When did you submit the additional
19         paper?
20              A.    I believe -- it was submitted by a
21         graduate student.  So I believe it was early
22         July.  Maybe July 10th or something like that.
23              Q.    And what's the subject matter of the
24         paper?
25              A.    The subject matter of the paper is
```

1    the geometrical uniformity of the vector

2    representation of words and large language

3    models, looking at the way in which uniformity

4    in that vector space improves -- the extent to

5    which it improves model performance.

6         Q.    Okay.

7              Each of those individual words, I

8    understood.

9              I can admit to you I have no idea

10   what you just said.

11             So explain it to me as though I was,

12   you know, a five-year-old in terms of what this

13   was looking at.

14        A.    Yeah.  So ChatGPT, which you may

15   have heard of, is a large language model.

16   There are several other open source ones.

17             Those models work by teaching

18   computers to play guess-the-next-word.  And one

19   of the outgrowths of that guess-the-next-word

20   is a set of numbers that represent each word as

21   a long vector or string of numbers.

22             And so, the question that we are

23   looking at is, do those vectors, which you can

24   think of as just points in space, do they kind

25   of fill up the space or are they clumped in

**Exhibit 2** Page: 44
**149**

Deposition of John Chandler, Ph.D.                                    Favell, et al. v. University of Southern California and 2U Inc.

```
 1              different places?
 2                      And the less clumpy they are, it
 3       seems like the better the language model
 4       performs on a battery of tasks.
 5              Q.    Okay.
 6                      And where did you submit that paper?
 7              A.    I know the website through which we
 8       submitted it, but I can't remember the name of
 9       the journal.  It's a computer science journal.
10              Q.    Okay.
11                      Was it a peer-reviewed article or
12       just a paper --
13              A.    It is undergoing peer review now.
14              Q.    Got it.  Okay.
15                      So looking at your education, and
16       we'll start from the earliest date, in 1996,
17       you got a BA in mathematics from Middlebury
18       College?
19              A.    That's correct.
20              Q.    Okay.
21                      And then a few years later, you got
22       your master's in mathematics?
23              A.    That's correct.
24              Q.    And that was from the University of
25       Washington?
```

```
 1                    A.    Correct.
 2                    Q.    And then in 2010, you got a Ph.D. in
 3            mathematical sciences, correct?
 4                    A.    That's correct.
 5                    Q.    And your dissertation was
 6            statistical learning in online advertising.
 7                          Do you see that?
 8                    A.    I do.
 9                    Q.    And what specifically did that paper
10            or that dissertation talk about in the context
11            of statistical learning and online advertising?
12                    A.    So statistical learning is an a
13            field of statistics that looks to understand
14            large data sets, basically.
15                          And I was applying the tools of
16            statistical learning to online advertising
17            data.
18                    Q.    To --
19                          (Multiple speakers.)
20                    A.    Sorry.
21                    Q.    I'm sorry.
22                          To reach what conclusion?
23                    A.    Specifically to measure the
24            performance of online advertising.
25                          We were working on a technology
```

Favell, et al. v. University of Southern California and 2U Inc.

1    called multitouch attribution, where the credit

2    for an online sale or something like a sale is

3    split across all of the marketing touch points

4    that someone is exposed to.

5            And so, my dissertation was a

6    statistical approach to sharing the credit for

7    the sale.

8        Q.    Okay.

9            So, for example, I go to buy a shirt

10   and I go online to a clothing manufacturer.  I

11   look at the shirt and I'm thinking about it.

12   And then pretty soon, I start seeing ads in my

13   feed on my social media and I start seeing ads

14   in my Web searches for that same shirt.

15           Those are different touch points I

16   would have come across in terms of advertising

17   messages for that product.

18           You're trying to determine, on a

19   statistical basis, which or how to attribute

20   the credit for my ultimate purchase through

21   those, for my case, the three examples of the

22   places I saw the advertisement?

23       A.    That's generally correct.

24           You know, I am doing this for you

25   and millions of other people who go through a

1    similar process.  And then using the sort of

2    statistical techniques to try to determine for

3    each individual ad -- maybe you saw a display

4    ad on ESPN and you received an ad in your feed

5    on Facebook and you did some searches for

6    good-looking lawyer shirts.

7              And, you know, that comes through

8    and then we have all of that information and

9    aggregate it and try to divide the credit

10   between those different touch points.

11             The --

12   Q.    And --

13             (Multiple speakers.)

14   A.    Sorry.

15   Q.    Please.

16   A.    I was just going to say, the

17   standard at the time I was doing my work is

18   just to give a hundred percent of the credit to

19   the most recent piece of marketing someone saw.

20   Which ignores a lot of the upstream

21   information.

22   Q.    And were you focused on a particular

23   product or service?

24   A.    For my dissertation, I worked with

25   several different advertisers that were across

1    a couple of different sort of types of

2    products.

3            I was also working professionally in

4    data science and marketing.  And so, in that

5    capacity, I was working with hundreds of

6    advertisers.

7        Q.    And did you reach the conclusion

8    that statistical learning could help allocate

9    credit for online advertising?

10        A.    Yes.  Given the proper data, you

11    could use these modeling techniques to

12    determine the relative amounts of credit for

13    different types of touch points.

14        Q.    And, Dr. Chandler, what would be the

15    proper data you would need to perform that

16    analysis?

17        A.    For the analysis that I was doing, I

18    required log level data.  And I'll talk about

19    that just a little bit because I think it's

20    going to come up again later today.

21            Log level data is data that has each

22    individual marketing exposure and actions taken

23    by an individual at the level of a unique

24    identifier.

25            So I was not working with personally

1    identifiable information.  But I had cookie

2    I.D.s, which are unique random numbers

3    associated with a device and a browser.  And I

4    had a record for every ad that was seen, every

5    ad that was clicked on.

6              In some cases, I only had the

7    clicks.  The main example for my work on the

8    dissertation was search advertising.  I only

9    had search clicks.  And then I had all of the

10    behavior on the advertiser's website.

11              And again, at that level of a unique

12    identifier for the browser and device.

13         Q.    Okay.

14              Has the process changed in any

15    material way in terms of how you would approach

16    statistical learning and online advertising

17    from when you wrote your dissertation to today?

18         A.    Yes.  There have been a number of

19    changes.  Most of data that I was working with,

20    I gathered in 2008.  So that was 16 years ago.

21              So there have been a number of

22    changes in the advertising and marketing

23    technology space since then that hamstring the

24    particular modeling approach that I did in my

25    dissertation.

```
 1              Q.    Okay.

 2                    And so, how has the modeling

 3        approached changed in light of that?

 4              A.    In most cases, the -- so the

 5        modeling that I was doing serves this

 6        multitouch attribution.  Where it's about

 7        looking at everything someone was exposed to

 8        and then sharing that credit across all of

 9        those exposures.

10                    There is another paradigm of

11        marketing measurement called media mix

12        modeling.  And that data works with summary

13        information.  So rather than Mr. Campbell

14        received these ads, it's here's how many

15        display ads we showed in a given week or a

16        given day.

17                    And then similarly, here's how many

18        people purchased shirts in a given day, let's

19        say.

20                    And media mix modeling uses

21        techniques from time series modeling and

22        econometrics to attempt to share that credit in

23        a summary fashion.

24                    There's also a set of techniques

25        that fall under a category I would call
```

1    experimentation.  So randomized control trials

2    are the gold standard of measuring casual

3    relationships.  And marketing has begun to

4    embrace this kind of experimentation

5    methodology.

6              So those are some changes in terms

7    of how marketing is evaluated in terms of

8    measuring marketing performance.

9              I can also talk about some of the

10   changes in the -- what we call the marketing

11   ecosystem that have given some of these

12   changes, if you like.

13        Q.    I think that's okay.

14              Let me just pause for a second and

15   ask you a question.

16              In this case, the USC case, you

17   didn't use any of these tools, whether it was

18   touch point attributes, media mix modeling,

19   experimentation, to measure marketing

20   performance specific to advertising in this

21   case.

22              Is that fair?

23              ATTORNEY BRYANT:  Object to form.

24        A.    It's correct that I did not use

25   these techniques.  Those techniques answer

1    questions different from the questions that I

2    was attempting to answer in my report.

3        Q.    Okay.

4              Do you hold any degrees in

5    marketing?

6        A.    I do not have any degrees in

7    marketing.

8        Q.    Okay.

9              And what coursework, if any, did you

10   have in marketing during either your

11   undergraduate, your master's program, or your

12   Ph.D.?

13       A.    I have only participated in

14   marketing classes as the professor, not as the

15   student.

16       Q.    Got it.

17             I'm going to go down to the bottom

18   of your teaching experience.

19             And your first teaching experience

20   listed was the University of Washington.

21             Do you see that?

22       A.    I do.

23       Q.    And you were an instructor teaching

24   calculus, precalculus, linear algebra, and

25   algebra?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 55 of 402    Page
ID #:2410
Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

1      A.    That's correct.

2      Q.    And that was from 1998 to 1999?

3      A.    That's correct.

4      Q.    Did you do any -- strike that.

5            Did you teach marketing at the

6    University of Washington during this period?

7      A.    I did not teach marketing at the

8    University of Washington during this period.

9      Q.    Okay.

10           And then you were an adjunct

11   professor at the University of San Diego,

12   correct?

13     A.    That's correct.

14     Q.    And that's their online program?

15     A.    That's correct.

16           It is a online program for a

17   master's in applied data science.

18     Q.    Okay.

19           And do you teach any marketing

20   courses as part of your work at the University

21   of San Diego?

22     A.    I do not teach any marketing classes

23   as part of my work at the University of San

24   Diego.

25           I'm trying to remember if any of the

```
 1        assignments deal with marketing data there.
 2        But I don't believe they do.
 3             Q.    Okay.
 4                   And then from 2018 to the present,
 5        you've been a visiting professor at the
 6        University of Montevideo -- I can't say it.  I
 7        was trying.
 8             A.    ORT University in Montevideo,
 9        Uruguay.
10             Q.    Yes.  Thank you.
11                   Is that an online course as well?
12             A.    That class has gone through a few
13        different iterations.  I have taught it
14        exclusively in person.  I have taught it
15        exclusively online during the pandemic.
16                   And for the last several years, I've
17        taught it partially online and partially in
18        person.
19             Q.    Okay.
20                   And is that a summer course or is
21        that a year-round course?
22             A.    That class typically runs from the
23        second week of February through the middle of
24        March.
25             Q.    Okay.
```

```
 1                    Do you have other teaching

 2          obligations during that period of time?

 3              A.    Yes.  I'm also teaching at the

 4          University of Montana during that time.

 5              Q.    Is your teaching at the University

 6          of Montana online?

 7              A.    In the fall semester, with the

 8          exception of 2020, I teach in person at the

 9          University of Montana.  And then in the spring

10          semester, I teach my classes online.

11              Q.    I assume that allows you to be in

12          Uruguay to teach your class in person?

13              A.    That's generally correct, although

14          one of my colleagues taught in-person classes

15          at the University of Montana and in one week

16          flew from Missoula to Montevideo, taught

17          20 hours face-to-face, and flew back to Montana

18          in the middle of semester.  And she did it like

19          six years in a row.

20              Q.    You're not doing that, I assume?

21              A.    I am much more sane, no.

22                    No, I am not.

23              Q.    Okay.

24                    And at the ORT University in

25          Uruguay, do you teach marketing there?
```

```
 1          A.    I cover some marketing concepts, but
 2     it is not principally a marketing class other
 3     than we use marketing data for examples in this
 4     telling stories with data class that I teach at
 5     -- in Uruguay and at the University of Montana.
 6          Q.    Okay.
 7                And then right above that, there's
 8     just something that says instructor.  And it
 9     says develop syllabus and taught simulations in
10     R.
11                And that was in 2007.
12                Again, lots of words I understand
13     individually, but I don't have any clue what
14     that means.
15                So can you explain to me what that
16     was.
17          A.    Yeah, you have great company with
18     all of the students who took that class.  This
19     was a class that I taught when I was working on
20     my Ph.D.
21                The University of Montana's
22     statistics department exists by teaching people
23     like me, who were getting Ph.D.s, essentially,
24     in statistics.  And then also teaching people
25     from other colleges around campus specifically
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 59 of 402    Page
ID #:2414
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1       for history, wildlife, biology, people like

2       that.

3                       And so, they get thrown into these

4       500 level statistics classes with lack of

5       requisite knowledge, particularly in the

6       statistical computing language R.

7                       And so, I developed a class to try

8       to help these students improve their R skills.

9       And it was probably my first real R class.  And

10      it was maybe five times more difficult than it

11      should have been.

12          Q.      I assume, based on that description,

13      you didn't teach marketing as part of that?

14          A.      That's correct.  That class did not

15      involve marketing.

16          Q.      Okay.

17                      And then beginning in 2014, through

18      today, you are a clinical professor at the

19      University of Montana, correct?

20          A.      That's correct.

21          Q.      Okay.

22                      And -- strike that.

23                      Is there a particular college or

24      department that you are a part of?

25          A.      Yes.  I am in the college of

1     business.  And I am in the marketing and

2     management department at the University of

3     Montana.

4          Although I also teach classes in the

5     management information sciences or MIS

6     department.

7          Q.    And what marketing -- specific

8     marketing courses have you taught at the

9     University of Montana?

10         A.    The only class that I've taught at

11    the University of Montana that has marketing in

12    the title was a class I taught once or twice

13    when I was first starting at the University of

14    Montana that I believe was called advanced

15    marketing analytics.

16         I now teach marketing within some of

17    the classes listed here, but I don't have a

18    standalone marketing class that I teach.

19         Q.    Okay.  Got it.

20         Do you have an understanding of --

21    of the term or the phrase consumer behavior?

22         A.    Yes.

23         Q.    Okay.

24         And just give me your understanding,

25    to make sure we're on the same page in terms of

1    what we're talking about, of what consumer

2    behavior is.

3        A.    I see consumer behavior as sitting

4    at the intersection of business, marketing, and

5    psychology.  And trying to understand the ways

6    in which marketing, public relations,

7    communications from firms influences consumers'

8    attitudes and behaviors with respect to those

9    firms and the things those firms are selling.

10        Q.    Okay.

11            Have you ever taught, based on that

12    description, any courses in consumer behavior?

13        A.    I have taught -- like, many of my

14    classes deal with aspects of consumer behavior.

15    I do not -- we have a class in consumer

16    behavior at the University of Montana.  And I

17    do not teach that class.

18        Q.    Okay.

19            What aspects of consumer behavior

20    have the courses you taught touch on?

21        A.    In applied data analytics, we have

22    worked with marketing and business performance

23    data, analyzing that data to improve business

24    outcomes.  And so, we are measuring facets of

25    consumer behavior via the data created by

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 62 of 402   Page
ID #:2417
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1    consumers as part of transacting with firms.

2              Text mining and unstructured data,

3    we work with data related to things like social

4    media posts about firms and the attitudes that

5    consumers have about companies.  Analyzing

6    consumer surveys, analyzing information such as

7    when people leave a -- for instance, if you

8    leave LinkedIn, they give you a little pop-up

9    to say, tell us why you're leaving.

10             And so, working with that kind of

11   data to understand decisionmaking.

12             Advanced applied modeling, we do

13   modeling on data related to marketing.

14   Estimating things like probability of purchase,

15   customer lifetime value.

16             And then in telling stories with

17   data, we work with public and private entities

18   to understand consumer behavior, again, through

19   the lens of data, with the goal of students

20   improving their ability to communicate

21   data-driven concepts.

22        Q.    Have you, yourself, ever fielded a

23   consumer survey?

24        A.    Yes.

25        Q.    And when did you do that?

1        A.    While I was working at Atlas and

2    Microsoft, I participated in dozens of surveys

3    in terms of designing the surveys and analyzing

4    the data.

5            I've worked as a consultant with

6    firms that were using survey information as

7    part of their marketing outcomes.

8            And so, I assisted with the

9    development of those surveys, tested them, and

10   then analyzed the results.  So yeah, I would

11   say I've worked with dozens, maybe scores of

12   surveys over the last 20 years.

13       Q.    Okay.

14            I want to be careful.  And I just

15   want to make sure we're on the same page.

16            When you say you've worked with, my

17   question was sort fielding, designing, being

18   part of the process.

19            Is the answer still the same that

20   you, personally, have been involved in

21   designing and fielding dozens of surveys

22   throughout the years?

23       A.    Yes, I think that's accurate.

24            I think fielding could have a

25   variety of different meanings.  But in the

1    sense of helping to design the survey,

2    sometimes actually building the survey

3    instrument, although that's not usually my

4    role.  Testing that survey instrument.

5         And then analyzing the results has

6    been the work that I've been doing.

7         Q.    So let me make sure I'm clear.

8         You just sort of described the steps

9    as you understand them in terms of the surveys,

10   these consumer surveys.

11        Which steps are you involved in?

12        ATTORNEY BRYANT:  Objection.

13        A.    I've been involved in, I think,

14   every step related to survey creation,

15   deployment, monitoring, and analysis.

16        Q.    And again, how many surveys have you

17   created?

18        A.    I have been part of teams creating

19   -- I mean, you know, my estimate would be

20   between 50 and 100 over the last 25 years.

21        Q.    And how many surveys have you,

22   yourself, not part of any team, created?

23        A.    Solo, probably just a handful.

24        Q.    And when you say deployed, does that

25   mean you've -- I'm using the term fielded.

```
 1                      But deployed means you've sent it
 2         out for -- strike that.
 3                      Give me your definition on deployed.
 4                      I won't define it for you.
 5              A.      By deployed, I mean taking the
 6         design of the survey, which is usually done in
 7         a tool like Microsoft Word, and then putting
 8         that into a survey tool such as Qualtrics, and
 9         then getting that survey to individuals who
10         will fill out that survey.
11                      Typically, that's via something like
12         e-mail.  Sometimes in research, we'll use a
13         service like Mechanical Turk, which is a place
14         when you can pay people small amounts of money
15         to do tasks.  One of those tasks can be filling
16         out a survey.
17                      And I also worked on a survey for a
18         paper about invasive weeds, where the surveys
19         were mailed physically to respondents.
20              Q.      Okay.
21                      And then monitoring surveys, that's
22         just overseeing the results as they're coming
23         in?
24              A.      Basically like kind of quality
25         control, like making sure that we don't have
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 66 of 402   Page
ID #:2421
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1      questions that everyone is skipping.  Or we

2      don't have people missing parts of the survey

3      and things like that.

4           Q.    Okay.

5                 And then analyzing, you mean as

6      taking the results of the survey and trying to

7      glean from those results something, whatever it

8      is you're trying to figure out?

9                 ATTORNEY BRYANT:  Objection.

10          A.    That's correct.  It is looking at

11     the results of the survey.  Sometimes that's

12     numerical.  Sometimes those are text-based.

13     And then attempting to do things like test

14     hypotheses, produce indices or summary

15     information, that sort of thing.

16          Q.    Do you consider yourself an expert

17     in consumer behavior?

18          A.    I would say yes, particularly on the

19     data side.  I am less expert on the sort of

20     psychological side of consumer behavior.  But I

21     have worked with enough consumer behavior data

22     for long enough that I would consider myself an

23     expert in consumer behavior.

24          Q.    Okay.

25                So let's just break that down a

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 67 of 402    Page
ID #:2422

Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

1    little bit.

2              You certainly -- I think you were

3    clear you consider yourself an expert on

4    consumer behavior on the data side.

5              Do you consider yourself an expert

6    on the -- on the sort of psychological aspect

7    of consumer behavior?

8         A.    I think it probably depends on

9    specifically what we're talking about.  If we

10   are talking about how marketing plans are put

11   together and how marketers decide how to reach

12   audiences, then yes, I've been doing that work

13   for 25 years and I consider myself an expert in

14   it.

15             If we get down to the sort of

16   nitty-gritty level of, you know, the particular

17   color of an ad and how that influences

18   someone's decision, which is an aspect of

19   consumer behavior, I am not an expert in that

20   facet of consumer behavior.

21        Q.    You gave a very specific example.

22             I'm not sure if you meant you're not

23   an expert in deciding what colors impact or

24   influence consumers.

25             Are you talking about, though, like,

Favell, et al. v. University of Southern California and 2U Inc.

```
 1        in terms of things in ads that influence

 2        consumers, that you're not an expert, or what

 3        do you mean by that last answer?

 4                ATTORNEY BRYANT:  Object to form.

 5         A.     I mean there are certain subtle

 6        psychological ways in which the content of an

 7        ad, which we usually call the creative, can

 8        psychologically influence consumers.

 9                I -- my expertise in that is, I

10        would say, highly varied.  There are people who

11        that's all they do.  And I think they have a

12        sort of total comprehension of this role in

13        consumer behavior.

14                I -- as I said, I'm much more

15        focused on the data piece.  And so, I have

16        generated consumer behavior insights for many

17        years for many different advertisers along

18        these types of facets, these sort of more

19        psychological aspects.

20                I have participated in hundreds of

21        meetings on putting together the creatives

22        used.  And so, I am sort of a practitioner

23        expert in that sense.

24                But there is this sort of narrow

25        area of marketing psychology that I would not
```

 1         consider myself a particular expert in.

 2              Q.    Have you ever been qualified by a

 3         Court as an expert in consumer behavior?

 4              A.    I've only been qualified by a Court

 5         in -- as an expert in marketing.  Which

 6         consumer behavior is a subset of.

 7              Q.    Okay.

 8                    So were you offering consumer

 9         behavior opinions in the matter in which you

10         were qualified as an expert in marketing?

11              A.    Yes, I would say some of my opinions

12         touch on consumer behavior in those matters.

13              Q.    Did you perform any surveys in any

14         of those matters?

15              A.    I did not perform any surveys.

16              Q.    Okay.

17                    Have you ever performed a survey as

18         part of any litigation work?

19              A.    I have not.

20              Q.    Okay.

21                    Have you ever published any

22         peer-reviewed articles on consumer behavior?

23              A.    You know, I think the -- for

24         instance, that paper on invasive weeds, they

25         used a survey to understand attitudes towards

1    invasive weeds and the most effective way to

2    communicate to people to take care of their

3    property.

4              That is -- that would fall under the

5    heading of consumer behavior.  I believe that's

6    my only peer-reviewed article on that.

7              If we look at the publications

8    section, I can tell you quickly.

9         Q.   There we go.  I was trying to move

10   it.  I wasn't having any luck.

11             We're at your publications section.

12             Any other articles which you believe

13   touch on consumer behavior?

14        A.   Those -- so those last two touch on

15   consumer behavior.

16             If you scroll down a little bit more

17   to the working papers, I have one.  The first

18   paper there that I'm working on with Dr. Bu is

19   -- I think touches on consumer behavior.  It's

20   about the way people use language in politics.

21             And those are the only ones.

22        Q.   Okay.

23             Have you ever -- strike that.

24             ATTORNEY CAMPBELL:  Why don't we go

25        ahead -- we've been going a little over an

```
 1                    hour.
 2                          Why don't we go ahead and take our
 3                    first break.
 4                          We can go off the record.
 5                          THE VIDEOGRAPHER:  Off the record
 6                    11:12 a.m.
 7                          (Recess is taken.)
 8                          THE VIDEOGRAPHER:  Back on the
 9                    record 11:24 a.m.
10               BY ATTORNEY CAMPBELL:
11                    Q.    Dr. Chandler, can you tell me a
12               little bit about the work you did in the Juul
13               matters.
14                          And we can start with the California
15               one first.
16                    A.    Yes.  For the Juul case, I prepared
17               three different expert reports.  The first one
18               was for class certification and was related to
19               estimating the number of purchasers of Juul
20               products who were over 18 who were exposed to
21               Juul's marketing, the number of purchasers of
22               Juul products who were under 18 who were
23               exposed to Juul products.
24                          And then the same two groups, but
25               just for residents of California.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 72 of 402    Page
ID #:2427

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1              The second report I refer to it as

2       the merits report, which probably means more to

3       you than it actually does to me.  And that was

4       related to Juul's marketing practices.

5              And then there was a third report

6       that was specifically focused on six bellwether

7       school districts in a report that we call the

8       government entities report.  And it was related

9       to Juul's marketing in specific areas around

10      school districts.

11         Q.    Focusing on the first report for

12      class certification, where you were estimating

13      the number of purchasers over and under the age

14      of 18 that were exposed to Juul marketing, how

15      did you go about calculating exposure in that

16      case?

17         A.    In many ways, it was very similar to

18      this case.  I began with a comprehensive review

19      of Juul's marketing behavior over the course of

20      the firm, using information from Juul and from

21      their advertising agencies and third parties

22      they worked with.

23              And then building estimates either

24      based on contemporaneous analysis by those

25      firms or analyzing them myself to try to

1   assemble a picture of the number of people who

2   saw those advertisements over the full time

3   period.

4           They went through several very

5   distinctive marketing campaigns.  And so, there

6   were estimates related to different campaigns.

7       Q.    So if I understood you correctly,

8   some of your analyses was based on

9   contemporaneous estimates prepared by Juul or

10   its advertising agencies with respect to the

11   exposure of their advertisements?

12       A.    I would just say it wasn't only

13   their agencies.  It was also other firms that

14   they were working with that would not consider

15   themselves agencies.

16       Q.    Okay.

17           So either Juul or someone on Juul's

18   behalf conducted contemporaneous estimates of

19   exposure for certain advertisements?

20       A.    Exactly.

21       Q.    Okay.

22           And what was the format of the

23   analyses that these either Juul or people on --

24   or companies on Juul's behalf performed?

25       A.    I'm not a hundred percent certain

Exhibit 2
177   Page: 72

1    what you mean by format.  But some of these

2    were in PowerPoint presentations and I was just

3    pulling estimates from those slide decks.

4              Others were in written form,

5    documents or e-mails.

6              In other cases, it was data stored

7    in Excel or comma-separated value files.  And I

8    was gathering the estimates from those.

9         Q.    Okay.

10             Were these estimates or were -- was

11    this actual exposure?

12        A.    There really isn't a clean

13    definition of actual exposure.  It is very

14    tricky to get a perfect estimate of how many

15    people are exposed to a marketing campaign.

16             The traditional marketing practice

17    is to use, you know, what I'm calling

18    estimates, but I think we would consider those

19    to be as close to the actual values as it's

20    possible to get.

21        Q.    Okay.

22             And so, these estimates that were

23    prepared by Juul or on Juul's behalf were

24    quantitative in nature?

25        A.    In some cases, it was quantitative

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 75 of 402   Page
ID #:2480
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1    in nature with the -- in the sense of a

2    specific number.  So X million people were

3    reached by a given piece of marketing.

4              Other times, it was quantitative,

5    but based on a proportion.  So a certain

6    marketing campaign might reach Y percent of

7    people perhaps in a given geography or perhaps

8    nationwide.

9              And then other times, it was more

10   qualitative, looking at the expected coverage.

11   So, for instance, an agency might say, we

12   expect everyone in a given municipality to have

13   received three or more ads during a period of

14   time.  And so, I was using the -- their

15   estimate of exposure in that municipality along

16   with the population information, for instance,

17   to make an estimate.

18        Q.    And who was -- just not entirely

19   clear to me.  I apologize.

20              The expected coverage in the

21   municipalities, who was making -- performing

22   that estimate of three or more individuals

23   likely saw an advertisement?

24        A.    I think, broadly speaking, it would

25   marketers.  Sometimes they were employees of

 1    Juul.  Sometimes employees of Juul's

 2    advertising agency.

 3            There were times where people

 4    analyzed Juul's data on their behalf, like

 5    consulting firms, and they were producing

 6    estimates like this.

 7            You know, for instance, McKinsey did

 8    a lot of work for Juul and had some of these

 9    estimates.

10    Q.    On the three or more estimate you

11    talked about, was it based on quantitative

12    data, or what were they basing it on?

13    A.    Many different pieces of information

14    come together to make these kinds of estimates.

15    It can very hard to, again, as I said, like,

16    sort of precisely estimate marketing exposures.

17            For instance, with the three or

18    more, I believe that -- in that case, it was a

19    radio campaign.  And so, the person or people

20    who were doing that analysis were, I would

21    expect, getting information from the radio

22    station or whoever sells advertising for the

23    radio station, looking at things average

24    frequency, combining that with the media plan

25    they were running, so the number of buys and

Favell, et al. v. University of Southern California and 2U Inc.

```
 1        that sort of thing, to come up with that

 2        estimate.

 3              Q.    Okay.

 4                    And in terms of the quantitative

 5        data that was tracked, can you give me examples

 6        of the type of quantitative data that was

 7        available to you either through Juul or third

 8        parties on its behalf?

 9              A.    Yes.  In some cases, I received

10        specific reach estimates for a piece of

11        marking.  For instance, an out-of-home campaign

12        that I analyzed had, probably from the entity

13        that was selling the billboard space, an

14        estimate of how many people would see that

15        billboard in a given month.  So that's a

16        direct, you know, I take that number and I use

17        that number.

18                    Sometimes --

19              Q.    Let me just hit pause for a second

20        on that example.

21                    So that would be based, for example,

22        on traffic flow around that billboard?

23                    ATTORNEY BRYANT:  Object to form.

24              A.    In my case, I was using estimates

25        from the firm.  And so, yes, I think, like, the
```

1          general practice would be looking at traffic

2          flow, looking at the duration of time the ad

3          was up.

4                    The direction of travel matters for

5          out-of-home if it's a static billboard.  If

6          it's a bus, then it's a different matter.

7               Q.    Okay.

8                    You were going to give me another

9          example, I think.

10               A.    You are correct.

11                    So sometimes there were direct reach

12          estimates.  In many cases, there were merely

13          impression estimates.  And so, a given

14          marketing campaign in certain geographies

15          generated 5 million impressions.  So those are

16          ad views.  And then I did analysis to translate

17          the impressions into number of people.

18                    There were other times where

19          PowerPoint presentations, perhaps at the end of

20          a campaign, would be put together with summary

21          information of that campaign and would include

22          estimates such as X percent of adults in the

23          U.S. were reached by a given campaign.

24                    Then there were cases where there

25          were exports from social media platforms that

Deposition of John Chandler, Ph.D.                   Favell, et al. v. University of Southern California and 2U Inc.

1    included reach estimates.  And I used those

2    directly.

3        Q.    Let's understand some terminology

4    here.  You've used reach and you've used

5    impressions.

6             So you were talking about direct

7    reach with the out-of-home campaigns.

8             Define for me what reach is.

9             Not that your report talks about it,

10   but I'd like to get your testimony on that.

11       A.    Yeah.  So generally speaking, reach

12   is used in conjunction with some qualifiers.

13   Like, we would say the reach of a campaign or

14   the reach of an ad.  And what we mean is the

15   number of people exposed to the campaign or

16   exposed to that ad.  Sometimes it is in a given

17   time period.

18            There's also a concept called new

19   reach, which is people you're reaching who you

20   haven't reached before.

21            Online, people often conflate reach

22   to people with reach to cookies because the

23   latter, reach to cookies, is much easier to

24   measure.

25            But generally speaking, reach means

 1    the number of people exposed to a piece of

 2    marketing or a campaign.

 3        Q.    Okay.

 4             So I'm driving down the street.

 5    There's an out-of-home campaign on a billboard.

 6    And I'm driving down the street, but I'm

 7    focused, like I should be, on the road.  And I

 8    pass that billboard and I don't see it.  I

 9    don't notice it.  I don't look at it.

10             I still am someone that the

11    billboard reached; is that right?

12        A.    Out-of-home can be, you know, a

13    little bit trickier in terms of how they

14    actually calculate that reach.  They do

15    discount for some of these angles at which you

16    saw, had the opportunity to see it.

17             You know, a sort of similar example

18    might be going back to the shirt.  You're on

19    ESPN.com.  An ad for the shirt comes up.

20    Perhaps it comes up -- what we say -- we call

21    it below the fold, so at the bottom of the

22    page.  Borrowing that term from newspaper

23    advertising.

24             An ad delivered to a website you're

25    on would count toward the reach even though, in

Exhibit 2 Page: 79
184

1    this example, perhaps you didn't see it.

2          Q.    So why is there a distinction with

3    out-of-home campaigns?

4                In other words, why do they try to

5    adjust for angle and people who may not have

6    been viewing?

7                And it doesn't sound like they do

8    the same online advertising.

9          A.    Oh, they -- I think all media

10   channels do some of this.  So in online

11   advertising, we do distinguish between

12   impressions above the fold and below the fold.

13               Some marketers discount the below

14   the fold advertisement.  Sometimes people will

15   talk about opportunity to see rather than

16   reach, trying to account for this

17   linguistically.

18               Online, a much bigger problem is,

19   you know, it's usually referred to as, like,

20   impression fraud.

21               But it is page views not generated

22   by a person, generated by, like, a Web crawler

23   or a bot.  Most online advertises -- or sorry,

24   online publishers make efforts to remove those

25   from the count.

**Exhibit 2** Page: 80
**185**

1           Similarly, print media.  So

2    magazines go through a series of calculations

3    to come up with an estimate that is off of

4    impressions that may be different from the

5    circulation number.

6           So you might send out a million

7    magazines, but if your magazine is going to,

8    you know, 200,000 of those magazines are going

9    to a doctor's office, then that impression

10   count and the reach is higher than the

11   circulation number.

12          And so, there are certain nuances of

13   marketing measurement across all of these

14   channels.

15       Q.    In the example of magazines, do they

16   take into consideration the number of people in

17   the household?

18       A.    Typically, there is sort of a

19   multiplier to go from an issue sent to

20   household size.  You know, it's a very rough

21   estimate.

22       Q.    Okay.

23          So let's -- again, let's talk for a

24   second about reach.

25          Reach is the number of people

```
 1        exposed to an advertisement subject to perhaps

 2        some adjustments for things like billboards,

 3        angles, something that might be below the fold.

 4               But generally speaking, it's talking

 5        about the number of people that were exposed to

 6        a particular advertisement.

 7               Is that fair?

 8        A.     Yes.

 9        Q.     Okay.

10               And how does impressions differ from

11        reach?

12        A.     So impressions are the number of ad

13        views, or we might say opportunity to see ads.

14        And so, going back to your billboard example,

15        let's imagine the billboard is near a stoplight

16        that you're unlucky enough to hit every day, so

17        you actually glance at it.

18               You know, the first day of the month

19        you see it, you would be reached by that ad in

20        that month for the first time.

21               And on the next 20 days when you see

22        it, each one of those you're generating an

23        impression of the billboard, whereas the reach

24        stays constant because it's the same you who is

25        seeing it.
```

1          So impressions are the number of

2     views or opportunities to see an advertisement.

3          Q.    Okay.

4          And how are -- in the online world,

5     how are impressions calculated?

6          A.    Today, the general way that

7     impressions are calculated is by the

8     publisher's ad server and sometimes the

9     advertiser's ad server.

10         And so, when someone visits a

11    website -- and for now, let's hold off on what

12    are called, like, the walled gardens of places

13    like Amazon or Facebook or Instagram.

14         But when someone visits a website

15    and the -- you know, what that triggers is a

16    server request to bring the page to the user's

17    browser.  During that period of time, there is

18    a long list of ad tech machinations that happen

19    to fill in the ads that that person will be

20    exposed to or have the opportunity to see.

21         Those -- as those ads are served

22    into the page, that activity is logged.  And

23    the sum of those log events becomes the

24    impression count.  Subject to some of the stuff

25    we talked about before, like filtration

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

```
 1        afterwards and that kind of thing.
 2              Q.    So I go on to ESPN and there's an ad
 3        for my shirt.  I've been reached, right,
 4        because the ad is -- and it's above the fold,
 5        let's say, so I've seen it, or I can see it.
 6              Let's -- whether I saw it or not,
 7        it's there.
 8              And then I go on that same ESPN
 9        page ten times because I'm looking at the
10        Dodgers score.
11              That would be one reach and ten
12        impressions?
13              Am I --
14              A.    Yes.  Generally speaking, one reach,
15        ten impressions.
16              You know, for instance, if you were
17        frantically hitting refresh on the page to get
18        an update, there might be some filters in place
19        to prevent a second impression from being
20        counted within 30 seconds of a previous
21        impression.
22              But generally speaking, you've got
23        it.
24              Q.    Okay.
25              But reach and -- neither reach nor
```

1      impression actually record whether I saw the

2      ad.

3                       That's just the opportunity to see

4      the ad?

5            A.    That's correct.  It's the delivery

6      of the ad that reach and impressions tell us

7      about.

8                       There are some technologies where

9      you might -- people will track mouse movements

10     and see if it goes across the ad and that sort

11     of thing.

12                      But generally speaking, when we talk

13     about impressions, we are talking about the

14     serving of the ad to the browser, not what's

15     happening visually for the person who's

16     visiting the page.

17           Q.    And -- and on that particular page,

18     the only way to know if I saw the ad would be

19     if I clicked on it?

20                      ATTORNEY BRYANT:  Object to form.

21           A.    Yes.

22           Q.    Is that true?

23           A.    Or interactive with the ad in some

24     sense.

25           Q.    Okay.

1             And in -- does that have a name in

2       marketing, in marking terms?

3             A.    I think, if I'm correctly

4       understanding the question, maybe an

5       interaction event.

6             Q.    Okay.

7             A.    Or a click event, if it's a click.

8             Q.    Okay.

9             So I've been reached.  Maybe I have

10      ten impressions because I revisited the website

11      ten times and that same ad appears every time.

12            If there's no interaction of it, you

13      don't know if I actually saw the ad.

14            But if there's an interaction of it,

15      you can record that as an interaction; is that

16      correct?

17            A.    Yes.  And generally speaking,

18      marketers put different value on different

19      types of events.

20            So a view event, while we know that

21      in aggregate, view events influence consumers,

22      we know more about click events, where someone

23      has actually interacted with the ad.

24            Q.    Okay.

25            I guess the way I'm thinking about

Deposition of John Chandler, Ph.D.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 88 of 402    Page ID #:2443

Favell, et al. v. University of Southern California and 2U Inc.

```
1        it is the most direct way of knowing whether an

2        ad is effective is by having some interaction

3        between the ad and the consumer?

4                    ATTORNEY BRYANT:  Object to form.

5        BY ATTORNEY CAMPBELL:

6             Q.    Would you agree?

7             A.    I think it depends on your

8        definition of effective.  If, by effective, we

9        mean interacting with an advertisement, then I

10       think that is generally true.  You know, most

11       firms have metrics that they care about beyond

12       that.  So it's not just about impressions and

13       reach.  It's about conversions.

14                   And so, by conversion I mean

15       everything from you visiting the retailer's Web

16       page who is selling the shirt.

17                   You know, if you are a very cautious

18       consumer, maybe you would do search on best,

19       you know, business shirts that don't wrinkle or

20       something and read content marketing on it.

21                   And so, some firms would say if

22       someone sees an ad and then goes to this

23       content marketing, that's a form of conversion.

24                   You put the shirt in your shopping

25       cart, that's the step on the way to purchase.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 89 of 402    Page ID #:2444

Deposition of John Chandler, Ph.D.                          Favell, et al. v. University of Southern California and 2U Inc.

1          And, you know, I talk a lot about

2     the funnel in my report, all the way to the

3     actual hitting purchase button, which is the

4     sale.

5          And so, traditionally, marketers

6     measure the effectiveness of their marking

7     based on the metric that's sort of closest to

8     the business.

9          So for someone like 2U, it would be

10    enrollment.  For a shirt retailer, it would be

11    volume of sales.  Maybe number of new

12    customers.  That sort of thing.

13         Q.    Have you ever studied or researched

14    ad fatigue for online advertisements?

15         A.    Yes.

16         Q.    And in what context did you study

17    that?

18         A.    A wide variety.  While I was at

19    aQuantive, I was in the technology division

20    atlas.  And so, our analytics group, we really

21    had sort of three main functions.  One was we

22    essentially did free consulting for our best

23    advertising clients.

24         And so, I would do work with their

25    data to try to generate insights for them to

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 90 of 402    Page
ID #:2446

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1    improve performance.  Typically, those kind of

2    consultant engagements would turn into what we

3    called thought leadership, which would be

4    aggregating the results from a number of

5    advertisers and then writing those up as white

6    papers and speaking at conferences about it.

7             And then if there was good reception

8    for that work product, we would do the research

9    and design of product features.  And so, it

10   would be incorporated into the tools that we

11   made for agencies and advertisers.

12            So I followed that entire cycle on a

13   set of analyses related to optimal frequency.

14            So optimal frequency is sort of the

15   ideal number of times to expose someone to an

16   advertisement.  It varies by medium.  It varies

17   by message.  It varies by advertising products.

18   By the consideration cycle.

19            And so, I think you'll see on my CV

20   an optimal frequency white paper.  But for that

21   research, I analyzed scores of advertisers'

22   frequency data to estimate the optimal

23   frequency, which is kind of the other side of

24   the coin of ad fatigue.

25            Once you've passed the point of

 1      optimality, you are headed into this role of ad

 2      fatigue, where the ads are no longer effective.

 3      And it is possible to saturate an audience to

 4      the point where the ads actually have a

 5      negative impact.  Although that's usually rare.

 6      Although perhaps becoming more common in the

 7      world of display retargeting.

 8              Q.    You're looking at a guy who ignores

 9      all online ads.

10              A.    A lot of people say they ignore all

11      online ads.  It is harder to truly do it.

12              Q.    It may or may not be true.

13              I think I'm someone who suffers from

14      advertising fatigue.

15              You know, for example, I could go to

16      a Home Depot and find something that I want to

17      buy and say, I wonder if there's -- where in

18      the store I can find it.  So I punch it in on

19      my phone.  They say it's aisle 10.  I guess

20      Home Depot will tell me that.

21              And then later that evening, an ad

22      might pop up for that same product, either at

23      Home Depot or some other place.  I could care

24      less about that ad.  I've already made my

25      purchase.  I ignore it.  If I even see it.

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1              So wasted dollars from the

2         advertising side, but maybe they don't think

3         so.

4                   That's my rant.

5                   You don't need to answer or respond

6         to that.

7         A.      My personal corant is the online

8         purchase, where you have purchased the shirt

9         and then you get a thousand ads for the shirt.

10        It shouldn't be so hard to turn that off.

11                  But, you know, I will say that

12        marketing is a -- it is a mask game, right.

13        Like, marketers know that there are people like

14        you out there who are suffering from ad

15        fatigue.

16                  And, you know, they may -- you know,

17        Home Depot employs a relatively large set of

18        data scientists.  And so, they may have

19        analyzed that data and know that, all right,

20        there are going to be certain people who are

21        less likely to come back to the Home Depot

22        store after we do this.

23                  But in aggregate, they are making

24        business decisions to continue to do this.

25        Because, in aggregate, they are seeing positive

1     lift from this behavior.

2            Q.    Does optimal frequency depend on the

3     product or service being offered?

4            A.    Yes.

5            Q.    And does optimal frequency depend on

6     the type of ad?

7            A.    Yes.

8            Q.    I have no idea how we got on that

9     topic.  But we'll move on.

10            A.    I will be happy to talk about

11    optimal frequency for the next four hours, if

12    you're coming down to the home stretch of your

13    exhibits and questions.

14            Q.    Not even close.

15                  Okay.  I want to switch gears for a

16    second.

17                  In some of the materials you viewed,

18    you saw references and marketing and

19    advertising to top ranked, correct?

20            A.    That's correct.

21            Q.    Is there a universally accepted

22    meaning of the term or phrase top ranked?

23                  ATTORNEY BRYANT:  Object to form.

24            A.    You know, I think there is probably

25    some consistency in how people would interpret

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 94 of 402    Page

Deposition of John Chandler, Ph.D.                    ID #:2449 Favell, et al. v. University of Southern California and 2U Inc.

1      that number.  But I am not aware of a

2      universally agreed to definition.

3              Q.    Okay.

4                    And that's in particular true with

5      -- with graduate schools.  Let's focus on

6      education, a graduate school education.

7                    Are you aware of any consistent

8      meaning of the term top ranked?

9              A.    I -- you know, I am, through my work

10     in this case, aware of some consistency in how

11     2U uses that term.

12                   But generally speaking, I am not

13     aware of a consistent definition.

14             Q.    Okay.

15                   Have you conducted any study survey

16     in this case to determine how prospective

17     students of the Rossier School of Education

18     understood the term top ranked?

19             A.    I have not.

20             Q.    Okay.

21                   And have you conducted any study to

22     determine how prospective students of the

23     Rossier Online School of Education understood

24     the term top ranked?

25             A.    I have not.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 95 of 402    Page
ID #:2450

Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

```
 1          Q.    Okay.

 2                Have you conducted any study to

 3    determine whether rankings, just generally

 4    speaking, are an important factor in the

 5    decision of prospective students to apply to a

 6    graduate program?

 7          A.    I have -- if by study, you mean a

 8    survey or something like that, I have not done

 9    a survey on this.

10                I have analyzed the marketing

11    practices of 2U and USC, and I can appreciate

12    how they thought about numerical rankings and

13    top ranked as a component of their marketing

14    strategy.

15          Q.    Okay.

16                So I want to set aside what the

17    advertisers thought about the importance or

18    relative importance of top ranked and just

19    focus on the recipient of the advertisements.

20                It's fair to say you haven't

21    conducted any study or research to determine

22    whether rankings were important in the decision

23    of prospective students to apply to the Rossier

24    school, correct?

25          A.    You know, I think marketing is
```

1        really just kind of two-way communication

2        between an advertiser adopting a practice,

3        trying that practice, seeing how it performs,

4        and then iterating on that.

5                    And so, I think that the way in

6        which top ranked and numerical rankings

7        continue to appear in the marketing materials

8        does tell us how it affected potential

9        students.

10                   I've also looked at materials like

11       the chat that I reference in my report.  And

12       so, we can see the impact of this rankings

13       information on students.

14                   And so, in that sense, I have done

15       research and analysis related to this, but I

16       have not done a separate survey or something

17       like that.

18            Q.    Okay.

19                  Have you conducted any quantitative

20       study to determine the number of students

21       exposed to any message from USC Rossier

22       concerning rankings?

23            A.    What do you mean by quantitative

24       study?

25            Q.    Any study that would determine with

1    any reasonable degree of certainty how many

2    people were actually exposed to an

3    advertisement that referred to the ranking of

4    the USC Rossier school?

5        A.    In aggregate, I have an opinion on

6    how many -- the fraction of students who are

7    exposed as being all or virtually all.

8            But beyond that, I break down my

9    analysis based on the various ways that

10    students were reached by the marketing of 2U,

11    and to a lesser extent, USC.

12            That's been the extent of that

13    quantitative analysis.

14        Q.    I think you were pretty clear in

15    your report that there was the absence of

16    quantitative data for you to look to to

17    determine things like social media reach or

18    online advertising campaign reach.

19            Is that fair?

20        A.    Yes, the data that I had available

21    often did not allow specific quantitative

22    estimates of exposure of a particular piece of

23    marketing.  Which is why my opinion is in this

24    sort of aggregate form.

25        Q.    And so, you can't give me a number,

1    for example, of students who are exposed to any

2    particular advertisement, correct?

3          A.    My estimate is that all or nearly

4    all.  And so, we can take the total enrollment

5    number and use that as my numerical estimate,

6    if you wanted it.

7                But generally speaking, it is all of

8    the students who are exposed to the ranking

9    information via several different places where

10   it was appearing.

11         Q.    You haven't seen any quantitative

12   data from USC, from 2U, or anyone else that

13   would suggest a number of students or

14   prospective students who were exposed to a

15   particular ranking advertise, have you?

16               ATTORNEY BRYANT:  Object to form.

17         A.    There are -- there are a few places

18   where this information exists in quantitative

19   form, but not in ways that allow me to estimate

20   with precision the number of people who were

21   exposed to the ranking information beyond these

22   sort of larger statements I'm making about the

23   student population.

24         Q.    Got it.

25               Given your expertise, can you tell

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 99 of 402    Page
ID #:2454
Deposition of John Chandler, Ph.D.                    Favell, et al. v. University of Southern California and 2U Inc.

1      me what analyses are usually conducted to

2      assess whether a marketing campaign was

3      effective; in other words, led to an increase

4      in sales or not?

5            A.    Yeah.  And just using the language

6      of this case and talking about enrollment --

7      and I have worked with the University of

8      Montana's enrollment data over the years, so I

9      have worked on this professionally in addition

10     to working on it in this case.

11                You know, I think that in some

12     cases, there will be estimates that you can

13     derive via that multitouch attribution, like I

14     did in my dissertation work, where you might

15     have log level information about marketing

16     exposures and individual enrollment data.

17                There's also the possibility of

18     doing a media mix model, as we mentioned

19     before, that kind of aggregate time series

20     model that tells us about the aggregate effect

21     of marketing on things like enrollment.

22                Experiments would be possible,

23     carried out by the marketers.

24                And so, those are some of the

25     primary most sophisticated ways to measure

1    marketing performance.

2              At lower levels of sophistication,

3    there are proxy measures that people use.  So,

4    for instance, simply monitoring enrollment over

5    time, looking at things like the funnel.

6              So looking at how site visitors turn

7    into leads, to use the language of 2U, and then

8    those leads turn into enrolled students.

9              Marketers will often use something

10   like that last touch attribution to measure the

11   effectiveness of specific marketing channels in

12   isolation using these kinds of key performance

13   indicators or KPIs.

14       Q.   On the multilevel touch attribution,

15   have you seen any log level data in this case?

16       A.   No, I was unable to find any log

17   level data related to this case.

18       Q.   And you mentioned a second ago the

19   last touch attributes.

20             Have you seen any data that suggest

21   how many students enroll based on that last

22   touch?

23       A.   Yes.  I did not analyze that data in

24   great detail because it's not relevant to my

25   opinions.  But there is data throughout.

1          For instance, those marketing plans

2     that I cite include historical information like

3     how did we do last year?  What are we going to

4     do this year?

5          And most of those include some

6     measures of performance, sometimes very

7     specifically looking at, for instance,

8     referring URL for students who complete an

9     application and where are those students coming

10    from.

11         Other times, it's discussed in a

12    more qualitative way.  There's places where

13    2U's marketers are talking about high

14    performing ads or landing pages that are high

15    performing.  And those are typically using

16    methods like that last touch attribution.

17         Q.    When you say they referenced high

18    performing ads, did they quantify what made it

19    a high performing ad?

20         A.    The ones I'm thinking of right now

21    were offered without quantification.

22         Q.    Okay.

23         And are surveys ever employed to

24    assess if a marketing campaign is effective?

25         A.    Sometimes, particularly with firms

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 102 of 402
Page ID #:2457
Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1          that are not primarily transacting their

2          business online.  So, for instance, Coca-Cola.

3          Coca-Cola does not run ads on Instagram to

4          cause you to go out to your local convenience

5          store and by a six-pack of Coke.

6                    But they are often trying to create

7          brand affinity.  There are terms in this kind

8          of work, like unaided recall.  So name a brand

9          of soda.

10                    Aided recall.  Have you heard of any

11          of these brands?  Coke would be a bad example

12          for that because it's impossible to live in the

13          world and not hear of Coke.

14                    Attitudes towards the firm sometimes

15          measured with surveys.  So those kinds of

16          things.

17              Q.    Okay.

18                    And what about econometric models,

19          were they used to assess whether a marketing

20          campaign was effective?

21              A.    Yes.  I won't resist the opportunity

22          to say that econometrics is really just a

23          subset of time series modeling, which is a

24          subset of statistics.

25                    But yes, econometric models are used

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 103 of 402
Page ID #:2458

Deposition of John Chandler, Ph.D.                    Iola Favell, et al. v. University of Southern California and 2U Inc.

1          to measure marketing effectiveness.

2              Q.     Give me an example of how it might

3          be used.

4              A.     So that media mix modeling that I

5          was describing is a form of econometric

6          modeling, where typically a third party, on

7          behalf of an advertiser, will assemble data for

8          that advertiser, looking at kind of the

9          totality of marketing.  Then also trying to

10         control for other factors such as -- for

11         instance in higher education, the unemployment

12         rate is an important covariant to understanding

13         performance.  When unemployment goes up,

14         enrollments also go up, generally speaking.

15                 And so, you are attempting to build

16         a model where you control for things like

17         overall trend, seasonal effects, these

18         covariants unrelated to marketing.  And then

19         you include as much marketing information as

20         possible and fit a model that estimates the

21         impact of that marketing, holding all else

22         equal.

23             Q.     Okay.

24                 And then you mentioned experiments

25         and the use of experiments to assess whether a

1        marketing message was effective, correct?

2              A.    Yes.

3              Q.    Okay.

4                    Did you conduct any of these types

5        of analyses in this case?

6                    And what I mean by are either

7        surveys, econometric modeling, or experiments

8        to determine whether the USC advertisements

9        and, in particular, the reference to top ranks

10       were effective?

11                   ATTORNEY BRYANT:   Object to form.

12             A.    I was not asked to assess the

13       effectiveness of this marketing.  And so, I

14       didn't use any of those techniques.

15             Q.    Got it.

16                   Do you know if anyone has been asked

17       in this case to do that?

18             A.    I do not know.

19             Q.    Okay.

20                   I may have asked you this, and

21       forgive me if I did.

22                   But did you conduct any analyses to

23       assess if USC's communications about its

24       ratings or rankings were important or material

25       to students' decisions to enroll at USC

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 105 of 402
Page ID #:2460

Deposition of John Chandler, Ph.D.
Iddell, et al. v. University of Southern California and 2U Inc.

1    Rossier?

2         A.    The analyses I did were limited to

3    those discussed in my report.  And so, I am

4    looking at the marketing materials and the ways

5    in which both the marketers and the students

6    talked about the rankings, incorporated the

7    rankings in their marketing materials modified

8    the way the rankings were used or top ranked.

9              And so, from that, I have analyzed

10   the role of rankings in the marketing done by

11   2U and USC.

12             But I have not conducted, like, a

13   separate survey or something.

14        Q.    Okay.

15             So it's fair to say you can't tell

16   me, for example, the proportion of students who

17   decided to enroll at the USC school of

18   education because they saw and relied upon the

19   ranking that was advertised?

20             ATTORNEY BRYANT:  Object to form.

21        A.    I cannot give you a specific

22   estimate of the fraction of students who

23   enrolled, whose decision was driven in whole or

24   in part by the rankings information.

25        Q.    Okay.

Deposition of John Chandler, Ph.D.       Iovell, et al. v. University of Southern California and 2U Inc.

```
 1              A.    I see the performance data and the
 2        way in which 2U talks about the performance of
 3        the marketing.  Much of that marketing included
 4        the rankings.
 5              And so, I'm making inferences in
 6        some cases about that role.  But I can't give
 7        you a specific fraction.
 8              Q.    Okay.
 9              Can you give me any examples of
10        students whose decision to enroll in the
11        Rossier School of Education was -- was because
12        of a ranking?
13              ATTORNEY BRYANT:  Object to form.
14              A.    You know, I think that I can point
15        to, like, the chats that I used in my report.
16        The way the students were talking about the
17        rankings and going to a highly ranked school.
18              And we can see from that that
19        rankings influenced the students thinking about
20        Rossier.
21              Similarly, I cite a number of, like,
22        LinkedIn pages where people included ranking
23        information in their sort of LinkedIn profile
24        page where they describe their educational
25        background.
```

Iola Favell, et al. v. University of Southern California and 2U Inc.

1            And so, you know, clearly, those are

2      students for whom the ranking is important.  So

3      those are the examples of ways where I see it

4      showing up in the student behavior.

5            Q.    And can you determine from those

6      examples how important it was; in other words,

7      where on the scale of things the student

8      considered it fell in terms of the decision to

9      enroll in Rossier?

10           A.    No.  I can sort of see the

11     influence, but I can't tell you how it compares

12     to other aspects like location or cost or

13     something like that.

14           Q.    Okay.

15            I mean, for example, can you tell me

16     whether school rankings are more or less

17     important than, for example, job placement

18     statistics?

19           A.    No, I cannot tell you that.

20           Q.    Okay.

21            And another example, can you tell me

22     whether or not school rankings are more or less

23     important than the school location?

24           A.    No.  I mean, I think that, again,

25     that was not an analysis I was asked to do.  So

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 108 of 402
Page ID #:2463

Deposition of John Chandler, Ph.D.                    Iravedra-Bell, et al. v. University of Southern California and 2U Inc.

1      I have not done it.

2              Q.    Okay.

3                    Have you conducted any analysis of

4      the number of students that would not have

5      enrolled at USC, and in particular the Rossier

6      school, had they known that the ratings were

7      inflated?

8              A.    I have not done any analysis like

9      that.

10                   I also can never figure out if we're

11     saying -- if inflated is the right term here,

12     since they were lower.  But yes.

13             Q.    You understood my question, though?

14             A.    Yes.  I'm sorry.  I was -- I

15     understand your question.

16             Q.    Okay.  Thank you.

17                   No, I appreciate the distinction.

18                   But because you said that, I wanted

19     to make sure you understood what I meant when I

20     said inflated.

21                   They were ranked higher than, at

22     least according to the plaintiffs, they

23     otherwise would have been without proper

24     reporting.

25                   Is that how you understood it?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 109 of 402
Page ID #:2464

Deposition of John Chandler, Ph.D.                    Burwell, et al. v. University of Southern California and 2U Inc.

 1         A.    I understood it to mean that the

 2    rankings were better than what they should have

 3    been --

 4              (Multiple speakers.)

 5         Q.    Okay.

 6         A.    -- and so, yes.

 7         Q.    Okay.

 8              So if I use inflation again down the

 9    road, we'll have that agreement.  Your

10    definition is the one we'll agree to.

11              How is that?

12         A.    That sounds great.

13         Q.    Okay.

14              And to be clear, you didn't conduct

15    any survey of USC students to assess if the

16    information about the alleged inflation of USC

17    ratings at the Rossier school would have

18    changed their decision to enroll in the

19    program, correct?

20         A.    I did not perform any survey work in

21    relation to this expert report.

22         Q.    Okay.  All right.

23              Why don't we move to your expert

24    report.

25              It will be Exhibit 1078.

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 110 of 402
Page ID #:2465
Deposition of John Chandler, Ph.D.
Campbell, et al. v. University of Southern California and 2U Inc.

```
 1                  (Exhibit 1078, Expert Report, marked
 2            for identification.)
 3                  (Document review.)
 4        BY ATTORNEY CAMPBELL:
 5            Q.    We'll move to page 3, which sets
 6        forth your assignment.
 7                  Now, let's see.  Okay.
 8                  On page 3, where the assignments are
 9        listed, do you see that?
10            A.    I do.
11            Q.    Okay.
12                  And it looks like, according to
13        Roman numeral 2, Section 2 assignments, that
14        you were given four assignments.
15                  Is that fair?
16            A.    Yes.
17            Q.    Okay.
18                  And you say (as read):  I have been
19        asked to offer any expertise on the following
20        subjects.
21                  One:  The digital marketing,
22        business structures, and practices that pertain
23        to student recruitment for online graduate
24        programs.
25                  This includes an account of the role
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 111 of 402
Page ID #:2466

Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

1          of marketers, marketing campaigns, and

2          marketing techniques used in the industry.

3                    Did I read that correctly?

4          A.    Yes, I believe so.

5          Q.    Okay.  I hope so.

6                    So in terms of -- you mentioned to

7          me a little bit your involvement at the

8          University of Montana in enrollment and

9          recruiting.

10                   Are you -- do you have any

11         involvement in -- for the recruiting of online

12         students for graduate programs at the

13         University of Montana?

14         A.    Yes.

15         Q.    And can you explain to me what

16         involvement you have.

17         A.    Our analytics master's program in

18         the college of business is offered with an

19         online option.  And so, I have participated in

20         the marketing of that program.

21         Q.    Okay.

22                   When you say you participated in the

23         marketing of that program, how did you

24         participate?

25         A.    You know, I -- in a surprisingly

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 112 of 402
Page ID #:2467

Deposition of John Chandler, Ph.D.    Howell, et al. v. University of Southern California and 2U Inc.

1    comprehensive way.  I have -- everything from I

2    have appeared in video and still ads, so my

3    only turn as a model, to planning the marketing

4    campaigns, helping to allocate budgets for

5    marketing.  Measuring the effectiveness of

6    those marketing campaigns.

7              Informal, I would say, sort of

8    surveys of students to see what marketing is

9    resonating with those students.

10             Recruiting other students to help us

11   market the program.  Yeah.

12        Q.    On the informal surveys, are you

13   talking about just picking up the phone or

14   sending an e-mail and talking to someone or is

15   it more than that?

16        A.    Sometimes like a simple kind of

17   Google form style survey, just asking students,

18   like, which of these factors influenced their

19   decision to attend.

20             You know, for instance, almost all

21   of our students take more than one year to go

22   through our program.  But the fact that there

23   is a one-year option is incredibly important to

24   them to make the decision.

25             So uncovering that through survey

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 113 of 402
Page ID #:2468
Deposition of John Chandler, Ph.D.                 Iudicell, et al. v. University of Southern California and 2U Inc.

```
 1              research.
 2                    Q.     Got it.
 3                           And are these sent to students that
 4              have enrolled, prospective students, or both?
 5                           I'm talking about the informal
 6              surveys.
 7                    A.     Oh, the informal surveys were just
 8              students who had enrolled.
 9                           Analyzing the marketing data was for
10              prospective students and then ultimately for
11              students who enrolled.
12                    Q.     And besides the one-year option,
13              what else did you learn about the decision
14              points of the students in terms of what drove
15              them to ultimately enroll?
16                    A.     The University of Montana, part of
17              our ethos is trying to make education
18              affordable to all, particularly people who are
19              first generation college students or
20              underserved populations.
21                           As part of that, we keep our tuition
22              very low.  And so, the price point was an
23              important decision for my students.
24                           The flexibility in our delivery
25              methods, the ability to receive instruction in
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 114 of 402
Page ID #:2460

Deposition of John Chandler, Ph.D.    Iglesell, et al. v. University of Southern California and 2U Inc.

1    person and online and asynchronously was

2    important.

3                There's a group of students for whom

4    our location in the Northern Rockies is very

5    important.

6                Those are the primary things I can

7    remember gleaning from that information.

8        Q.    And these were surveys done of just

9    the graduate students?

10        A.    Yes, these are all graduate

11    students.

12        Q.    Okay.

13                Is this something that University of

14    Montana regularly does each semester or each

15    year once graduate students enroll, that they

16    ask them these informal questions?

17        A.    No.  I wish it was.  But it's a

18    little more ad hoc, unfortunately.

19        Q.    And so, you -- is there -- in these

20    informal surveys, is there a type of ranking;

21    in other words, here's, like, the most

22    important thing, and then you list the other

23    things?

24                How do you measure what is important

25    to students?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 115 of 402
Page ID #:2470

Deposition of John Chandler, Ph.D.                     Maxwell, et al. v. University of Southern California and 2U Inc.

1          A.    In our case, we ranked based on the

2    number of students who selected it as an

3    important decision and criterion.

4                But there was no analysis really

5    beyond that.

6          Q.    Got it.

7                Now, were the students -- was it an

8    open-ended survey or was it just here are boxes

9    to check the reasons that were most important

10   to you or both?

11         A.    Both.

12         Q.    Okay.

13               And then you would take all of --

14   strike that.

15               Could you, as a student in this

16   informal survey, check more than box?

17         A.    Yes.

18         Q.    Okay.

19               So you would take all of these

20   surveys given to students through those Google

21   forms and you would aggregate the responses.

22               And based on that, you gleaned that

23   the one-year option was the most often checked

24   box, I'll call it, in terms of the students who

25   took the survey?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 116 of 402
Page ID #:2471

Deposition of John Chandler, Ph.D.                Campbell, et al. v. University of Southern California and 2U Inc.

1        A.    I think affordability might have

2    number one for our students.

3             I was more just struck by the number

4    of students who said the one-year option was

5    extremely important compared to the number who

6    actually graduated in one year.

7        Q.    Interesting, yeah.

8             And so, with that information about

9    what students found to be important in their

10   decision to enroll, did you adjust any of the

11   marketing campaigns at the University of

12   Montana graduate school to account for those

13   things?

14       A.    Yes.

15       Q.    Okay.

16            Have you seen or been provided any

17   similar type of surveys in this case, informal,

18   formal, or otherwise, where those types of

19   questions were asked of prospective or enrolled

20   students?

21       A.    I don't believe so.

22       Q.    Okay.

23       A.    One other --

24       Q.    Of course.

25       A.    -- thing related to this.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 117 of 402
Page ID #:2472

Deposition of John Chandler, Ph.D.                    Iwersdell, et al. v. University of Southern California and 2U Inc.

```
 1                    I've also done extensive work with
 2          the University of Montana as a whole, working
 3          on enrollment and retention for both graduate
 4          and undergraduate university-wide.
 5                    So I just wanted to make sure that I
 6          was clear about working in both capacities.
 7              Q.    No, that's super helpful.
 8                    And in that sort of university-wide
 9          work you've done, have you done -- have you
10          delivered any formal or informal surveys
11          similar to the one you talked about for the
12          graduate school?
13              A.    No.  I have analyzed some survey
14          data that was -- where the survey was designed
15          and fielded by others.  And then I helped with
16          the analysis.
17                    And most of my work for the VP of
18          marketing and communication at the University
19          of Montana was related to data analysis.
20              Q.    Okay.
21                    And you did, in fact, see some data
22          analysis resulting from surveys that were done
23          of students as to reasons why they enrolled in
24          the University of Montana?
25              A.    That's right.
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 118 of 402
Page ID #:2473

Deposition of John Chandler, Ph.D.                    Burchell, et al. v. University of Southern California and 2U Inc.

```
 1                Q.    Okay.

 2                      And university-wide, did it -- did

 3          the answers differ from what you saw at the

 4          graduate level?

 5                A.    There was more variety in the

 6          answers.  You know, the -- our graduate program

 7          has about 50 students at a time, whereas the

 8          university as a whole is closer to 10,000

 9          students.  And so, there's just much more

10          diversity in terms of people's decision.

11                      There are differences between

12          graduate and undergraduate.  Our undergraduates

13          are often much more focused on location,

14          cost -- excuse me -- and areas of study,

15          generally.

16                      Whereas the graduate students,

17          having picked a program, that's actually much

18          more related to that specific program and less

19          about the fact that it happens to be in a

20          beautiful town in Western Montana.

21                Q.    Does the University of Montana, in

22          any of its marketing materials, discuss its --

23          its -- any ranking it's received from any third

24          party?

25                A.    Yes.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 119 of 402
Page ID #:2474

Deposition of John Chandler, Ph.D.                    Iovrell, et al. v. University of Southern California and 2U Inc.

1      Q.    And how so?  And in what context?

2      A.    Off the top of my head, our college

3   of business is the highest ranked business

4   school in the Big Sky Conference.  Which is,

5   you know, kind of a western Ivy League.

6           And, you know, I -- that is

7   prominent in our college of business marketing

8   materials.  For undergraduates, we now have a

9   direct admission to the college of business,

10  where incoming first-year students can apply

11  and be accepted into business as a business

12  major.  And so, the top ranked in the

13  conference is -- is discussed there.

14          Our forestry program and our

15  doctorate of physical therapy are highly ranked

16  nationally.  And so, those rankings appear in

17  the marketing materials for those programs.

18          It's not exactly ranking

19  information, but the University of Montana

20  recently became an R-1 institution.  So

21  Research 1, which is the highest tier of

22  research universities.  And so, you know, that

23  was something that appeared in marketing

24  communications around when it happened.

25      Q.    Okay.

Deposition of John Chandler, Ph.D.                    Bissell, et al. v. University of Southern California and 2U Inc.

1              And so, for the graduate school of

2      business and college of business -- strike

3      that.

4              Let me try again.

5              The -- the ranking for the Big Sky

6      Conference was for the graduate school, which

7      is part of the college of business, or was it

8      the college of business in general?

9         A.    It was the latter.  So it was -- the

10     college of business in general was the top

11     ranked in the Big Sky.

12             And then we have three graduate

13     programs within the college.  And we also would

14     talk about that ranking when we are marketing

15     the graduate programs.

16        Q.    Got it.

17             Each of the three graduate programs

18     within the college of business?

19        A.    I believe so.  Certainly, the

20     master's in business administration and our

21     master's of business analytics, we talk about

22     it.

23             The master's of accountancy is

24     nationally ranked, and so they will often talk

25     about their specific ranking.  The last time I

Deposition of John Chandler, Ph.D.    Campbell, et al. v. University of Southern California and 2U Inc.

```
 1          looked at it, I believe it was top 20, but not
 2          top 15.
 3               Q.    Okay.
 4                     And in any of the informal surveys
 5          you conducted of graduate school students, was
 6          the ranking mentioned as a reason why they
 7          enrolled to the University of Montana graduate
 8          program?
 9               A.    I don't believe it was.
10               Q.    Okay.
11                     THE COURT REPORTER:  I'm sorry to
12          interrupt.
13                     Chris, did you object?
14                     I could not hear you.
15                     ATTORNEY BRYANT:  I did object on
16          that.
17                     I'm sorry.  I may not have hit
18          unmute quickly enough.
19                     ATTORNEY CAMPBELL:  Not a problem.
20                     And, Chris, feel free to interrupt
21          me if you don't feel like you got your
22          objection in.
23                     ATTORNEY BRYANT:  Sorry.  I didn't
24          know on that.
25                     And I just -- and maybe for a
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 122 of 402
Page ID #:2477
Deposition of John Chandler, Ph.D.                    Harwell, et al. v. University of Southern California and 2U Inc.

1          clarification for that, the objection is

2          not to the, you know, the broad question.

3               As it was asked, I was not sure

4          whether you were asking whether the survey

5          asked that question, or there were

6          responses to that question.

7               So if you wanted to clarify that.

8               ATTORNEY CAMPBELL:  Sure.

9     BY ATTORNEY CAMPBELL:

10          Q.   I was really -- it's really both.

11               Because it was both a closed and an

12     open-ended survey -- a closed-ended question

13     that mentioned ranking?

14          A.   I do not believe there was, if we're

15     talking about the master's in business

16     analytics.

17          Q.   Yeah.

18               And in terms of that survey, was

19     there any -- I think what your answer was is

20     you don't recall there being any open-ended --

21     any answer to any survey question that mentions

22     survey as part of an open-ended question,

23     correct?

24          A.   Yeah, I don't believe that

25     open-ended responses included ranking on that

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 123 of 402
Page ID #:2478

Deposition of John Chandler, Ph.D.                    Kimbell, et al. v. University of Southern California and 2U Inc.

1       survey.

2             Q.    Thank you.

3                   I'm not sure what I -- question I

4       just asked.  But that was the answer I was

5       looking for.  Thank you.

6                   ATTORNEY BRYANT:  I'm willing to

7             meet you halfway.

8                   ATTORNEY CAMPBELL:  I totally

9             appreciate it.

10                  THE COURT REPORTER:  And just real

11            quick for the witness, if you can pause

12            before answering so that I don't miss any

13            objections.  And maybe just slow down a

14            tiny bit.

15                  THE WITNESS:  Apologies.

16      BY ATTORNEY CAMPBELL:

17            Q.    Okay.

18                  Back to your report, Exhibit 1078.

19                  I think we've covered topic

20      assignment one.

21                  Assignment two is the stages of the

22      consumer journey related to student recruiting

23      and enrollment.

24                  So your experience in the -- I said

25      the consumer journey -- your experience in the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 124 of 402
Page ID #:2479

Deposition of John Chandler, Ph.D.                    Burwell, et al. v. University of Southern California and 2U Inc.

1    customer journey comes from your experience at

2    the University of Montana; is that correct?

3         A.    Primarily, yes.  I have done

4    marketing work as part of aQuantive and my work

5    at Atlas with online education programs,

6    schools like University of Phoenix and Cappella

7    University.

8              But generally speaking, I am basing

9    my work on this customer journey to enrollment

10   on my work at the University of Montana and

11   mapping my understanding of customer journeys

12   generally onto the framework of higher

13   education.

14        Q.    Okay.

15             Have you ever written any

16   peer-reviewed articles on the customer journey

17   for student recruiting and enrollment?

18        A.    I have not.

19        Q.    Okay.

20             And then the third assignment you

21   had was the marketing channels and strategies

22   relevant to online recruitment, including the

23   role of search engines, display marketing,

24   social media marketing, e-mail marketing,

25   search engine optimization, affiliate

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 125 of 402
Page ID #:2480

Deposition of John Chandler, Ph.D.                    Initi Bushnell, et al. v. University of Southern California and 2U Inc.

1    marketing, print marketing, and the use of data

2    analysis in marketing campaigns.

3              In terms of that third assignment,

4    as it relates to online recruiting, beyond your

5    work at the University of Montana, do you have

6    any other experience in online recruitment of

7    students and the marketing channels and

8    strategies used?

9         A.    I have professional experience

10   through my work on these kinds of campaigns.

11   And then I have broad professional experience

12   on all of these sort of listed items, not

13   specifically related to recruitment but related

14   to online marketing generally.

15        Q.    Okay.

16             So I want to understand your

17   professional experience, as you described it,

18   for online recruitment, marketing channels, and

19   strategies aside from the University of

20   Montana, which we've already talked about.

21             So can you explain to me what your

22   experience, professional experience is.

23        A.    Yes.  So at aQuantive, which is

24   A-Q-U-A-N-T-I-V-E, I was a data scientist

25   working on marketing campaigns.  We made tools

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 126 of 402
Page ID #:2481
Deposition of John Chandler, Ph.D.                Iacovelli, et al. v. University of Southern California and 2U Inc.

1    for agencies and advertisers.  And among our

2    clients were online education providers.

3              And so, I worked on these campaigns

4    looking at the marketing performance data, the

5    media plans, the marketing strategies, advising

6    the advertisers, the universities, and also

7    their agencies on improving performance.

8         Q.   And what years did you work at

9    aQuantive?

10        A.   I worked at aQuantive from 1999

11   through 2007, when we were acquired by

12   Microsoft.

13             And then I worked with some of these

14   advertisers and agencies as part of Microsoft's

15   advertiser and publisher solutions.

16             And I was at Microsoft through early

17   2012.

18        Q.   And in particular, which online

19   education companies did you provide any

20   services for?

21        A.   My recollection is that we certainly

22   worked with the University of Phoenix and

23   Cappella University.

24             And I worked some on recruitment for

25   -- I believe it was some of the Pacific

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 127 of 402
Page ID #:2482

Deposition of John Chandler, Ph.D.        Russell, et al. v. University of Southern California and 2U Inc.

1          Northwest schools.  University of Washington,

2          University of Oregon.  Perhaps University of

3          California at Berkeley.

4                    They were a client.  I can't

5          remember if I analyzed their data.

6               Q.    Okay.

7               A.    Those are the ones that I can call

8          to mind.

9               Q.    Okay.

10                    And this was mostly -- all of these

11         universities you mentioned with online

12         programs, your role was to analyze their data?

13              A.    I participated in marketing

14         strategy, marketing planning.  And then I was

15         the person who was primarily responsible for

16         the data analysis.

17                    Whereas on the strategy piece, I was

18         working as part of a team.

19              Q.    And in your experience, has online

20         education changed in any material way from 2012

21         to today?

22              A.    Yes, online education has become

23         more prevalent.  The technique to facilitate

24         online education has improved.

25                    It would be -- it is my

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 128 of 402
Page ID #:2483

Deposition of John Chandler, Ph.D.    Maxwell, et al. v. University of Southern California and 2U Inc.

1    understanding that more students are availing

2    themselves of online education, although it is

3    somewhat hard to measure in the post pandemic

4    world.

5        Q.    Is there a point in time that you

6    sort of target as seeing sort of the sea change

7    in online education, where it became more

8    prevalent and more user friendly and all of

9    those things you mentioned?

10       A.    It's hard for me to answer with real

11   precision.  I feel like there was a sort of sea

12   change in the late oughts, so 2008, 2009, 2010.

13   There was a change in online education around

14   when the -- what I think of as sort of the

15   federal government crackdown on online

16   education.  But I'm less familiar with that

17   change.

18            And then the largest sea change

19   happened in 2020, when many schools began to do

20   more online education related to the pandemic.

21       Q.    Okay.

22            Let's look at this last assignment

23   and then we'll take a break.

24            Assignment number four is the scope

25   of the University of Southern California's

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 129 of 402
Page ID #:2484
Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

```
1          Rossier School of Education's recruitment

2          practices, specifically the portion of

3          matriculating students from 2013 through 2022,

4          who were recruited for the program with online

5          advertising that made use of fraudulent

6          rankings.

7                    Do you see that?

8          A.    I do.

9          Q.    Why did you pick 2013 through 2022?

10         A.    You know, I received this assignment

11   from counsel.  I don't recall how that number

12   was decided upon.

13                    Yeah, I'm sorry.  I don't remember.

14         Q.    That's fine.  If you don't know, you

15   don't know.

16                    Then you use the term fraudulent

17   rankings.

18                    Do you see that?

19         A.    I do.

20         Q.    Is that a term someone gave you or

21   is that a term that you, yourself, chose?

22         A.    I chose that term based on my

23   understanding of the case and the Jones Day

24   report.  And what seems to be, at least to my

25   reading, clear admissions of this ranking
```

 1    inflation.

 2          Q.    Do you have any -- any legal

 3    training?

 4          A.    No.

 5          Q.    Okay.

 6                And do you understand that the term

 7    fraud is a -- can have a legal connotation,

 8    correct?

 9          A.    I know that in the vaguest possible

10    way that it means something specific to

11    lawyers.

12                I meant it in the sense of rankings

13    that did not accurately reflect the status of

14    Rossier if they had not manipulated the

15    statistics they reported to U.S. News & World

16    Reports.

17          Q.    Okay.

18                In fairness, it's sort of a loaded

19    term.  It's a term that has a meaning in our

20    legal system.

21                And you're not using it, though, in

22    the legal sense, true?

23          A.    What does it mean in the legal

24    sense?

25          Q.    Well, it depends on where you are

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 131 of 402
Page ID #:2486
Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

```
1        and the state you're in.

2                    But it tends to be, you know, an

3        intentional false or misleading statement that

4        someone relies on to their detriment.

5                    Have you established that every

6        student who was exposed to this statement

7        relied on this statement?

8            A.    I have not.

9                    And so, I am, I think, using it in a

10       sense of the false or misleading statement

11       with, perhaps, out the reliance piece that

12       accompanies the legal definition.

13           Q.    Okay.

14                   ATTORNEY CAMPBELL:  Let's go ahead

15           and take a break.

16                   Let's go off the record.

17                   It's 10:36 -- 12:36.

18                   THE VIDEOGRAPHER:  Off the record

19           12:36 p.m.

20                   (Recess is taken.)

21                   THE VIDEOGRAPHER:  Back on record

22           12:48 p.m.

23       BY ATTORNEY CAMPBELL:

24           Q.    All right.

25                   Let's go back to your report,
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 132 of 402
Page ID #:2487
Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

1        Exhibit 1078.

2                I'm done looking at the assignment

3        with you and I want to move on to the summary

4        of opinions.

5                Starting with opinion number one, it

6        says (as read):  2U, on behalf of USC Rossier,

7        engaged in a sophisticated multichannel

8        marketing strategy.  This strategy effectively

9        addressed all stages of the marketing funnel,

10       ensuring comprehensive engagement with

11       prospective students.

12               By leveraging various channels such

13       as e-mail, websites, social media, print, and

14       online media, 2U maximized the reach and impact

15       of its marketing efforts.

16               Do you see that?

17           A.    I do.

18           Q.    When you use reach here, are you

19       using it in a qualitative or a quantitative

20       way?

21           A.    I'm using it in a qualitative way.

22           Q.    Okay.

23           A.    So what I mean by this is, it is my

24       assessment, based on reviewing 2U's marketing

25       practices, that they did an efficient job

1     reaching prospective students sort of

2     generally.

3          Q.    Got it.

4               And when you say that in -- in this

5     first opinion that they maximized the impact of

6     marketing efforts, is that a qualitative or a

7     quantitative opinion?

8          A.    That opinion is generally

9     qualitative.

10              And there are places where 2U

11    reported the impact of its marketing and I felt

12    that their assessment of their work conformed

13    to my understanding of marketing best practices

14    and they were making decisions that seemed to

15    me to be sensible and sophisticated to ensure

16    that Rossier's recruitment strategies were as

17    effective as possible.

18         Q.    Can you help to understand, when you

19    use the word impact here, what do you mean by

20    that?

21         A.    Generally speaking, what I mean is

22    the process by which people move down the

23    funnel.  So going from not thinking about a

24    graduate degree in education or thinking about

25    it, but not thinking about Rossier in

1    particular, to becoming aware of Rossier,

2    interested, engaged with Rossier, trying to

3    learn more about it, down to filling out an

4    application.

5           And then having applied and being

6    accepted, then enrolling.

7           So impact here really is sort of

8    wholistic in the sense of moving potential

9    students closer to becoming actual students.

10        Q.    Got it.

11           The second opinion says (as read):

12    2U executed extensive e-mail marketing

13    campaigns that adhered to best practicing

14    within the industry.

15           These campaigns included

16    personalized drip e-mails to prospective

17    students through their decisionmaking process.

18           Actually, I don't think -- I spent

19    all that time reading that, Dr. Chandler, but I

20    don't actually think I have any questions until

21    later about that.  We'll get into the specifics

22    of that opinion.

23           Let's jump to the opinion number

24    three.

25           (As read):  The use of rankings was

**Exhibit 2**
**238**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 135 of 402
Page ID #:2490

Deposition of John Chandler, Ph.D.                    Iovwell, et al. v. University of Southern California and 2U Inc.

1   a key differentiator in 2U's marketing efforts

2   on behalf of USC Rossier.

3            Let's pause there for a second.

4   We'll get into this a little bit.

5            Help me to understand the term key

6   differentiator as used in this particular

7   opinion.

8       A.    So, to me, a key differentiator is

9   part of an -- in marketing, we would call it a

10  value proposition to a potential consumer.  In

11  this case, a prospective student.

12           And the rankings were an important

13  piece of 2U's marketing.  And so -- and were a

14  sort of key differentiator in the sense that it

15  appears to be important to 2U and to USC to

16  make sure that the rankings were known by

17  prospective students and included in their

18  decisionmaking process.

19      Q.    Did you, in your review of the

20  40,000-plus documents in this case, come across

21  any documents that suggested that the students

22  viewed the ranking to be an important part of

23  the marketing message?

24      A.    The -- you know, the places where I

25  saw the students talking about or using the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 136 of 402
Page ID #:2491

Deposition of John Chandler, Ph.D.                    Iglovell, et al. v. University of Southern California and 2U Inc.

 1          rankings were places like the chat, which I

 2          offered as an example of the way students were

 3          talking about the rankings.

 4                         And then things like the LinkedIn

 5          profile pages or sharing rankings information

 6          on Twitter.

 7                         And so, there's evidence that the

 8          rankings were important to students.

 9               Q.    Important for what, though?

10               A.    Important to the students'

11          conception of Rossier.

12               Q.    Okay.

13                         Maybe it was important to them

14          because they thought it helped them get a

15          better-paying job, for example.

16                         That could be one example of why a

17          student would put top ranked on their LinkedIn

18          profile.

19                         Would you agree?

20                         ATTORNEY BRYANT:  Object to form.

21               A.    Absolutely.  I agree with that.

22                         I think that somebody putting top

23          ranked on their LinkedIn profile, you know, at

24          that stage of a student's career, once they've

25          received the degree, is an example of a student

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 137 of 402
Page ID #:2492
Deposition of John Chandler, Ph.D.                    Iovand 2ll, et al. v. University of Southern California and 2U Inc.

1    using that ranking as a key differentiator to
2    potential employers.
3            And I think it's kind of consistent
4    with the way in which a student would, or a
5    prospective student might think of it as a key
6    differentiator because that might be a --
7    something they're thinking about.
8            They might say, oh, here's highly
9    ranked school.  If I get a degree from here, I
10   will be able to use that to demonstrate value
11   to an employer.
12       Q.    In the 40,000-plus pages of
13   documents you had access to, did you see a
14   single example of where a student, a particular
15   student, said, I enrolled in the Rossier
16   Graduate School of Education online program
17   because of the ranking?
18       A.    I did not see a student saying, the
19   reason I enrolled was because of the ranking.
20           I only see the usage of that ranking
21   in other context.
22       Q.    Okay.
23           And I think I know the answer to
24   this next question, but I'm going to ask it any
25   way.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 138 of 402
Page ID #:2493
Deposition of John Chandler, Ph.D.                    Iovell, et al. v. University of Southern California and 2U Inc.

```
 1                    Did you see, in the 40,000-plus
 2        documents you had access to, a single reference
 3        by any student that the ranking was a key
 4        differentiator for them in their decision to
 5        enroll in the Rossier School of Education?
 6              A.    I will just mention, for the record,
 7        that I think the number of documents that I had
 8        access to was between 38,000 and 39,000, just
 9        so I don't misrepresent what I had access to.
10                    I did not see a case where a student
11        used the phrase key differentiator.
12                    That type of terminology was used by
13        the marketers, not the students.
14              Q.    Okay.
15                    And apologies.  I had 40,000 in my
16        head.  What you may have said is approximately
17        40,000 earlier.
18                    So forgive me.  I wasn't intending
19        to misstate your prior testimony.
20                    And did you see any document in the
21        nearly 40,000 documents you reviewed that --
22        that looked at or studied, whether, in fact,
23        rankings were a key differentiator in students'
24        decisions to -- decision to enroll in the
25        Rossier Graduate School of Education?
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 139 of 402
Page ID #:2494

Deposition of John Chandler, Ph.D.

Iovell, et al. v. University of Southern California and 2U Inc.

1                    ATTORNEY BRYANT:  Object to form.

2          A.    I did not see a primary analysis by

3    someone at 2U or someone at USC looking at the

4    impact of rankings on the decisionmaking

5    process.

6                    I think, from our perspective, being

7    able to see the totality of the marketing, we

8    can infer that the marketing of the rankings

9    was effective because of the way it remained in

10   the marketing materials and was sort of

11   carefully modified over time to reflect the

12   rankings at the time.

13                   And so, there is this way in which

14   we -- I am inferring the importance of the

15   rankings.  But I did not see a primary analysis

16   of that component of the marketing.

17         Q.    Okay.

18                   And, Dr. Chandler, you would agree

19   with me that rankings -- strike that.

20                   You would agree with me, Dr.

21   Chandler, that the importance of rankings to

22   any particular student could vary?

23         A.    I think that I would agree that it

24   could vary within bounds, perhaps.  It is hard

25   for me to imagine a prospective student who,

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 140 of 402
Page ID #:2495
Deposition of John Chandler, Ph.D.                    Iglowell, et al. v. University of Southern California and 2U Inc.

1        for instance, had a negative association with a

2        highly ranked school.

3                 So I think that for some students,

4        their -- it may be the most important criteria.

5        For other students, it may be among the

6        criteria that they are using to evaluate a

7        school.  And so, in that sense, it varies.

8                 But I don't think all possible

9        levels of influence exist.

10       Q.    Well, do you think it's possible

11       that there are students who didn't factor the

12       school's ranking into their decision to enroll

13       at all?

14       A.    I think it is theoretically

15       possible.  It does strike me as unlikely.

16       Q.    You haven't seen any evidence in the

17       documents you reviewed that rules that out,

18       though, correct?

19       A.    I have not seen any evidence that

20       rules out the possibility that a student

21       decided to enroll in Rossier without using the

22       rankings.

23       Q.    What is your understanding of the

24       graduate -- online graduate programs that were

25       being offered by Rossier?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 141 of 402
Page ID #:2496
Deposition of John Chandler, Ph.D.    Iniguell, et al. v. University of Southern California and 2U Inc.

1      A.    I know that Rossier was offering a

2    handful of programs.  There was a program that

3    I think I mostly referred to as Ed.D. OCL,

4    education doctorate.

5            There was a master's in teaching

6    program.

7            There were other programs that

8    Rossier offered for parts of the time period

9    where I looked at evidence.

10     Q.    Did you -- did you do any analysis

11    or study of the extent of competition for, for

12    example, the OCL online program at any given

13    point in time in your analysis?

14            ATTORNEY BRYANT:  Object to form.

15     A.    I believe that I have reviewed

16    documents, yes.

17            Let me start over.

18            I have reviewed documents where 2U

19    performed a competitive analysis of Rossier

20    programs, looking at regional and national

21    competitors and highlighting key

22    differentiators.

23            And so, I have seen some evidence

24    like that.

25     Q.    Okay.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 142 of 402
Page ID #:2497
Deposition of John Chandler, Ph.D.          Bowell, et al. v. University of Southern California and 2U Inc.

1           Specific to the OCL program?

2        A.    I can't recall if it was specific to

3    OCL.

4        Q.    Okay.

5              And in opinion number three, you say

6    rankings was a key differentiator.

7              You've seen in the 2U materials that

8    there were other key differentiators, correct?

9        A.    Yes.

10       Q.    Okay.

11             We'll go through some of those as we

12   go through your report.

13             Let's move on.

14             Give me just a second.

15             I'm deciding whether I want to go

16   through any more of these summary of opinions

17   or just dive in.  So give me just one second.

18             (Document review.)

19   BY ATTORNEY CAMPBELL:

20       Q.    Let's just look at opinion number

21   ten and then we'll go into some of the details.

22             Opinion number ten says (as read):

23   Furthermore, considering the extensive

24   marketing of fraudulent rankings to an audience

25   for whom this information was a key

1    differentiator, it is my professional opinion

2    as a marketer and as a professor of marketing,

3    that USC's behavior can be fairly described as

4    unethical.

5            I actually just want to focus on the

6    first part.

7            We've talked a little bit about key

8    differentiators, and I think you mentioned you

9    saw materials where rankings was described by

10   2U as a key differentiator.

11           To be clear, you can't state with a

12   reasonable degree of scientific certainty that

13   for any one student in the population of online

14   graduate students at Rossier, that rankings was

15   a key differentiator, can you?

16       A.    I think the examples that I give,

17   that we just discussed with the way students

18   talked about the ranking, once they were

19   enrolled and after they left the program, you

20   know, for those students, I can say

21   specifically it was a key differentiator.

22           Generally speaking, I see the

23   rankings as a differentiator for the

24   prospective students as an potential audience

25   for 2U's marketing.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 144 of 402

Deposition of John Chandler, Ph.D.                    Page ID #:2490ll, et al. v. University of Southern California and 2U Inc.

```
 1            Q.    Okay.

 2                  But again, back to my question.

 3                  And let's focus on prospective

 4       students, okay.  Not how people used it after

 5       the fact, but all prospective students.

 6                  Can you tell me with a reasonable

 7       degree of scientific certainty for any one

 8       student who enrolled at the Rossier online

 9       school of education, that rankings was a key

10       differentiator for them.

11                  ATTORNEY BRYANT:  Object to form.

12            A.    You know, we're talking about people

13       who enrolled.  And so, the examples that I gave

14       are people who were one-time prospective

15       students, then enrolled, and then talked about

16       the rankings in a way that showed those

17       rankings to be a key differentiator.

18                  So I would say that those are

19       examples of students for whom the rankings were

20       a key differentiator.

21            Q.    Now, you don't know, for those

22       students in those examples you gave, people who

23       mentioned rankings in their LinkedIn or

24       mentioned it elsewhere, whether it became a key

25       differentiator -- strike that.
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 145 of 402
Page ID #:2500

Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

 1            Whether it was a key differentiator

 2       at the time they enrolled or if it later became

 3       key differentiator when they went to go look

 4       for a job, true?

 5            A.    I can say with a reasonable degree

 6       of scientific certainty that those students and

 7       alums were exposed to the rankings.

 8            But I cannot say at the time that

 9       they were making their decision, for any

10       particular student, that it was a key

11       differentiator.  I can infer that for

12       prospective students generally it was, based on

13       2U and USC's behavior.

14            But can't speak to a specific

15       student at the time they were a prospective

16       student.

17            Q.    Thank you.

18            That was my question.

19            That's helpful.  Thank you.

20            I want to go down to paragraph 20 of

21       Exhibit 1078.

22            The last sentence of paragraph 20

23       says (as read):  Once I have set forth the

24       basic concepts and strategies that shape online

25       marketing campaigns like those at USC Rossier

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 146 of 402
Page ID #:2501

Deposition of John Chandler, Ph.D.    Campbell, et al. v. University of Southern California and 2U Inc.

1    ran, oversaw, and profited from, I will explain

2    in greater detail at how these tools were

3    deployed to recruit students to Rossier

4    specifically.

5            Do you see that?

6        A.    I do.

7        Q.    You understand that USC is a

8    not-for-profit university?

9        A.    Yes.  I'm using profited there in

10    the sense of achieved its business goals.

11        Q.    Okay.  Got it.

12            You're not opining in any way of any

13    profits earned by USC as a result of what you

14    claimed to be fraudulent ranking marketing

15    practices, true?

16        A.    That's correct.

17            ATTORNEY BRYANT:  Objection to form.

18        A.    I am talking about profit in the

19    sense of enjoyed the success stemming from

20    these practices.

21            Not in terms of filthy lucre.

22            THE COURT REPORTER:  Again, just try

23    to pause because it's hard to hear your

24    attorney.

25    BY ATTORNEY CAMPBELL:

**Exhibit 2
250**

```
 1            Q.    Flipping through, because we talked

 2       a lot about some of this stuff I have noted in

 3       your report.

 4                  So then let's go to page 16 of

 5       Exhibit 1078.  And I want to look at

 6       paragraph 56 for a moment.

 7                  THE WITNESS:  I joke that professors

 8       get paid by the word, but it really comes back

 9       when you have to scroll through all of this.

10            Q.    It definitely is in the running for

11       one of the longest reports I've read.

12            A.    You're welcome.

13            Q.    Okay.

14                  I just -- I had a question.  We

15       talked a little bit about this before.

16                  But you're talking about the

17       enrollment journey.

18                  And in paragraph 56, you say in the

19       last sentence (as read):  Through my role on

20       the campus-wide search committee for the

21       University of Montana vice president of

22       marketing communication, I was exposed to

23       strategies and practices at dozens of other

24       universities and colleges.

25                  Do you see that?
```

**Exhibit 2
251**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 148 of 402
Page ID #:2503

Deposition of John Chandler, Ph.D.                    Iredell, et al. v. University of Southern California and 2U Inc.

1         A.    I do.

2         Q.    Which are the other universities and

3    colleges to which you were exposed to their

4    strategies and practices?

5         A.    So I served on the hiring committee

6    for our vice president of marketing

7    communication.  And we received 160 or so

8    applicants, all of whom sent in CVs, cover

9    letters, marketing materials.

10              We winnowed that list down to about

11   20 people we interviewed, casting a very wide

12   net.

13              And I participated in those

14   interviews.  And in all of those interviews,

15   the candidates talked about how they performed

16   marketing at their institutions.

17              And I believe for the 20 who made it

18   to the interview round, they were all at

19   institutions of higher education.

20              And so, through the cover letters

21   and through the interviews, I had an

22   opportunity to hear them describe their

23   marketing practices and kind of what was

24   important to them.

25              And I had an opportunity to ask them

**Exhibit 2**

**252**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 149 of 402
Page ID #:2504

Deposition of John Chandler, Ph.D.    Iorwell, et al. v. University of Southern California and 2U Inc.

1    questions about it and learn how they think

2    about marketing.  And so, that's what I'm

3    talking about here.

4         Q.    Got it.

5              Were any of the 20 or so candidates

6    from what you would consider top ranked

7    universities?

8         A.    Yes.  There were a few from

9    institutions that were top 20 in sort of

10   national U.S. News & World Reports rankings.

11             We had a mix of people who ran

12   marketing for lower ranked institutions.  And

13   then people who worked on marketing teams at

14   higher ranked institutions applying for the

15   job.

16        Q.    Okay.

17             And the person you ultimately hired,

18   was that a person from a top ranked university?

19        A.    The person we ultimately hired was

20   from the University of Wyoming.

21        Q.    And do you know where the University

22   of Wyoming ranks in the U.S. News & World

23   Report ranking?

24        A.    I do not know.

25        Q.    Okay.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 150 of 402
Page ID #:2505
Deposition of John Chandler, Ph.D.                    Bewell, et al. v. University of Southern California and 2U Inc.

```
 1                    Moving right along.
 2                    Don't get too excited.  That's not
 3          where I intended to go.
 4               A.    I'll try to stay calm.
 5               Q.    It's freezing up on me a little bit.
 6                    Apologies.  Let's see.
 7                    I thought I was going to speed it up
 8          by going to a jump site, but that didn't quite
 9          work as I planned.
10                    I want to look at paragraph 84 of
11          Exhibit 1078 on page 24 of your report.
12                    In particular, you're talking about
13          the 2013 marketing overview.
14                    And you say(as read):  The 2013
15          marketing overview begins by listing the
16          ranking as the number one key message of the
17          brand identity saying, quote, top ranked school
18          of education, number 17 (U.S. News & World
19          Report.)
20                    Do you see that?
21               A.    I do.
22               Q.    And you see that you have a footnote
23          then that cites to a particular document,
24          correct?
25               A.    Yes.
```

```
 1              Q.    Let's go ahead and look at Exhibit

 2       1079, which I believe is the marketing plan

 3       you're referring to.

 4                    Are you seeing that on your screen,

 5       sir?

 6              A.    I am.

 7                    (Exhibit 1079, Marketing Plan,

 8       marked for identification.)

 9       BY ATTORNEY CAMPBELL:

10              Q.    And is this the marketing plan you

11       were referring to in that particular paragraph?

12              A.    I believe so.

13              Q.    Okay.

14                    And you, in particular, cite to

15       page 29 of this document.  So let's go there.

16                    It's freezing up on me.  I

17       apologize.

18                    I'm not actually seeing page

19       numbers, so let me try this a different way.

20                    (Document review.)

21       BY ATTORNEY CAMPBELL:

22              Q.    Okay.

23                    I'm on page 3 of 30.

24                    Do you see that?

25              A.    I do.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 152 of 402
Page ID #:2507

Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

```
 1              Q.     Okay.

 2                     When you said at 29, I thought you

 3       meant page 29 of this report.

 4                     But what you meant was the Bates

 5       number 1129.  So I'm good now.

 6                     And there's a section called key

 7       messages.  And then it says USC credibility and

 8       quality.

 9                     Do you see that?

10              A.     I do.

11              Q.     Is this the section of '23 marketing

12       plan from which you concluded that rankings was

13       a number one key message?

14                     ATTORNEY BRYANT:  Object to form.

15              A.     I can't recall with precision what

16       was back on my report.  But what I meant was

17       under key messages, top ranked is listed as the

18       first key message.

19              Q.     Okay.

20                     Let me just go back to your report.

21                     In paragraph 84, you say (as read):

22       The 2013 marketing overview begins by listing

23       the ranking as the number one key message.

24                     And tell me, again, what you meant

25       by that is it's just the first to show up on
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 153 of 402
Page ID #:2508

Deposition of John Chandler, Ph.D.                    Iyell, et al. v. University of Southern California and 2U Inc.

1    the list, true?

2         A.    It is the -- yes, if we ordered the

3    key messages, it would be the first in the list

4    or number one.

5         Q.    Okay.

6              And you read the testimony of Dr.

7    Gerber, correct?

8         A.    Yes.

9         Q.    And she said that that list was not

10   intended to be in any particular order of

11   importance.

12             Do you remember reading that?

13             ATTORNEY BRYANT:  Object to form.

14        A.    I do not remember reading that.

15             Although I am also basing this on

16   the document itself, where it is in an order

17   and this is the first one.

18        Q.    Okay.

19             Do you have any basis to conclude

20   that this order is in order of importance?

21        A.    It is standard practice, in my

22   experience, to, when you are listing things,

23   list them in an ordering where the more

24   important ones are toward the top.

25             And that is -- that is what I'm

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 154 of 402
Page ID #:2509

Deposition of John Chandler, Ph.D.                Iovell, et al. v. University of Southern California and 2U Inc.

 1    basing this on.

 2        Q.    Okay.

 3            Do you have any basis to believe

 4    that 2U followed that standard practice?

 5        A.    Yes, there are many 2U lists that I

 6    looked at across a variety of PowerPoint

 7    presentations where it seemed to me that they

 8    were ordering the list with the most important

 9    item first, which strikes me as a very standard

10    practice.

11        Q.    Can you say with any certainty that

12    it was, in fact, the number one key message of

13    the brand?

14            ATTORNEY BRYANT:  Object to form.

15        A.    The only thing that I am saying here

16    in paragraph 84 in this first sentence is that

17    it appears to be the number one key message in

18    the sense that it come first in the list and it

19    is what they are leading with.

20            I am not speaking to 2U's mental

21    state about what it represented.

22        Q.    Okay.

23            Going back to Exhibit 1079.

24            They list, as part of their key

25    messages, it looks like eight key messages.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 155 of 402
Page ID #:2510
Deposition of John Chandler, Ph.D.    Iredell, et al. v. University of Southern California and 2U Inc.

```
 1                    Do you see that?
 2          A.    I do.
 3          Q.    And one, for example, is -- sorry,
 4    the second one, for example, is that the USC
 5    Rossier school is a tier one research
 6    institution focused on urban education across
 7    all educational disciplines.
 8                    Do you see that?
 9          A.    I do.
10          Q.    And that was one of the key
11    differentiators or key messages that 2U and USC
12    Rossier were using in their advertising?
13          A.    I have not done a detailed look at
14    their marketing surrounding this particular
15    bullet point.
16                    But certainly, I would consider it a
17    key message under this umbrella of credibility
18    and quality.
19          Q.    You mentioned earlier that the
20    University of Montana had reached an R-1
21    status.
22                    Is that the same as a tier one
23    research institution?
24          A.    I suspect the answer is yes.
25          Q.    Okay.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 156 of 402
Page ID #:2511
Deposition of John Chandler, Ph.D.    Kendall, et al. v. University of Southern California and 2U Inc.

```
 1                    And when University of Montana
 2          reached that R-1 designation, for lack of a
 3          better term, it counted that in its advertising
 4          and marketing materials, correct?
 5               A.    That's correct.
 6                    And I think your terminology was
 7          perfect.
 8               Q.    Okay.  Thanks.
 9                    Because they believed that being a
10          tier one or an R-1 research institution was
11          something that students might find important.
12                    Is that fair?
13               A.    Yes.  I think that the University of
14          Montana suspected that there would be groups of
15          students where the opportunity to participate
16          in research would be an important part of their
17          decisionmaking.
18                    And the R-1 status confers the -- an
19          implicit promise of getting to rub shoulders
20          with people doing that kind of research.
21               Q.    Okay.
22                    And the third key message listed in
23          Exhibit 1079 is the 100-year history of
24          preparing educational leaders to be change
25          agents.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 157 of 402
Page ID #:2512

Deposition of John Chandler, Ph.D.                    Iglecell, et al. v. University of Southern California and 2U Inc.

```
 1                        Do you see that?
 2            A.     I do.
 3            Q.     And do you think -- strike that.
 4                   Do you have any -- well, strike
 5       that.
 6                   Do you agree that a hundred-year
 7       history of preparing educational leaders is a
 8       key message that would resonate with students?
 9                   ATTORNEY BRYANT:   Object to form.
10            A.     I am speculating here, but I suspect
11       that a hundred-year history is something that
12       would resonate with some groups of students.
13                   I think the preparing educational
14       leaders to be change agents doesn't sound like
15       something that a student would ever say.
16                   But I think the history would be
17       part of the decisionmaking process for some
18       students.
19            Q.     What about the last point, a
20       commitment to help graduates throughout their
21       careers to achieve success, do you think that's
22       a factor that students would find important?
23            A.     I think that that is probably a
24       factor that, as you put it, students would find
25       important.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 158 of 402
Page ID #:2513
Deposition of John Chandler, Ph.D.                    Ibarra-Caldwell, et al. v. University of Southern California and 2U Inc.

1          It is unclear to me how much value

2     prospective students would put on that.  Often

3     in my experience, students become more focused

4     on kind of that career placement the further

5     they go in their program.

6          Q.    For those who are seeking a graduate

7     degree in education, do you think career

8     placement is an important factor in their

9     consideration of enrolling in a school?

10              ATTORNEY BRYANT:  Object to form.

11         A.    I expect that for some students, it

12    is an important part of their decisionmaking.

13         Q.    In order to know -- you know, let's

14    pick student -- student Mr. Smith (sic).

15    That's my hypothetical student.

16              She's a principal at an elementary

17    school.  She would like to advance in her

18    career, make some more money.

19              And so, she enrolls in the Rossier

20    online Ed.D. program.

21              Okay.  That's my hypothetical

22    teacher.

23              Do you have any way of knowing what

24    factors she considered most important in her

25    decision to enroll?

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 159 of 402
Page ID #:2514
Deposition of John Chandler, Ph.D.                Iezzell, et al. v. University of Southern California and 2U Inc.

```
1         A.    No, I think, for a hypothetical
2    individual student, I don't have a way of
3    knowing how that student makes his or her
4    decision.
5              I think that in aggregate, right, if
6    we imagine a collection of hypothetical
7    students, then we can make statements about how
8    they are making their decision based on the
9    efficacy of the marketing and what messages
10   that marketing contained.
11             But for an individual student, we
12   cannot say how they make that decision,
13   certainly in the hypothetical case or generally
14   with the data that I have available.
15        Q.    And for Ms. Smith, in order to know
16   the reasons she made the decision to enroll in
17   Rossier, you would have to interview her or
18   survey her, true?
19             ATTORNEY BRYANT:  Object to form.
20        A.    I think that certainly those two
21   ways would tell us what someone was responding
22   to.
23             Yeah, I think with -- for instance,
24   going back to that example of multitouch
25   attribution.  If we had every ad exposure for
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 160 of 402
Page ID #:2515
Deposition of John Chandler, Ph.D.                Iddell, et al. v. University of Southern California and 2U Inc.

1        Ms. Smith and could see the ads that were
2        interacted with, those that weren't, if we had
3        site information and could see what sites Ms.
4        Smith visited, how much time she spent on that
5        site, then I think we could make inferences
6        about what was resonating without a survey or
7        an interview.
8                But those are the ways I would
9        imagine doing that.
10        Q.    Okay.
11                But that's not data you have for any
12        particular student who was enrolled in the
13        Rossier online program, correct?
14        A.    That's correct.  All of my data is
15        much more aggregate.
16        Q.    And when you aggregate, what you're
17        really doing in many respects is just taking an
18        average.
19                The average student, this may have
20        resonated.
21                But for any particular student, you
22        can't tell with certainty whether a particular
23        message resonated, correct?
24                ATTORNEY BRYANT:  Object to form.
25        A.    I think that, sort of generally

Deposition of John Chandler, Ph.D.                Bardwell, et al. v. University of Southern California and 2U Inc.

1    speaking, the spirit of your question is

2    accurate.  It is when you aggregate, you are

3    looking at group behavior.  And in some

4    philosophical sense, this might be an average

5    behavior.  Although we can tease out subgroups

6    within the larger group sometimes based on

7    performance.

8              Similarly, 2U employed a wide

9    variety of marketing techniques.  One of those

10   was to use the rankings extensively.  But there

11   were other types of messages.

12             For instance, in their e-mail

13   campaigns, they had a number of triggers that

14   would prod students to finish their

15   application.

16             And so, for the students who

17   received that e-mail, we can say that, again,

18   in aggregate for that small group, or that

19   smaller group, receiving reminders to finish an

20   application was effective at encouraging them

21   to finish the application.  And then ultimately

22   some of them enrolled.

23             So I think there are subdivisions

24   within this marketing pattern.  But generally

25   speaking, yes, when we aggregate, we are losing

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 162 of 402
Page ID #:2517
Deposition of John Chandler, Ph.D.                    Savell, et al. v. University of Southern California and 2U Inc.

1          that individual identification.

2                Q.    And one of the subdivisions is

3          students who maybe, for example, didn't receive

4          a single e-mail from 2U on Rossier's behalf,

5          correct?

6                A.    It is my understanding, based on my

7          review of 2U's e-mail marketing data, their

8          campaign overviews, and Dr. Gerber's testimony,

9          that all students would receive e-mails from 2U

10         on behalf of USC Rossier.

11               Q.    Isn't it true from Ms. Gerber's

12         testimony that you had to opt in to receive

13         communications from 2U?

14                     ATTORNEY BRYANT:    Object to form.

15               A.    It is my understanding that that

16         opting in was the beginning of the application

17         process.  So when someone went from simply a

18         site visitor to a lead, it seems to me that 2U

19         is using that term lead to generally mean

20         people who are in that enrollment funnel.

21                     And part of that is capturing the

22         prospective students' e-mail address and

23         enrolling them in these drip marketing

24         campaigns.

25               Q.    Give me one second here.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 163 of 402
Page ID #:2518

Deposition of John Chandler, Ph.D.                    IBell, et al. v. University of Southern California and 2U Inc.

```
 1                Do you remember Dr. Gerber, in

 2        talking about the e-mail campaigns of 2U,

 3        explaining that e-mails were sent to only

 4        people who had opted in to receive information

 5        about the program?

 6        A.    Yes.  But as I said, you know, the

 7        program could only be applied for online.

 8                And my understanding is that that

 9        opt-in was really the beginning of the student

10        moving from kind of that awareness to interest,

11        where they began a relationship with 2U via

12        e-mail.

13                And that driving people to that

14        opt-in stage was a critical component of 2U's

15        marketing plan.

16        Q.    Do you remember Dr. Gerber saying

17        that not every individual would receive e-mails

18        and it would depend on the stage they were in

19        the funnel?

20        A.    I remember -- I'd have to pull up

21        the actual --

22                THE VIDEOGRAPHER:  Excuse me,

23            Counsel.

24                The witness's counsel dropped off

25            the meeting.
```

```
 1                    ATTORNEY CAMPBELL:  Let's go off the

 2          record.

 3                    THE VIDEOGRAPHER:  Off the record

 4          1:31 p.m.

 5                    (Recess is taken.)

 6                    THE VIDEOGRAPHER:  Back on the

 7          record 1:34 p.m.

 8     BY ATTORNEY CAMPBELL:

 9          Q.    Dr. Chandler, we had a little bit of

10     a technical difficulty there.

11                    You were in the middle of answering

12     a question.

13                    Do you still have the question in

14     mind?

15          A.    I do.

16          Q.    Okay.

17                    Go ahead and finish your answer.

18          A.    So I would need to refresh my memory

19     of Dr. Gerber's specific testimony.

20                    But the statement that it would

21     depend on where someone was in the funnel, I

22     interpreted that to mean that at the very

23     highest levels of the funnel, before someone

24     had really entered the 2U system, they would

25     not have necessarily received e-mails.
```

**Exhibit 2
268**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 165 of 402
Page ID #:2520

Deposition of John Chandler, Ph.D.    Tidwell, et al. v. University of Southern California and 2U Inc.

1            So, for instance, someone who

2       clicked on a Facebook ad and landed on

3       Rossieronline.USC.edu, that person is anonymous

4       to 2U, and would not receive an e-mail.

5            As soon as a student requested

6       information, began the application process, any

7       of those things would require an e-mail

8       address.  And the evidence that I've seen

9       indicates that once 2U had an e-mail address

10      for the student, which would be a requirement

11      for the student to apply and enroll, they were

12      receiving e-mails from 2U.

13      Q.    What if I was interested in going to

14      USC because everyone in my family was a Trojan

15      and I wanted to -- I decided I wanted to get a

16      graduate degree in education.  So I typed in

17      Rossier School of Education.

18            And among the choices in the search

19      was apply now.  And I click on that apply now.

20      Now, I'm in the application and I fill it out

21      and submit it.

22            Would I have ever received an e-mail

23      from 2U -- well, 2U that was -- would have as

24      part of the message the ranking of the school?

25            ATTORNEY BRYANT:  Object to form.

1          A.    In that somewhat extraordinary

2     hypothetical, I am not sure if you would have

3     received an e-mail message with the ranking

4     information.

5               You would have also needed to avoid

6     a variety of other ways you could have seen the

7     ranking information beyond e-mail in order to

8     remain ignorant of the ranking.

9          Q.    On the application landing page, is

10    there any mention of ranking?

11         A.    To the best of my knowledge, there

12    is not.

13         Q.    Okay.

14              I'm going to move on to a new

15    exhibit.

16              Let me just check.

17              This may be a good time for a break.

18         A.    I'm happy to break for lunch now, if

19    you'd like, or go for another 20 or 30 minutes,

20    if you want.

21         Q.    Yeah, let's look just quickly at

22    Exhibit 1080.

23              (Exhibit 1080, 2014 Marketing Plan,

24         marked for identification.)

25              ATTORNEY CAMPBELL:  We'll go for ten

**Exhibit 2**
**270**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 167 of 402
Page ID #:2522

Deposition of John Chandler, Ph.D.                    Bartell, et al. v. University of Southern California and 2U Inc.

```
 1              minutes or so more, if you don't mind.
 2                      THE WITNESS:  No problem.
 3                      ATTORNEY CAMPBELL:  I don't know if
 4           it's something I did.
 5                      I'm not seeing exhibits.
 6                      THE WITNESS:  I can see it.
 7                      ATTORNEY CAMPBELL:  Okay.  It must
 8           be something I did.
 9                      Let me see if I can get back to it.
10                      There it goes.  Okay.
11       BY ATTORNEY CAMPBELL:
12           Q.    Okay.
13                 Do you see Exhibit 1080?
14           A.    I do.
15           Q.    Okay.
16                 This is what you referenced in your
17       report as the 2014 marketing plan.
18                 Do you remember that?
19           A.    Yes.
20           Q.    Okay.
21                 How do you know this is the
22       marketing plan for 2014?
23           A.    Off the top of my head, I would need
24       to probably scroll through this to see how I
25       determined that.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 168 of 402
Page ID #:2523

Deposition of John Chandler, Ph.D.                    Iscoll, et al. v. University of Southern California and 2U Inc.

```
 1              Q.    Would you mind just taking control

 2       over it, and you can double-click the document

 3       and look through it.

 4                    And just let me know how you reached

 5       the conclusion that this was the marketing plan

 6       for 2014.

 7              A.    Yes.

 8              Q.    Okay.  Thank you.

 9              A.    I have control.

10                    (Document review.)

11              A.    So I'll continue to scroll.

12                    But I suspect that this is part of

13       how I came to this conclusion, is it has

14       summary information through the first half of

15       2014.

16                    So I will continue to --

17       (inaudible.)

18              Q.    Okay.

19                    (Document review.)

20              A.    All right.  This is -- there we go.

21                    The reproduction on these documents

22       can be hard to read.

23                    (Document review.)

24              A.    Okay.  And I'm relinquishing

25       control.
```

1    I believe that I determined this was

2    the 2014 marketing plan because the charts in

3    this presentation go through about August of

4    2014.

5    And so, I identified this as a

6    document that was presumably delivered in

7    September or October of 2014.

8    There may have been associated

9    metadata with this that I was also using.  But

10    based on the content of this file, that's how I

11    came to this conclusion.

12    Q.    Got it.  Okay.

13    ATTORNEY CAMPBELL:  Paul, I don't

14    seem to be able to get control back.

15    THE VIDEOGRAPHER:  Give me a moment,

16    Counsel.  I have to reshare it.

17    ATTORNEY CAMPBELL:  Okay.

18    THE VIDEOGRAPHER:  One moment,

19    Counsel.

20    ATTORNEY BRYANT:  This is probably a

21    good time for a break because I'm going to

22    move on to the next one anyway.

23    So why don't we go ahead and go off

24    the record for the lunch break.

25    THE VIDEOGRAPHER:  Off the record

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 170 of 402
Page ID #:2525

Deposition of John Chandler, Ph.D.

Iturbell, et al. v. University of Southern California and 2U Inc.

```
 1              1:42 p.m.

 2                   (Recess is taken.)

 3                   THE VIDEOGRAPHER:  Back on the

 4              record 2:31 p.m.

 5    BY ATTORNEY CAMPBELL:

 6         Q.    Dr. Chandler, before we broke for

 7    lunch, we were beginning to go through some of

 8    the marketing plans that you identified in your

 9    report.

10              What I want to do is show you what

11    we've marked as Exhibit 1081, which is the 2015

12    online marketing plan for USC Rossier online.

13                   (Exhibit 1081,2015 Online Marketing

14              Plan, marked for identification.)

15    BY ATTORNEY CAMPBELL:

16         Q.    We'll get back to this in a moment,

17    but is this the marketing plan that you

18    reviewed and referred to in your report?

19         A.    Yes, I believe so.

20         Q.    I'm tracking your report and the way

21    your report is structured is you mentioned

22    2015, but then you sort of jump to some other

23    ones and get back to 2015.

24              So that's what I'm going to do.

25              So we'll move on to Exhibit 1082 for
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 171 of 402
Page ID #:2526

Deposition of John Chandler, Ph.D.                    Campbell, et al. v. University of Southern California and 2U Inc.

1          now.

2                    And we'll get back to Exhibit 1081

3          in just a moment.

4                    (Exhibit 1082, 2017 Online Marketing

5                Plan, marked for identification.)

6          BY ATTORNEY CAMPBELL:

7                Q.    But Exhibit 1082, that's the USC

8          Rossier online marking plan?

9                A.    For 2017.

10               Q.    And this is what you reviewed as

11         part of your analysis of the marketing and

12         advertising practices of 2U?

13               A.    That's correct.

14               Q.    Okay.

15                    Does the 2017 marketing plan

16         anywhere mention the ranking of the school or

17         that the Rossier school is top ranked?

18               A.    I don't recall if it does.

19               Q.    All right.

20                    I'll represent to you I searched the

21         document and didn't see any reference to it.

22                    Do you have -- whether rankings or

23         top rank was a key differentiator, as you

24         referred to it, in 2017?

25                    ATTORNEY BRYANT:  Object to form.

Deposition of John Chandler, Ph.D.          Iovell, et al. v. University of Southern California and 2U Inc.

1          A.    You know, I am aware that 2U was

2     continuing to use the rankings in its marketing

3     materials in 2017.

4                One aspect of these marketing plans

5     is that they tend to be delivered to a very

6     similar audience year over year.

7                And I believe, although I'm not

8     relying upon it, Ms. Courtney maybe mentions

9     this, that there were kind of these big annual

10    meetings.  And so, one aspect of these

11    marketing plans is that many of them take place

12    in the context of the ones that have gone

13    before.

14                And so, I believe your

15    representation that top ranked does not appear

16    in this.  But also, I think that it is part of

17    the context within which this marketing plan

18    was delivered to the USC audience.

19          Q.    If you move down the report towards

20    the end.  Let me get there.

21                There's some -- sorry, just freezing

22    up a little bit.

23                There's a section in the 2017

24    marketing plan on page 48 that's called the

25    keyword ranking, correct?

```
 1          A.    Yes.

 2          Q.    And what's a keyword ranking?

 3          A.    So search marketing is a marketing

 4     channel where advertisers and people on their

 5     behalf purchase keywords.  These keywords can

 6     be exact word or words that need to match a

 7     user's search query, or they can be

 8     approximate.

 9               Those keywords define when the ads

10     are shown in search marketing.  The ads in

11     search marketing are text ads.  So it's the

12     paid search link that you see on sites like

13     Google and Bing.

14               And the rankings refer typically to

15     where a given advertiser falls in the search

16     results for a given keyword.  So, for instance,

17     the most expensive search keyword in history

18     was mesothelioma, which was purchased by law

19     firms during the asbestos litigation.  And a

20     law firm would pay money to appear higher in

21     the search results.

22               And so, typically, rankings refer to

23     essentially how much money an advertiser is

24     willing to pay for a click in order to appear

25     in the search results.  And so, a ranking of
```

**Exhibit 2**

**277**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 174 of 402
Page ID #:2529
Deposition of John Chandler, Ph.D.                Iovell, et al. v. University of Southern California and 2U Inc.

1          one might mean that they are the top result

2          when someone searches for a keyword such as

3          mesothelioma.  A ranking of ten might mean they

4          are the tenth result in the search listing --

5          in the paid search listings.

6                    Sometimes keyword rankings are used

7          from a performance standpoint to refer to the

8          performance of the keyword.  So regardless of

9          where the term or the ad for that advertiser

10         falls in the results, you may be talking about

11         rankings in terms of how it performs based on

12         some metric, like cost per application in this

13         case.

14         Q.    Well, let's look specifically at the

15         keyword rankings in Exhibit 1082 on the

16         following page, with the Bates number of 42326.

17                    And this is the MAT, M-A-T, keyword

18         ranking.

19                    This is for the master's in

20         teaching, correct?

21         A.    Correct.

22         Q.    And so, let's take a look at this

23         and see if you can help me understand it.

24                    So the first keyword listed here is

25         teaching degree.

 1                    And it says Google ranked 22.

 2          Monthly search Volume 4,4000.

 3                    Do you see that?

 4               A.    I do.

 5               Q.    And so, is the Google rank, what you

 6          described a moment ago, that if someone were to

 7          search for teaching degree, that the Rossier

 8          school would show up as 22 on the list?

 9                    Is that how you read this?

10               A.    Yes, 22 on the list of paid search

11          results.  So there are natural search results,

12          as well, that Google serves regardless of any

13          kind of financial transaction.

14                    The paid search results are the ones

15          where an advertiser has essentially offered a

16          click bounty to Google if someone clicks on the

17          ad.

18                    So teaching degree, Rossier would

19          show up as the 22nd paid search.

20                    MAT online, Rossier -- excuse me --

21          Rossier would show up as the second paid search

22          result.

23                    And then the monthly search volume

24          gives us an indication of, presumably over the

25          course of 2017, an average of how many times

1    someone search -- performed a search on Google

2    that included the phrase listed in the keyword

3    column.

4         Q.    And you're sure these are keyword

5    rankings for paid advertisements -- paid

6    rankings or whatever you called them?

7              ATTORNEY BRYANT:  Objection to form.

8         A.    I would be surprised if they were

9    natural search results.  Typically, this is

10   talked about in marketing materials as paid

11   search, because that is a lever that

12   advertisers can easily control.

13             The natural search results can be --

14   I mean the word manipulated here not in a

15   sinister way, but can be affected by search

16   engine optimization techniques or SEO

17   techniques.

18             So it's possible that these are

19   unpaid, but I would expect them to be paid.

20        Q.    Got it.

21             Help me to understand.

22             So I'm starting an online graduate

23   school of education.  And one of the ways I

24   want to promote and market and advertise my new

25   school is through paid searches.

Deposition of John Chandler, Ph.D.                    Hartwell, et al. v. University of Southern California and 2U Inc.

```
 1                    I assume I reach out to Google or
 2         one of the search engine companies to engage in
 3         a transaction where I'm going to pay for a
 4         certain rank.
 5                    But how do I know what phrase or
 6         phrases I should be paying for?
 7              A.    So a couple of just sort of small
 8         modifications to this hypothetical.
 9                    The purchasing of search advertising
10         is -- would be done just by you without
11         interacting with a human on Google's side.  And
12         let's just continue to use Google as an
13         example.
14                    So you would go to Google Ads.  You
15         would create a profile.  You would give them
16         your credit card.  And then you would have the
17         opportunity to purchase keywords.
18                    You can kind of sit around a
19         conference room with a lot of coffee and just
20         come up with an initial list.  You can feed
21         Google your nascent Web pages and they will
22         process them and suggest some keywords for you.
23                    Once you've been advertising for a
24         while, Google will continue to suggest new
25         keywords for you to purchase.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 178 of 402
Page ID #:2533

Deposition of John Chandler, Ph.D.                Iovino-Young Bell, et al. v. University of Southern California and 2U Inc.

1          One other point of clarification.

2   You can't purchase a ranking spot.  Google's

3   algorithm, by which it determines which search

4   ads to show, is proprietary.  But largely

5   speaking, it's based on two metrics.

6          One is the amount of money you're

7   willing to pay per click.  And the other is

8   Google's of estimate of the probability that

9   someone will click on your ad.

10          I worked on the Bing search team for

11   about a year, so we did things very similarly.

12          If you multiply that probability

13   times the cost-per-click, that's an expected

14   value per search.  What Google is trying to do

15   is maximize that expected value.

16          And so, you can control how much

17   you'll pay.  And by cranking up that amount,

18   you can influence your ranking.

19          But Google is also focused on

20   providing a high quality search experience for

21   the people who are looking for your program.

22          And so, if your online school --

23   let's say it's an online law school.  You could

24   buy the keyword "best online medical school"

25   and offer to pay a thousand dollars per click.

1    But Google might not ever show that your search

2    ads.

3         I think we might have just lost

4    Chris again.

5         Oh, never mind.  Sorry.  It's just

6    the video thing.  Apologies.

7         I have the hide nonvideo

8    participants.

9         THE WITNESS:  So, Chris, if you turn

10    off your video, I lose you on my display.

11    A.    So Google is also controlling what

12    ads are shown.  And Google will give you

13    estimates of, if you change the cost-per-click

14    you are offering, where they estimate it will

15    land you in the ranking.

16    Q.    Okay.

17         And so, here, looking at the MAT

18    keyword rankings, teaching degree, when -- when

19    folks searched for teaching degree, USC Rossier

20    showed up as the 22nd search result, most

21    likely paid search result, correct?

22    A.    That's correct.  And that would be

23    probably appear on the second or third sort of

24    page of search results.  Although in many

25    cases, it's an infinite scroll.

**Exhibit 2**
**283**
Page: 178

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 180 of 402
Page ID #:2535

Deposition of John Chandler, Ph.D.                                    Iovell, et al. v. University of Southern California and 2U Inc.

1      Q.    Okay.

2            And I noticed here that in these

3      keywords ranking, that there's no mention of

4      top ranked or any U.S. News & World Report

5      ranking; is that correct?

6      A.    That's correct.  I don't see a

7      reference to top ranked or a numerical ranking

8      in their top keywords.

9      Q.    Okay.

10            And the idea behind keyword ranking

11      is you want to maximize your spot in the Google

12      rank by using terms that are likely to be

13      searched by prospective customers, correct?

14            ATTORNEY BRYANT:  Object to form.

15      A.    Generally speaking, this kind of

16      search marketing that we're looking at -- and

17      this is called nonbranded search because USC

18      and Rossier don't appear in these keywords.

19            Generally speaking, the purpose of

20      these campaigns is to help people who are

21      interested in what you have to sell or in your

22      program to find your site.

23            And so, what you are trying to do is

24      anticipate what sort of terms a person who is

25      looking for your program and ideally getting

1    kind of -- they are primed and ready to apply,

2    you're trying to determine what sort of terms

3    they would search for.

4         Q.    Okay.

5              And these are the terms in 2017 that

6    were ones most likely to be searched by

7    prospective students of Rossier for the MAT

8    program?

9              ATTORNEY BRYANT:   Object to form.

10        A.    Yes, my interpretation of this is

11   that these were the highest volume or highest

12   performing keywords that 2U was using in 2017.

13        Q.    Got it.

14             And similarly, if you continue down

15   the page to the Ed.D. OCL keyword rankings,

16   these were the top keywords by volume that 2U

17   or that -- that prospective students were using

18   to find Ed.D. OCL programs?

19        A.    That's correct.  That is my

20   interpretation of this, is that this is how

21   people were finding Ed.D. programs.

22             And so, I think we can infer from

23   this that students were unlikely to or less

24   likely to search for, for instance, top ranked

25   Ed.D. program and more likely to search for

1    something like Ed.D. program.

2        Q.    Got it.

3            More generically, just an Ed.D.

4    program or Ed.D. doctorate, things of that

5    nature.

6            Okay.  On Exhibit 1082, I actually

7    have a color version, a cleaner version of the

8    2017 marketing plan tagged at the end of the

9    black and white version that was the production

10    version in this case.

11            So I wanted to show you that just

12    because there are a few tables and charts that

13    use color coding, that I thought would be

14    easier to read and understand in a colored

15    version.

16            So scrolling through -- and just to

17    be clear for the record, at the end of the 2017

18    marketing presentation at 42330, I tagged onto

19    this Exhibit A identical version of the 2017

20    marketing plan, but just in its original format

21    in color without Bates numbers.  Okay.

22            Are you with me on that, Dr.

23    Chandler?

24        A.    I am.

25        Q.    Okay.  Great.

**Exhibit 2**
**286**

1          Okay.  So I'm looking at a page

2     which is page 63 of 106 of Exhibit 1082, that

3     shows the 2016 enrollment enrollments by

4     source, and then it says master's.

5          Do you read this as being a summary

6     of sources of enrollment for the master's

7     program at Rossier in 2016?

8          A.    I read it slightly differently,

9     maybe.

10          Q.    Okay.

11          A.    So this use of source is not the way

12     I think normal people would use source.  I

13     think a kind of common definition of source in

14     this sense would be, where did they come from.

15          The way that source is typically

16     used in this kind of context is essentially to

17     mean referring URL.  So as we were talking

18     earlier today, if someone clicks on an

19     advertisement, we know much more than if they

20     simply view it.

21          If someone clicks on, let's say, a

22     paid search ad, then as part of that click

23     event there's a referring URL that carries

24     along information that indicates what keyword

25     was clicked on, what search engine.  And that

Deposition of John Chandler, Ph.D.                    Iliescu-Haskell, et al. v. University of Southern California and 2U Inc.

```
 1           is used to define the source of the visit.
 2                    This direct source and, you know,
 3           typically, direct is used without a modifier
 4           here.  It says direct apply.
 5                    But the standard term in marketing
 6           is just direct as a source.  What that means is
 7           we don't have that attendant information.
 8                    So this may be someone who visited
 9           the page before via a method we can track and
10           now they've come back just by typing in
11           Rossieronline.USC.edu.  This may be someone who
12           is kind of in the system, but has cleaned out
13           their cookies, changed browsers, that sort of
14           thing.
15                    And so, this direct apply are people
16           who showed up at the website.  And this may
17           mean at the application website without that
18           referring URL.  They navigated there not via a
19           click or not via a click that was tracked.
20           Q.    And it's not just URLs.
21                    I mean, it includes clicks from paid
22           e-mails as well, correct?
23           A.    Yes, the referring -- like,
24           technically speaking, when you click on a paid
25           e-mail, you are requesting an URL from a server
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 185 of 402
Page ID #:2540

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1      that bounces you to the landing page.

2                    So it's a similar mechanism.  But

3      what they've done here is they have rolled up

4      all of their referring traffic into these

5      categories.

6                    So we can see direct apply, which we

7      can use synonymously as source unknown.  It has

8      33 percent of the traffic.

9                    Web, which is, I would presume here,

10     a click from a different part of the website.

11     It's 26 percent of the traffic.

12                    Paid search is next highest.  And

13     then it falls off after that.

14          Q.    So, Dr. Chandler, you indicated that

15     direct apply is a situation where you don't

16     know where they came from.

17                    But they actually have a category

18     called unassigned as well, don't they?

19          A.    They do.

20          Q.    Are you certain that direct apply is

21     unknown as opposed to they know exactly where

22     they came from; they came right to the website

23     through the -- to the application page?

24                    ATTORNEY BRYANT:  Object to form.

25          A.    I am virtually certain.  This use of

**Exhibit 2
289**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 186 of 402
Page ID #:2541

Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

 1          direct is very common.

 2                    And assigned -- unassigned could be

 3          mean something like a corrupted cookie or

 4          something anomalous.

 5                    In the vast majority of cases, this

 6          direct navigation is the most common way for

 7          people to show up on a website.  Speaking from

 8          the experience of retail advertising, as well

 9          as higher Ed.

10          Q.    It could include, as I described

11          earlier in a hypothetical, a student who's just

12          simply searched for Rossier and clicked on the

13          apply button and applied and didn't see any

14          marketing materials, went straight to the

15          application page, correct?

16                    ATTORNEY BRYANT:  Object to form.

17          A.    Typically, the -- if somebody -- so

18          in that hypothetical that you went through, if

19          someone searched for apply to Rossier, they

20          would receive both paid search links, in this

21          case, they would be branded search links, and

22          they would receive natural search links.

23                    It's unclear to me where natural

24          search appears here.  I suspect it could be

25          included in direct apply.  It could be included

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 187 of 402
Page ID #:2542

Deposition of John Chandler, Ph.D.                    Iniell, et al. v. University of Southern California and 2U Inc.

 1    in other inbound.

 2                    The only way to avoid that sort of

 3    ability to track where you came from would be

 4    if this hypothetical person opened up a new

 5    browser tab and typed the URL for the

 6    application.  You know, which would be

 7    something like Rossieronline.USC.edu/apply.  Or

 8    something like that.

 9                    So it's possible to arrive directly

10    to the application page without the ability to

11    track it.  But it's quite unlikely because

12    those URLs don't allow for any mistakes in

13    typing.

14                    And so, most people would come in

15    via a search in this kind of hypothetical.

16         Q.    And looking for the master's program

17    as the sources of enrollment, paid e-mail shows

18    up as a zero percent, correct?

19                    ATTORNEY BRYANT:  Object to form.

20         A.    Yes, I think that is how we're meant

21    to interpret this graph, is that there were no

22    people whose -- and again, I assume we're using

23    last touch attribution here.  So what was the

24    last thing that someone did.

25                    And so, it appears that in 2016,

1    they did not have anyone who clicked on a paid

2    e-mail listing and then had that as their last

3    touch.

4              And so, you know, this conforms with

5    our thinking about the funnel, right.  The

6    e-mail campaigns were used in a variety of

7    places in the funnel.  But, you know, they were

8    -- I mean, they were prompting people to finish

9    applications.  But it looks like people were

10   still visiting, you know, various parts of the

11   website or using paid search perhaps in a

12   navigational way.  That's what that 19 percent

13   would represent -- (inaudible) -- a white paper

14   on navigational search, which is really just

15   paid search that is used to navigate the Web

16   versus change consumer behavior.

17        Q.    Okay.

18              Do you know what the reference to

19   portal is here in the green?

20        A.    Yes.  So there were a handful of

21   websites, I believe, that were not owned and

22   operated by 2U.

23              The mini sites would've been

24   operated by 2U.  But the portals were a flavor

25   of affiliate marketing.  I can't remember the

**Exhibit 2**
**292**
Page: 187

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 189 of 402
Page ID #:2544

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

 1          names of the main ones that 2U used off the top

 2          of my head.

 3                    But the way that these portals work

 4          is they are aggregators of information about

 5          graduate programs.  And then students who click

 6          on a link from the portal and arrive at Rossier

 7          generate a cost to 2U, where 2U will pay for

 8          that referral.

 9                    So this is broadly under the

10          category of affiliate marketing.  And my

11          recollection is there were two or three of

12          these portals that 2U used over time.

13               Q.    Okay.

14                    So when you go to the next page of

15          this document, the 2016 enrollments by source,

16          Ed.D. OCL, I notice here that there is no

17          direct apply.

18                    Does that mean we know the source

19          for every person who enrolled in the Ed.D. OCL

20          program?

21               A.    It would be impossible to know the

22          source in every case.  And so, I don't know who

23          if the person who made this didn't plot the

24          direct.

25                    That's a very common practice for

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 190 of 402
Page ID #:2545

Deposition of John Chandler, Ph.D.                    Iskell, et al. v. University of Southern California and 2U Inc.

 1            people doing marketing analytics is to just not

 2            include direct because it's hard to make

 3            inferences based on -- or it's hard to make

 4            recommendations for actions based on that.

 5                    It's extremely difficult for me to

 6            imagine that there is no -- there's no direct

 7            traffic to the Ed.D. page.  And it appears that

 8            a large fraction came from other parts of the

 9            website.  So maybe this page was hard to

10            navigate to and people didn't bookmark it.

11                    I'm not sure what's happening here.

12            Q.    Okay.

13                    And here, when you look at the 2016

14            enrollments by source, paid e-mails doesn't

15            show up here, correct?

16            A.    That's correct.  Paid e-mail is not

17            on this list.

18            Q.    Okay.

19                    And it looks like paid social is

20            about one percent?

21            A.    Yes, I think that one actually

22            doesn't have a label.  But it's between one and

23            two percent.

24            Q.    Yeah.  Fair enough.  Okay.

25                    Got it.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 191 of 402
Page ID #:2546

Deposition of John Chandler, Ph.D.    Caldwell, et al. v. University of Southern California and 2U Inc.

1              I think we're done with this

2       exhibit.

3                   Okay.  For now, we'll jump back to

4       Exhibit 1081, which is the 2015 marketing plan.

5                   Are you seeing that on your screen?

6          A.    I am.

7          Q.    And at the end of this marketing

8       plan -- I apologize, it's just a little slow

9       for me -- it references an appendix.

10                  Do you see that?

11         A.    I do.

12         Q.    And the appendix lists four items,

13      correct?

14         A.    Yes.

15         Q.    Did you look at any of the documents

16      referenced here in the appendix?

17         A.    I don't recall seeing anything below

18      this.  I've seen this page.

19         Q.    Okay.

20                  Do you think it would be important

21      to know more about the brand and programming

22      messaging as reflected in the third bullet?

23         A.    I think that I know a great deal

24      about the brand and program messaging.  But I'm

25      interested in what this appendix holds.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 192 of 402
Page ID #:2547
Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1          Q.    And what about audience and

2     messaging research, would you be interested in

3     seeing that?

4          A.    Yes.

5          Q.    Did you ever ask for either of these

6     documents as part of your -- your analysis of

7     the nearly 40,000 documents?

8          A.    I -- I searched for keywords that I

9     would expect would turn this -- turn up these

10    documents.

11         Q.    Okay.  That wasn't my question.

12              My question was:  Did you ask anyone

13    for those documents?

14         A.    It's possible that I asked

15    Ms. Robertson, our researcher, to look for,

16    again, keywords that would include what's

17    listed here in items 3 and 4.

18              I did not make a specific request to

19    anyone for these appendix items.

20         Q.    Okay.  Got it.

21              Okay.  In the 2014 marketing plan,

22    like the marketing plan we looked at a moment

23    ago in 2017, they have a keyword ranking,

24    correct?

25         A.    That's correct.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 193 of 402
Page ID #:2548

Deposition of John Chandler, Ph.D.                Iovell, et al. v. University of Southern California and 2U Inc.

1    Q.    This one doesn't specify whether

2    it's for the MAT or the OCL, right?

3                ATTORNEY BRYANT:  Objection to form.

4    A.    That's correct.  Although generally,

5    we can infer from the keyword itself what

6    program it's designed to attract prospective

7    students for.

8                There are some, like becoming a

9    teacher and teaching credential, that probably

10   apply to both programs.

11   Q.    Okay.

12               And again, on this particular

13   keyword ranking, there's no ranking for top

14   ranked or any reference to the U.S. News &

15   World Report, correct?

16   A.    That's correct.

17               And again, I infer from that that

18   students were unlikely to top ranked or a

19   specific numerical ranking in the search terms

20   they were using on Google.

21   Q.    I want to jump back to your report.

22               I don't know if you can see it on

23   your end, but I'm getting the wheel of death --

24   or there it goes.

25               And in particular, look at

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 194 of 402
Page ID #:2549

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1        paragraph 94.

2                        This is mentioned in the context of

3        the 2015 marketing plan, which is why I'm

4        jumping here.

5                        You say here (as read):  It's also

6        worth noting that 2U planned to present its

7        staff as admissions counselors, a role

8        typically given to staff persons within the

9        university, in order to guide students through

10       the educational decisions.

11                       As we will see below, these

12       marketers, presenting themselves as counselors,

13       worked aggressively to enroll USC Rossier

14       students online.

15                       Why does this matter?

16            A.    You make a fair point.

17                       I think that, as someone who works

18       in higher education, I was bothered by this

19       fact.  It struck me as a misrepresentation.

20                       But it is not directly germane to my

21       assignment.  And I don't believe I offer any

22       opinions to which it relates.

23            Q.    Okay.

24                       That was going to be my next

25       question.  So I appreciate your candor, Dr.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 195 of 402
Page ID #:2550

Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

1      Chandler.

2              And just to be clear, there is, in

3      the lawsuit filed, there's some mention of the

4      incentive compensation ban.

5              You're not offering any testimony on

6      that particular topic, correct?

7          A.    Unless my opinions somehow bear on

8      that in a way that I can't currently

9      anticipate, I am not intending to offer

10     opinions on that.

11         Q.    Okay.  Great.

12             I want to move on.

13             We talked a little bit about this

14     earlier, your use of the word fraudulent.

15             In paragraph 103, you say (as read):

16     Plaintiffs allege that for years, USC submitted

17     inaccurate and incomplete data.

18             Is that a fair substitute to your

19     term fraudulent ranking in light of our earlier

20     conversation; in other words, inaccurate and

21     incomplete data?

22             In other words, is that what you

23     meant by fraudulent?

24         A.    I think by fraudulent, what I meant

25     was the inaccurate and incomplete data that

Deposition of John Chandler, Ph.D.    Bradwell, et al. v. University of Southern California and 2U Inc.

1  caused U.S. News & World Report to rank USC

2  higher than it would have if it had received

3  correct data.  So I think that's what I mean by

4  fraudulent.

5      Q.    How do you know that it caused U.S.

6  News & World Report to rank USC higher?

7          Did you study that?

8      A.    I am basing that on documents I

9  reviewed for this case.  So things like the

10  Jones Day report.

11      Q.    And did Jones Day reach the

12  conclusion that USC was ranked higher than it

13  should have been in light of the incomplete or

14  inaccurate data?

15      A.    That was my impression based on

16  reading it, and also based on e-mail

17  communications when the practice came to the

18  attention of the dean that followed Dean

19  Gallagher, Dean Noguera.

20          I believe that they were discussing

21  this as Rossier reported inaccurate statistics

22  and received a better ranking than they

23  deserved.

24      Q.    Now, to be clear, Dr. Chandler,

25  though, you're not offering any opinion about

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 197 of 402
Page ID #:2552

Deposition of John Chandler, Ph.D.
Favell, et al. v. University of Southern California and 2U Inc.

1    USC's -- the Rossier's school's ranking as to

2    whether it would be higher or different as a

3    result of what you view as incomplete and

4    inaccurate data, correct?

5         A.    That's correct.  I'm not offering an

6    opinion on what the ranking would have been

7    with correct data or something like that.

8         Q.    So forgive me if I asked this

9    question earlier.

10              You looked at a lot of marketing

11   materials and marketing plans.

12              The opinions that we went through

13   this in this case that you offered, am I

14   correct that you're offering opinions -- I did

15   ask this question.

16              The period of time from 2013

17   forward.

18              I'll strike that question, because

19   now, as I started to ask it, I recall that we

20   actually spoke about that earlier.  So forgive

21   me.

22              I want to look at paragraph 104 in

23   Exhibit 1078 on page 34.

24              And in the second sentence, you say

25   (as read):  The report focused on the fact that

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 198 of 402
Page ID #:2553

Deposition of John Chandler, Ph.D.                    Iredell, et al. v. University of Southern California and 2U Inc.

1    USC had counted only a small portion of its

2    in-person doctoral students and no online

3    doctoral students in connection with the

4    student selectivity metric.

5            What specifically did Rossier report

6    in terms of the doctoral students to U.S. News

7    & World Report?

8        A.    I would probably have to refresh my

9    memory in order to remember this with

10   precision.

11           My recollection is that there were

12   some places where USC reported information

13   related to its Ph.D. programs and represented

14   those as being part of the Ed.D. online

15   program.

16           And again, my impression of it at

17   this distance from reading the report was that

18   USC was not consistent in the way it reported

19   its selectivity and enrollment numbers, and was

20   inconsistent in a way that benefitted Rossier

21   in terms of rankings.

22       Q.    But you don't recall the specific

23   details about what information it chose to

24   report versus what information it didn't choose

25   to report?

```
 1            A.    It has been too long since I read
 2     this report.
 3            Q.    And you're not offering any opinion
 4     on that particular topic, correct?
 5            A.    That's correct.  The opinions that
 6     I'm offering are limited to my list of opinions
 7     at the top.
 8            Q.    Okay.
 9                  Moving down to paragraph 108.
10                  Last paragraph of paragraph 108
11     states (as read):  Plaintiff allege that data
12     manipulation was intentional.
13                  First of all, are you offering any
14     opinion about whether any alleged data
15     manipulation was intentional?
16            A.    I am not.
17            Q.    And I think we talked about a second
18     ago the inflated rank allowed USC to increase
19     enrollment and tuition charged in these online
20     programs.
21                  Are you offering any opinion about
22     whether the alleged inflated rank allowed USC
23     to increase its enrollment?
24            A.    I'm not offering a specific opinion
25     on that.
```

1          Although could I see just footnote

2    64 to see what I'm citing to there.

3          Q.    Of course.

4                (Document review.)

5          A.    Oh, okay.  This is just the second

6    amended complaint.

7                Yes.  So I'm not offering an opinion

8    on this.  I am referencing the complaint.

9          Q.    Okay.

10               And then similarly, where you say

11   plaintiffs allege data manipulation and the

12   inflated rank allowed USC to charge more in

13   tuition, are you offering an opinion about

14   that?

15         A.    I am not.

16         Q.    Okay.

17               You would agree with me, Dr.

18   Chandler, that in the context of education,

19   supply is not unlimited.

20               Is that fair?

21               ATTORNEY BRYANT:  Object to form.

22         A.    Supply in the sense of classroom

23   capacity for graduate programs?

24         Q.    Yes.

25         A.    Generally speaking, over the last

 1   ten years, supply has exceeded demand.  But I
 2   would -- yeah, I'm not offering an opinion on
 3   the extent to which supply is infinite or
 4   limited.
 5           From a philosophical standpoint, I
 6   am happy to say that it is not truly infinite.
 7       Q.    Okay.
 8           And in terms of customers --
 9   customers, students of education have some
10   differences than customers of, for example,
11   retail products.
12           Would you agree that there's
13   differences in their characteristics?
14           ATTORNEY BRYANT:  Objection.
15       A.    I think -- sorry, Chris.
16           THE WITNESS:  Lisa, did you catch
17       that?
18           THE COURT REPORTER:  I caught his
19       objection.
20           Did you answer?
21           THE WITNESS:  I have not.  I was
22       about to.
23       A.    I wanted to make sure I didn't talk
24   over the objection this time.
25           I think that there is a wide space

Iovell, et al. v. University of Southern California and 2U Inc.

1    of retail products.  Some are very

2    different from an education purchase.  So

3    things like consumer packaged goods,

4    clothing, anything that could be a real

5    impulse purchase.

6              I think there are other retail

7    transactions that are maybe closer to the

8    decision to enroll in a university.

9              And so, ones that I have worked on

10   that I think might be closer are things like

11   financial services.  So someone depositing

12   $25,000 or $50,000 in a mutual fund, that is a

13   client that I worked for that is a high

14   consideration purchase.  People tend to do a

15   great deal of research before that.

16             Another retail sale might be a car

17   purchase.  Where -- well, some people perhaps

18   purchase cars I impulsively, most people do a

19   lot of research on cars.  And the techniques

20   can be much more similar to what's happening

21   with education.

22             So I think it's complicated.

23             But there are certainly some

24   products that are very different from online

25   education.

**Exhibit 2**
Page: 201
**306**

1        Q.    And one of the differences in

2    education, in general, is that not every person

3    who's interested in enrolling in a school,

4    whether it's online or in person, is actually

5    accepted to that school, correct?

6             ATTORNEY BRYANT:  Object to form.

7        A.    I think that that is a potential

8    difference.

9             The University of Montana, for

10   undergraduates, has an acceptance rate of

11   roughly 94 percent.  And so, the people we are

12   not accepting lack things like a high school

13   diploma or a GED.  And so, there are some

14   places where applicants are accepted if they

15   meet the criteria of the institution.

16            There are other more competitive

17   schools where not everyone who applies receives

18   an acceptance.

19       Q.    And the USC Rossier school is more

20   like the latter, where it's more competitive

21   and not everyone who applies is accepted,

22   correct?

23       A.    I did not review acceptance

24   information for this, so I don't know.

25       Q.    Got it.  Okay.  Fair enough.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 204 of 402
Page ID #:2559
Deposition of John Chandler, Ph.D.    Russell, et al. v. University of Southern California and 2U Inc.

 1              In paragraph 111, they're talking

 2      about the misreported ranking in the USC's

 3      marketing materials.

 4              And you say in paragraph 111 (as

 5      read):  The marketing expert at -- marketing

 6      experts at 2U were correct in their assessment

 7      of the impact of rankings on prospective

 8      students.

 9              What do you mean by that?

10      A.    Can we scroll up just a little bit

11      so we can also see -- (inaudible.)

12      Q.    Of course.

13      A.    So the marketing overview documents

14      mention this -- the ranking as a key

15      differentiator, a key message, that sort of

16      thing.

17              What I mean by the first sentence of

18      paragraph 111 is that I don't just have to rely

19      on 2U's written assessment of whether or not

20      the ranking was important.  And what I am --

21      what the rest of this paragraph discusses is a

22      new rankings release in early 2018.

23              And then Amber Sommerville, who's a

24      USC employee, sent an e-mail to Dean Gallagher

25      that showed the very high level of interest and

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 205 of 402
Page ID #:2560
Deposition of John Chandler, Ph.D.                Iniguez-Bell, et al. v. University of Southern California and 2U Inc.

1    engagement with the rankings when these new

2    ones came out.

3              And so, the commentary in the bullet

4    points are quotes from Ms. Somerville's e-mail,

5    and I'm using them to illustrate that when new

6    ranking information came out, it was highly

7    salient to the audience.

8         Q.    Well, how big was the audience?

9         A.    The -- you know, I don't know how

10   many e-mails went to the prospective student

11   e-mail list.  At times, that was scores of

12   thousands of prospective students.

13             The newsletter, you know, 559

14   clicks, I'm not sure what the click-through

15   rate was, so I don't know the denominator of

16   that.

17             But -- so the audience, I would

18   guess, would be in the under a quarter million,

19   roughly, size.

20             And then these metrics indicate

21   interactions and things like site visits and

22   open rates on e-mails.

23        Q.    Who was the audience?

24        A.    It depends on the type of message.

25        Q.    Let's go through each one of these.

1          On the website, who was the audience

2     on the website for this particular message,

3     this news article?

4               ATTORNEY BRYANT:  Object to form.

5          A.   So on the website, we have what I

6     would sort of maybe say is -- are several

7     different audiences.

8               We have prospective students.  We

9     have enrolled students.  We have alums.

10    Faculty and staff could potentially be

11    interested in this as well.

12              And so, the website is a broad,

13    general set of audiences.

14         Q.   Okay.

15              And then focusing on the website for

16    a moment.

17              Of the 2,606 page views of the

18    rankings news article, you can't tell me how

19    many of those were prospective students,

20    correct?

21         A.   That's correct.  The data is not

22    broken down to show me prospective students.

23              And I am using this evidence to just

24    show that the rankings were an engaging topic

25    for website visitors.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 207 of 402
Page ID #:2562

Deposition of John Chandler, Ph.D.    Russell, et al. v. University of Southern California and 2U Inc.

1      Q.    If the audience was 250,000 people,

2    based on what you said, do you view that the

3    2,606 page views was material?

4      A.    It was the highest visited page and

5    had roughly 13 times -- or no, more than that,

6    maybe 20 times the visits of the next highest

7    visited page.

8              So yes, I would say that this is

9    material.

10     Q.    Not immaterial to websites, because

11   maybe it's a crummy website and no one visits.

12             But my question is, if the potential

13   audience is 250,000 people, as you said

14   earlier, is 2,606 page views of an -- would you

15   be happy with that, that page view, if you

16   presented an article on Montana's website and

17   your audience was 250,000 people?

18             ATTORNEY BRYANT:  Object to form.

19             You can answer.

20     A.    Just to clarify that.  Under a

21   quarter million, I was including all four

22   bullet points in there.

23             So I was also talking about Facebook

24   audience and things like that.

25             But I mean, the answer to your

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 208 of 402
Page ID #:2563

Deposition of John Chandler, Ph.D.                    Widell, et al. v. University of Southern California and 2U Inc.

1    question is, like, yes, if I put together some

2    information and had it posted on UMT.edu and it

3    generated the most page views of any page on

4    the site and exceeded the next highest page by

5    a factor of 20, I'd be ecstatic.

6         Q.    But all of that's relative, sir,

7    right?

8              It's -- I mean, if very few people

9    visit your website, any activity is going to be

10   a multiple of visits that you're used to?

11             ATTORNEY BRYANT:    Object to form.

12        A.    I'm prepared to agree that it is

13   relative.

14             You know, a site that is trafficked

15   very little will have small page view counts.

16   A site that is trafficked by tons of people

17   will have high page view counts.

18             We know that this is not a low

19   quality Web page.  I reviewed the Web page.

20   The Rossieronline.USC.edu and the

21   Rossier.USC.edu pages were high quality pages.

22   They received a great deal of traffic over the

23   period of time that I looked at their data.

24             And so, again, you know, the thing

25   that I want to highlight is new rankings

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 209 of 402
Page ID #:2564

Deposition of John Chandler, Ph.D.    Birtell, et al. v. University of Southern California and 2U Inc.

```
 1          generated the most page views of any page on

 2          this site.

 3               Q.     Are you sure it's in the entire site

 4          or is it within the news portion of the site?

 5               A.     I am not entirely sure that

 6          parenthetical statement highest visited page is

 7          pretty -- (inaudible.)  It's possible that

 8          Ms. Sommerville meant highest visited news page

 9          and just didn't write news.

10               Q.     Okay.

11                      I want to go back to the 250,000

12          estimate you gave about the potential audience

13          for this message.

14                      How did you come up with that

15          number?

16                      ATTORNEY BRYANT:  Object to form.

17                      You can answer.

18               A.     When you asked the question about

19          potential audience, I quickly scanned the

20          bulleted list to remind myself of what was on

21          it.  And in my head, I sort of quickly summed

22          up some numbers like total page views to the

23          websites.

24                      Which are on the order of, you know,

25          my recollection, again, off the top of my head,
```

 1    was kind of 100- to 300,000 over the course of

 2    the year.

 3                And so, I estimated that potentially

 4    in a week or a couple weeks, 25-, 50,000,

 5    75,000 people could have theoretically seen the

 6    website.

 7                The e-mail to prospective students,

 8    2U was harvesting e-mails from students who

 9    were interested.  But they were also purchasing

10    e-mails.  And it purchased tens of thousands of

11    those.

12                So I added those together.

13                I don't know about the newsletter

14    circulation or certainly didn't know off the

15    top of my head, so I didn't really include that

16    in my estimate.

17                And then Facebook, they were not

18    paying to promote this, I assume.  And so,

19    we're looking at tens of thousands of people

20    potentially could see it.  And I couldn't sum

21    those up in my head very quickly.

22                And so, I said under 250,000 in an

23    effort to be conservative.

24          Q.    Okay.

25                And you don't know how many e-mails

1    went out to prospective students, correct,

2    specifically during this period?

3        A.    In this case, I do not know

4    specifically how many e-mails went out to

5    prospective students.  But I am aware of data

6    that indicates, again, tens of thousands of

7    e-mail addresses that 2U had access to.

8            And so, that was the estimate that I

9    was using.

10        Q.    Got it.

11            And the e-mail to prospective

12    students, less than half opened up the e-mail,

13    correct?

14        A.    That is correct.

15            And I agree with Ms. Sommerville's

16    contention that that is impressive.

17        Q.    So there's 51 percent of the people

18    who never saw that message.

19            You would agree?

20            ATTORNEY BRYANT:  Object to form.

21            ATTORNEY CAMPBELL:  At least through

22    -- excuse me.  I'm sorry, Chris.

23    BY ATTORNEY CAMPBELL:

24        Q.    At least through the e-mail to

25    prospective students?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 212 of 402
Page ID #:2567

Deposition of John Chandler, Ph.D.                    Savell, et al. v. University of Southern California and 2U Inc.

```
 1                    ATTORNEY BRYANT:  Object to form.

 2           A.    It is correct that the estimate of

 3     the number of people who didn't open the e-mail

 4     or didn't open the e-mail in a way that's

 5     trackable is 51 percent.

 6                  In order for people who send e-mails

 7     to know that the e-mail was opened, the person

 8     on the receiving end has to agree for the

 9     images to be shown.

10                  By default, Gmail, for instance,

11     does not show those images and then you have to

12     click at the top and say show images from this

13     sender or always show images from this sender.

14                  So some people may have opened it

15     without images, and then those people would

16     show up as not opening it because they couldn't

17     be tallied.

18                  So again, to your point earlier,

19     it's relative.  And so, this is a high open

20     rate for an e-mail.  But it doesn't give us a

21     perfect picture of how many people actually saw

22     it.

23           Q.    And then with respect to the

24     newsletter, there's 559 clicks through the

25     special e-newsletter.
```

 1              And I think you told me you don't

 2       know what the circulation of that newsletter

 3       was back then, correct?

 4          A.    That's correct.

 5              And I also don't know what this

 6       second clause, open rate of 72 percent among

 7       USC deans, means.

 8              I can't imagine having enough deans

 9       that you could calculate a fraction of those

10       who are opening it at 72 percent.

11              So I'm not crystal clear on what the

12       newsletter is showing other than

13       Ms. Sommerville thought it was notable.

14          Q.    And then Facebook, 127 users shared

15       our post, netting 891 reactions.

16              In 2018, what were the number of

17       prospective students for the USC Rossier online

18       program?

19              ATTORNEY BRYANT:  Object to form.

20          A.    I don't know that number with

21       precision.

22              If we are using prospective student

23       in the 2U sense of the word, or the two words,

24       then I would expect there would be, again, tens

25       of thousands of prospective students.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 214 of 402
Page ID #:2560
Deposition of John Chandler, Ph.D.                    Iankowski, et al. v. University of Southern California and 2U Inc.

```
 1          Q.    And of the tens of thousands of

 2     prospective students, you can't tell us whether

 3     any of those prospective students actually saw

 4     the Facebook post, correct?

 5                ATTORNEY BRYANT:  Object to form.

 6          A.    I can't say the number of

 7     prospective students who saw the Facebook post.

 8                There were 17,376 users reached.  It

 9     would be extremely improbable for none of those

10     17,000 people to be prospective students.

11                But I can't say the number.

12          Q.    Okay.

13                You don't know if it's 1 or 1,000 or

14     10,000 of the 17,000 are prospective students,

15     correct?

16          A.    That's correct.  I could estimate

17     potentially a number.  But it is somewhere

18     between a relatively small amount, 500 to a

19     thousand, and something higher, maybe more like

20     10- or 12,000.

21          Q.    Are prospective students?

22          A.    I would estimate that the fraction

23     of prospective students would be kind of

24     somewhere in that range.

25                But that is a very rough estimate.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 215 of 402
Page ID #:2570

Deposition of John Chandler, Ph.D.                    Huttrell, et al. v. University of Southern California and 2U Inc.

```
 1              Q.    Okay.

 2                    You don't have any specific data

 3      that would show you in 2018 how many Facebook

 4      users that were reached through this particular

 5      marketing message were prospective students,

 6      correct?

 7              A.    That's correct.  I don't have data

 8      that breaks down the Facebook audience by

 9      prospective student versus current student

10      versus alum versus merely very interested in

11      USC Rossier.

12              Q.    Okay.

13                    And then scrolling down to the next

14      page, there's a reference to Twitter.

15                    There's a 142 favorites, 47

16      retweets, and 364 link clicks.

17                    Do you see that?

18              A.    I do.

19              Q.    How many total Twitter followers

20      were there for the USC Rossier school in 2018?

21                    ATTORNEY BRYANT:  Object to form.

22              A.    I'm not sure I can recall with

23      precision.  My recollection is around 8,000.

24              Q.    And of the 8,000 or so, 142 made it

25      a favorite.
```

**Exhibit 2
319**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 216 of 402
Page ID #:2571
Deposition of John Chandler, Ph.D.                    Mandell, et al. v. University of Southern California and 2U Inc.

 1              Is that -- am I reading that

 2      correctly?

 3          A.    I think we would say favorited it,

 4      which is less grammatical than what you said.

 5          Q.    I was just trying to read what it

 6      said here.  But I like your version better.

 7              And you don't know of those who

 8      favorited it or retweeted it or who had links,

 9      those were prospective students, correct?

10          A.    That's correct.  It's very similar

11      to the Facebook situation that we just

12      discussed, where undoubtedly prospective

13      students were included in this count.  But I

14      can't say how many numerically.

15          Q.    Got it.

16              ATTORNEY CAMPBELL:  Time certainly

17      flies when you're having fun.  We've gone about

18      another hour.

19              So let's take a short break and then

20      we'll jump into the e-mails starting on

21      paragraph 115 of your report.

22              THE VIDEOGRAPHER:  Off the record

23          3:32 p.m.

24              (Recess is taken.)

25              THE VIDEOGRAPHER:  Back on the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 217 of 402
Page ID #:2573

Deposition of John Chandler, Ph.D.                    Campbell, et al. v. University of Southern California and 2U Inc.

1          record 3:43 p.m.

2      BY ATTORNEY CAMPBELL:

3          Q.    Okay.

4              Dr. Chandler, I want to go back to

5      your report, Exhibit 1078, and move down to the

6      section D, USC's e-mail marketing.

7              Are you with me there?

8          A.    I am.

9          Q.    Okay.

10             And in paragraph 115, you say (as

11     read):  As mentioned above, e-mail drip

12     campaigns are created by marketers to maintain

13     engagement with prospective customers.

14             2U, on behalf of USC, created these

15     campaigns for prospective students.

16             And then you say (as read):  2U

17     followed the common marketing practice of using

18     e-mail for both prospective and remessaging.

19             In the former case, 2U purchased

20     e-mail addresses for the purpose of marketing.

21             And it's that last sentence I want

22     to focus on for a second.

23             We saw back in the 2017 marketing

24     plan that the paid e-mails represented the

25     smallest fraction of enrollment by source

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 218 of 402
Page ID #:2573

Deposition of John Chandler, Ph.D.                    Cappell, et al. v. University of Southern California and 2U Inc.

```
 1          reported by 2U, correct?
 2                      ATTORNEY BRYANT:  Object to form.
 3          A.    Yes.  We were looking at what I
 4    believe is the last ad attribution for
 5    enrollments.
 6                      And so, you know, I don't think that
 7    gives us a very clear picture of, like, for
 8    instance, all the marketing touch points.  But
 9    it was among the lowest categories for the
10    master's in teaching enrollment -- attributed
11    enrollments.
12          Q.    In fact, it wasn't among the lowest.
13                      It was the lowest?
14                      Do you remember that?
15          A.    Oh, I thought it was sandwiched
16    between a couple and didn't have a label.  But
17    I might be misremembering.
18                      ATTORNEY CAMPBELL:  Paul, do you
19          have Exhibit 1082 you can put back on.
20          Apology.
21          A.    I apologize for the imperfections of
22    my memory on this.
23          Q.    No, Dr. Chandler, that's totally
24    okay.  I don't expect you to remember all of
25    this.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 219 of 402
Page ID #:2574

Deposition of John Chandler, Ph.D.                    Iliadell, et al. v. University of Southern California and 2U Inc.

 1              I just want to make sure we're on

 2      the same page.

 3              Okay.  So I've shown you the black

 4      and white version.

 5              But paid e-mail is the last on the

 6      list and we think it was zero percent, correct?

 7          A.    Yes, that is correct.

 8              I was misremembering, I think, our

 9      conversation about unassigned.

10          Q.    Okay.

11              And then we -- we looked at the

12      Ed.D. OCL program, paid e-mail didn't even show

13      up as the enrollment by source, correct?

14          A.    That's correct.  There were not

15      enrollments for the Ed.D. OCL program that 2U

16      attributed the last touch to be e-mail.

17          Q.    Okay.

18              And do you have any reason to

19      believe that those numbers positioning, let's

20      call it, of the paid e-mails in the -- in terms

21      of the enrollment by source changed in any of

22      the years you studied?

23          A.    If the question you're asking is if

24      we reproduced that circular plot for different

25      years, would it look roughly the same for

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 220 of 402
Page ID #:2575

Deposition of John Chandler, Ph.D.    Iglesdell, et al. v. University of Southern California and 2U Inc.

1    e-mail, I think the answer is, yes, it probably

2    would look roughly the same for e-mail.

3         I don't think that is the correct

4    way to measure the effectiveness of the e-mail

5    marketing campaigns.

6         Q.    Okay.

7         But you have no reason to think it

8    would look any -- any different in any

9    significant way from the 2016 enrollment by

10   source numbers we looked at and the 2017

11   marketing plan, correct?

12        A.    I'm sorry.  Can you repeat that

13   question for me.

14        Q.    I'll withdraw the question.  I think

15   you've answered it.

16        Going down to paragraph 116, you say

17   (as read):  When asked if these prospecting

18   e-mails would contain the ranking information,

19   Dr. Gerber said -- excuse me -- stated, quote,

20   I believe so, yes.

21             Do you see that?

22        A.    I do.

23        Q.    And then your citation for that is

24   page 105 of her transcript, correct?

25        A.    Yes.

**Exhibit 2**

**324**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 221 of 402
Page ID #:2576

Deposition of John Chandler, Ph.D.    Mitchell, et al. v. University of Southern California and 2U Inc.

1    Q.    Was that all that Dr. Gerber said on

2    that subject?

3    A.    There was a great deal of

4    conversation in her deposition about the e-mail

5    marketing and the use of the rankings in the

6    e-mail marketing.

7              I'm quoting certain sections here.

8    But I came away from reading that deposition

9    thinking that Dr. Gerber was unequivocal on the

10   presence of the ranking and the initial e-mails

11   that prospective students would receive.

12   Q.    Well, do you remember when she was

13   asked how often the paid e-mail made mention of

14   U.S. News & World Report, she responded that it

15   would depend on the type of e-mail

16   communication and where someone was in the

17   funnel?

18   A.    I recall that.

19              I also recall her saying that, and

20   I'm paraphrasing here, she felt very strongly

21   that the rankings would be included in the

22   initial sort of welcome e-mails that went out.

23   Q.    And -- but not every prospective

24   student got a welcome e-mail.

25              You would agree?

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 222 of 402

Deposition of John Chandler, Ph.D.   Page ID #:2577  ell, et al. v. University of Southern California and 2U Inc.

```
 1                    ATTORNEY BRYANT:  Object to form.
 2           A.    I think that all or virtually all
 3      prospective students would receive one of those
 4      e-mails.
 5                    In order to begin the process of
 6      receiving information and begin applying,
 7      prospective students would need to enter an
 8      e-mail.  And entering an e-mail opts them in to
 9      receive e-mail communications.  And as far as I
10      -- (inaudible) -- from the produced materials
11      based on the e-mails, there were a whole set of
12      welcome e-mails that were part of this drip
13      campaign.
14                    And Dr. Gerber stated that the
15      welcome e-mails would have included the ranking
16      information.
17           Q.    But she also said you had to opt in
18      to receive those welcome e-mails, didn't she?
19           A.    Yes, but opting in is a request for
20      information.
21                    You know, I think you are using
22      opting in as though students might receive
23      e-mails or not receive e-mails and be able to
24      continue the process.
25                    And I don't think that's accurate.
```

1          I think that by beginning their

2     relationship with 2U, the students were opting

3     in.  I don't think there was an opt-out option

4     that allowed the students to continue the

5     process.

6          Each e-mail had the opportunity to

7     opt out.  And so, after that initial e-mail,

8     students could click the unsubscribe button and

9     still remain in the funnel.  But that would

10    happen after receiving the first e-mail.

11    Q.    Is it possible that a student could

12    enroll in the USC Rossier online school during

13    the period you evaluated and never request

14    information and get onto the mailing list of

15    2U?

16          ATTORNEY BRYANT:  Object to form.

17    A.     I think that, you know, like we

18    talked through your hypothetical of someone who

19    loves USC and wants a graduate degree in

20    education, typing in the full application URL

21    and landing immediately on that application

22    page and applying right there in one go.  They

23    didn't save it.  They just sat down.  They had

24    all their materials ready to go and started and

25    finished an application in one session.

 1              And I think that is a possible

 2     scenario where someone could have avoided the

 3     e-mail.  But it is also very farfetched to me.

 4              I think students typically would

 5     request information.  They would look around

 6     the site.  They would begin receiving these

 7     e-mails.  Perhaps they would opt out, but they

 8     would have already received the welcome

 9     e-mails.

10              But I think it is extremely unlikely

11     that a student could have applied for this

12     program without receiving the welcome e-mail.

13          Q.   And have you seen any study about or

14     any data that would tell you how many of those

15     prospective students opened that welcome

16     e-mail?

17          A.   There is some data on the -- in the

18     production that has open rates for e-mails.  I

19     can't recall what the open rates were on the

20     welcome e-mail.

21              I will note that anyone who did not

22     open the e-mail could not unsubscribe, so they

23     would have continued to receive e-mails.

24              So it would be the entire collection

25     of e-mails that they would be receiving until

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 225 of 402
Page ID #:2580

Deposition of John Chandler, Ph.D.                    Iliescu, et al. v. University of Southern California and 2U Inc.

```
 1          they opened one and hit unsubscribe.
 2                   So again, avoiding this ranking
 3          information is very challenging via e-mail.
 4               Q.   Well, you can also just hit delete,
 5          correct?
 6               A.   Right.  And receive another e-mail
 7          three days later.  And another one five days
 8          later.
 9                   I believe that they had nine e-mails
10          in the first 75 days, if I'm remembering
11          correctly.  And you'd have to keep deleting
12          these.
13               Q.   And you would delete nine e-mails,
14          correct?
15               A.   Yes, you would delete nine e-mails
16          for a program that you are so interested in
17          that you then apply for and enroll in.
18               Q.   Well, let's say I went online and I
19          gave my information and I said, well, I'm all
20          in.  I'm just going to go apply.  I don't need
21          any of the information.  I'm good.
22                   You could presumably delete those
23          e-mails and never look at them, correct?
24               A.   Yes.
25                   I don't know how long it has been
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 226 of 402
Page ID #:2581
Deposition of John Chandler, Ph.D.    Iredell, et al. v. University of Southern California and 2U Inc.

1    for you since you applied to a program, but

2    these applications are relatively

3    time-consuming and tedious.  And it's uncommon

4    for students to do that just in one go.

5                I think that it is possible that

6    someone started the application.  They have

7    decided they want to go to Rossier.  They avoid

8    opening the e-mails, avoid looking at them,

9    delete them.

10               They also avoid the other places

11   that the ranking information is available.  And

12   then finished their application, continued to

13   avoid that information while they're waiting

14   for an decision, and then eventually enroll.

15               Which is why my opinion on this is

16   all or nearly all or virtually all students

17   would have been exposed to the rankings.

18        Q.    I took it from your last answer that

19   you were suggesting I'm old.  But I won't be

20   offended.

21        A.    I did not mean to suggest that.

22               And I would like the record to

23   reflect that you look very youthful and fresh

24   to me.

25        Q.    Okay.

1          Have you actually looked at every

2     welcome e-mail that was ever sent during the

3     period you studied?

4          ATTORNEY BRYANT:  Object to form.

5      A.    No.  I have attempted to find these

6     welcome e-mails.

7          It is my understanding, based on Dr.

8     Gerber's testimony, that the content of the

9     e-mails was largely worked on and edited and

10    taken from Google Docs that were sort of

11    continuously overwritten.

12         And so, I could not find the text of

13    these welcome e-mails in the production.

14         So I have not looked at them.  I am

15    relying on Dr. Gerber's testimony about the

16    content.

17     Q.    And you understand that Dr. Gerber

18    joined 2U in 2019, correct?

19         ATTORNEY BRYANT:  Object to form.

20     A.    That conforms to my recollection of

21    the testimony.  I can't remember the year

22    exactly.

23         But I also know that Dr. Gerber is

24    2U's representative in this matter.  And so, I

25    find her testimony to be credible.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 228 of 402
Page ID #:2583

Deposition of John Chandler, Ph.D.                Iscowell, et al. v. University of Southern California and 2U Inc.

1    Q.    Well, she didn't say she knew

2    absolutely that every e-mail to prospective

3    students contained the ranking information.

4              She said she believes so, but that

5    was based on the belief of what she knew from

6    2019, forward, wasn't it?

7              ATTORNEY BRYANT:  Object to form.

8    A.    I'm not sure how she was making that

9    statement of belief.

10    Q.    Okay.

11              She didn't say it affirmatively; she

12    just was sharing her belief, true?

13              ATTORNEY BRYANT:  Object to form.

14    A.    She stated multiple times that she

15    believed that the ranking information would've

16    been included.

17              And I believe, later in the

18    deposition, she used a phrase like absolute

19    inclusion.

20    Q.    Let's look at that because that's

21    further down on paragraph 116.

22              And I'm looking at page 38 of your

23    report.

24              She actually starts that sentence by

25    saying, I would imagine that that would be an

Deposition of John Chandler, Ph.D.                Ellis et al. v. University of Southern California and 2U Inc.

```
 1          absolute inclusion.
 2                    Again, she's not saying definitively
 3          it was.  She's saying she could imagine it was.
 4                    You would agree with that, correct?
 5                    ATTORNEY BRYANT:  Object to form.
 6              A.    I believe in your question, what I
 7          heard you say was she could imagine, and she's
 8          saying would imagine.
 9                    I take this as someone who is
10          testifying under oath and is afraid to make a
11          misstatement and says absolute inclusion.
12                    You know, she didn't say, I would
13          imagine that it would be something we would
14          talk about it, or I would imagine that people
15          might do that.
16                    She says, I would imagine that would
17          be an absolute inclusion.
18                    And that's what I would imagine,
19          too, as from my marketing perspective.
20              Q.    That's right.
21                    And you also didn't see any of the
22          welcoming e-mails.
23                    So you're just using your best guess
24          as to what was included, much like she was,
25          correct?
```

Deposition of John Chandler, Ph.D.                    Iovell, et al. v. University of Southern California and 2U Inc.

```
 1                    ATTORNEY BRYANT:  Object to form.
 2          A.    My recollection from Dr. Gerber's
 3     testimony is that I have a great deal more
 4     marketing experience than she does.  And so, I
 5     don't think that her best guess and my best
 6     guess are necessarily equivalent.
 7                She also works for 2U and
 8     understands their marketing practices in a more
 9     detailed way than I do.
10                So we are coming at this from
11     different perspectives, and are agreeing in our
12     assessment that a key differentiator, such as
13     the ranking, would have been included.
14                And Dr. Gerber said repeatedly under
15     oath that she believed the ranking was included
16     and said that it would be an absolute
17     inclusion.
18          Q.    Much like you, because the welcome
19     e-mails were written over, she has no basis to
20     know with any certainty whether the welcome
21     e-mails actually included any discussion of
22     rankings, correct?
23                    ATTORNEY BRYANT:  Object to form.
24          A.    I respectfully disagree that she has
25     no basis to know.  She is someone with a great
```

**Exhibit 2
334**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 231 of 402
Page ID #:2586

Deposition of John Chandler, Ph.D.                    ...ell, et al. v. University of Southern California and 2U Inc.

1     deal of marketing experience at 2U.  She was

2     designated as 2U's corporate representative.

3              She has a basis to know how 2U sets

4     up their e-mail marketing campaigns.

5         Q.    E-mail marketing campaigns that

6     predated her by six years, at least, of the

7     period you're looking at.

8              You think she knew what was in those

9     e-mails?

10             ATTORNEY BRYANT:  Object to form.

11        A.    I do.  I do not think the content of

12    welcome e-mails likely changed dramatically

13    from 2018 to 2019, for instance, or 2017 to

14    2019.

15             Certainly, as the rankings changed,

16    Dr. Gerber testified that they would update

17    that ranking information.  And my recollection

18    is she said that quite definitively.

19             But I think that Dr. Gerber is

20    qualified to offer her testimony on the

21    presence of the ranking in the e-mails.

22             And again, this is exactly what I

23    would advise a client to do.  I mean, this

24    conforms to marketing best practices in a way

25    that is highly predictable.

1      Q.    There was two types of e-mails

2    utilized in this marketing campaign, at least

3    two types, paid and unpaid, correct?

4          A.    That is correct.

5                I would maybe just clarify a little

6    bit that most of the paid e-mails -- when we

7    say paid e-mails in this context, it's payment

8    to purchase the e-mail address, since the

9    actual sending of the e-mail is quite low

10    marginal cost.

11          Q.    Fair enough.

12                And can you tell me what the

13    click-through rate was for the paid e-mails.

14          A.    My recollection is -- I mean, it

15    varies by e-mail.

16                Some of the e-mails had relatively

17    high click-through rates.  My recollection,

18    from looking at the data, is that, for

19    instance, those e-mails that were sent to spur

20    someone to finish their application process had

21    relatively high open and click-through rates.

22                The welcome e-mails had lower

23    click-through rates.  But it varied quite a

24    bit.

25                Generally speaking, a click-through

1    rate of between half a percent to two percent

2    is relatively standard for many types of e-mail

3    marketing.

4         Q.    Okay.

5              And when you say relatively high for

6    the paid e-mails, what would that be in terms

7    of the click-through rate?

8         A.    Again, I would be -- I'm speculating

9    a little bit because I can't remember exactly

10   what the numbers were.  But my sense was that

11   there were -- I mean, there were some e-mails

12   that had very high click-through rates that

13   went out to very few people and click-through

14   rates of 80 percent or a hundred percent.

15             Generally speaking, I would think

16   that some of these higher click-through rates

17   might be more in the 10 percent to 30 percent

18   range.

19        Q.    And of those high click-through

20   rates or relatively high click-through rate

21   e-mails, how many of those had a marketing

22   message about the rankings of the USC Rossier

23   school?

24        A.    Because the text of the e-mails has

25   not been produced, I can't say.

**Exhibit 2
337**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 234 of 402
Page ID #:2588

Deposition of John Chandler, Ph.D.          Iola Favell, et al. v. University of Southern California and 2U Inc.

1      Q.    Okay.

2            Let's go down to the paragraph 122.

3            You say (as read):  Similarly, in

4      2021, we see USC Rossier touting its ranking

5      from the e-mail address

6      communications@Rossier.USC.edu in an e-mail

7      sent to its enrolled graduate students.

8            Do you see that?

9      A.    I do.

10     Q.    What is the impact of sending an

11     e-mail to an enrolled graduate student who is

12     already admitted to attending USC Rossier

13     school?

14           ATTORNEY BRYANT:  Object to form.

15     A.    I can speculate what the -- what the

16     goal would be.  There's --

17     Q.    I don't want you to speculate.

18           If you know, tell me.  If you have

19     opinion that's based on something other than

20     speculation, let me know.

21           But I don't want you to guess or

22     speculate.  We talked about that at the

23     beginning of deposition.

24           ATTORNEY BRYANT:  Object to form.

25           And maybe it is a -- I'm not sure if

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 235 of 402
Page ID #:2590

Deposition of John Chandler, Ph.D.

Campbell, et al. v. University of Southern California and 2U Inc.

 1              this is a thing, but when you say the

 2              impact of this, do you mean the goal?

 3                   The question that you asked.

 4                   ATTORNEY CAMPBELL:  Let me withdraw

 5              it, Chris.  And let me ask a whole other

 6              question around that area.

 7                   ATTORNEY BRYANT:  Okay.

 8         BY ATTORNEY CAMPBELL:

 9              Q.   These students, right, who are

10         enrolled graduate students, they've been

11         through the purchase funnel, correct?

12              A.   They have purchased one item from

13         Rossier.

14                   Many students received multiple

15         degrees from the same institution.  For

16         instance, about 25 percent of our analytics

17         students also do a master's of business

18         administration with us.

19                   And so, a student who is enrolled in

20         the master's of teaching and is really enjoying

21         being back in school, is a prospective student

22         for the education doctorate, for instance.

23              Q.   How do you know that?

24              A.   Because I have seen students receive

25         multiple degrees and multiple graduate degrees

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 236 of 402
Page ID #:2591

Deposition of John Chandler, Ph.D.        Iovell, et al. v. University of Southern California and 2U Inc.

```
1              from many -- in many cases.  I mean, I...

2                   Q.    Let's focus on the USC online

3         Rossier school.

4                        How many MAT students went on to get

5         an online Ed.D. degree?

6                   A.    I don't know.

7                   Q.    How many MAT students at the Rossier

8         online school went to get an Ed.D. or Ph.D.,

9         whether online or in person?

10                  A.    Again, I don't know.  This number

11        could be, you know, as small as a couple of

12        percent or as high as maybe 10 or 20 percent.

13                  Q.    Okay.

14                       Let's go to paragraph 125.

15                       I'm jumping, Dr. Chandler, from

16        paragraph to paragraph.  If you need me to move

17        up and put things in context, please let me

18        know, as you've done before.

19                       But we're now talking about USC's

20        Rossier's websites, okay?

21                  A.    Okay, yeah.  And I'm tracking.

22                  Q.    Okay.  Great.

23                       And in paragraph 125, you say (as

24        read):  And once students landed on the Rossier

25        online page, they had many opportunities to be
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 237 of 402
Page ID #:2592

Deposition of John Chandler, Ph.D.                    Iola Favell, et al. v. University of Southern California and 2U Inc.

1      exposed to the fraudulent rankings.

2                  Do you see that?

3          A.     I do.

4          Q.     And while they had many

5      opportunities to be exposed, you can't state --

6      you cannot state with any certainty whether

7      they were actually exposed, can you?

8          A.     That's correct.  Given the data that

9      we have, I can't say with certainty that any

10     specific student visited any one of these

11     pages.

12                 I am talking in this section about

13     these pages, some of which had a large amount

14     of traffic, relative to the site overall, that

15     had the rankings.  And so, these were other

16     opportunities for students to see these

17     fraudulent rankings.

18                 But I can't say -- I can't make a

19     statement about a specific student.

20         Q.     Okay.

21                 And -- and these pages -- these --

22     well, when you say they land on the Rossier

23     online page and they had many opportunities to

24     be exposed to the fraudulent rankings, when you

25     say exposed in this context, are you talking

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 238 of 402
Page ID #:2593

Deposition of John Chandler, Ph.D.                    Iverell, et al. v. University of Southern California and 2U Inc.

1    about that they saw it or they had the

2    potential to see it?

3         A.    I mean, that they visited a Web page

4    where the ranking was displayed.

5         Q.    Okay.

6               And for those students that -- I

7    didn't mean to cut you off.

8               Are you done?

9         A.    Yes, I can be done.

10        Q.    Okay.

11              And for those students who visited a

12   Rossier online page that had ranking-related

13   information, you haven't studied, nor have you

14   seen any evidence of how many of those people

15   actually saw the representation; in other

16   words, saw it, read it when they were on that

17   particular Web page, correct?

18        A.    Yes, I cannot -- in addition to not

19   being able to say if a specific student visited

20   one of these pages because of the data

21   limitations, I'm similarly limited in my

22   ability to say if someone was on that page, did

23   their eyes land upon the ranking information.

24              Generally speaking, the rankings

25   were in a prominent place.  And so, some

**Exhibit 2
342**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 239 of 402
Page ID #:2594
Deposition of John Chandler, Ph.D.    Iovell, et al. v. University of Southern California and 2U Inc.

1    fraction of visitors may have hit the page and

2    realized they were in the wrong place and

3    bounced away immediately.

4              But for people who visited the page,

5    my expectation is -- but I don't have data to

6    confirm -- that they would have seen the

7    ranking on that page.

8         Q.    Okay.

9              How many of the -- well, let's move

10   to paragraph 126.

11             You say (as read):  We can verify

12   that the fraudulent rankings appear on certain

13   Rossier online pages.  These Web pages with

14   rankings information include the following.

15             And then you have a series of URLs

16   with information for various dates and time,

17   correct?

18        A.    That's correct.

19        Q.    And -- and was this information you

20   gathered from -- well, let me ask you.

21             Where did you gather this

22   information from?

23        A.    So these URLs were visited by a Web

24   service called the Internet Archive.  And so,

25   this is a -- what's called a Web crawler that

**Exhibit 2**
Page: 238
**343**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 240 of 402
Page ID #:2595

Deposition of John Chandler, Ph.D.                Iovell, et al. v. University of Southern California and 2U Inc.

1    visits pages and takes essentially snapshots of

2    them.  These snapshots aren't taken every day.

3            And so, what I have done is I've

4    gone to the Internet Archive.  I've looked at

5    this URL over time.  And then I've noted when

6    the rankings first appear and when the rankings

7    no longer appear.

8            And I've also made note of when the

9    phrase top ranked was used instead of a

10   numerical ranking.

11           Typically, top ranked was used with

12   a link to U.S. News & World Reports.  So

13   someone who wanted to see what -- learn more

14   about the term top ranked could visit the U.S.

15   News & World Reports page.

16       Q.    At some point in time, the two-year

17   advertising for Rossier switched from a

18   specific ranking to the phrase top ranked,

19   correct?

20           ATTORNEY BRYANT:  Object to form.

21       A.    The usage -- sorry, are you asking

22   specifically about Rossieronline.USC.edu?

23       Q.    Yes.

24       A.    That's correct.

25       Q.    Okay.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 241 of 402
Page ID #:2596
Deposition of John Chandler, Ph.D.                    Tidwell, et al. v. University of Southern California and 2U Inc.

1          Do you remember when that switch

2     happened?

3          A.    I have it in my report.  I can't

4     remember which year it switched to --

5               (Multiple speakers.)

6          Q.    And I'm --

7          A.    2019.

8          Q.    You say here beginning in July 2018,

9     the switch to saying top ranked?

10         A.    Oh, yes, apologies.

11              So that particular page on the

12    Rossieronline.USC.edu site began displaying the

13    ranking on November 16, 2017.  And through at

14    least June 27, 2018, which is the last archive

15    version I have.

16              And then the next archive, which was

17    July 2018, the site was saying top ranked.

18              And by site here, I mean this

19    specific URL.

20         Q.    Got it.  Okay.

21         A.    And perhaps I would also just like

22    to clarify for the record, the -- there was an

23    -- I believe it was 2019, and it was the

24    Rossier.USC.edu, switched from a numerical

25    ranking to top ranked.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 242 of 402
Page ID #:2597

Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

```
 1                          And I have that in my report.

 2            Q.     Okay.

 3            A.     But I don't remember exactly.

 4            Q.     That's fine.

 5                   So you list eight examples of where

 6      the rankings appear on certain Rossier online

 7      pages, correct?

 8            A.     That's correct.

 9            Q.     Okay.

10                   For any of these eight pages, can

11      you tell me how many prospective students

12      visited those pages.

13            A.     I -- for some of these, I have

14      reliable total page visits.  But it is not

15      split out into prospective students versus

16      current students.

17                   So I can't give you a numerical

18      estimate for each one of these.

19            Q.     Okay.

20                   And when you go -- we'll move on to

21      paragraph 130, where it's talking about USC

22      Rossier, USC Rossier online.

23                   Do you see that?

24            A.     I do.

25            Q.     And then in this section, this
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 243 of 402
Page ID #:2598

Deposition of John Chandler, Ph.D.                    Antonell, et al. v. University of Southern California and 2U Inc.

1          beginning of paragraph 130, you begin to

2          display a series of snapshots of Web pages

3          displaying ranking information, correct?

4              A.    That's correct.

5              Q.    And this goes on for several pages.

6                    But I guess the question is -- and

7          we can look at each one individually, but I

8          think I know the answer.  And we can just start

9          with the first one.

10                   Which is, right after paragraph --

11         sorry, paragraph 131, you refer to an April 25,

12         2016, display of a ranking.

13                   Do you see that?

14             A.    I do.

15             Q.    And then you have that imagery

16         below, correct?

17             A.    That's correct.  I have a screen

18         shot of the top part of the page.

19             Q.    Okay.

20                   That's from the Wayback Machine?

21             A.    Yes, the Internet Archive.

22             Q.    Okay.

23                   Sometimes referred to as the Wayback

24         Machine, correct?

25             A.    That's correct.

1          That just seems like such a cheesy

2     way to refer to it.  I prefer Internet Archive.

3          Q.    Okay.

4          For this particular view that we're

5     looking at, April 25, 2016, from Internet

6     Archive, can you tell me what the website

7     traffic was for this particular page -- this

8     particular URL that's listed here.

9          A.    I cannot tell you the traffic to

10     that page during a particular time period.  The

11     production includes information on the total

12     number of site visits and by page.

13          And then it includes daily visit

14     information across all pages.

15          But it doesn't include the

16     combination of an individual page by date.

17     Which is what I would need to estimate the site

18     traffic to this particular page within the site

19     for any time period.

20          Q.    Okay.

21          And similarly, you can't, much like

22     the Rossier online website we talked about

23     previously, you don't -- you can't give me the

24     number of prospective students that visited the

25     particular pages -- particular page reflected

1    on the below paragraph 131, correct?

2            A.    That's correct.  In addition to not

3    having the data to precisely estimate the

4    number of visitors, I don't have a way to tell

5    us what fraction of those visitors were

6    prospective students.

7                    And the point I'm making with the

8    website portion of this report is that there

9    were many prospective students who were exposed

10   to the rankings on the Web page.

11                   Unfortunately, I can't quantify that

12   -- the number of prospective students.  But

13   there were many opportunities for them to see

14   it on pages that received a lot of traffic.

15   And it stands to reason would be visited by

16   students who were engaged in learning more

17   about this program that they were considering

18   enrolling in.

19           Q.    And with respect to all of the URL

20   captures in Section 1 about USC Rossier, USC

21   Rossier online, the answer is the same with

22   respect to your ability to know the specific

23   traffic or the number of prospective students

24   that visited any one of these particular Web

25   pages, correct?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 246 of 402
Page ID #:2601

Deposition of John Chandler, Ph.D.          Maxwell, et al. v. University of Southern California and 2U Inc.

1      A.    It's correct.  The same limitations

2   exist for every one of these pages.

3      Q.    Okay.

4            And these continue on through

5   page 46, correct, and then you move on to the

6   USC Rossier School of Education, correct?

7      A.    That's correct.

8            Could we scroll up to around 135.

9      Q.    Of course.

10            You say when.

11      A.    Okay.

12            When.

13            Again, just to clarify, this was the

14   switch from numerical ranking to top ranked

15   that I was referring to.  And so, this was on

16   the Rossieronline.USC.edu About page, where

17   they moved from using a numerical ranking to

18   using top ranked.

19      Q.    Okay.

20            And the this you're referring to is

21   the discussion in paragraph 135?

22      A.    Yes, 134 and 135 is the discussion

23   that I referenced earlier imprecisely.

24      Q.    Great.  Thank you for that.

25            Then we move on after that to the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 247 of 402
Page ID #:2602
Deposition of John Chandler, Ph.D.                    Iovell, et al. v. University of Southern California and 2U Inc.

 1          USC Rossier School of Education.

 2                    This is the Rossier school website

 3          not specific to online, correct?

 4                A.    That's correct.

 5                Q.    Okay.

 6                    And similar to the Rossier online

 7          website, you went through and you had screen

 8          captures of various URLs that made reference or

 9          mention to ranking, correct?

10                A.    That's correct.  In this subsection,

11          all of the screen captures are the

12          Rossier.USC.edu homepage.  And I'm just

13          illustrating the presence of the ranking on

14          this homepage over time.

15                Q.    Okay.

16                    And that starts at page 47.  It

17          continues through page 55.

18                    Just quickly showing you what's

19          here.

20                    (Document review.)

21                Q.    So for all of the Rossier.USC.edu

22          screen captures you have, from pages 47 to 55,

23          you're unable to tell me exactly what the

24          website traffic was for each of those

25          particular pages, correct?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 248 of 402
Page ID #:2603

Deposition of John Chandler, Ph.D.

Iddell, et al. v. University of Southern California and 2U Inc.

1       A.    That's correct.   The data

2   limitations prevent me from giving you an exact

3   numerical estimate.

4       Q.    And similar to my other question,

5   you can't tell me the precise number of

6   prospective students that visited each of the

7   websites -- each of the Web pages over time

8   captured in pages 47 to 55, correct?

9       A.    Yes, this -- the same data

10  limitations exist for these pages, where I

11  cannot tell you the fraction of prospective

12  students.

13           And I'm kind of using this section

14  to illustrate that prospective students had

15  many opportunities, unfortunately

16  unquantifiable, to see the ranking information

17  on the Web page.

18           So again, going back to our

19  hypothetical, if you somehow slipped through

20  the cracks of the e-mail messages, then you had

21  opportunities on the Web page.

22      Q.    Okay.

23           Now, I want to jump to page 57 of

24  your report.   Exhibit 1078.

25           Which is USC search and display

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 249 of 402
Page ID #:2604

Deposition of John Chandler, Ph.D.                Iliescu-Bell, et al. v. University of Southern California and 2U Inc.

1      marketing.

2                     Do you see that?

3           A.    I do.

4           Q.    Explain to me what search and

5      display marketing is.

6           A.    So those are two separate marketing

7      channels.  Search, we've talked about a little

8      bit about.  This is the opportunity to purchase

9      keywords from a search engine such as Google or

10     Bing and pay for clicks on the text ads that

11     would accompany someone searching.

12                    So someone searches, for instance,

13     as we looked at earlier, someone searches for

14     MAT online.

15                    Then 2U would have a text ad that

16     would be served by Google to the person who is

17     conducting that search.  And the text ad

18     itself, we don't have production that tells us

19     what's in that text ad.

20                    So that could say something like, if

21     it's MAT online, the text ad might say:  Earn

22     your master's in teaching online at Rossier.

23                    Or it might say:  Earn your master's

24     in teaching at a top ranked school.

25                    So we don't know what's in that text

```
 1        ad.

 2                 And then when people click, they go

 3        to a landing page.  And that's kind of the

 4        search marketing.

 5                 Display marketing, as I think I have

 6        explained further above, is a graphical ad.

 7        There are various common sizes.  Like banner

 8        ads at the top of the page for 168 by 60

 9        pixels.  Or the square ones, 250 by 250 pixels.

10        These contain images, texts, and, again, come

11        along with a click-through URL so that someone

12        who is exposed to that ad and clicks on it can

13        visit the Web page.

14                 We don't have the images themselves,

15        so I can't say what -- what is -- what the

16        content of those ads is.

17                 And then I should have also

18        mentioned that those ads, where a search is

19        purchased from a search engine, there are many

20        publishers that have space for display

21        advertising, and advertisers and agencies

22        purchase that inventory either directly from a

23        publisher or via, like, a programmatic auction

24        or something like that.

25             Q.   Okay.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 251 of 402
Page ID #:2606

Deposition of John Chandler, Ph.D.                    Iwaytowell, et al. v. University of Southern California and 2U Inc.

```
 1              So for both the search and the
 2    display marketing, you haven't been given and
 3    you haven't seen any specific examples of the
 4    type of search and display marketing used,
 5    correct?
 6              ATTORNEY BRYANT:  Object to form.
 7         A.    It's correct that I don't have these
 8    ads, and so I have not been able to review
 9    them.
10         Q.    Okay.
11              And you don't know what the
12    click-through rate is for either the search or
13    the display marketing, correct?
14         A.    We generally -- when we talk about
15    search marketing, we usually just talk about
16    clicks because Google and Bing do not release
17    the number of impressions.  And so, it is hard
18    to know the click-through rate.
19              For display, I have not been able to
20    find click-through rates on those.
21         Q.    Okay.
22              And then we'll move to social media
23    marketing.
24              And you begin a discussion about
25    social media and you say (as read):  There are
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 252 of 402
Page ID #:2607

Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

1    better records on USC's use of social media to

2    promote its program.

3              USC continues to tout its ranking on

4    social media, especially on Twitter, LinkedIn,

5    and Facebook.

6              And you say (as read):  We can see

7    many affiliates, officers, and graduates of

8    Rossier repeating the rankings in many of the

9    social media posts.

10              And the first one you focus on is

11   Twitter posts, correct?

12        A.    That's correct.

13        Q.    And you say that @USCRossier has

14   8,598 followers, correct?

15        A.    Yes, as of July 6, 2024.

16        Q.    And as of July 6, 2024, how many of

17   those followers were prospective students?

18              ATTORNEY BRYANT:  Object to form.

19        A.    It's not possible to estimate that.

20        Q.    How many of the 8,598 followers, as

21   of July 6, 2024, signed up for the @Rossier --

22   or maybe followed is a better way of phrasing

23   it -- followed the @Rossier Twitter page while

24   they were prospective students?

25        A.    Again, it's not possible to estimate

**Exhibit 2**
**356**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 253 of 402
Page ID #:2608
Deposition of John Chandler, Ph.D.                Iturbell, et al. v. University of Southern California and 2U Inc.

 1          that numerically.  It's quite likely that

 2          prospective students would have followed the

 3          USC Rossier account while they were in the

 4          consideration period, and they would have

 5          followed it likely on whatever platforms they

 6          use.

 7                    So Twitter is not the most popular

 8          social media platform.  But, you know,

 9          Facebook, LinkedIn, they all have different

10          profiles -- (inaudible) -- who use them.

11                    And so, I would expect that

12          prospective students who were heavy users of a

13          given social media platform would have been

14          likely to follow the Rossier account on that

15          platform.

16                    But I can't quantify the number of

17          prospective students who were following that at

18          any given time.

19               Q.    When you say it's quite likely, what

20          do you base that on?

21               A.    My experience doing social media

22          marketing.  And so, social media has become a

23          popular way for people to share information and

24          stay in contact with both brands and firms.

25                    And so, again, in my experience, the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 254 of 402
Page ID #:2609

Deposition of John Chandler, Ph.D.                    Iglesarell, et al. v. University of Southern California and 2U Inc.

1    followers of a social media account had a range

2    of people.  People who have -- who are

3    considering a purchase, people who are

4    interested in a brand, and people who have

5    purchased.  Or in this case, prospective

6    students, students, alums.

7        Q.    Okay.

8              And so, you don't know what

9    percentage of the followers at @USCRossier

10   Twitter account were prospective students?

11             I think I already asked that, but

12   just to confirm.

13             Correct?

14       A.    I'm happy to reconfirm that I cannot

15   say the fraction of these people who were

16   following the Rossier account.  I can't say

17   what fraction were prospective students.

18       Q.    At the University of Montana,

19   whether it's the undergrad or the graduate

20   school, have you ever studied the social media

21   to determine how many prospective students use

22   any particular social media platform to learn

23   about the school?

24       A.    I have done a little bit of work on

25   some social media platforms:  Facebook,

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 255 of 402
Page ID #:2610

Deposition of John Chandler, Ph.D.                    Iwell, et al. v. University of Southern California and 2U Inc.

1    Instagram, Twitter, and LinkedIn.

2    Unsurprisingly, to me, LinkedIn has relatively

3    view prospective students who are following us.

4                Facebook, Instagram, and Twitter are

5    more likely to contain prospective students.

6    And those dynamics have shifted over the time

7    that we're discussing here.

8         Q.    And tell me about the study that you

9    performed that helped you to glean that.

10               ATTORNEY BRYANT:  Object to form.

11               You can go.  Sorry about that.

12        A.    No problem.  I apologize.

13               That was working with data from the

14    social media platforms and monitoring it over

15    time, matching data from the platforms to

16    e-mail addresses that we had for both current

17    students and prospective students, and then

18    also looking at what kinds of messages

19    resonated with prospective students versus

20    current students because we were also analyzing

21    these data to identify opportunities to prevent

22    attrition.  So students dropping out.

23        Q.    What percentage of the Facebook

24    followers on the University of Montana were

25    prospective students, based on your study?

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 256 of 402
Page ID #:2611

Deposition of John Chandler, Ph.D.

Iniewell, et al. v. University of Southern California and 2U Inc.

1      A.    My recollection is -- and this study

2   was from 2017 -- was that it was around 15 to

3   20 percent.

4      Q.    And how about for Instagram?

5      A.    Instagram was higher.  Closer to

6   probably 40 percent.

7      Q.    40 percent of the Instagram

8   followers at the University of Montana in 2017

9   were prospective students?

10      A.    That was -- yeah, engaging with our

11   Instagram account over a six-month period.

12      Q.    What six-month period in 2017?

13      A.    I can't recall with precision.  I

14   believe it spanned the end of 2016 into the

15   beginning of 2017.  Because we were looking at

16   some recruitment strategies that we were using

17   on Instagram.

18      Q.    And just to make sure I'm clear,

19   during that period, of the people that

20   interacted with your Instagram account,

21   40 percent of them were prospective students?

22      A.    That was our estimate based on

23   e-mail matching.

24      Q.    Okay.

25            And what about Twitter?

1          A.    Twitter was lower.  It was more in

2     that 10 to 15 percent range.

3          Q.    Okay.

4                And then you mentioned that LinkedIn

5     was the lowest.

6                Do you remember what range it was

7     in?

8          A.    It was below ten percent, certainly.

9          Q.    Okay.

10               And looking at the various social

11    media, you talk about Twitter and you talk

12    about LinkedIn and I believe you talk about

13    Facebook.

14               In all of those social media

15    platforms, were you able to determine how many

16    of the followers at any given point in time

17    were prospective students?

18         A.    No, the data to study that at any

19    kind of scale does not exist.

20         Q.    Okay.

21               And sorry to make that such a big

22    question, but it saved a lot of little

23    questions by asking it on social media as a

24    whole as opposed to going one by one.

25         A.    I'm happy to do these in batches.

**Exhibit 2
361**

1          ATTORNEY BRYANT:  We've been going

2      for a little while.

3          I don't know, John, if you need to

4      take a break or anything, or if we're good

5      to keep going.

6          THE WITNESS:  Yeah, I'm getting

7      close to needing a short break.

8          ATTORNEY CAMPBELL:  So we can

9      certainly take a break right now.  It's

10     probably a good time for me to look at my

11     notes because we're going through a lot of

12     pages here, because there's kind of

13     multiples of social media feeds.

14         So why don't we take 15 this time

15     around.  And then I promise you the next

16     session will be the last.

17         THE WITNESS:  You don't have to keep

18     that promise.  But that sounds great.

19         So maybe we'll come back at ten

20     minutes to the top of the hour.

21         ATTORNEY CAMPBELL:  That sounds

22     good.

23         THE VIDEOGRAPHER:  Off the record

24     4:34 p.m.

25         (Recess is taken.)

**Exhibit 2**
**362**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 259 of 402
Page ID #:2614

Deposition of John Chandler, Ph.D.    Iliescu, et al. v. University of Southern California and 2U Inc.

```
 1                    THE VIDEOGRAPHER:  Back on the
 2              record 4:51 p.m.
 3                    ATTORNEY CAMPBELL:  Can we put back
 4              up Exhibit 1078.
 5         BY ATTORNEY CAMPBELL:
 6              Q.    Okay.
 7                    Dr. Chandler, we were looking at the
 8         information relating to the Twitter post for
 9         you @USCRossier.
10                    I was asking you a few questions.
11                    In paragraph 166, you say (as read):
12         Some or all of these followers will receive
13         posts created by the Rossier account.
14                    Some or all of these followers will
15         also receive messages like the example below,
16         where the Pullias Center celebrates the
17         fraudulent rankings.
18                    Do you see that?
19              A.    I do.
20              Q.    And in the Tweet, USC Pullias Center
21         for Higher Education says (as read):  Pullias
22         researchers lead @USCRossier to a number seven
23         rank on the U.S. News list of higher education
24         administrative programs.
25                    Do you see that?
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 260 of 402
Page ID #:2615
Deposition of John Chandler, Ph.D.    Iliescu, et al. v. University of Southern California and 2U Inc.

1        A.    I do.

2        Q.    And do you have an understanding

3    that the higher education administrative

4    program is different than the Rossier program

5    for which Jones Day concluded there was

6    misinformation in the rankings?

7        A.    I do.  I am offering this as an

8    example of rankings appearing in a Tweet.

9            But I acknowledge that this a

10   different program.

11       Q.    Okay.

12           And it's not the, quote, fraudulent

13   ranking that's being touted by USC Pullias,

14   correct?

15       A.    Yes, you are correct.

16           I have written in error here.

17       Q.    Okay.  Fair enough.

18           I appreciate your candor on that.

19           Let's move down to paragraph 167.

20           You are showing other examples of

21   where people retweeted ranking announcements

22   for the USC Rossier School of Education,

23   correct?

24       A.    That's correct.

25       Q.    Now, how many of these -- you give

1     four examples.

2               Did you find other -- were these the

3     only examples you found or were there more?

4          A.    There were more.

5          Q.    Okay.

6               How did you decide which ones to

7     use?

8          A.    I believe these were the top ones

9     when I did the search.  And I made a screen

10    capture of them and inserted them.

11         Q.    Okay.

12              And how many followers did each of

13    these individuals have?

14         A.    I have not tabulated the number of

15    followers for each of these individuals.

16              I'm merely trying to illustrate the

17    way in which earned social media is shared on,

18    in this case, Twitter.

19         Q.    Okay.

20              And you don't know, for example,

21    whether any of these four individuals that you

22    have put in here as examples have followers who

23    are prospective students, fair?

24         A.    That's correct.  I don't know about

25    the prospective students' status of followers

**Exhibit 2**

Page: 260

**365**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 262 of 402
Page ID #:2617

Deposition of John Chandler, Ph.D.    Halldorsdottir, et al. v. University of Southern California and 2U Inc.

1      of these people.

2          Q.    And when you testified a moment ago

3      that you did some researching, tell me about

4      the searches you performed to find these

5      particular examples.

6          A.    If we scroll up to the previous page

7      and look at the footnote, I have the search

8      that I performed.

9              So I'm looking for the entire

10     string, USC Rossier school of education or

11     @USCRossier or hashtag USC Rossier.

12             And then I'm also looking for the

13     occurrence of ranked, ranking, or ranks.

14             And I'm limiting my results to 2015

15     through the end of 2021.

16         Q.    Okay.

17             And this search was performed within

18     a Twitter environment?

19         A.    Exactly.

20             If you go to now X.com and paste

21     everything after the colon into the search, you

22     will see the results of this search.

23         Q.    Okay.

24             Now, you mentioned in your

25     assignments section of your report in

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 263 of 402
Page ID #:2618

Deposition of John Chandler, Ph.D.                    Iticurrell, et al. v. University of Southern California and 2U Inc.

1    paragraph 13 -- actually, subparagraph 4 of

2    paragraph 13, that you were analyzing the scope

3    of the students -- let me make sure I'm reading

4    this right -- hold on.

5         The scope of university -- you say

6    in subparagraph 4 of paragraph of 13 that (as

7    read):  The scope of University of Southern

8    California Rossier School of Education

9    recruitment practices, specifically the portion

10   of matriculating students from 2013 to 2022,

11   who were recruited from -- or excuse me, for

12   the program with online advertisements that

13   made use of fraudulent rankings.

14        So you're looking at the scope from

15   2013 to 2022.

16        Is there a particular reason why, in

17   searching Twitter, you didn't start in 2013 and

18   carry it to 2022?

19        ATTORNEY BRYANT:  Object to form.

20   A.    I -- my recollection is that by the

21   time I was writing the Twitter section of the

22   report, I was more focused on later time

23   periods.  And I think I started in 2015 because

24   that was the marketing plan that I dove deeply

25   into.  And so, I just started it at that same

```
 1            time.
 2                 Q.    Okay.
 3                       I mean, you looked at the 2013
 4            marketing plan as well, correct?
 5                 A.    Yes.  Again, I think it was merely
 6            because it was the 2015 one was top of mind
 7            when I was searching Twitter.
 8                 Q.    Okay.
 9                       So you cannot offer any opinion of
10            what happened in 2013 or 2014 with respect to
11            social media posts on Twitter, for example,
12            correct?
13                 A.    I would rather than say for example
14            in your question, I would say specifically on
15            Twitter, I am not offering an opinion about
16            what happened on Twitter before 2015.
17                 Q.    What about Facebook?
18                 A.    Facebook, I did -- I don't remember
19            the dates from which I scrolled Facebook.
20                       I'm happy to kind of look at the
21            Facebook screen shots and use the dates of the
22            posts as my bookends on that.
23                 Q.    Okay.
24                       We'll do that with -- with Facebook,
25            and we'll do that with LinkedIn as well.
```

```
 1                      We'll get to that.
 2                      I also noticed, in looking at the
 3         website screen captures, that the screen
 4         captures that you had for Rossier online, for
 5         example, started in 2016.
 6                      Do you remember that?
 7            A.    Yes, I think that's correct.
 8            Q.    And for the Rossier website, not the
 9         Rossier online, but just the Rossier website,
10         that that -- the screen shots you have started
11         in 2017.
12                      Do you recall that?
13            A.    That sounds correct.
14            Q.    Okay.
15                      And so, is it fair to say you're not
16         offering any opinion about what was on the
17         Rossier online website prior to 2016?
18            A.    I think that's fair to say.  My
19         recollection is that for all of the screen
20         captures from the Internet Archive, I -- my
21         date ranges were defined by when the screen
22         captures happened and/or when the rankings
23         appeared on those pages.
24                      And so, that's how I picked the date
25         range.
```

**Exhibit 2**
Page: 264
**369**

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

```
 1          Q.    Okay.

 2                And similarly, for Rossier.com or

 3     Rossier website -- maybe it's not Rossier.com.

 4                But the general Rossier website

 5     which you started gathering screen shots in

 6     2017, you have no opinion about the advertising

 7     practices on the website prior to 2017,

 8     correct?

 9                ATTORNEY BRYANT:  Object to form.

10          A.    Yes, I cannot verify the presence or

11     absence of the rankings on the Rossier.USC.edu

12     page prior to the first screen capture.

13          Q.    Okay.  Wonderful.

14                I don't mean it as wonderful.  But

15     thank you for your answer.  That was helpful.

16                Okay.

17          A.    Yes, we win.

18                Having opposing counsel say

19     wonderful after an answer is probably not

20     ideal.  But I appreciate your --

21          Q.    No, it was me more acknowledging

22     that you answered my question and you helped me

23     to understand.  So that what was I was

24     commenting on.

25                But anyway, probably not a good
```

1    thing for me to say.

2                    If we look at paragraph 170, you say

3    (as read):  We see many examples of the

4    rankings being shared.  These shares fall into

5    the category of earned social media.  Neither

6    2U nor USC had to pay for the exposure.

7                    Instead, these marketing messages

8    were the result of a steady investment in

9    social media and Twitter.

10                   And then below that, you have some

11   screen captures of five different shares.

12                   Do you see that?

13        A.    I do.

14        Q.    And so, when you say share, this is

15   someone who is sharing a particular Tweet about

16   the rankings of the Rossier school.

17                   Is that what you mean?

18        A.    Yes, I think most of these examples,

19   my assumption is that these were written by the

20   Twitter user.

21                   And so, in the first example, we

22   have Dr. Jamie Lee -- and I suspect that what

23   is happening here is that Dr. Lee is retweeting

24   or authoring this Tweet and sharing this on

25   Twitter to all of their followers.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 268 of 402
Page ID #:2623

Deposition of John Chandler, Ph.D.                Lambert, et al. v. University of Southern California and 2U Inc.

 1                And by using the @ sign to tag

 2       USCGlobalEdD and @GlobalEdExecs and using the

 3       hashtag kind of amplifying that message, I will

 4       anticipate an upcoming question and say that I

 5       recognize that the global Ed.D. program is a

 6       separate program from the Ed.D. OCL program.

 7                And I'm merely trying to illustrate

 8       that by investing time and attention on social

 9       media platforms, Rossier and 2U benefitted from

10       users creating or sharing content that falls

11       under the category of earned social media in

12       the sense that they didn't have to pay Twitter

13       for these messages to go out.

14                Users shared of their own volition.

15           Q.    Okay.

16                For any of these examples you give

17       here, do you know how many followers any of the

18       five individuals have?

19           A.    I have not analyzed the number of

20       followers of these accounts.

21           Q.    Okay.

22                And these screen captures were taken

23       within the last couple months, correct?

24           A.    That is correct.

25           Q.    And only one person liked Dr. Lee's

1     post, correct?

2           A.    That's correct.  The number retweets

3     are shown by the sort of two arrow symbol.  And

4     then the number of likes is shown beside the

5     heart symbol.

6           Q.    She had one retweet -- that's really

7     hard for me to say for some reason -- and one

8     like, correct?

9           A.    That's correct.

10          Q.    And if you go down to the Inner

11    Genius Prep, he had no retweets and only one

12    like, correct?

13          A.    That's correct.

14          Q.    And Journeys in Film had neither a

15    retweet nor a like, correct?

16          A.    That's correct.

17                And just to clarify, you know, the

18    interactions with the Tweets are valuable.

19    Simply sharing the Tweets -- so Journeys in

20    Film, all or some fraction of the followers of

21    Journeys in Film would receive this Tweet in

22    their feed.

23                So interactions are one measure of

24    engagement.

25                But then there's also sort of the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 270 of 402
Page ID #:2625

Deposition of John Chandler, Ph.D.                    Bethell, et al. v. University of Southern California and 2U Inc.

1    impression nature of someone simply sharing the

2    message and it appearing to their followers.

3         Q.    And, Dr. Chandler, you didn't study

4    the number of impressions for any of these

5    particular Twitter users, correct?

6         A.    That's correct.

7         Q.    Okay.

8              In paragraph 172, you're focusing on

9    an example of USC Rossier sharing their ranking

10   via status message.

11             Do you see that?

12        A.    I do.

13        Q.    Okay.

14             And in paragraph 172, you say (as

15   read):  It's impossible to know the exact

16   number of impressions generated by this

17   message.

18             And that's a true statement,

19   correct?

20        A.    It is a true statement.

21        Q.    And then you go on to say (as read):

22   It is likely that a message with this much

23   engagement would be seen by most of the

24   thousands of followers the account had at the

25   time.

```
 1                        So let's dig into that a little bit.
 2                        You say it's likely, but you don't
 3         actually know whether this particular sharing
 4         of the ranking message was seen by most of the
 5         thousands of followers, correct?
 6              A.    I say that it's likely.  I can't
 7         verify the number of followers who would see
 8         this message.
 9                        Twitter has released the algorithm
10         that they used to promote messages during this
11         time period.  And number of retweets, number of
12         likes are components of that.
13                        And so, based on my knowledge of how
14         these algorithms work and Twitter marketing and
15         dynamics generally, I think that it is likely
16         that a message that had this much engagement,
17         which, again, these numbers look relatively
18         small, 17 retweets, 16 likes, but for USC
19         Rossier, this was a message that had relatively
20         high engagement.
21                        I would expect that most of their
22         followers would have seen this message in their
23         feed based on how the algorithm works.
24              Q.    You say relatively high engagement.
25                        Are you talking about the 17
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 272 of 402
Page ID #:2627

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1    retweets and the 10 likes?

2         A.    I believe it's 16 --

3         Q.    Sorry.

4               (Multiple speakers.)

5         A.    -- likes.

6               No problem.

7               Yes, that's what I'm talking about.

8         Q.    Okay.

9               Did you compare the engagement of

10   this message with other messages Tweeted by the

11   USC Rossier school?

12        A.    Not systematically.  But I scrolled

13   through many messages just getting an overall

14   idea of, like, where this fell.  And seemed to

15   be more engagement than many of their other

16   Tweets.

17        Q.    Have you ever heard of the phrase or

18   the concept of social media mining?

19        A.    I'm not sure I have heard mining

20   using that context.

21        Q.    Okay.

22               And of the folks that engage with

23   this sharing of the ranking news by

24   @USCRossier, you can't tell me how many of the

25   people that you say most likely saw this

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 273 of 402
Page ID #:2628

Deposition of John Chandler, Ph.D.                    Birchall, et al. v. University of Southern California and 2U Inc.

1       message were prospective students, correct?

2              A.    No, I can't quantify the fraction of

3       the audience that were prospective students.

4              Q.    Okay.

5                    And then in paragraph 173, you're

6       talking about -- you say (as read):  These are

7       the Twitter users who reposted USC status.

8                    And then you have a list of people

9       who reposted USC status.

10                    Do you see that?

11             A.    I do.  I think I'm referring to that

12       previous, like, this Tweet that we've been

13       discussing --

14             Q.    Right.

15             A.    -- and I think I just took a screen

16       shot of all of the people who retweeted that.

17             Q.    Okay.

18                    And this was, in fact, all the

19       people who retweeted this, correct?

20             A.    If you scroll to the bottom, I...

21                    (Document review.)

22             A.    I'm just trying to count quickly.

23                    It is all or most of the people.

24             Q.    Okay.

25                    Because you say in paragraph 173

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 274 of 402
Page ID #:2620

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1      these are the Twitter users who reposted USC

2      status.

3                So fair to say that these are, in

4      fact, all of them?

5           A.    Yes, that's fair.

6           Q.    And did you do any study about how

7      many followers each of these particular Twitter

8      users had at the time you captured this?

9           A.    I did not.

10          Q.    Okay.

11                Let's jump to paragraph 182.

12                Let me actually go up because we're

13     talking about LinkedIn.  Let me make sure I put

14     this in context.

15                Earlier, I had asked you about the

16     periods of time that you studied the various

17     LinkedIn posts.

18                And so, on paragraph 176 on page 66

19     of Exhibit 1078, you begin to talk about the

20     use of LinkedIn to promote the rankings of the

21     school of education, correct?

22          A.    That's correct.

23          Q.    And I also asked you about the time

24     period that you studied, and you said you

25     weren't quite sure without seeing the dates of

1         the various captures.

2                     Looking at, for example,

3         paragraph 178, can you tell when this

4         particular post was made?

5         A.    This look like it was in 2021.

6         Q.    Okay.

7                     Because it was three-plus years ago,

8         correct?

9         A.    That's correct.

10        Q.    And then if you scroll down under

11        paragraph 179, can you tell when this

12        particular LinkedIn post was made?

13        A.    Yes, I believe this is a LinkedIn

14        profile page for an alum.  And, you know, this

15        was -- I can tell when I accessed it, which was

16        July 10th of 2024.  I don't know what that page

17        was created.

18                     But we have the finished degree in

19        August 2023.  So I would expect that that one

20        at the top here -- if you scroll up just a

21        little bit more -- you know, we can see that

22        this person posting on LinkedIn lists their

23        time in school from January 2020 to

24        August 2023.

25                     So I would expect this part of the

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 276 of 402
Page ID #:2631

Deposition of John Chandler, Ph.D.                    Bristol, et al. v. University of Southern California and 2U Inc.

1    profile page was created around then.

2         Q.    Okay.

3              And then similarly, when looking at

4    paragraph 180, Dr. Nadia Assaf, do you know

5    when she posted any information about the

6    ranking of USC?

7         A.    Again, I don't know precisely.  My

8    assumption would be that Dr. Assaf updated

9    their profile page around December of 2021.

10        Q.    Okay.

11             And then paragraph 181 is talking

12   about Melessa Hamilton.

13             And can you tell me when she posted

14   information about the USC Rossier school's

15   ranking.

16        A.    Again, my assumption is that was it

17   was by the end of 2021.

18        Q.    Okay.

19             So based on the LinkedIn pages or

20   profiles that we just looked at, the earliest

21   that you studied these LinkedIn messages about

22   USC's Rossier school's rankings was 2020, fair?

23             ATTORNEY BRYANT:  Object to form.

24        A.    Certainly, that appears to be the

25   earliest time period for any of these screen

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 277 of 402
Page ID #:2632

Deposition of John Chandler, Ph.D.    Iradell, et al. v. University of Southern California and 2U Inc.

 1    shots.

 2          Q.    And so, therefore, you're not

 3    offering any opinion about what was posted on

 4    LinkedIn prior to 2020, are you?

 5          ATTORNEY BRYANT:   Object to form.

 6          A.    I think that I am offering these as

 7    examples of the way in which former students

 8    talked about the rankings on LinkedIn, and

 9    illustrating the possibly of prospective

10    students seeing these rankings on LinkedIn.

11          I did not attempt to create a

12    comprehensive timeline of this sort of behavior

13    on LinkedIn.

14          So in my report, I'm showing

15    examples from 2020 onward.

16          There may well be others.

17          Q.    Okay.

18          But you're not offering any opinion

19    about what people were posting on LinkedIn

20    prior to 2020, are you?

21          A.    I am not offering an opinion of what

22    people were posting on LinkedIn prior to 2020.

23          I am also not offering an opinion

24    that this behavior began in 2020.

25          Q.    You just don't know when it began,

Deposition of John Chandler, Ph.D.        Iankowell, et al. v. University of Southern California and 2U Inc.

```
 1        fair?
 2             A.    I don't know with certainty when it
 3        began.
 4             Q.    Okay.
 5                   And then in paragraph 182, you say
 6        (as read):  When I estimate the fraction of
 7        students who saw the fraudulent rankings, these
 8        type of exposure are not tallied.
 9                   Do you see that?
10             A.    I do.
11             Q.    Now, you say when you estimate the
12        fraction of students who saw the fraudulent
13        rankings, I want to be very careful here.
14                   You don't actually know whether any
15        particular student saw a fraudulent ranking.
16                   You only know -- your opinion is
17        only that they may have been exposed to a
18        potentially fraudulent ranking.
19                   Isn't that fair?
20             A.    Yes, that's fair.  I am stating that
21        students and prospective students have the
22        opportunity to see the rankings via a platform
23        like LinkedIn or like Twitter or like Facebook.
24                   But I don't know with certainty
25        because the data aren't available that any
```

**Exhibit 2**
**382**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 279 of 402
Page ID #:2634
Deposition of John Chandler, Ph.D.                    Iordell, et al. v. University of Southern California and 2U Inc.

1      particular student actually was exposed to it,

2      or even if they were exposed, that they looked

3      at it.

4          Q.    Isn't the same true with respect to

5      the e-mails and the online pages we looked at,

6      that while a student may have been exposed to

7      it, you can't state with any scientific

8      certainty whether any student actually saw the

9      message about rankings, correct?

10             ATTORNEY BRYANT:  Object to form.

11         A.    I feel like that statement is

12     overstrong.  Again, marketing tends to be

13     something that that is analyzed in most cases

14     in aggregate form.

15             And so, in aggregate, I can say that

16     prospective students were exposed to the

17     rankings via these channels we're talking

18     about.  E-mail, websites, earned social media.

19             But I can't make statements because

20     we don't have the data or the data is not

21     available.

22             I can't make statements about

23     specific students, or unfortunately I'm unable

24     to quantify the number of prospective students

25     or students who are exposed.

1       Q.    Or who saw a message?

2       A.    Exposed or actually looked at with

3    their eyes.

4       Q.    Got it.  Okay.  Thank you.

5           Now, I want to go through the same

6    exercise we did a moment ago with the LinkedIn

7    and that we did with the Twitter, and look at

8    the Facebook examples you gave, and look at the

9    dates that you captured these various screen

10   shots.

11          So the first one is -- follows

12   paragraph 184.  And there's a post.

13          Can you tell me from when that post

14   was captured.

15      A.    Yes.  If we look at the footnote

16   149 -- I'm sorry.

17          And you're talking about the screen

18   shot under paragraph 184?

19      Q.    So let me actually re-ask the

20   question because it was a bad question.

21          So the screen shot under

22   paragraph 184 reflects a Facebook message from

23   USC Rossier School of Education -- or I'm

24   sorry, that's their face page, correct?

25      A.    Yes, this is the Facebook page for

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 281 of 402
Page ID #:2636

Deposition of John Chandler, Ph.D.                    Iacovell, et al. v. University of Southern California and 2U Inc.

 1    USC Rossier School of Education.

 2          Q.    And do you know for how long the

 3    Facebook page of -- of USC Rossier School of

 4    Education, or over what period USC Rossier

 5    School of Education mentioned rankings, if

 6    ever?

 7               ATTORNEY BRYANT:  Object to form.

 8               But you can answer.

 9          A.    I can't recall off the top of my

10    head.  I'm happy to sort of scroll through this

11    section and refresh my memory.

12          Q.    Sure.

13               I'm going to scroll through each

14    one.

15               So why don't we just say this.

16               If you see something that helps

17    refresh your recollection about whether and

18    when USC Rossier talked about rankings on their

19    Facebook page, let me know, okay?

20               (Document review.)

21          Q.    So going under paragraph 185, there

22    is a Facebook post from USC Rossier online.

23               And that's -- is that the online

24    Facebook page for USC Rossier?

25          A.    Yes.  Under paragraph 185, we see

1    the Facebook page for USC Rossier online,

2    although we're not looking at a post yet from

3    that page.

4              Q.    Right.

5              And can you recall whether on the

6    Facebook page of USC Rossier online, there was

7    mention of rankings by Rossier?

8              ATTORNEY BRYANT:  Object to form.

9         A.    Again, I would need to look at the

10    subsequent pages to say.

11         Q.    Okay.

12              So now, let's move down to the

13    subsequent pages.

14              We're looking at paragraph 186.

15              There is a message dated March 30,

16    2021, from the USC Rossier School of Education

17    about their ranking, correct?

18         A.    That's correct.

19         Q.    Okay.

20              And that's -- I'm sorry.

21              (Multiple speakers.)

22         A.    No, I was just going to say, yeah,

23    so this is March 30, 2021.  There are a number

24    of posts on Facebook, it appears, that have

25    been removed.  Some of these I've been able to

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 283 of 402
Page ID #:2638

Deposition of John Chandler, Ph.D.          Birdsall, et al. v. University of Southern California and 2U Inc.

 1          access.

 2                      And if we look at the footnote, we

 3          can -- we can see how that's done.

 4                      But the this is an example of

 5          Rossier sharing the ranking in March of 2020.

 6              Q.    When you say look at the footnote to

 7          see how that was done, what footnote are you

 8          talking about?

 9              A.    Footnote 151.

10              Q.    Okay.

11                      So in paragraph 186, you say (as

12          read):  USC Rossier School of Education has

13          posted about its ranking on Facebook in posts

14          that have since been removed, the first of

15          which is below.

16                      And then in footnote 151, you give

17          an URL for a Facebook post, correct?

18              A.    That's correct.

19                      And so, the first URL in footnote

20          151 is the URL for the page.  And I was not

21          able to find the post on that page.

22                      By going to the second URL, the one

23          that has that long number after profile and

24          then the search query that I used, I was able

25          to pull back up the removed post.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 284 of 402
Page ID #:2639

Deposition of John Chandler, Ph.D.                    Iddell, et al. v. University of Southern California and 2U Inc.

1    Q.    How do you know it was, quote,

2    removed?

3    A.    I didn't see it on their page when I

4    went to try to find it directly on the page.

5    Q.    But you were able to find it -- it

6    existed somewhere on Facebook.

7    Is that fair?

8    A.    That's correct.

9    Q.    Okay.

10    So then, again, starting with the

11    first post, paragraph 186, that's from March of

12    2021, correct?

13    A.    That's correct.

14    Q.    Okay.

15    And then we move to the next post

16    under paragraph 187.

17    And this is from March of 2020,

18    correct?

19    A.    That's correct.  And this post had

20    the same type of behavior, where I was not able

21    to find it under their profile page.

22    But by searching specifically, I was

23    able to bring it up on Facebook.  So it exists

24    somewhere, but it's not part of their standard

25    profile page.

**Exhibit 2**
**388**

```
 1              Q.    Okay.

 2                    And then we see the next post,

 3        paragraph 188.

 4                    This is from March 12th of 2019,

 5        correct?

 6              A.    That's correct.

 7              Q.    And then we move on.

 8                    So, so far, just to keep tally,

 9        March 12th of 2019 is the earliest post we've

10        seen, correct?

11                    You would agree?

12              A.    That's correct.

13                    The next page, I think, has 2018.

14              Q.    Okay.

15                    And so, we look under paragraph 189.

16                    This is a post from March of 2018.

17                    Do you see that?

18              A.    I do.

19              Q.    Okay.

20                    So now, that now is the earliest

21        post we've seen.

22                    And then we looked at paragraph 190.

23                    And under there is a post dated also

24        March of 2018, correct?

25              A.    That's correct.
```

**Exhibit 2**
Page: 284
**389**

```
 1              Q.    And then under paragraph 129,
 2       there's a Facebook post.
 3                    And this one is dated in January of
 4       2020, correct?
 5              A.    That's correct.
 6              Q.    And under paragraph 192, there's one
 7       dated March of 2019, correct?
 8              A.    That's correct.
 9                    In paragraph 192, this is not a
10       Facebook post where Rossier was sharing the
11       rankings.  This is a message where USC was
12       encouraging people to join its community on
13       Facebook.
14                    So I'm illustrating the way in which
15       they sort of bolstered their audience.
16              Q.    Okay.
17                    So having gone through now the
18       various Facebook posts, the earliest one we saw
19       was from March of 2018, correct?
20              A.    That's correct.
21              Q.    Are you offering any opinion about
22       the content of USC Rossier or Rossier online's
23       Facebook practices before March of 2018?
24              A.    I would answer this in the same way
25       I answered, I think, the previous question,
```

**Exhibit 2**
**390**
Page: 285

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 287 of 402
Page ID #:2642

Deposition of John Chandler, Ph.D.                    Iglaus, et al. v. University of Southern California and 2U Inc.

```
 1        where I'm not offering evidence of Rossier or

 2        Rossier online sharing the rankings before

 3        2018.

 4                    But I am not trying to represent

 5        that they did not do it beforehand.  And these

 6        were just the examples I chose.

 7             Q.    You don't -- as you sit here today,

 8        you don't know whether they did or didn't?

 9             A.    I cannot recall whether there was

10        anything before March of 2018.

11             Q.    Okay.

12                    Then we get online media.

13                    And in paragraph 194, you talk about

14        an article posted online in 2019, in which USC

15        Rossier emphasized the importance of its

16        ranking for recruiting new students.

17                    And you acknowledge here that the

18        article relates to the undergraduate program,

19        correct?

20             A.    That's correct.

21             Q.    And you say (as read):  While it --

22        while this subject of this article is the

23        undergraduate program, the quotes from Dr.

24        Julie Posselt, an associated professor of

25        higher education at Rossier, apply equally well
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 288 of 402
Page ID #:2643

Deposition of John Chandler, Ph.D.                    Iskandrell, et al. v. University of Southern California and 2U Inc.

1    to graduate programs.

2                      How do you know that what was posted

3    on this by Dr. Posselt applies equally to

4    graduate programs?

5                      ATTORNEY BRYANT:  Object to form.

6        A.    I am using Dr. Posselt's

7    justification of this statement that rankings

8    play a large role in a university's status for

9    incoming applicabilities.

10                     And then she goes to on to say (as

11   read):  Higher education is what we call, in

12   sociology, a status economy.  Status is

13   extremely important as a resource.  Rankings

14   are one indicator of status.

15                     It is my opinion that these

16   statements apply to graduate and undergraduate

17   programs equally well.

18       Q.    And what's the basis of that

19   opinion?

20       A.    My understanding of what status

21   economy means, my understanding of higher

22   education being a term that includes graduate

23   and undergraduate education, and my

24   understanding that rankings are an indicator of

25   status offered here in an unqualified form by

1    Dr. Posselt.

2            And so, I am saying that it applies

3    equally well.

4        Q.    What is status economy?

5        A.    A status economy is an economy based

6    on position typically within a hierarchy.  And

7    it is an economy that is sort of contrasted to,

8    like, a simple economic model of the economy,

9    where value is determined by money.

10           A status economy is a collection of

11    individuals where the wealth in a general sense

12    is determined partially by status within the

13    hierarchy.

14       Q.    When it says plays a large role,

15    have you seen any evidence of or any

16    quantification of what large role means in this

17    context?

18       A.    I have not seen an estimate of what

19    a large role means in this context.

20       Q.    Are there other factors that play a

21    large role in a university's status for

22    incoming applicants?

23           ATTORNEY BRYANT:  Object to form.

24       A.    Yes, I think some of things that we

25    discussed earlier, such as how long the school

Deposition of John Chandler, Ph.D.            Bardell, et al. v. University of Southern California and 2U Inc.

 1        has existed, its research status, things like

 2        that.

 3              Q.    Geography?

 4              A.    Yes, geography could also be

 5        included.

 6              Q.    Okay.

 7                    And the last sentence in the quote

 8        from Dr. Posselt says (as read):  Status is

 9        extremely important as a resource.  Rankings

10        are one indicator of status.

11                    What are other indicators of status?

12              A.    I believe that we just talked about

13        those.  But there are other indicators for

14        status, such as how long an organization has

15        existed, geography, the number of alums, and

16        the position they hold within society.

17                    There are a variety of indicators.

18              Q.    Okay.

19                    Let's move on to paragraph 200.

20                    You say in paragraph 200 that (as

21        read):  Repeated emphasis on the rankings is

22        something that students themselves began to

23        comment on.

24                    My first question for you:  How many

25        students began to comment on the rankings?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 291 of 402
Page ID #:2646
Deposition of John Chandler, Ph.D.                          Cantwell, et al. v. University of Southern California and 2U Inc.

 1                    ATTORNEY BRYANT:   Object to form.

 2           A.    I don't know how many students began

 3      to comment on the rankings.   These chats were

 4      part of the production from the named

 5      plaintiffs.   And so, these were the ones that I

 6      had access to.

 7                    And I wanted to illustrate the way

 8      in which students talked about the rankings

 9      when they were talking to each other.

10           Q.    And the students you're talking

11      about are two disgruntled students who sued the

12      University of Southern California, correct?

13                    ATTORNEY BRYANT:   Objection.

14           A.    I think that second chat involves

15      multiple students.   You know, we have Sarah,

16      Ahmad and Jey and Julie.   And so, you know,

17      Julie Cantwell is talking about the rankings.

18                    Sarah is talking about the rankings.

19                    I don't believe that they are

20      plaintiffs, but I could be wrong.

21           Q.    The only one who actually mentions

22      the ranking in the first conversation is

23      Mr. Murtada, correct?

24           A.    Yes, although MaryAnne seems to

25      agree in some sense with the comment:   I've

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 292 of 402
Page ID #:2647
Deposition of John Chandler, Ph.D.                Cantwell, et al. v. University of Southern California and 2U Inc.

```
1        been wondering the same.
2                    It feels, to me, like a conversation
3        about rankings between two people in that case.
4            Q.    Again, Mr. Murtada is a named
5        plaintiff in this case, correct?
6            A.    That's correct.
7            Q.    In the section you captured below in
8        paragraph 201, there's a conversation between
9        some students on August 14, 2020, at 1:20 p.m.
10                   Julie Cantwell says (as read):
11       Didn't they have us read an article last
12       semester that said rankings were all crap
13       anyway?
14                   Do you see that?
15           A.    I do.
16           Q.    Did you ever discuss with
17       Mr. Murtada or Ms. Cantwell or anyone else what
18       that article was?
19           A.    I did not.
20           Q.    Have you ever read articles that
21       suggest that USC News & World Report rankings
22       are unreliable?
23                   ATTORNEY BRYANT:  Object to form.
24           A.    I have seen articles questioning the
25       validity of these rankings as a metric.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 293 of 402
Page ID #:2648

Deposition of John Chandler, Ph.D.                    ...ell, et al. v. University of Southern California and 2U Inc.

1          Q.    Do you personally question the

2     validity of the rankings as a metric?

3                    ATTORNEY BRYANT:  Object to form.

4          A.    I personally think that rankings

5     like this are a product of the algorithm used

6     to calculate them.  And I think these rankings

7     accurately reflect the information that is put

8     into that algorithm.

9                    I do not have detailed knowledge of

10    what the algorithm is.  But I guess I would say

11    that I neither think the rankings are

12    unreliable nor particularly reliable.  Merely

13    reflect the data that is combined to make the

14    ranking.

15         Q.    Dr. Chandler, do you have any

16    opinion on the utility of rankings and making

17    decisions about enrollment into universities?

18                    ATTORNEY BRYANT:  Object to form.

19         A.    I think my opinions about the

20    utility of rankings are limited to the sort of

21    descriptive way in which I have noted 2U and

22    USC emphasizing and sharing and celebrating the

23    rankings.

24                    And so, it is my opinion that 2U and

25    USC feel like the rankings have utility.  But I

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 294 of 402
Page ID #:2640
Deposition of John Chandler, Ph.D.    Iarussell, et al. v. University of Southern California and 2U Inc.

1    am not offering an independent assessment of

2    the utility of the rankings.

3        Q.    Okay.

4            Do you have any basis to know or

5    opine on the utility of the rankings that are

6    advertised by the University of Montana in

7    terms of decisions to apply or enroll into the

8    university?

9            ATTORNEY BRYANT:  Object to form.

10       A.    I'm sorry.  I lost the thread of

11   that question.

12           Would it be possible --

13       Q.    That's okay.

14           So we talked earlier about how the

15   University of Montana uses various rankings for

16   its various schools and programs, correct?

17       A.    Correct.

18       Q.    Have you ever studied utility

19   students place on those rankings in making

20   decisions to apply or enroll in the university

21   or any of its colleges?

22           ATTORNEY BRYANT:  Object to form.

23           You can answer.  Sorry.

24       A.    I have not studied the utility of

25   prospective students, or that prospective

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 295 of 402
Page ID #:2650
Deposition of John Chandler, Ph.D.    Iqbell, et al. v. University of Southern California and 2U Inc.

1    students at the University of Montana place on

2    the rankings.

3        Q.    Okay.

4            In paragraph 205 -- I'm sorry.  Now,

5    we're moving to the scale of USC's marketing

6    campaigns.

7            You're talking about the budgets for

8    marketing spend for various years.

9            By the way, did you look at any

10    marketing spend prior to the fiscal year

11    '17-'18 year?

12        A.    This was earliest marketing spend

13    document that I could find in the production.

14        Q.    You say (as read):  As we can see,

15    USC spent indirectly between 398,000 fiscal

16    year '21-'22, and 640,000 fiscal year 2021 on

17    expenses related to marketing, with significant

18    portions of that budget being spent to promote

19    their fraudulent rankings.

20            How do you know that a significant

21    portion of the budgets reflected above

22    paragraph 205 went to spend on promoting the

23    rankings of the Rossier school?

24        A.    There were significant line items

25    associated with website design and maintenance.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 296 of 402
Page ID #:2651

Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

1    Print marketing, both the creation of the print

2    materials and the postage to send those out.

3              As I had mentioned above, with

4    search and display, I can't verify the content

5    of the marketing.  But it is quite likely that

6    some of the marketing on search and some of the

7    marketing on display, both of which represent

8    significant line items, included the rankings.

9              And so, I am sort of putting those

10   pieces together in the absence of more detailed

11   information from 2U and USC to assert that some

12   significant fraction of this budget was spent

13   on marketing that included the rankings.

14        Q.    Okay.

15              But not a significant -- you don't

16   know whether a significant portion of the

17   dollars spent were actually spent to promote

18   the rankings, correct?

19        A.    You know, we may be in, like, a

20   semantic hole here.

21              The website, for instance, costs

22   thousands -- like tens of thousands of dollars,

23   sometimes more, in the year they did the

24   redesign.  And that website included the

25   rankings.

**Exhibit 2**
**400**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 297 of 402
Page ID #:2652

Deposition of John Chandler, Ph.D.                    Iglebell, et al. v. University of Southern California and 2U Inc.

```
 1                        And so, the creation and maintenance
 2          of the website was a significant expenditure.
 3          The rankings were included on that website
 4          during the periods of time we looked at above.
 5                        And so, this is where I am getting
 6          my assertion that a significant portion of the
 7          budget included the rankings.
 8                        In addition to the things I
 9          mentioned earlier in the previous question,
10          potential spend on search and display and the
11          money spent purchasing e-mails and maintaining
12          the e-mail marketing campaigns.
13                Q.    Okay.
14                        When you say a significant portion,
15          what portion?
16                A.    I'm not sure I understand the
17          question.
18                Q.    Well, I'm using your words here.
19                        You say a significant portion of
20          that budget is being spent to promote their
21          fraudulent rankings.
22                        So I'm asking you, when you say
23          significant portion, what was the portion?
24                A.    Can we scroll up just a little bit.
25                Q.    Yes, of course.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 298 of 402
Page ID #:2653
Deposition of John Chandler, Ph.D.                Iloh, et al. v. University of Southern California and 2U Inc.

1              A.    That's great.

2                    And actually, can we go a little bit

3       higher.  I'm just trying to remember these

4       headers.

5                    So, you know, I don't have an exact

6       number for each of these columns.

7                    The promotion and recruiting covers

8       direct marketing costs.  A large fraction of

9       these costs were related to website maintenance

10      and design.

11                   I think my recollection is the FY

12      '18-'19, the second data row of the table, that

13      large value in P & R was related to website

14      design.

15                   So I don't have a significant number

16      for that significant portion.  I'm just

17      illustrating that there was a great deal of

18      money put behind these initiatives.  Some those

19      initiatives include the ranking information.

20             Q.    Okay.  Got it.

21                   Okay.  And based on your analysis of

22      the materials in this case, you would agree

23      that the nature of the USC Rossier

24      ranking-related statements changed over time,

25      correct?

Iverell, et al. v. University of Southern California and 2U Inc.

```
 1          A.    I'm not sure what we -- I'm not sure
 2     what we mean by nature here.
 3          Q.    Yeah, let me withdraw and ask a more
 4     specific question.
 5               Is it correct that some of the time
 6     communications may have referred to a specific
 7     ranking, while other times it may have just
 8     referred to top ranked?
 9               ATTORNEY BRYANT:  Object to form.
10          A.    It is correct that the -- sometimes
11     numerical rankings were used.  Sometimes top
12     ranked was used.  And it varied by channel and
13     by time.
14          Q.    Okay.
15               And have you done any analysis of
16     how often each occurred; in other words, how
17     often the specific ranking was used versus just
18     the reference to being top ranked?
19               ATTORNEY BRYANT:  Object to form.
20          A.    I have attempted to document the
21     usage in the places where I can based on the
22     data that's available.
23          Q.    Okay.
24               So whatever analysis you performed
25     on that is contained within the four corners of
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 300 of 402
Page ID #:2655
Deposition of John Chandler, Ph.D.                    Iredell, et al. v. University of Southern California and 2U Inc.

 1        your report.

 2                     Is that fair?

 3            A.      Yes, I believe that's fair.

 4            Q.      Okay.

 5                     We're looking at the marketing spend

 6        again, which is paragraph 204.

 7                     Does the marketing spend information

 8        in that chart in paragraph 204 provide any

 9        insight into the number of prospective students

10        that were exposed to the ranking statements?

11            A.      Only in a very indirect way in that

12        the money spent, some fraction of that went to

13        prospective students.  Some fraction of that

14        included the rankings.

15                     But we can't determine the portion

16        exactly.

17            Q.      Got it.

18                     And then we're getting near the end.

19                     I just want to jump back up to

20        paragraph 9.  Which is one of your -- I'm

21        sorry, no, I want to go to the opinions section

22        of your report.

23                     We're looking at the opinions

24        section, which is paragraph 14.  And it's the

25        ninth opinion, which shows up on page 5.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 301 of 402
Page ID #:2656

Deposition of John Chandler, Ph.D.                Farrell, et al. v. University of Southern California and 2U Inc.

1          Do you see that?

2      A.    I do.

3      Q.    And you say (as read):  Given the

4  extensive and varied exposure methods outlined

5  above, I can state with a reasonable degree of

6  scientific certainty that all or nearly all

7  students at USC Rossier in the MAT and OCL

8  programs during the period of ranking

9  manipulations were exposed to the fraudulent

10 rankings.

11          Do you see that?

12     A.    I do.

13     Q.    What degree of scientific certainty

14 do you have?

15          ATTORNEY BRYANT:  Object to form.

16     A.    I am about to say a reasonable one.

17     Q.    Okay.

18          Can you quantify that for me.

19          ATTORNEY BRYANT:  Sorry if you

20 weren't done with the question.

21          ATTORNEY CAMPBELL:  No, no, I was

22 done.

23 BY ATTORNEY CAMPBELL:

24     Q.    So can you state with specificity

25 what the degree of scientific certainty is in

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1          that particular opinion?

2               A.    I'm interpreting that question to

3          mean can I give you a precise numerical value

4          for the number of prospective students or

5          matriculated students who were exposed to the

6          rankings.

7                    Am I understanding correctly?

8               Q.    Well, I mean, you used the term

9          degree of scientific certainty.

10                   So I guess I'm trying to understand,

11         what degree of certainty do you have?

12                   Is it 50 percent, is it 90 percent,

13         that the opinion in paragraph 9 is accurate?

14              A.    Oh, virtually complete certainty.

15              Q.    Have you estimated an error rate

16         associated with this degree of certainty?

17              A.    Unfortunately, because of the

18         availability of data, I can't estimate an error

19         rate or even give precise numerical estimates

20         for this.

21                   My estimate is based on combining

22         these many pieces of evidence that we've been

23         talking about.  The e-mails, the websites, the

24         other forms of marketing that we've been

25         discussing, and my marketing experience in

1    looking at the scenarios that would have to

2    occur for a student to matriculate having not

3    been exposed to the rankings during this period

4    of time.

5         And I can say with a reasonable

6    degree of scientific certainty that all or

7    nearly all would've been reached.

8         I mean, we talked through some

9    hypothetical scenarios where someone could have

10   avoided the e-mails.  Those alone would

11   probably give me this level of scientific

12   certainty combined with all of the other ways

13   the ranking information was shared, that is how

14   I arrived at this degree of certainty.

15        Q.    Okay.

16             And we talked about this before, but

17   I want to be really clear.

18             In terms of this particular opinion,

19   when you say they were exposed to it, they may

20   have come across a particular marketing piece

21   that made mention of the rankings, but we have

22   no evidence and no way to measure whether they

23   actually read or considered that particular

24   mention of the rankings, correct?

25             ATTORNEY BRYANT:  Object to form.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 304 of 402
Page ID #:2659

Deposition of John Chandler, Ph.D.    I  Cabell, et al. v. University of Southern California and 2U Inc.

1      A.    I'm certainly not saying that no

2    evidence exists to say that.  There are places

3    where we, as we've talked about before, I can

4    say with certainty -- I can make with certainty

5    a statement about exposure and not be able to

6    say that someone looked at that exposure.

7           I can infer from the marketing

8    practices that 2U engaged in and the way in

9    which the rankings remained an important part

10    of the marketing throughout the entire time

11    period and use that as evidence that the

12    rankings were, in fact, seen.  Because

13    marketers would not continue to use them if

14    they were not effective.

15           But that is the extent of the sort

16    of direct evidence I have.  It's the behavior

17    of 2U and USC who have access to data during

18    this time period that I don't have access to

19    now.

20      Q.    Dr. Chandler, does the University of

21    Montana have any data that suggest that the use

22    of rankings in its advertisements in marketing

23    is effective?

24           ATTORNEY BRYANT:  Object to form.

25      A.    Yes, we have performance data at the

1    creative level.  And by creative, I mean the

2    copy of the content of the ads.  We have

3    performance data at the creative for ads on

4    social media, for some display advertising, for

5    some e-mail marketing.

6              And that data includes whether or

7    not the rankings were part of the creative.

8    And so, you can look at two ads, compare their

9    performance.  If one ad had the ranking and one

10   doesn't, then you can use that difference in

11   performance to estimate the impact of ranking.

12             That data doesn't exist in this

13   situation.

14        Q.    Got it.

15             ATTORNEY CAMPBELL:  Can we just go

16        off the record.  We'll take two minutes.  I

17        think I'm done.

18             But I just want to confer with my

19        colleague and then we'll come back and wrap

20        it up.

21             I mean I literally need two minutes.

22             THE WITNESS:  No problem.  We can

23        just wait right here online.

24             THE VIDEOGRAPHER:  Off the record

25        5:48 p.m.

**Exhibit 2**
Page: 304
**409**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 306 of 402
Page ID #:2661

Deposition of John Chandler, Ph.D.                Campbell, et al. v. University of Southern California and 2U Inc.

 1                    (Recess is taken.)

 2                    THE VIDEOGRAPHER:  Back on the

 3           record 5:52 p.m.

 4                    ATTORNEY CAMPBELL:  Dr. Chandler,

 5           thank you for your time.

 6                    I don't have any further questions

 7           at the moment.

 8                    I understand your counsel has a few

 9           questions.  And I may have follow-up after

10           that.

11                    So I'll turn it over to Mr. Bryant.

12        EXAMINATION BY

13        ATTORNEY BRYANT:

14           Q.    Thank you very much.

15                    Dr. Chandler, I've got just a few

16        questions.  Hopefully, we won't be here too

17        long.

18                    Some of them, I'm trying to figure

19        the best way to approach this.

20                    ATTORNEY BRYANT:  And I want to say,

21        Mark, I apologize.  I don't have control of the

22        exhibits.  So I might ask you to scroll through

23        a few things.

24                    ATTORNEY CAMPBELL:  I think Paul can

25           give you control.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 307 of 402
Page ID #:2662
Deposition of John Chandler, Ph.D.                    Campbell, et al. v. University of Southern California and 2U Inc.

 1                   So just as soon as he puts them on

 2              the screen, if you double-click on it, you

 3              should gain control.

 4                   ATTORNEY BRYANT:  Perfect.

 5         BY ATTORNEY BRYANT:

 6              Q.    All right.

 7                   If we could bring up the report.

 8                   And is that 1078?  Yes.

 9                   ATTORNEY BRYANT:  And so, if I

10              double-click, I'll have control?

11                   ATTORNEY CAMPBELL:  Yes.

12         BY ATTORNEY BRYANT:

13              Q.    I'm not click to start.

14                   All right.  Am I okay?

15                   There we go.

16                   I'm going to go down to page 45 to

17         46.

18                   And so, there are -- I believe this

19         is -- okay.  Yup, this is where I am.

20                   So right now, I'm scrolling past,

21         because we're not really going to talk about

22         this, pages 42, 43, 44, and the first part of

23         45.

24                   These are, I guess, as you've

25         represented in your -- in your earlier

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 308 of 402
Page ID #:2663

Deposition of John Chandler, Ph.D.    Iliescu-Bell, et al. v. University of Southern California and 2U Inc.

1    testimony, these are sort of screen shots

2    relating to the Rossieronline.USC.edu program

3    of various pages, correct?

4         A.    That's correct.

5         Q.    And for each of these pages, you've

6    sort of given -- identified when specific ranks

7    were used -- or sorry.

8              Better way of saying that, when

9    numerical rankings were used?

10        A.    That's correct.

11        Q.    And when -- in some instances, it

12   switched from numerical rankings to discussing

13   things like top ranked?

14        A.    Yes, that's correct.

15        Q.    Okay.

16             There was some testimony -- I just

17   want to make sure that it is clear for the

18   record, that, I guess, say, represented that it

19   switched from using the numerical rankings to,

20   quote/unquote, just top ranked or only top

21   ranked.

22             Are you aware of any of these where

23   the only representation on these -- and if you

24   need me to slow down or go to specific things

25   -- where the only representation made is that

1    it is top ranked as opposed to being top ranked

2    among the graduate schools of education in the

3    U.S. News & World Report?

4         A.    It's my understanding that when the

5    Web page changed to say top ranked, it always

6    included a mention of where that ranking was

7    occurring and stated USC News & World Report,

8    where it had a link to the rankings.

9         Q.    Okay.

10              I'd like to recall, and you may

11   recall there were a couple of hypotheticals

12   that were raised, paraphrasing some of the

13   hypotheticals, about a student who perhaps went

14   to the website, knew they were going to apply,

15   and sort of, like, made it through the website

16   without being exposed, or somehow applied

17   without being exposed to the rankings.

18              Let's look at page -- starting on

19   page 47, where it switches to USC Rossier

20   School of Education.

21              This Rossier.USC.edu, that's a

22   different page.

23              What is that Rossier.USC.edu page?

24        A.    So that is the homepage for the

25   entire school of education.

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 310 of 402
Page ID #:2665
Deposition of John Chandler, Ph.D.    Maxwell, et al. v. University of Southern California and 2U Inc.

 1              And the Rossieronline.USC.edu was

 2    specifically for the online programs managed by

 3    2U.

 4         Q.    Okay.

 5              And in each of these, if I'm not

 6    mistaken, each of these screen shots, there is

 7    some sort of a reference to a U.S. News

 8    ranking.

 9              So, I guess, looking March 20, 2017,

10    we see ranked number 15 here?

11         A.    That's correct.

12         Q.    And at some point in time, you

13    talked about sort of placement.

14              And I know this placement was not in

15    the context of placement on the homepage.  I

16    think at the time when you talked about

17    placement, it was with respect to Google

18    keyword rankings, which I'll ask you about in a

19    minute.

20              But, you know, this is -- is there

21    -- does placement matter in the design of a Web

22    page?

23              ATTORNEY CAMPBELL:  Objection to

24         form.

25         A.    Yes, there are --

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 311 of 402
Page ID #:2666

Deposition of John Chandler, Ph.D.                    Farrell, et al. v. University of Southern California and 2U Inc.

 1              ATTORNEY BRYANT:  Let me ask this

 2         question.

 3              Sorry, John.  Dr. Chandler.

 4    BY ATTORNEY BRYANT:

 5         Q.    Does -- can you describe for me what

 6    significance, if any, the placement of

 7    particular content has when it comes to website

 8    design?

 9              ATTORNEY CAMPBELL:  Objection to

10         form.

11    BY ATTORNEY BRYANT:

12         Q.    You can answer.

13         A.    Apologies.

14              Yes, the placement on a Web page and

15    website design has an influence on what content

16    people see on that page.

17              There's well-established research on

18    the way in which people read information

19    online.  Typically, people start at the top

20    left and will move down the left-hand side and

21    then across from there.

22              And so, people tend to read much

23    like we read books.  And will see the

24    information kind of in the order it's

25    displayed, going left to right and top to

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 312 of 402
Page ID #:2667

Deposition of John Chandler, Ph.D.                    Iovell, et al. v. University of Southern California and 2U Inc.

```
 1              bottom.
 2                        Things like font size influence
 3              whether or not an element of a page is viewed.
 4              Colors can influence whether or not part of a
 5              page is viewed.
 6                        And so, in this case specifically,
 7              like the example that we're on here in
 8              paragraph 145, the number 15, beneath that it
 9              says USC Rossier U.S. News rank for best
10              education schools.
11                        And that number 15 is prominently
12              displayed with a lot of white space around it.
13              And kind of toward the middle of page in a
14              large font.  Very easy for people to see.
15                   Q.    And what -- if you can describe what
16              on the left-hand side is visible when looking
17              at that ranking.
18                   A.    On the left-hand side, we see some
19              button, like request for information.  That's
20              how people would kind of enter in their e-mails
21              and begin receiving these e-mail campaigns.
22                        Apply now.  And visit campus.
23                        And so, these are ways for students
24              to engage more deeply with the Rossier school.
25                   Q.    Okay.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 313 of 402
Page ID #:2668

Deposition of John Chandler, Ph.D.                    Campbell, et al. v. University of Southern California and 2U Inc.

```
 1                      And so just so I understand, and I
 2            -- it is your representation that people
 3            oftentimes, or there's literature saying that
 4            folks start in the top left-hand side, look
 5            down the left-hand side, and then sort of
 6            generally read right to left, as we do in, I
 7            guess, English?
 8                      ATTORNEY CAMPBELL:  Objection to
 9                 form.
10            BY ATTORNEY BRYANT:
11                 Q.    You can answer.
12                 A.    Yes, there's some variation
13            depending on how the page is laid out.
14                      But a page like this, people would
15            start in the upper left.  Likely most would
16            look into that initial box in the center,
17            improving learning.  And then look at the
18            numbers beneath.
19                      It is also possible that someone
20            start in the top left and just go down that
21            column and then move to the right.
22                 Q.    Okay.
23                      And so, let's look at paragraph 148
24            here for a minute.
25                      And so, I guess this is -- and I'm
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 314 of 402
Page ID #:2660

Deposition of John Chandler, Ph.D.                    Campbell, et al. v. University of Southern California and 2U Inc.

```
 1        trying to understand the exposure answers.

 2                    So if I went to Rossier.USC.edu on

 3        January 27, 2018, this is what I would see?

 4            A.    That's correct.

 5            Q.    Okay.

 6                    And so, if I were the hypothetical

 7        student that knew that I wanted to apply, I

 8        might just click the apply now button?

 9            A.    If you knew you wanted to apply, you

10        would presumably click the apply now button.

11                    But this entire page would be

12        visible to you.

13            Q.    And so, in your -- in your opinion,

14        when you're talking about exposure,

15        specifically that opinion number nine, exposure

16        of students who matriculate, that student who

17        is -- that hypothetical student would be

18        counted in your exposure; is that correct?

19                    ATTORNEY CAMPBELL:  Objection to

20            form.

21            A.    The student --

22                    (Multiple speakers.)

23                    ATTORNEY CAMPBELL:  I'm sorry, Dr.

24            Chandler.

25                    Objection to form.
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 315 of 402
Page ID #:2670

Deposition of John Chandler, Ph.D.                Tynell, et al. v. University of Southern California and 2U Inc.

1        A.    A student who visited this page

2    would be counted in that exposure.

3              We also discussed a hypothetical

4    that I found farfetched.  There would be

5    someone directly landing on the application

6    page, which is not what's shown here.

7              But I think that would be a very

8    uncommon way for a student to begin the

9    application process.

10       Q.    Okay.

11             ATTORNEY BRYANT:  I'm trying to get

12   out of here and I'm not sure how to get out of

13   here.

14             ATTORNEY CAMPBELL:  You want to take

15       the exhibit down, do you mean?

16             ATTORNEY BRYANT:  Okay.  No, no, no.

17             I made it my whole screen.  I

18       apologize.

19             ATTORNEY CAMPBELL:  Oh, okay.

20             ATTORNEY BRYANT:  Can we go to --

21       let's if I have any more questions here.

22             (Document review.)

23   BY ATTORNEY BRYANT:

24       Q.    Let's stick here for just a moment.

25             I'm not sure if we need to refer to

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 316 of 402
Page ID #:2671

Deposition of John Chandler, Ph.D.                Iovino Powell, et al. v. University of Southern California and 2U Inc.

```
 1          your report.
 2                     I just want to ask some questions
 3          about Twitter.  And I'll use Twitter instead of
 4          X.  Not a fan of dead-naming, but I'll stick
 5          with Twitter for clarity's sake.
 6                     There was -- received some questions
 7          knowing the number of followers individual
 8          people who posted things have.
 9                     Is it your understanding of how
10          Twitter works that the views a particular Tweet
11          receive are limited to the accounts that follow
12          that particular Tweeter or poster?
13                     Said another way, do I have to
14          follow a particular profile to see their
15          Tweets?
16          A.    Not necessarily.  There are a
17          variety in ways in which Tweets can appear in a
18          feed.  Poplar Tweets can be promoted by Twitter
19          regardless of follower status.
20                     Also, firms can pay Twitter to
21          promote Tweets and those Tweets can be seen by
22          people outside of their followers.
23          Q.    So is it fair to say that the
24          absence or presence of the number of likes,
25          retweets, or reposts are not necessarily
```

 1          indicative of the number of impressions a Tweet

 2          has had?

 3                  A.    Yes, that's accurate.

 4                  Q.    Okay.

 5                      ATTORNEY BRYANT:  Can we switch to

 6          Exhibit 1081.

 7                      All right.  And am I going to need

 8          to double-click again?

 9                      THE VIDEOGRAPHER:  You need to click

10          on the document to take control.

11                      ATTORNEY BRYANT:  Okay.  Perfect.

12                      And I can search like normal, I

13          guess.

14                      Let's see.

15                      (Document review.)

16      BY ATTORNEY BRYANT:

17                  Q.    So I'm looking at Exhibit 1081.

18                      We'll look here at page 16 on the

19          PDF.  It is 2U Favell 431 in Bates number.

20                      And we've got a list of keyword

21          rankings.

22                      I believe that there were two,

23          potentially three of these tables or similar

24          tables that we saw in this report.

25                      Just one sort of technological

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 318 of 402
Page ID #:2673
Deposition of John Chandler, Ph.D.                    Isabell, et al. v. University of Southern California and 2U Inc.

 1          clarification.

 2                    If I were to type into my Google --

 3          and I sort of did this on a break -- online

 4          Ed.D. programs.  And I received in the Google

 5          bar three different programs with information

 6          about those three different programs that said

 7          sponsored underneath.

 8                    Is that -- I guess how does that --

 9          like, is that keyword ranking?

10                    There's -- I just want a little

11          clarity on what keyword rankings are.

12          A.    Yes.  So if you search online Ed.D.

13          programs and you see in your initial search

14          results three sponsored links that come up.

15          What you're actually seeing is the creative for

16          the search marketing.  So that is the ad for

17          search.

18                    The first ranking or the first

19          listing that you see, that is the search

20          advertising that has a rank of one.

21                    The second one has a rank of two, et

22          cetera.

23                    And so, as you continue to scroll,

24          you will see, for instance, like, paid listings

25          on the right-hand sidebar.  The rankings kind

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 319 of 402
Deposition of John Chandler, Ph.D.                Page ID #:2674
Page ID #:2674, et al. v. University of Southern California and 2U Inc.

 1          of continue down that sidebar.

 2                  Q.    Okay.

 3                        And -- and when I search this online

 4          -- and so, I guess the question -- I'm -- you

 5          help me understand this.

 6                        The keyword ranking will sort of

 7          serve me some number of sponsored rankings or

 8          sponsored results, I guess.

 9                        Is that accurate?

10                  A.    I would say the search engine will

11          serve you a certain number of sponsored

12          results.

13                  Q.    Okay.

14                        And is there necessarily any

15          connection between the words used in the

16          keyword search and the content of the creative

17          that pops up into those, I guess, responses

18          that I've been served by the search engine?

19                        ATTORNEY CAMPBELL:  Object to form.

20                  A.    You know, there is, in some very

21          broad sense, a connection only in that if you

22          search online Ed.D. programs, you are unlikely

23          to receive search creative about ice hockey

24          sticks.  Right.  You are going to receive

25          creative related to the advertisers who have

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 320 of 402
Page ID #:2675

Deposition of John Chandler, Ph.D.                    Iwanowell, et al. v. University of Southern California and 2U Inc.

 1          purchased that keyword.

 2                   But the actual creative on the

 3          search ad can include anything.  And that's

 4          decided by the marketer.

 5                   And so, part of what we discussed

 6          earlier in the deposition is that the keyword

 7          that's being purchased is an attempt to put

 8          oneself in the mind of a prospective student.

 9          What would someone in this case, you know,

10          perhaps in -- you know, thinking about the

11          awareness stage of online Ed.D., you know, what

12          might they type into their search bar.

13                   But then the creative, you are

14          attempting to put your most compelling foot

15          forward.  And so, that creative can include

16          anything that the marketing firm thinks will be

17          persuasive who's searched for that keyword.

18              Q.   Okay.

19                   So it's my understanding that you do

20          not have access to the creative or the sort of

21          text content of the ads that were served using

22          these keywords; is that correct?

23              A.   That's correct.

24                   And Dr. Gerber, I believe, testified

25          that they did not retain that information.

```
 1              Q.    But just so that I understand and
 2         just to put a bow on it, in these keyword --
 3         sorry, in these keyword rankings, the term top
 4         ranked or specific ranks are not used, correct?
 5                    In the actual -- scratch that.
 6                    I will ask the question again.
 7                    In the keywords that are represented
 8         -- and I can scroll to different pages, if
 9         you'd like.
10                    In the keywords that are represented
11         in these keyword ranking tables presented in
12         the 2U marketing plans, the word rankings or
13         top ranked are not keywords; is that correct?
14              A.    That's correct for the keywords that
15         we're seeing here.  This is a fraction of the
16         total keywords purchased.
17                    But yes, for the keywords we're
18         looking at here, rankings and top ranked do not
19         appear.  But in the creative, those words could
20         appear.
21              Q.    So you anticipated.
22                    So you -- and we don't have -- it's
23         my understanding that you don't know whether
24         they did or they did not, correct?
25              A.    That's correct.
```

Exhibit 2
425

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 322 of 402
Page ID #:2677

Deposition of John Chandler, Ph.D.                    Caldwell, et al. v. University of Southern California and 2U Inc.

1        Q.    But the absence of ranking or top

2    ranked in these lists of keywords does not

3    definitively tell you whether or not they

4    appeared in ads that were served to people who

5    searched these terms?

6        A.    That's correct.  We cannot infer

7    from what's in the keyword what was in the

8    creative.

9        Q.    Okay.

10             ATTORNEY BRYANT:  Can we go to

11   Exhibit 1082.

12   BY ATTORNEY BRYANT:

13       Q.    There we go.

14             And I'm going to scroll down to the

15   bottom for these color ones.  I like the color

16   a lot more than these others.

17             All right.  So I've got up -- I just

18   want to make sure you've got up on your screen,

19   this -- is this what we were talking about

20   here?

21       A.    I believe we are on a different

22   page.

23       Q.    I believe we are on a different

24   page.

25       A.    If you scroll through, I'll

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 323 of 402
Page ID #:2678

Deposition of John Chandler, Ph.D.                Iliescu-Terrell, et al. v. University of Southern California and 2U Inc.

```
 1          recognize --

 2                      (Multiple speakers.)

 3          Q.    Okay.  Enrollment by source.

 4                That's what I was looking for.

 5                And that's one of two that I'm going

 6     to ask you about.

 7                Okay.  And I think this is -- I

 8     think hopefully can help me clear up some

 9     confusion that I've got here.

10                So this is looking at, you know,

11     2016 enrollment by source for the master's

12     program.

13                I believe you agreed with that?

14          A.    Yes.  My understanding of what's

15     depicted in this chart is the -- what I would

16     call the attributed source for enrollments to

17     the master's program.

18                And so, this represents the last

19     location that someone visited before they

20     arrived, basically.

21                I'm not sure exactly where 2U

22     determined the cutoff here.  But this is kind

23     of the attributed source, is my understanding.

24          Q.    Okay.

25                So this -- this -- and so, not --
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 324 of 402
Page ID #:2679
Deposition of John Chandler, Ph.D.    Burchell, et al. v. University of Southern California and 2U Inc.

1    when you say not knowing where the cutoff is,

2    is that saying, like, it's not clear if this is

3    the last thing they did before starting the

4    application or the last thing they did before,

5    you know, submitting the application, but they

6    got to some point near the end.

7              Is that a fair characterization?

8              I know that's probably going to get

9    an objection.  I apologize.

10              ATTORNEY CAMPBELL:  Objection to

11        form.

12        A.    The -- we don't how close it is to

13    the end.  In a normal sort of retail

14    environment, instead of enrollments by source,

15    this would be sales by source.  And then we

16    would know that those were people who had hit

17    the purchase button on the page.

18              Since there is not an enroll button

19    on higher education websites, I would suspect

20    that this is either students who request

21    information and subsequently enrolled and it's

22    last thing they did before requesting

23    information.

24              Or it's application starting and

25    then they finished the application and were

```
 1          accepted and subsequently enrolled.
 2                    Or it was the finishing the
 3          application and then enrolling.
 4                    And so, it's unclear what action we
 5          are doing this marketing attribution for.  But
 6          I suspect it is one of those.
 7               Q.   Okay.
 8                    And so, is it fair to say that this
 9          provides some sort of a snapshot of something
10          happened that immediately before time zero,
11          whatever time zero is?
12                    ATTORNEY CAMPBELL:  Objection to
13               form.
14               A.   Yes, I think that's a fair
15          characterization.
16               Q.   Okay.
17                    Does this in any way represent the
18          amount of marketing creative that an enrolled
19          student was exposed to?
20               A.   It absolutely does not.
21                    And the entire point of the
22          statistical modeling I did in my dissertation
23          is that you have to look at the totality of
24          touch points and not just the last touch point
25          before someone takes an action.
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 326 of 402
Page ID #:2681

Deposition of John Chandler, Ph.D.                    Bilwell, et al. v. University of Southern California and 2U Inc.

```
 1              And so, I do not think that this
 2     accurately reflects the totality of the
 3     marketing that someone was exposed to.
 4              An analogy I might use is if you
 5     attributed all of the sales of Budweiser to a
 6     neon Bud sign in a bar.  Just because someone
 7     walked past that neon sign does not mean the
 8     neon sign caused them to the order the
 9     Budweiser.
10        Q.    Okay.
11              But if the last -- okay.  So I guess
12     I'm understanding now.
13              If the last thing the individual saw
14     before buying the Budweiser was the neon sign,
15     that would be that last touch point
16     attribution, but it might --
17        A.    Yes.
18              (Multiple speakers.)
19        Q.    Okay.
20              I guess would another analogy --
21     sticking away from sports analogies.  That
22     might not be -- hockey assist versus soccer
23     assist.  That might not work too well.  All
24     right.
25              But, I guess, this is a -- can we
```

 1          tell from this how many enrolled students

 2          received e-mails of any kind from USC or 2U?

 3                A.    No, and I think that's illustrated

 4          by the fact that paid e-mail has a zero percent

 5          slice here.  But we know that virtually all

 6          enrolled students were receiving e-mails from

 7          Rossier or from 2U.

 8                Q.    All right.

 9                      And can we tell anything from this

10          about, you know, whether students -- let me see

11          how I'm going to say this.

12                      Forget that.

13                      I'm going to move to a question

14          about e-mails, actually.

15                      So I'm going to switch back

16          Exhibit 1078, your report.

17                      THE COURT REPORTER:  Counsel, do you

18          mind if we take a short break just for a

19          moment.

20                      THE VIDEOGRAPHER:  Off the record

21            6:19 p.m.

22                      (Recess is taken.)

23                      THE VIDEOGRAPHER:  Back on the

24            record 6:23 p.m.

25          BY ATTORNEY BRYANT:

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 328 of 402
Page ID #:2683
Deposition of John Chandler, Ph.D.    Iudicell, et al. v. University of Southern California and 2U Inc.

1          Q.    All right.

2                Dr. Chandler --

3                ATTORNEY BRYANT:  And if I could get

4          Exhibit 1078 back up.

5     BY ATTORNEY BRYANT:

6          Q.    All right.

7                And I'm going to scroll to -- let's

8     see if I got to click it first --

9     paragraph 111.

10               Sorry.  Here we go.

11               So it's paragraph 111.  Talk about

12    an e-mail that a USC employee, Amber

13    Sommerville, sent to Dean Gallagher

14    highlighting and the, quote, excellent interest

15    in the announcement.

16               And I believe the announcement here

17    refers to new rankings being released; is that

18    correct?

19          A.    That's correct.

20          Q.    And as you said through your

21    testimony -- and I'll scroll down so you can

22    see the remainder of the paragraph -- it looks

23    like this announcement was made in many

24    formats:  Website, e-mails and newsletter,

25    Facebook, and Twitter; is that correct?

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 329 of 402
Page ID #:2684

Deposition of John Chandler, Ph.D.    Iovell, et al. v. University of Southern California and 2U Inc.

```
 1              A.    That's correct.
 2              Q.    For the e-mail to prospective
 3       students, that I believe that you, you know,
 4       used the -- it says here 49 percent opened the
 5       e-mail.
 6                    Actually, backing up.
 7                    Do these bullet points -- are those
 8       your characterizations?
 9              A.    No, this is -- this is quotation by
10       Ms. Sommerville.
11              Q.    So these bullet points are not your
12       characterizations.
13                    So saying impressive for context of
14       varying levels of interest and commitment,
15       that's not your language?
16              A.    That's correct.
17              Q.    Okay.
18                    Do you agree with that sentiment?
19                    ATTORNEY CAMPBELL:  I'm going to
20       object to the form.
21                    Calls for speculation.
22                    But go ahead.
23              A.    I think Ms. Sommerville is in much a
24       better position to make that assessment.  I
25       think that I certainly agree with what she is
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 330 of 402
Page ID #:2635
Deposition of John Chandler, Ph.D.                    Cordell, et al. v. University of Southern California and 2U Inc.

1    saying here that a 49 percent open rate in the

2    referred e-mail seems quite good.

3                    And I think this showcases the

4    engagement of the audience with the ranking

5    information.

6         Q.    Okay.

7                    And so, I also believe that you

8    said, with respect to the e-mail itself, that

9    the 49 percent opening the e-mail may not be a

10    perfectly precise number; is that correct?

11         A.    That's correct.  That is a lower

12    bound on the number of people who looked at the

13    e-mail.

14         Q.    Okay.

15                    And do you know what the subject

16    line of this e-mail was?

17         A.    I do not.  The only information I

18    have about these metrics is what I'm quoting

19    here from Ms. Sommerville.

20         Q.    Okay.

21                    And I believe -- and I want to sort

22    of make sure that I'm understanding from a

23    technology perspective and how you -- and how

24    one might be exposed to rankings.

25                    It's my understanding -- and so,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 331 of 402
Page ID #:2686

Deposition of John Chandler, Ph.D.                    Bell, et al. v. University of Southern California and 2U Inc.

1        this is the start of the question.

2                        It's my understanding, and please

3        tell me if this understanding is correct, that

4        an e-mail that contained, in the body of the

5        e-mail, rankings information, if that e-mail

6        were opened, that is counted as an exposure in

7        sort of your conceptualization of this?

8                A.    That's correct.

9                        And if the subject of that e-mail

10       included the ranking information, then simply

11       receiving the e-mail would also be an exposure

12       because that subject would show up regardless

13       of whether or not the e-mail was opened.

14               Q.    Okay.

15                       So to the extent that the 49 percent

16       is there, that is truly a lower bound of the

17       exposures related to that e-mail blast; is that

18       correct?

19                       ATTORNEY CAMPBELL:  Object to form.

20       BY ATTORNEY BRYANT:

21               Q.    You can answer.

22               A.    That is correct.

23               Q.    I'd like to go back to paragraph 14,

24       which I believe is your summary of opinions.

25                       Yes.

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 332 of 402
Page ID #:2687

Deposition of John Chandler, Ph.D.                    Iravedell, et al. v. University of Southern California and 2U Inc.

1          And go down to opinion number nine.

2          (As read):  Given the extensive and

3     varied exposure methods outlined above, I can

4     state with a reasonable degree of scientific

5     certainty that all or nearly all of the

6     students at USC Rossier in the MAT and OCL

7     program during the period of ranking

8     manipulations were exposed to the fraudulent

9     rankings.

10          The pervasiveness of these rankings

11     across multiple touch points ensured their

12     near-universal reach.

13          Is it your opinion, looking at this

14     summary on number nine, are you offering an

15     opinion -- no, scratch that.

16          You were asked multiple times about

17     prospective students.

18          Does number nine, your opinion

19     number nine, the summary, does that opinion

20     mean that every single prospective student for

21     the MAT and OCL program was exposed to

22     fraudulent rankings?

23          ATTORNEY CAMPBELL:  Objection to

24       form.

25       A.   It's my opinion that it would be

```
 1        virtually impossible for a prospective student

 2        to have applied and enrolled and not seen the

 3        rankings.

 4              Q.    So that -- is it fair to say that

 5        your opinion with respect to number nine deals

 6        with a subset of prospective students?

 7              A.    That's correct.

 8              Q.    Okay.

 9                    And so, just to put a finer point on

10        it.

11                    It's your opinion that it would be

12        virtually impossible for a student to enroll in

13        these programs, these programs being the MAT

14        and OCL programs, without being exposed to the

15        rankings?

16              A.    That's correct.

17                    ATTORNEY CAMPBELL:  Objection.

18                    Asked and answered.  Sorry.

19              A.    That's correct.

20              Q.    And it is not your opinion that

21        every single potential student or prospective

22        student who might consider enrolling in these

23        programs was exposed to the rankings?

24              A.    That is also correct.

25              Q.    Okay.
```

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 334 of 402
Page ID #:2680

Deposition of John Chandler, Ph.D.                    Iredell, et al. v. University of Southern California and 2U Inc.

```
 1                          Actually, one last question,
 2           actually, I think.
 3                          It has to do with your dissertation.
 4                          Let's go all the way back to the
 5           beginning and when you talked about multitouch
 6           attribution.
 7                          When you were talking about
 8           multitouch attribution in the context of your
 9           dissertation, did that deal with anything
10           besides digital -- I guess, what -- what --
11           what modes of content delivery did your
12           multitouch attribution relate to?
13                A.    It -- my dissertation only related
14           to what's called addressable media and only
15           digital media.  So this was media where I could
16           track the exposure at the individual level and
17           whether or not someone purchased at that same
18           individual level.
19                Q.    And so, when additional
20           nonaddressable content is a part of the --
21           scratch that.
22                          Not -- can you give me some examples
23           of nonaddressable content.
24                A.    Yes.  Traditional media.  So most
25           traditional television, radio, out-of-home
```

 1        print is generally considered nonaddressable

 2        because of multiple people in the household.

 3               These forms of media are not

 4        addressable because they can't be targeted to

 5        specific individuals.

 6               Q.   Okay.

 7               And does the fact that these

 8        particular forms of media are not addressable

 9        provide any insight -- I guess, what does

10        addressability or not addressability tell us

11        about exposure, if anything?

12               A.   If -- if there is media that is

13        digital and addressable, then it is

14        theoretically possible, with log level data, to

15        associate the exposure of the advertising to an

16        individual and then look at their subsequent

17        behavior.

18               And then we can use statistical

19        methods to estimate the impact of each

20        individual piece of media that the person was

21        exposed to.

22               Q.   Okay.

23               And -- okay.

24               But addressable -- is it fair to say

25        that addressable content provide -- would

**Exhibit 2**
Page: 334
**439**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 336 of 402
Page ID #:2691

Deposition of John Chandler, Ph.D.    Maxwell, et al. v. University of Southern California and 2U Inc.

1          provide you with a lower bound for exposure?

2                    A.    Yes, that is absolutely fair to say.

3                    Q.    Okay.

4                         ATTORNEY BRYANT:  I don't have any

5          more questions.

6                         THE WITNESS:  All right.

7                         ATTORNEY CAMPBELL:  Well, thank you,

8          Dr. Chandler, for your time.

9                         I don't have any further questions

10         either.

11                        THE WITNESS:  Okay.

12                        THE VIDEOGRAPHER:  Can we close the

13         record, Counsel?

14                        ATTORNEY CAMPBELL:  Please.

15                        (Continued on the following page to

16         include jurat.)

17

18

19

20

21

22

23

24

25

Exhibit 2
440

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 337 of 402
Page ID #:2692

Deposition of John Chandler, Ph.D.                Harwell, et al. v. University of Southern California and 2U Inc.

1           THE VIDEOGRAPHER:  We are

2      concluding.

3             Going off the record 6:35 p.m.

4      Central.

5             (Time Noted:  6:35 p.m. Central.)

6             (7:35 p.m. Eastern.)

7

8             ----------------------

9             JOHN CHANDLER

10

11   Subscribed and sworn to before me

12   this      day of               2024.

13

14   ---------------------------------------

15

16

17

18

19

20

21

22

23

24

25

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 338 of 402
Page ID #:2693

Deposition of John Chandler, Ph.D.                Iyengar, et al. v. University of Southern California and 2U Inc.

```
 1                    C E R T I F I C A T E

 2

 3        STATE OF NEW YORK    )

 4                             ) ss.:

 5        COUNTY OF NEW YORK    )

 6

 7                 I, LISA M. MURACO, a Notary Public

 8            within and for the State of New York, do

 9            hereby certify:

10                 That JOHN CHANDLER, the witness whose

11            deposition is hereinbefore set forth, was

12            duly sworn by me and that such deposition

13            is a true record of the testimony given by

14            such witness.

15                 I further certify that I am not

16            related to any of the parties to this

17            action by blood or marriage; and that I am

18            in no way interested in the outcome of this

19            matter.

20                 IN WITNESS WHEREOF, I have hereunto

21            set my hand this 5th day of August, 2024.

22                           --------------------------

23                           LISA M. MURACO

24

25
```

Exhibit 2
442

1

2                        I N D E X

3

4    WITNESS                                        PAGE

5    JOHN CHANDLER

6    ATTORNEY CAMPBELL                              5

7    ATTORNEY BRYANT                                305

8

9                      E X H I B I T S

10    DESCRIPTION                                    PAGE

11    Exhibit 1074, Notice of Deposition            21

12

13    Exhibit 1075, Contract Agreement              22

14

15    Exhibit 1076, Invoices                        34

16

17    Exhibit 1077, CV                              43

18

19    Exhibit 1078, Expert Report                   109

20

21    Exhibit 1079, Marketing Plan                  150

22

23

24

25

Deposition of John Chandler, Ph.D.                    Cantwell, et al. v. University of Southern California and 2U Inc.

1

2          I N D E X   O F   E X H I B I T S(Cont'd.)

3     DESCRIPTION                                    PAGE

4     Exhibit 1080, 2014 Marketing Plan              165

5

6     Exhibit 1081,2015 Online Marketing Plan        169

7

8     Exhibit 1082, 2017 Online Marketing            170
      Plan
9

10

11                    INFORMATION  REQUESTED
                         Page      Line
12
                          42        11
13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 2**
**444**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 341 of 402
Page ID #:2696
Deposition of John Chandler, Ph.D.    Favell, et al. v. University of Southern California and 2U Inc.

```
 1

 2              ERRATA SHEET FOR THE TRANSCRIPT OF:

 3     Case Name:      FAVELL, et al. v USC, et al.
       Dep. Date:      THURSDAY, AUGUST, 1, 2024
 4     Deponent:       JOHN CHANDLER

 5                       CORRECTIONS:

 6     Pg. Ln.  Now Reads        Should Read       Reason

 7     ___ ___  _____    _____     _____

 8     ___ ___  _____    _____     _____

 9     ___ ___  _____    _____     _____

10     ___ ___  _____    _____     _____

11     ___ ___  _____    _____     _____

12     ___ ___  _____    _____     _____

13     ___ ___  _____    _____     _____

14     ___ ___  _____    _____     _____

15     ___ ___  _____    _____     _____

16     ___ ___  _____    _____     _____

17     ___ ___  _____    _____     _____

18

19                              _____

20                              Signature of Deponent

21     SUBSCRIBED AND SWORN BEFORE ME

22     THIS_____DAY OF_____, 2024.

23

24     _____

25     (Notary Public)  MY COMMISSION EXPIRES:_____
```

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 342 of 402
Page ID #:2697

Deposition of John Chandler, Ph.D.                    Howell, et al. v. University of Southern California and 2U Inc.

**WORD INDEX**

**< $ >**
**$15,015.60**  40:*15*
**$2,056.50**  40:*5*
**$25,000**  201:*12*
**$3,987.75**  38:*8*
**$50,000**  201:*12*
**$53,000**  42:7
**$773.40**  41:8

**< 0 >**
**004**  39:22
**00846-GW-MAR**  1:*5*

**< 1 >**
**1**  1:*16*  2:2  5:2
34:*11*  39:*11*, 25
118:*21*  213:*13*
244:*20*  338:*1*  339:*1*
340:*1*
**1,000**  213:*13*
**1.12**  38:*16*, 17
**1:20**  291:9
**1:31**  163:4
**1:34**  163:7
**1:42**  169:*1*
**10**  30:*10*  90:*19*
213:*20*  232:*17*
235:*12*  256:2  271:*1*
338:*1*  339:*1*  340:*1*
**10,000**  117:8  213:*14*
**10:00**  2:3
**10:03**  5:3
**10:36**  130:*17*
**100**  63:*20*  209:*1*
**100-year**  155:*23*
**1015**  3:*6*
**103**  194:*15*
**104**  196:22
**105**  219:*24*
**106**  182:2
**1074**  21:*4, 5, 7, 10*
338:*1*
**1075**  22:24, *25*  27:*18*
338:*1*
**1076**  34:*3, 4, 11, 18*
35:*5*  36:2, *10*  37:*14*
38:*15*  39:*21*  41:*13*,

**14, 16**  338:*1*
**10763**  34:*9*
**10764**  34:*9*
**1077**  42:*25*  43:2, *12*
338:*1*
**1078**  108:*25*  109:*1*
122:*18*  131:*1*  144:*21*
146:5  149:*11*  196:*23*
216:5  247:*24*  258:*4*
273:*19*  306:8  326:*16*
327:*4*  338:*1*
**1079**  150:2, *7*  153:*23*
155:*23*  338:*1*
**108**  198:9, *10*
**1080**  165:22, *23*
166:*13*  339:*1*
**1081**  169:*11*  170:2
190:*4*  316:6, *17*
**1081,2015**  169:*13*
339:*1*
**1082**  169:*25*  170:*4, 7*
173:*15*  181:6  182:2
217:*19*  321:*11*  339:*1*
**109**  338:*1*
**10th**  43:22  274:*16*
**11**  338:*1*  339:*1*
340:*1*
**11:00**  2:*4*
**11:12**  70:6
**11:24**  70:9
**111**  203:*1, 4, 18*
327:9, *11*
**1129**  151:*5*
**115**  215:*21*  216:*10*
**116**  219:*16*  227:*21*
**12**  338:*1*  339:*1*
340:*1*
**12,000**  213:*20*
**12:36**  130:*17, 19*
**12:48**  130:22
**122**  233:2
**125**  235:*14, 23*
**126**  238:*10*
**127**  212:*14*
**129**  285:*1*
**12th**  284:*4, 9*
**13**  206:5  262:*1, 2, 6*
338:*1*  339:*1*  340:*1*
**130**  241:*21*  242:*1*

**131**  242:*11*  244:*1*
**134**  245:22
**135**  245:8, *21, 22*
**14**  36:*15*  291:9
299:*24*  330:23  338:*1*
339:*1*  340:*1*
**1400**  3:*14*
**142**  214:*15, 24*
**145**  311:8
**148**  312:23
**149**  279:*16*
**15**  120:2  255:2
256:2  257:*14*  309:*10*
311:8, *11*  338:*1*
339:*1*  340:*1*
**150**  338:*1*
**151**  282:9, *16, 20*
**15th**  3:6
**16**  23:*17*  50:20
146:*4*  240:*13*  270:*18*
271:2  316:*18*  338:*1*
339:*1*  340:*1*
**160**  147:7
**165**  339:*1*
**166**  258:*11*
**167**  259:*19*
**168**  249:8
**169**  339:*1*
**16th**  24:7, *9, 11*
**17**  149:*18*  270:*18, 25*
338:*1*  339:*1*  340:*1*
**17,000**  213:*10, 14*
**17,376**  213:8
**170**  266:2  339:*1*
**17-'18**  294:*11*
**172**  269:8, *14*
**173**  272:5, *25*
**176**  273:*18*
**1761**  34:*9*
**1762**  34:*9*
**178**  274:*3*
**179**  274:*11*
**18**  70:20, *22*  71:*14*
338:*1*  339:*1*  340:*1*
**180**  275:*4*
**181**  275:*11*
**18-'19**  297:*12*
**182**  273:*11*  277:*5*
**184**  279:*12, 18, 22*
**185**  280:*21, 25*

**186**  281:*14*  282:*11*
283:*11*
**187**  283:*16*
**188**  284:*3*
**189**  284:*15*
**19**  187:*12*  338:*1*
339:*1*  340:*1*
**190**  284:22
**192**  285:6, *9*
**194**  286:*13*
**1996**  45:*16*
**1998**  54:2
**1999**  54:2  125:*10*
**19th**  41:*21*
**1st**  36:2  40:9

**< 2 >**
**2**  34:*11*  39:6  109:*13*
338:*1*  339:*1*  340:*1*
**2,606**  205:*17*  206:*3,
14*
**2:23-cv-00846-GW-
MAR**  5:*10*
**2:31**  169:*4*
**20**  30:*10*  56:*17*
62:*12*  82:*21*  120:*1*
144:*20, 22*  147:*11, 17*
148:5, *9*  165:*19*
206:6  207:5  235:*12*
255:*3*  309:9  338:*1*
339:*1*  340:*1*
**200**  289:*19, 20*
**200,000**  81:8
**20005**  3:7
**2007**  57:*11*  125:*11*
**2008**  50:20  127:*12*
**2009**  127:*12*
**201**  291:8
**2010**  46:2  127:*12*
**2012**  125:*17*  126:20
**2013**  128:*3, 9*  149:*13,
14*  151:22  196:*16*
262:*10, 15, 17*  263:*3,
10*
**2014**  58:*17*  165:*23*
166:*17, 22*  167:6, *15*
168:2, *4, 7*  191:*21*
263:*10*  339:*1*

Deposition of John Chandler, Ph.D.    Iavarone, et al. v. University of Southern California and 2U Inc.

**2015**  169:*11*, 22, 23
190:*4*  193:*3*  261:*14*
262:*23*  263:6, *16*
**2016**  182:*3*, 7  186:25
188:*15*  189:*13*  219:*9*
242:*12*  243:5  255:*14*
264:5, *17*  322:*11*
**2017**  170:*4*, 9, 15, 24
171:*3*, 23  174:25
180:5, *12*  181:8, *17*,
*19*  191:*23*  216:*23*
219:*10*  230:*13*
240:*13*  255:2, 8, *12*,
*15*  264:*11*  265:6, 7
309:*9*  339:*1*
**2018**  55:4  203:22
212:*16*  214:*3*, *20*
230:*13*  240:8, *14*, 17
284:*13*, 16, 24  285:*19*,
*23*  286:*3*, *10*  313:*3*
**2019**  226:18  227:6
230:*13*, 14  240:7, *23*
284:*4*, 9  285:7
286:*14*
**2020**  56:8  127:*19*
274:*23*  275:22  276:*4*,
*15*, 20, 22, 24  282:5
283:*17*  285:4  291:*9*
**2021**  233:4  261:*15*
274:5  275:9, *17*
281:*16*, 23  283:*12*
294:*16*
**2022**  128:*3*, 9  262:*10*,
*15*, 18
**2023**  36:*15*  274:*19*,
24
**2024**  1:*16*  2:2  5:2
23:*18*  24:7, 9, *11*
36:*3*  39:7, *12*, 16, 25
40:*10*  41:*21*  251:*15*,
*16*, 21  274:*16*  336:*12*
337:*21*  340:*1*
**204**  299:6, 8
**205**  294:*4*, 22
**21**  338:*1*  339:*1*
340:*1*
**2121**  3:*13*
**21-'22**  294:*16*
**21st**  9:7, 8

**22**  174:*1*, 8, *10*  338:*1*
339:*1*  340:*1*
**22nd**  9:8  174:*19*
178:*20*
**23**  151:*11*  338:*1*
339:*1*  340:*1*
**24**  14:*17*  149:*11*
338:*1*  339:*1*  340:*1*
**25**  63:*20*  66:*13*
209:*4*  234:*16*  242:*11*
243:5  338:*1*  339:*1*
340:*1*
**250**  249:*9*
**250,000**  206:*1*, 13, 17
208:*11*  209:22
**26**  184:*11*
**27**  240:*14*  313:*3*
**29**  150:*15*  151:2, *3*
**2U**  1:8  5:8  19:25
25:*18*  26:24  88:*9*
93:*11*  94:*11*  96:*10*
97:*12*  99:7  104:*11*
105:2  131:6, *14*
132:*10*  133:*12*
134:*15*  138:*3*  140:*18*
141:*7*  142:*10*  144:*13*
153:*4*, 5  154:*11*
160:*8*  161:*4*, 9, 13, 18
162:2, *11*  163:*24*
164:*4*, 9, 12, 23
170:*12*  171:*1*  180:*12*,
*16*  187:22, *24*  188:*1*,
*7*, *12*  193:6  203:6
209:8  210:7  212:*23*
216:*14*, 16, *19*  217:*1*
218:*15*  222:2, *15*
226:*18*  229:7  230:*1*,
*3*  248:*15*  266:6
267:*9*  292:*21*, 24
295:*11*  303:8, *17*
309:*3*  316:*19*  320:*12*
322:*21*  326:2, 7
**2U's**  100:*13*  131:*24*
134:*1*, 13  142:25
153:*20*  161:7  162:*14*
203:*19*  226:*24*  230:2

< 3 >

**3**  34:*11*  109:5, 8
150:*23*  191:*17*  338:*1*
339:*1*  340:*1*
**3:32**  215:23
**3:43**  216:*1*
**30**  39:*12*  84:*20*
150:*23*  165:*19*
232:*17*  281:*15*, 23
**30(b)(6**  18:25
**300,000**  209:*1*
**305**  338:*1*
**30th**  39:7  40:*9*
**31630**  1:*24*
**33**  184:8
**34**  196:*23*  338:*1*
**364**  214:*16*
**38**  227:22
**38,000**  137:8
**386**  41:8
**39,000**  137:8
**396**  39:*24*
**398,000**  294:*15*

< 4 >

**4**  34:*11*  36:2  191:*17*
262:*1*, 6  338:*1*  339:*1*
340:*1*
**4,4000**  174:2
**4:34**  257:24
**4:51**  258:2
**40**  255:6, 7, *21*
**40,000**  29:*18*  30:8
137:*15*, *17*, 21  191:7
**40,000-plus**  134:*20*
136:*12*  137:*1*
**409**  40:8
**42**  306:22  339:*1*
**42326**  173:*16*
**42330**  181:*18*
**43**  306:22  338:*1*
**431**  316:*19*
**44**  306:22
**45**  306:*16*, 23
**46**  245:5  306:*17*
**47**  214:*15*  246:*16*, 22
247:8  308:*19*
**48**  171:*24*
**49**  328:*4*  329:*1*, 9
330:*15*

< 5 >

**5**  40:8  77:*15*  299:25
338:*1*  339:*1*  340:*1*
**5:48**  304:25
**5:52**  305:*3*
**50**  63:*20*  117:7
301:*12*
**50,000**  209:*4*
**500**  58:*4*  213:*18*
**51**  210:*17*  211:5
**55**  246:*17*, 22  247:8
**559**  204:*13*  211:*24*
**56**  146:6, *18*
**57**  247:*23*
**5th**  337:*21*

< 6 >

**6**  251:*15*, 16, 21
338:*1*  339:*1*  340:*1*
**6:19**  326:*21*
**6:23**  326:*24*
**6:35**  336:*3*, 5
**60**  249:8
**600**  3:6
**63**  182:2
**64**  199:2
**640,000**  294:*16*
**66**  273:*18*

< 7 >

**7**  338:*1*  339:*1*  340:*1*
**7:35**  336:6
**72**  212:6, *10*
**75**  224:*10*
**75,000**  209:5
**750**  37:22

< 8 >

**8**  338:*1*  339:*1*  340:*1*
**8,000**  214:*23*, 24
**8,598**  251:*14*, 20
**80**  232:*14*
**84**  149:*10*  151:*21*
153:*16*
**891**  212:*15*

< 9 >

**9**  299:*20*  301:*13*

Deposition of John Chandler, Ph.D.    Sirrell, et al. v. University of Southern California and 2U Inc.

338:*1*  339:*1*  340:*1*

**90**  301:*12*

**90067**  3:*15*

**94**  193:*1*  202:*11*

< A >

**a.m**  2:*3, 4*  5:*3*  70:*6, 9*

**ability**  14:*18*  61:*20*  112:*25*  186:*3, 10*  237:*22*  244:*22*

**able**  36:*21*  136:*10*  138:*7*  168:*14*  221:*23*  237:*19*  250:*8, 19*  256:*15*  281:*25*  282:*21, 24*  283:*5, 20, 23*  303:*5*

**absence**  96:*15*  265:*11*  295:*10*  315:*24*  321:*1*

**absolute**  227:*18*  228:*1, 11, 17*  229:*16*

**Absolutely**  135:*21*  227:*2*  324:*20*  335:*2*

**acceptance**  202:*10, 18, 23*

**accepted**  92:*21*  118:*11*  133:*6*  202:*5, 14, 21*  324:*1*

**accepting**  202:*12*

**access**  29:*12, 13*  30:*5*  33:*20*  136:*13*  137:*2, 8, 9*  210:*7*  282:*1*  290:*6*  303:*17, 18*  319:*20*

**accessed**  274:*15*

**accompanies**  130:*12*

**accompany**  248:*11*

**accomplished**  34:*13*

**account**  80:*16*  109:*25*  115:*12*  252:*3, 14*  253:*1, 10, 16*  255:*11, 20*  258:*13*  269:*24*

**accountancy**  119:*23*

**accounts**  267:*20*  315:*11*

**accurate**  10:*1*  11:*5*  43:*12, 13*  62:*23*

**accurately**  129:*13*  292:*7*  325:*2*

**accused**  15:*4*

**achieve**  156:*21*

**achieved**  21:*23*  145:*10*

**acknowledge**  259:*9*  286:*17*

**acknowledging**  265:*21*

**acquire**  25:*16*

**acquired**  125:*11*

**action**  8:*15*  324:*4, 25*  337:*17*

**actions**  49:*22*  189:*4*

**activity**  83:*22*  207:*9*

**actual**  73:*11, 13, 19*  88:*3*  133:*9*  162:*21*  231:*9*  319:*2*  320:*5*

**ad**  48:*3, 4*  50:*4, 5*  66:*17*  67:*7*  77:*2, 16*  78:*14, 16*  79:*19, 24*  82:*12, 19*  83:*8, 9, 18*  84:*2, 4*  85:*2, 4, 6, 10, 14, 18, 23*  86:*11, 13, 23*  87:*2, 3, 22*  88:*14*  89:*24*  90:*1, 21, 24*  91:*14*  92:*6*  100:*19*  113:*18*  158:*25*  164:*2*  173:*9*  174:*17*  177:*9*  182:*22*  217:*4*  248:*15, 17, 19, 21*  249:*1, 6, 12*  304:*9*  317:*16*  319:*3*

**added**  209:*12*

**addition**  98:*9*  237:*18*  244:*2*  296:*8*

**additional**  43:*15, 18*  333:*19*

**address**  161:*22*  164:*8, 9*  231:*8*  233:*5*

**addressability**  334:*10*

**addressable**  333:*14*  334:*4, 8, 13, 24, 25*

**addressed**  131:*9*

**addresses**  210:*7*  216:*20*  254:*16*

**adhered**  133:*13*

**adjunct**  54:*10*

**adjust**  80:*5*  115:*10*

**adjustments**  82:*2*

**administer**  4:*12*

**administration**  119:*20*  234:*18*

**administrative**  258:*24*  259:*3*

**admission**  118:*9*

**admissions**  128:*25*  193:*7*

**admit**  44:*9*

**admitted**  233:*12*

**adopting**  95:*2*

**ads**  27:*8*  30:*22*  47:*12, 13*  51:*14, 15*  67:*1*  74:*13*  82:*13*  83:*19, 21*  90:*2, 4, 9, 11*  91:*9*  100:*14, 18*  101:*3*  111:*2*  159:*1*  172:*9, 10, 11*  176:*14*  177:*4*  178:*2, 12*  248:*10*  249:*8, 16, 18*  250:*8*  304:*2, 3, 8*  319:*21*  321:*4*

**adults**  77:*22*

**advance**  157:*17*

**advanced**  59:*14*  61:*12*

**advertise**  97:*15*  175:*24*

**advertised**  104:*19*  293:*6*

**advertisement**  47:*22*  74:*23*  80:*14*  82:*1, 6*  83:*2*  87:*9*  89:*16*  96:*3*  97:*2*  182:*19*

**advertisements**  26:*7*  72:*2, 11, 19*  88:*14*  94:*19*  103:*8*  175:*5*  262:*12*  303:*22*

**advertiser**  95:*2*  102:*7, 8*  125:*15*  172:*15, 23*  173:*9*  174:*15*

**advertisers**  48:*25*  49:*6*  67:*17*  89:*5, 11, 21*  94:*17*  125:*1, 6, 14*  172:*4*  175:*12*  249:*21*  318:*25*

**advertiser's**  50:*10*  83:*9*

**advertises**  80:*23*

**advertising**  46:*6, 11, 16, 24*  47:*16*  49:*9*  50:*8, 16, 22*  52:*20*  71:*21*  72:*10*  75:*2, 22*  79:*23*  80:*8, 11*  88:*23*  89:*17*  90:*14*  91:*2*  92:*19*  96:*18*  128:*5*  154:*12*  155:*3*  170:*12*  176:*9, 23*  185:*8*  239:*17*  249:*21*  265:*6*  304:*4*  317:*20*  334:*15*

**advise**  230:*23*

**advising**  125:*5*

**affiliate**  123:*25*  187:*25*  188:*10*

**affiliates**  251:*7*

**affinity**  101:*7*

**affirmatively**  227:*11*

**affordability**  115:*1*

**affordable**  112:*18*

**afraid**  228:*10*

**age**  71:*13*

**agencies**  71:*21*  72:*10, 13, 15*  89:*11*  125:*1, 7, 14*  249:*21*

**agency**  74:*11*  75:*2*

**agents**  155:*25*  156:*14*

**aggregate**  48:*9*  86:*21*  91:*23, 25*  96:*5, 24*  98:*19, 20*  114:*21*  158:*5*  159:*15, 16*  160:*2, 18, 25*  278:*14, 15*

**aggregating**  89:*4*

**aggregators**  188:*4*

**aggressively**  193:*13*

**ago**  50:*20*  99:*18*  174:*6*  191:*23*  198:*18*  261:*2*  274:*7*  279:*6*

**agree**  26:*21*  87:*6*  108:*10*  135:*19, 21*  138:*18, 20, 23*  156:*6*  199:*17*  200:*12*  207:*12*  210:*15, 19*  211:*8*  220:*25*  228:*4*  284:*11*  290:*25*  297:*22*  328:*18, 25*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 345 of 402
Page ID #:2700

Deposition of John Chandler, Ph.D.                    Iovell, et al. v. University of Southern California and 2U Inc.

**AGREED** 4:*1*, *5*, 9
93:2 322:*13*
**agreeing** 229:*11*
**Agreement** 22:25
23:*8* 27:*17* 108:*9*
338:*1*
**ahead** 20:25 22:*23*
69:25 70:2 130:*14*
150:*1* 163:*17* 168:*23*
328:22
**AHMAD** 1:*4* 290:*16*
**Aided** 101:*10*
**aisle** 90:*19*
**al** 5:*6* 340:*1*
**Alaska** 6:*16*, *24* 7:*10*
8:*14*, *16*
**alcohol** 14:*17*
**algebra** 53:*24*, *25*
**algorithm** 177:*3*
270:*9*, *23* 292:*5*, *8*, *10*
**algorithms** 270:*14*
**allege** 194:*16* 198:*11*
199:*11*
**alleged** 108:*16*
198:*14*, *22*
**allocate** 49:*8* 111:*4*
**allow** 96:2*1* 97:*19*
186:*12*
**allowed** 198:*18*, *22*
199:*12* 222:*4*
**allows** 32:25 56:*11*
**alongside** 29:2*1*
**alum** 214:*10* 274:*14*
**alums** 144:7 205:*9*
253:*6* 289:*15*
**Amazon** 83:*13*
**Amber** 203:*23*
327:*12*
**amended** 199:*6*
**amount** 42:*4* 177:*6*,
*17* 213:*18* 236:*13*
324:*18*
**amounts** 49:*12* 64:*14*
**amplifying** 267:*3*
**analogies** 325:2*1*
**analogy** 325:*4*, *20*
**analyses** 72:*8*, *23*
89:*13* 98:*1* 103:*5*, *22*
104:*2*

**analysis** 49:*16*, *17*
63:*15* 71:*24* 75:*20*
77:*16* 95:*15* 96:*9*, *13*
106:25 107:*3*, *8*
114:*4* 116:*16*, *19*, *22*
124:2 126:*16* 138:*2*,
*15* 140:*10*, *13*, *19*
170:*11* 191:*6* 297:2*1*
298:*15*, *24*
**analytics** 59:*15*
60:2*1* 88:20 110:*17*
119:2*1* 121:*16* 189:*1*
234:*16*
**analyze** 99:*23* 126:*12*
**analyzed** 62:*10* 75:*4*
76:*12* 89:2*1* 91:*19*
94:*10* 104:9 116:*13*
126:*5* 267:*19* 278:*13*
**analyzing** 60:*23*
61:*5*, *6* 62:*3* 63:*5*
65:*5* 71:25 112:*9*
254:20 262:2
**and/or** 264:22
**Angeles** 3:*15*
**angle** 80:*5*
**angles** 79:*15* 82:*3*
**announcement**
327:*15*, *16*, *23*
**announcements**
259:2*1*
**annual** 171:*9*
**anomalous** 185:*4*
**anonymous** 164:*3*
**answer** 10:*6*, *20*
11:*13*, *14* 15:*2* 23:*24*
36:*6* 52:25 53:*2*
62:*19* 67:*3* 91:*5*
121:*19*, *21* 122:*4*
127:*10* 136:*23*
154:*24* 163:*17*
200:*20* 206:*19*, *25*
208:*17* 219:*1* 225:*18*
242:*8* 244:2*1* 265:*15*,
*19* 280:*8* 285:*24*
293:*23* 310:*12*
312:*11* 330:2*1*
**answered** 15:*14*
22:*12* 219:*15* 265:22
285:25 332:*18*

**answering** 10:2*1*
122:*12* 163:*11*
**answers** 10:*16* 117:*3*,
*6* 313:*1*
**anticipate** 179:2*4*
194:*9* 267:*4*
**anticipated** 320:2*1*
**anxious** 17:*11*
**Anyway** 35:2*0*
168:22 265:25
291:*13*
**apart** 36:*24*
**Apologies** 122:*15*
137:*15* 149:*6* 178:*6*
240:*10* 310:*13*
**apologize** 7:*6* 74:*19*
150:*17* 190:*8* 217:2*1*
254:*12* 305:2*1*
314:*18* 323:*9*
**Apology** 217:2*0*
**appear** 95:7 118:*16*
171:*15* 172:20, *24*
178:*23* 179:*18*
238:*12* 239:*6*, *7*
241:*6* 315:*17* 320:*19*,
*20*
**appeared** 111:*2*
118:*23* 264:*23* 321:*4*
**appearing** 5:*15*
97:*10* 259:*8* 269:*2*
**appears** 86:*11*
134:*15* 153:*17*
185:*24* 186:25 189:7
275:*24* 281:*24*
**appendix** 190:*9*, *12*,
*16*, *25* 191:*19*
**applicabilities** 287:*9*
**applicants** 147:*8*
202:*14* 288:22
**application** 38:22
100:*9* 133:*4* 160:*15*,
20, *21* 161:*16* 164:*6*,
20 165:*9* 173:*12*
183:*17* 184:*23*
185:*15* 186:*6*, *10*
222:20, *21*, 25 225:*6*,
*12* 231:20 314:*5*, *9*
323:*4*, *5*, *24*, 25 324:*3*
**applications** 187:*9*
225:*2*

**applied** 54:*17* 60:2*1*
61:*12* 133:*5* 162:7
185:*13* 223:*11* 225:*1*
308:*16* 332:2
**applies** 202:*17*, *21*
287:*3* 288:*2*
**apply** 94:*5*, *23*
118:*10* 164:*11*, *19*
180:*1* 183:*4*, *15*
184:*6*, *15*, *20* 185:*13*,
*19*, 25 188:*17* 192:*10*
224:*17*, *20* 286:25
287:*16* 293:*7*, *20*
308:*14* 311:22 313:*7*,
*8*, *9*, *10*
**applying** 46:*15*
148:*14* 221:*6* 222:22
**appreciate** 94:*11*
107:*17* 122:*9* 193:25
259:*18* 265:*20*
**approach** 9:*20* 47:*6*
50:*15*, *24* 305:*19*
**approached** 51:*3*
**approximate** 172:*8*
**approximately** 137:*16*
**April** 40:2, *4* 242:*11*
243:*5*
**aQuantive** 88:*19*
123:*4* 124:*23* 125:*9*,
*10*
**A-Q-U-A-N-T-I-V-E**
124:*24*
**Archive** 238:*24*
239:*4* 240:*14*, *16*
242:2*1* 243:2, *6*
264:*20*
**area** 67:*25* 234:*6*
**areas** 71:9 117:*14*
**arrive** 186:9 188:*6*
**arrived** 302:*14*
322:*20*
**arrow** 268:*3*
**article** 45:*11* 69:*6*
205:*3*, *18* 206:*16*
286:*14*, *18*, *22* 291:*11*,
*18*
**articles** 68:22 69:*12*
123:*16* 291:20, *24*
**asbestos** 172:*19*
**aside** 94:*16* 124:*19*

**asked** 14:*12* 22:*14* 25:*10, 12* 103:*12, 16, 20* 106:*25* 109:*19* 115:*19* 121:*3, 5* 122:*4* 191:*14* 196:*8* 208:*18* 219:*17* 220:*13* 234:*3* 253:*11* 273:*15, 23* 331:*16* 332:*18*

**asking** 111:*17* 121:*4* 218:*23* 239:*21* 256:*23* 258:*10* 296:22

**aspect** 66:*6, 18* 171:*4, 10*

**aspects** 60:*14, 19* 67:*19* 106:*12*

**aspersions** 26:*14*

**Assaf** 275:*4, 8*

**assemble** 40:*25* 41:*5* 72:*1* 102:7

**assert** 295:*11*

**assertion** 296:*6*

**assess** 98:2 100:*24* 101:*19* 102:*25* 103:*12, 23* 108:*15*

**assessment** 131:*24* 132:*12* 203:6, *19* 229:*12* 293:*1* 328:*24*

**assigned** 185:2

**assignment** 25:*11* 109:*6* 122:*20, 21* 123:*20* 124:*3* 127:22, *24* 128:*10* 131:2 193:*21*

**assignments** 55:*1* 109:*8, 13, 14* 261:*25*

**assist** 325:22, *23*

**assisted** 62:*8*

**assisting** 27:*23*

**associate** 334:*15*

**associated** 50:*3* 168:*8* 286:*24* 294:*25* 301:*16*

**association** 139:*1*

**assume** 56:*11, 20* 58:*12* 176:*1* 186:22 209:*18*

**assumption** 266:*19*

**275:*8, 16***

**asynchronously** 113:*1*

**Atlas** 62:*1* 88:*20* 123:5

**attempt** 51:*22* 276:*11* 319:7

**attempted** 226:*5* 298:*20*

**attempting** 31:*7* 53:2 65:*13* 102:*15* 319:*14*

**attend** 111:*19*

**attendant** 183:*7*

**attending** 233:*12*

**attention** 195:*18* 267:*8*

**attitudes** 60:*8* 61:*4* 68:*25* 101:*14*

**ATTORNEY** 5:*24* 12:*20, 23* 17:*6, 7* 18:*3* 21:*7, 9, 19* 22:*1* 23:*2* 26:*20* 32:*2* 34:*6, 15, 21, 23* 42:*9, 13, 14* 43:*5* 52:*23* 63:*12* 65:*9* 67:*4* 69:*24* 70:*10* 76:*23* 85:*20* 87:*4, 5* 92:*23* 97:*16* 103:*11* 104:*20* 105:*13* 109:*4* 120:*15, 19, 23* 121:*8, 9* 122:*6, 8, 16* 130:*14, 23* 135:*20* 138:*1* 140:*14* 141:*19* 143:*11* 145:*17, 24, 25* 150:*9, 21* 151:*14* 152:*13* 153:*14* 156:9 157:*10* 158:*19* 159:*24* 161:*14* 163:*1, 8* 164:*25* 165:*25* 166:*3, 7, 11* 168:*13, 17, 20* 169:*5, 15* 170:*6, 25* 175:7 179:*14* 180:9 184:*24* 185:*16* 186:*19* 192:*3* 199:*21* 200:*14* 202:6 205:*4* 206:*18* 207:*11* 208:*16* 210:*20, 21, 23* 211:*1* 212:*19* 213:5 214:*21* 215:*16* 216:2 217:*2, 18* 221:*1*

**222:*16* 226:*4, 19* 227:*7, 13* 228:*5* 229:*1, 23* 230:*10* 233:*14, 24* 234:*4, 7, 8* 239:*20* 250:6 251:*18* 254:*10* 257:*1, 8, 21* 258:*3, 5* 262:*19* 265:9 275:*23* 276:*5* 278:*10* 280:*7* 281:*8* 287:*5* 288:*23* 290:*1, 13* 291:*23* 292:*3, 18* 293:9, *22* 298:9, *19* 300:*15, 19, 21, 23* 302:*25* 303:*24* 304:*15* 305:*4, 13, 20, 24* 306:*4, 5, 9, 11, 12* 309:*23* 310:*1, 4, 9, 11* 312:*8, 10* 313:*19, 23* 314:*11, 14, 16, 19, 20, 23* 316:*5, 11, 16* 318:*19* 321:*10, 12* 323:*10* 324:*12* 326:*25* 327:*3, 5* 328:*19* 330:*19, 20* 331:*23* 332:*17* 335:*4, 7, 14* 338:*1***

**Attorneys** 3:*5, 12* 4:*2*

**attract** 192:*6*

**attribute** 47:*19*

**attributed** 217:*10* 218:*16* 322:*16, 23* 325:*5*

**attributes** 52:*18* 99:*19*

**attribution** 47:*1* 51:*6* 98:*13* 99:*10, 14* 100:*16* 158:*25* 186:*23* 217:*4* 324:*5* 325:*16* 333:*6, 8, 12*

**attrition** 254:*22*

**auction** 249:*23*

**audience** 90:*3* 141:*24* 142:*24* 171:*6, 18* 191:*1* 204:*7, 8, 17, 23* 205:*1* 206:*1, 13, 17, 24* 208:*12, 19* 214:*8* 272:*3* 285:*15* 329:*4*

**audiences** 66:*12* 205:*7, 13*

**August** 1:*16* 2:2 5:2 168:*3* 274:*19, 24* 291:9 337:*21* 340:*1*

**authoring** 266:*24*

**authorized** 4:*11*

**availability** 301:*18*

**available** 76:7 96:*20* 158:*14* 225:*11* 277:*25* 278:*21* 298:22

**availing** 127:*1*

**Avenue** 3:*13*

**average** 75:*23* 159:*18, 19* 160:*4* 174:25

**avoid** 165:*5* 186:2 225:*7, 8, 10, 13*

**avoided** 223:*2* 302:*10*

**avoiding** 224:*2*

**aware** 15:*7, 9* 20:*14* 93:*1, 7, 10, 13* 133:*1* 171:*1* 210:*5* 307:22

**awareness** 162:*10* 319:*11*

**< B >**

**BA** 45:*17*

**back** 56:*17* 70:*8* 79:*18* 82:*14* 91:*21* 122:*18* 130:*21, 25* 143:2 146:*8* 151:*16, 20* 153:*23* 158:*24* 163:*6* 166:*9* 168:*14* 169:*3, 16, 23* 170:2 183:*10* 190:*3* 192:*21* 208:*11* 212:*3* 215:*25* 216:*4, 23* 217:*19* 234:*21* 247:*18* 257:*19* 258:*1, 3* 282:*25* 299:*19* 304:*19* 305:*2* 326:*15, 23* 327:*4* 330:*23* 333:*4*

**background** 105:*25*

**backing** 328:*6*

**BACON** 3:*11*

**bad** 101:*11* 279:*20*

**ban** 194:*4*

**banner** 249:*7*

Deposition of John Chandler, Ph.D.    Connell, et al. v. University of Southern California and 2U Inc.

**bar**  317:5  319:12
325:6
**base**  252:20
**based**  37:16  58:12
60:11  71:24  72:8
74:5  75:11  76:21
88:7  96:9  99:21
114:1, 22  128:22
131:24  144:12  158:8
160:6  161:6  168:10
173:11  177:5  189:3,
4  195:15, 16  206:2
221:11  226:7  227:5
233:19  254:25
255:22  270:13, 23
275:19  288:5  297:21
298:21  301:21
**basic**  144:24
**basically**  46:14
64:24  322:20
**basing**  75:12  123:8
152:15  153:1  195:8
**basis**  47:19  152:19
153:3  229:19, 25
230:3  287:18  293:4
**batches**  256:25
**Bates**  39:23  151:4
173:16  181:21
316:19
**battery**  45:4
**bear**  194:7
**beautiful**  117:20
**becoming**  90:6
133:1, 9  192:8
**began**  36:7  40:13
41:4  71:18  127:19
162:11  164:6  240:12
276:24, 25  277:3
289:22, 25  290:2
**beginning**  35:25
40:21, 25  58:17
161:16  162:9  169:7
222:1  233:23  240:8
242:1  255:15  333:5
**begins**  149:15  151:22
**begun**  52:3
**behalf**  1:4  72:18, 24
73:23  75:4  76:8
102:7  131:6  134:2

161:4, 10  172:5
216:14
**behavior**  50:10
59:21  60:2, 3, 12, 14,
16, 19, 25  61:18
65:17, 20, 21, 23  66:4,
7, 19, 20  67:13, 16
68:3, 6, 9, 12, 22  69:5,
13, 15, 19  71:19  92:1
106:4  142:3  144:13
160:3, 5  187:16
276:12, 24  283:20
303:16  334:17
**behaviors**  60:8
**belief**  227:5, 9, 12
**believe**  9:13  13:3
14:6  16:5  18:5, 24
19:22  20:16  27:25
28:5  31:13  36:14
39:4  41:10  43:20, 21
55:2  59:14  69:5, 12
75:18  110:4  115:21
119:19  120:1, 9
121:14, 24  125:25
140:15  147:17  150:2,
12  153:3  168:1
169:19  171:7, 14
187:21  193:21
195:20  217:4  218:19
219:20  224:9  227:17
228:6  240:23  255:14
256:12  260:8  271:2
274:13  289:12
290:19  299:3  306:18
316:22  319:24
321:21, 23  322:13
327:16  328:3  329:7,
21  330:24
**believed**  155:9
227:15  229:15
**believes**  227:4
**bellwether**  7:23  71:6
**Ben**  27:25
**beneath**  311:8
312:18
**benefitted**  197:20
267:9
**Berkeley**  126:3
**best**  10:18, 20  24:3
35:19  87:18  88:22

132:13  133:13
165:11  177:24
228:23  229:5  230:24
305:19  311:9
**better**  45:3  108:2
155:3  195:22  215:6
251:1, 22  307:8
328:24
**better-paying**  135:15
**beyond**  87:11  96:8
97:21  114:5  124:4
165:7
**Big**  118:4  119:5, 11
171:9  204:8  256:21
**bigger**  80:18
**bill**  38:7  41:23  42:2
**billboard**  76:13, 15,
22  77:5  79:5, 8, 11
82:14, 15, 23
**billboards**  82:2
**billed**  40:5
**billing**  22:13  37:23
**bills**  42:20
**Bing**  172:13  177:10
248:10  250:16
**biology**  58:1
**bit**  12:14  24:5
34:12  40:13  42:7
49:19  66:1  69:16
70:12  79:13  110:7
122:14  134:4  142:7
146:15  149:5  163:9
171:22  194:13
203:10  231:6, 24
232:9  248:8  253:24
270:1  274:21  296:24
297:2
**black**  181:9  218:3
**blast**  330:17
**blended**  37:2
**blood**  337:17
**body**  330:4
**bolstered**  285:15
**bones**  41:5
**bookends**  263:22
**bookmark**  189:10
**books**  310:23
**Borrowing**  79:22
**bot**  80:23
**bothered**  193:18

**bottom**  18:18  39:23
41:7  53:17  79:21
272:20  311:1  321:15
**bounced**  238:3
**bounces**  184:1
**bound**  329:12
330:16  335:1
**bounds**  138:24
**bounty**  174:16
**bow**  320:2
**box**  114:16, 24
312:16
**boxes**  114:8
**brand**  101:7, 8
149:17  153:13
190:21, 24  253:4
**branded**  185:21
**brands**  101:11
252:24
**break**  13:23  36:18
65:25  70:3  96:8
127:23  130:15
165:17, 18  168:21, 24
215:19  257:4, 7, 9
317:3  326:18
**breaks**  214:8
**bring**  83:16  283:23
306:7
**broad**  25:12  121:2
124:11  205:12
318:21
**broadly**  74:24  188:9
**broke**  169:6
**broken**  205:22
**brought**  8:16  15:22
**browser**  50:3, 12
83:17  85:14  186:5
**browsers**  183:13
**BRYANT**  3:8  10:16
12:20  17:6, 9  18:3
26:20  32:2  42:13
52:23  63:12  65:9
67:4  76:23  85:20
87:4  92:23  97:16
103:11  104:20
105:13  120:15, 23
122:6  135:20  138:1
140:14  143:11
145:17  151:14
152:13  153:14  156:9

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 348 of 402
Page ID #:2703
Deposition of John Chandler, Ph.D.    Hartwell, et al. v. University of Southern California and 2U Inc.

157:*10*  158:*19*
159:*24*  161:*14*
164:*25*  168:*20*
170:*25*  175:7  179:*14*
180:*9*  184:*24*  185:*16*
186:*19*  192:3  199:*21*
200:*14*  202:6  205:4
206:*18*  207:*11*
208:*16*  210:*20*  211:*1*
212:*19*  213:5  214:*21*
217:2  221:*1*  222:*16*
226:*4, 19*  227:7, *13*
228:5  229:*1, 23*
230:*10*  233:*14, 24*
234:7  239:*20*  250:6
251:*18*  254:*10*  257:*1*
262:*19*  265:9  275:*23*
276:5  278:*10*  280:7
281:8  287:5  288:*23*
290:*1, 13*  291:*23*
292:3, *18*  293:9, 22
298:*9, 19*  300:*15, 19*
302:*25*  303:*24*
305:*11, 13, 20*  306:*4, 5, 9, 12*  310:*1, 4, 11*
312:*10*  314:*11, 16, 20, 23*  316:5, *11, 16*
321:*10, 12*  326:*25*
327:*3, 5*  330:*20*
335:4  338:*1*
**Bu**  69:*18*
**Bud**  325:6
**budget**  294:*18*
295:*12*  296:7, *20*
**budgets**  111:*4*  294:7, *21*
**Budweiser**  325:5, *9, 14*
**build**  102:*15*
**building**  63:2  71:*23*
**bullet**  154:*15*  190:22
204:*3*  206:22  328:7, *11*
**bulleted**  208:*20*
**bus**  77:6
**business**  28:*1*  33:4
59:*1*  60:4, *22, 23*
87:*19*  88:8  91:*24*
101:2  109:22  110:*18*
118:*3, 7, 9, 11*  119:2,

7, *8, 10, 18, 20, 21*
121:*15*  145:*10*
234:*17*
**button**  88:*3*  185:*13*
222:8  311:*19*  313:*8, 10*  323:*17, 18*
**buy**  47:9  90:*17*
177:24
**buying**  325:*14*
**buys**  75:25

**< C >**
**cagey**  30:*1*
**calculate**  79:*14*
212:9  292:6
**calculated**  83:5, 7
**calculating**  71:*15*
**calculations**  81:2
**calculus**  53:*24*
**CALIFORNIA**  1:2, 8
3:*15*  5:7, 9  8:4, 6
9:*10*  70:*14, 25*  126:3
262:8  290:*12*
**California's**  127:*25*
**call**  26:5  29:*16*
31:22  35:20  51:25
52:*10*  67:7  71:7
79:20  114:24  126:7
134:9  218:*20*  287:*11*
322:*16*
**called**  5:20  15:*23*
17:*21*  29:24  34:8
38:22  47:*1*  51:*11*
59:*14*  78:*18*  83:*12*
89:3  151:6  171:24
175:6  179:*17*  184:*18*
238:*24, 25*  333:*14*
**calling**  73:*17*
**Calls**  328:*21*
**calm**  149:4
**campaign**  30:*23*
73:*15*  74:6  75:*19*
76:*11*  77:*14, 20, 21, 23*  78:*13, 15*  79:2, 5
96:*18*  98:2  100:*24*
101:*20*  161:8  221:*13*
231:2
**campaigns**  30:*17, 18, 20*  72:5, 6  78:7  80:3
110:*1*  111:*4, 6*

115:*11*  124:2, *10, 25*
125:3  133:*13, 15*
144:*25*  160:*13*
161:24  162:2  179:*20*
187:6  216:*12, 15*
219:5  230:4, 5  294:6
296:*12*  311:*21*
**CAMPBELL**  3:*16*
5:*24*  12:*23*  17:7
21:7, *9, 19*  22:*1*  23:2
34:6, *15, 21, 23*  42:*9, 14*  43:5  51:*13*  69:24
70:*10*  87:5  109:*4*
120:*19*  121:8, *9*
122:8, *16*  130:*14, 23*
141:*19*  145:25  150:*9, 21*  163:*1, 8*  165:25
166:3, 7, *11*  168:*13, 17*  169:*5, 15*  170:6
210:*21, 23*  215:*16*
216:2  217:*18*  234:*4, 8*  257:*8, 21*  258:*3, 5*
300:*21, 23*  304:*15*
305:*4, 24*  306:*11*
309:*23*  310:9  312:8
313:*19, 23*  314:*14, 19*
318:*19*  323:*10*
324:*12*  328:*19*
330:*19*  331:*23*
332:*17*  335:7, *14*
338:*1*
**campus**  57:25  311:22
**campus-wide**  146:*20*
**candidates**  147:*15*
148:5
**candor**  193:*25*
259:*18*
**Cantwell**  290:*17*
291:*10, 17*
**capabilities**  32:*25*
**capacities**  116:6
**capacity**  49:5  199:*23*
**Cappella**  123:6
125:*23*
**capture**  260:*10*
265:*12*
**captured**  247:8
273:8  279:9, *14*
291:7

**captures**  244:*20*
246:8, *11, 22*  264:3, *4, 20, 22*  266:*11*  267:22
274:*1*
**capturing**  161:*21*
**car**  201:*16*
**card**  176:*16*
**care**  69:2  87:*11*
90:*23*
**career**  135:*24*  157:*4, 7, 18*
**careers**  156:*21*
**careful**  62:*14*  277:*13*
**carefully**  138:*11*
**carried**  98:*23*
**carries**  182:*23*
**carry**  262:*18*
**cars**  201:*18, 19*
**cart**  87:25
**Case**  5:*10*  7:7, *21, 23, 24*  8:7, *14, 22, 23, 25*
9:2, *7, 9*  14:*13*  15:25
16:4  17:*3, 24*  20:*15*
24:20, *22*  25:6, *10*
29:*10*  36:7, *13, 14*
37:*15*  38:2  47:*21*
52:*16, 21*  70:*16*
71:*16, 18*  75:*18*
76:24  93:*10, 16*  98:6, *10*  99:*15, 17*  103:5, *17*  114:*1*  115:*17*
128:*23*  134:*11, 20*
137:*10*  158:*13*
173:*13*  181:*10*
185:*21*  188:22  195:9
196:*13*  210:3  216:*19*
253:5  260:*18*  291:3, *5*  297:22  311:6
319:9  340:*1*
**cases**  6:24  7:8, *16*
8:5, *12*  50:6  51:4
73:6, *25*  76:9  77:*12, 24*  98:*12*  105:6
178:25  185:5  235:*1*
278:*13*
**cast**  26:*13*
**casting**  147:*11*
**casual**  52:2
**catch**  200:*16*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 349 of 402
Page ID #:12704

Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

categories  184:*5*
  217:*9*
category  51:*25*
  184:*17*  188:*10*  266:*5*
  267:*11*
caught  11:*20*  200:*18*
cause  101:*4*
caused  195:*1, 5*
  325:*8*
cautious  87:*17*
celebrates  258:*16*
celebrating  292:*22*
Center  258:*16, 20*
  312:*16*
CENTRAL  1:*2*  2:*3*
  5:*3, 9*  336:*4, 5*
certain  20:*17*  23:*23*,
  *25*  67:*5*  72:*19, 25*
  74:*5*  77:*14*  81:*12*
  91:*20*  176:*4*  184:*20*,
  *25*  220:*7*  238:*12*
  241:*6*  318:*11*
certainly  37:*4*  66:*2*
  119:*19*  125:*21*
  154:*16*  158:*13, 20*
  201:*23*  209:*14*
  215:*16*  230:*15*  256:*8*
  257:*9*  275:*24*  303:*1*
  328:*25*
certainty  16:*13*  96:*1*
  142:*12*  143:*7*  144:*6*
  153:*11*  159:*22*
  229:*20*  236:*6, 9*
  277:*2, 24*  278:*8*
  300:*6, 13, 25*  301:*9*,
  *11, 14, 16*  302:*6, 12*,
  *14*  303:*4*  331:*5*
certification  70:*18*
  71:*12*
certify  337:*9, 15*
cetera  317:*22*
challenging  224:*3*
chance  14:*1*
CHANDLER  1:*15*
  2:*7*  5:*5*  6:*1*  20:*3*
  21:*12*  22:*3*  23:*3*
  39:*22*  40:*8*  42:*10*
  43:*6*  49:*14*  70:*11*
  133:*19*  138:*18, 21*
  163:*9*  169:*6*  181:*23*

184:*14*  194:*1*  195:*24*
  199:*18*  216:*4*  217:*23*
  235:*15*  258:*7*  269:*3*
  292:*15*  303:*20*  305:*4*,
  *15*  310:*3*  313:*24*
  327:*2*  335:*8*  336:*9*
  337:*10*  338:*1*  340:*1*
change  14:*5*  127:*6*,
  *12, 13, 17, 18*  155:*24*
  156:*14*  178:*13*
  187:*16*
changed  50:*14*  51:*3*
  108:*18*  126:*20*
  183:*13*  218:*21*
  230:*12, 15*  297:*24*
  308:*5*
changes  50:*19, 22*
  52:*6, 10, 12*
channel  172:*4*  298:*12*
channels  80:*10*
  81:*14*  99:*11*  123:*21*
  124:*7, 18*  131:*12*
  248:*7*  278:*17*
characteristics  200:*13*
characterization
  323:*7*  324:*15*
characterizations
  328:*8, 12*
characterize  19:*15*
charge  199:*12*
charged  198:*19*
chart  299:*8*  322:*15*
charts  168:*2*  181:*12*
chat  95:*11*  135:*1*
  290:*14*
ChatGPT  44:*14*
chats  105:*15*  290:*3*
check  41:*17*  114:*9*,
  *16*  165:*16*
checked  114:*23*
checks  42:*23*
cheesy  243:*1*
choice  28:*24*
choices  164:*18*
choose  197:*24*
chose  128:*21, 22*
  197:*23*  286:*6*
CHRIS  3:*8*  12:*17*
  120:*13, 20*  178:*4, 9*

200:*15*  210:*22*  234:*5*
circular  218:*24*
circulation  81:*5, 11*
  209:*14*  212:*2*
citation  219:*23*
citations  28:*25*
cite  100:*2*  105:*21*
  150:*14*
cites  149:*23*
citing  199:*2*
claimed  145:*14*
clarification  121:*1*
  177:*1*  317:*1*
clarify  121:*7*  206:*20*
  231:*5*  240:*22*  245:*13*
  268:*17*
clarity  317:*11*
clarity's  315:*5*
class  55:*12, 22*  56:*12*
  57:*2, 4, 18, 19*  58:*7, 9*,
  *14*  59:*10, 12, 18*
  60:*15, 17*  70:*18*
  71:*12*
classes  53:*14*  54:*22*
  56:*10, 14*  58:*4*  59:*4*,
  *17*  60:*14*
classroom  199:*22*
clause  212:*6*
clean  37:*9*  73:*12*
cleaned  183:*12*
cleaner  181:*7*
clear  7:*3*  9:*22*  11:*2*
  28:*20*  63:*7*  66:*3*
  74:*19*  96:*14*  108:*14*
  116:*6*  128:*25*  142:*11*
  181:*17*  194:*2*  195:*24*
  212:*11*  217:*7*  255:*18*
  302:*17*  307:*17*  322:*8*
  323:*2*
clearly  106:*1*
click  86:*7, 22*  164:*19*
  172:*24*  174:*16*  177:*7*,
  *9, 25*  182:*22*  183:*19*,
  *24*  184:*10*  188:*5*
  211:*12*  222:*8*  249:*2*
  306:*13*  313:*8, 10*
  316:*9*  327:*8*
clicked  50:*5*  85:*19*
  164:*2*  182:*25*  185:*12*
  187:*1*

clicks  50:*7, 9*  174:*16*
  182:*18, 21*  183:*21*
  204:*14*  211:*24*
  214:*16*  248:*10*
  249:*12*  250:*16*
click-through  204:*14*
  231:*13, 17, 21, 23, 25*
  232:*7, 12, 13, 16, 19*,
  *20*  249:*11*  250:*12, 18*,
  *20*
client  126:*4*  201:*13*
  230:*23*
clients  88:*23*  125:*2*
clinical  58:*18*
close  73:*19*  92:*14*
  257:*7*  323:*12*  335:*12*
closed  121:*11*
closed-ended  121:*12*
closely  6:*20*
closer  117:*8*  133:*9*
  201:*7, 10*  255:*5*
closest  39:*3*  88:*7*
clothing  47:*10*  201:*4*
clue  57:*13*
clumped  44:*25*
clumpy  45:*2*
Coca-Cola  101:*2, 3*
coding  181:*13*
coffee  176:*19*
coin  89:*24*
Coke  101:*5, 11, 13*
collaboration  28:*15*
  32:*24*
colleague  304:*19*
colleagues  56:*14*
collection  158:*6*
  223:*24*  288:*10*
College  45:*18*  58:*23*,
  *25*  110:*18*  112:*19*
  118:*2, 7, 9*  119:*2, 7, 8*,
  *10, 13, 18*
colleges  57:*25*
  146:*24*  147:*3*  293:*21*
colon  261:*21*
color  66:*17*  181:*7*,
  *13, 21*  321:*15*
colored  181:*14*
colors  66:*23*  311:*4*
column  175:*3*  312:*21*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 350 of 402
Page ID #:2705

Deposition of John Chandler, Ph.D.                    Russell, et al. v. University of Southern California and 2U Inc.

columns 297:6
combination 243:16
combined 34:20
292:13 302:12
combining 75:24
301:21
come 47:16 49:20
75:14 76:1 81:3
91:21 134:20 153:18
176:20 182:14
183:10 186:14
208:14 249:10
257:19 302:20
304:19 317:14
comes 48:7 79:19, 20
123:1 146:8 310:7
coming 42:23 64:22
92:12 100:9 229:10
comma-separated
73:7
comment 289:23, 25
290:3, 25
commentary 204:3
commenting 265:24
COMMISSION 340:1
commitment 156:20
328:14
committee 146:20
147:5
common 90:6
182:13 185:1, 6
188:25 216:17 249:7
communicate 32:20
61:20 69:2
communicated 32:17
communication 95:1
116:18 146:22 147:7
220:16
communications
31:14, 18 32:6, 13
33:2, 3, 5, 13 60:7
103:23 118:24
161:13 195:17 221:9
298:6
communications@Ros
sier.USC.edu 233:6
community 285:12
companies 61:5
72:24 125:19 176:2

company 57:17
compare 271:9 304:8
compared 115:5
compares 106:11
compelling 319:14
compensation 194:4
competition 140:11
competitive 140:19
202:16, 20
competitors 140:21
complaint 15:17, 22
20:4 28:16 31:2
199:6, 8
complete 11:6 43:12,
13 100:8 301:14
complicated 201:22
component 94:13
138:16 162:14
components 9:1
270:12
comprehension 67:12
comprehensive 71:18
111:1 131:10 276:12
computer 45:9
computers 44:18
computing 58:6
concept 78:18 271:18
conception 135:11
concepts 57:1 61:21
144:24
conceptualization
330:7
concerning 95:22
conclude 152:19
concluded 151:12
259:5
concluding 336:2
conclusion 46:22
49:7 167:5, 13
168:11 195:12
conclusions 17:24
conduct 103:4, 22
108:14
conducted 72:18
93:15, 21 94:2, 21
95:19 98:1 104:12
107:3 120:5
conducting 248:17
confer 304:18

Conference 118:4, 13
119:6 176:19
conferences 89:6
confers 155:18
confidence 16:13
confident 35:14
confirm 238:6
253:12
conflate 78:21
conformed 132:12
conforms 187:4
226:20 230:24
confusion 322:9
conjunction 78:12
connection 197:3
318:15, 21
connotation 129:7
conservative 209:23
consider 65:16, 22
66:3, 5, 13 68:1
72:14 73:18 148:6
154:16 332:22
consideration 81:16
89:18 157:9 201:14
252:4
considered 17:15, 21,
22 22:15 106:8
157:24 302:23 334:1
considering 141:23
244:17 253:3
consistency 92:25
93:10
consistent 93:7, 13
136:3 197:18
constant 82:24
consultant 62:5 89:2
consulting 75:5
88:22
consumed 14:17
consumer 59:21
60:1, 3, 12, 14, 15, 19,
25 61:6, 18, 23 63:10
65:17, 20, 21, 23 66:4,
7, 19, 20 67:13, 16
68:3, 6, 8, 12, 22 69:5,
13, 15, 19 87:3, 18
122:22, 25 134:10
187:16 201:3

consumers 60:7 61:1,
5 66:24 67:2, 8
86:21
contact 24:8 252:24
contacted 23:21
24:13 36:13
contain 219:18
249:10 254:5
contained 158:10
227:3 298:25 330:4
contemporaneous
34:1 71:24 72:9, 18
content 29:2, 6 67:6
87:20, 23 168:10
226:8, 16 230:11
249:16 267:10
285:22 295:4 304:2
310:7, 15 318:16
319:21 333:11, 20, 23
334:25
contention 210:16
context 46:10 88:16
118:1 136:21 171:12,
17 182:16 193:2
199:18 231:7 235:17
236:25 271:20
273:14 288:17, 19
309:15 328:13 333:8
continue 91:24 95:7
167:11, 16 176:12, 24
180:14 221:24 222:4
245:4 303:13 317:23
318:1
continued 223:23
225:12 335:15
continues 246:17
251:3
continuing 171:2
continuously 226:11
Contract 22:25 23:7
338:1
contrasted 288:7
control 21:20, 23
52:1 64:25 102:10,
16 167:1, 9, 25
168:14 175:12
177:16 305:21, 25
306:3, 10 316:10
controlling 178:11
convenience 101:4

conversation 194:*20*
218:*9* 220:*4* 290:*22*
291:*2, 8*
conversion 87:*14, 23*
conversions 87:*13*
conveyed 31:*15*
convicted 14:*22*
cookie 50:*1* 185:*3*
cookies 78:*22, 23*
183:*13*
copy 304:*2*
corant 91:*7*
corners 298:*25*
corporate 230:*2*
correct 7:*17, 18* 8:*16,*
*17* 9:*8, 14* 14:*5* 17:*1,*
*15, 16, 24, 25* 18:*2, 5*
22:*21* 23:*15* 26:*19*
29:*25* 32:*8* 37:*18, 23,*
*24* 38:*9, 19* 39:*13*
40:*2, 3, 6, 10, 11, 16,*
*17* 41:*21* 42:*17*
45:*19, 23* 46:*1, 3, 4*
47:*23* 52:*24* 54:*1, 3,*
*12, 13, 15* 56:*13*
58:*14, 19, 20* 65:*10*
77:*10* 85:*5* 86:*16*
92:*19, 20* 94:*24* 97:*2*
103:*1* 108:*19* 121:*23*
123:*2* 129:*8* 139:*18*
141:*8* 145:*16* 149:*24*
152:*7* 155:*4, 5*
159:*13, 14, 23* 161:*5*
170:*13* 171:*25*
173:*20, 21* 178:*21, 22*
179:*5, 6, 13* 180:*19*
183:*22* 185:*15*
186:*18* 189:*15, 16*
190:*13* 191:*24, 25*
192:*4, 15, 16* 194:*6*
195:*3* 196:*4, 5, 7, 14*
198:*4, 5* 202:*5, 22*
203:*6* 205:*20, 21*
210:*1, 13, 14* 211:*2*
212:*3, 4* 213:*4, 15, 16*
214:*6, 7* 215:*9, 10*
217:*1* 218:*6, 7, 13, 14*
219:*3, 11, 24* 224:*5,*
*14, 23* 226:*18* 228:*4,*
*25* 229:*22* 231:*3, 4*

234:*11* 236:*8* 237:*17*
238:*17, 18* 239:*19, 24*
241:*7, 8* 242:*3, 4, 16,*
*17, 24, 25* 244:*1, 2, 25*
245:*1, 5, 6, 7* 246:*3, 4,*
*9, 10, 25* 247:*1, 8*
250:*5, 7, 13* 251:*11,*
*12, 14* 253:*13* 259:*14,*
*15, 23, 24* 260:*24*
263:*4, 12* 264:*7, 13*
265:*8* 267:*23, 24*
268:*1, 2, 8, 9, 12, 13,*
*15, 16* 269:*5, 6, 19*
270:*5* 272:*1, 19*
273:*21, 22* 274:*8, 9*
278:*9* 279:*24* 281:*17,*
*18* 282:*17, 18* 283:*8,*
*12, 13, 18, 19* 284:*5, 6,*
*10, 12, 24, 25* 285:*4, 5,*
*7, 8, 19, 20* 286:*19, 20*
290:*12, 23* 291:*5, 6*
293:*16, 17* 295:*18*
297:*25* 298:*5, 10*
302:*24* 307:*3, 4, 10,*
*14* 309:*11* 313:*4, 18*
319:*22, 23* 320:*4, 13,*
*14, 24, 25* 321:*6*
327:*18, 19, 25* 328:*1,*
*16* 329:*10, 11* 330:*3,*
*8, 18, 22* 332:*7, 16, 19,*
*24*
**CORRECTIONS**
340:*1*
correctly 72:*7* 86:*3*
110:*3* 215:*2* 224:*11*
301:*7*
corrupted 185:*3*
cost 106:*12* 117:*14*
173:*12* 188:*7* 231:*10*
cost-per-click 177:*13*
178:*13*
costs 295:*21* 297:*8, 9*
counsel 5:*15* 11:*11,*
*12* 12:*5, 13, 16* 15:*10*
32:*7, 10, 12, 15, 18*
34:*19* 35:*11* 42:*11*
128:*11* 162:*23, 24*
168:*16, 19* 265:*18*
305:*8* 326:*17* 335:*13*
counselors 193:*7, 12*

count 79:*25* 80:*25*
81:*10* 83:*24* 215:*13*
272:*22*
counted 84:*20* 155:*3*
197:*1* 313:*18* 314:*2*
330:*6*
counts 207:*15, 17*
COUNTY 337:*5*
couple 49:*1* 176:*7*
209:*4* 217:*16* 235:*11*
267:*23* 308:*11*
course 10:*15* 13:*6*
33:*4* 55:*11, 20, 21*
71:*19* 115:*24* 174:*25*
199:*3* 203:*12* 209:*1*
245:*9* 296:*25*
courses 54:*20* 59:*8*
60:*12, 20*
coursework 53:*9*
COURT 1:*1* 4:*14*
5:*9, 12, 14, 17* 8:*6, 9*
10:*13, 24* 68:*3, 4*
120:*11* 122:*10*
145:*22* 200:*18*
326:*17*
Courtney 18:*24* 19:*2,*
*10, 21* 171:*8*
Courtney's 19:*12*
covariant 102:*12*
covariants 102:*18*
cover 40:*8* 57:*1*
147:*8, 20*
coverage 74:*10, 20*
covered 122:*19*
covers 39:*11* 40:*2*
42:*15* 297:*7*
crackdown 127:*15*
cracks 247:*20*
cranking 177:*17*
crap 291:*12*
crawler 80:*22* 238:*25*
create 101:*6* 176:*15*
276:*11*
created 27:*8* 60:*25*
63:*17, 22* 216:*12, 14*
258:*13* 274:*17* 275:*1*
creating 63:*18*
267:*10*
creation 63:*14* 295:*1*
296:*1*

creative 67:*7* 304:*1,*
*3, 7* 317:*15* 318:*16,*
*23, 25* 319:*2, 13, 15,*
*20* 320:*19* 321:*8*
324:*18*
creatives 26:*5* 67:*21*
credential 192:*9*
credibility 151:*7*
154:*17*
credible 226:*25*
credit 47:*1, 6, 20*
48:*9, 18* 49:*9, 12*
51:*8, 22* 176:*16*
criteria 139:*4, 6*
202:*15*
criterion 114:*3*
critical 162:*14*
crummy 206:*11*
crystal 212:*11*
CUMMINGS 1:*4*
current 214:*9*
241:*16* 254:*16, 20*
currently 13:*13*
194:*8*
cursory 18:*21* 19:*16*
customer 61:*15*
123:*1, 9, 11, 16*
customers 88:*12*
179:*13* 200:*8, 9, 10*
216:*13*
cut 237:*7*
cutoff 322:*22* 323:*1*
CV 6:*20, 21* 43:*1, 2,*
*6, 11* 89:*19* 338:*1*
CVs 147:*8*
cycle 89:*12, 18*

**< D >**
daily 243:*13*
D'Ambra 3:*23* 5:*11*
data 28:*2, 3* 33:*1*
46:*14, 17* 49:*4, 10, 15,*
*18, 21* 50:*19* 51:*12*
54:*17* 55:*1* 57:*3, 4*
60:*21, 23, 25* 61:*2, 3,*
*11, 13, 17, 19* 62:*4*
65:*19, 21* 66:*4* 67:*15*
73:*6* 75:*4, 12* 76:*5, 6*
88:*25* 89:*22* 91:*18,*
*19* 96:*16, 20* 97:*12*

Deposition of John Chandler, Ph.D.                    Tovell, et al. v. University of Southern California and 2U Inc.

98:8, *16*  99:*15*, *17*, *20*,
*23*, *25*  102:7  105:*1*
112:9  116:*14*, *19*, *21*
124:*1*, *24*  125:4
126:5, *12*, *16*  158:*14*
159:*11*, *14*  161:7
194:*17*, *21*, *25*  195:*3*,
*14*  196:4, 7  198:*11*,
*14*  199:*11*  205:*21*
207:*23*  210:5  214:2,
7  223:*14*, *17*  231:*18*
236:8  237:*20*  238:5
244:*3*  247:*1*, *9*
254:*13*, *15*, *21*  256:*18*
277:*25*  278:*20*
292:*13*  297:*12*
298:22  301:*18*
303:*17*, *21*, *25*  304:*3*,
*6*, *12*  334:*14*

**data-driven**  61:2*1*
**date**  5:2  45:*16*
243:*16*  264:*21*, *24*
340:*1*
**dated**  23:*17*  281:*15*
284:*23*  285:*3*, 7
**dates**  9:6  238:*16*
263:*19*, *21*  273:*25*
279:9
**Day**  20:6  51:*16*, *18*
82:*16*, *18*  128:*23*
195:*10*, *11*  239:2
259:5  336:*12*  337:2*1*
**days**  82:2*1*  224:7, *10*
**DC**  3:7
**dead-naming**  315:*4*
**deal**  55:*1*  60:*14*
190:*23*  201:*15*
207:22  220:3  229:3
230:*1*  297:*17*  333:9
**dealing**  28:*3*
**deals**  332:5
**dean**  20:8, *10*  195:*18*,
*19*  203:24  327:*13*
**deans**  212:7, 8
**death**  192:*23*
**December**  36:*15*
275:9
**decide**  66:*11*  260:6

**decided**  104:*17*
128:*12*  139:2*1*
164:*15*  225:7  319:4
**deciding**  32:*13*
66:23  141:*15*
**decipher**  36:2*1*
**decision**  66:*18*  94:5,
22  104:*23*  105:*10*
106:8  108:*18*  111:*19*,
*24*  112:*13*, *23*  114:*3*
115:*10*  117:*10*  137:4,
*24*  139:*12*  144:9
157:*25*  158:4, 8, *12*,
*16*  201:8  225:*14*
**decisionmaking**
61:*11*  133:*17*  134:*18*
138:*4*  155:*17*  156:*17*
157:*12*
**decisions**  27:6  91:*24*
103:*25*  132:*14*
137:*24*  193:*10*
292:*17*  293:7, *20*
**decks**  73:*3*
**deeply**  262:*24*  311:*24*
**default**  211:*10*
**Defendants**  1:9  3:*12*
**DEFENSE**  3:*4*
**define**  64:*4*  78:8
172:9  183:*1*
**defined**  264:2*1*
**definitely**  146:*10*
**definition**  64:*3*
73:*13*  87:8  93:*2*, *13*
108:*10*  130:*12*
182:*13*
**definitively**  228:2
230:*18*  321:*3*
**degree**  96:*1*  132:*24*
135:25  136:9  142:*12*
143:7  144:5  157:7
164:*16*  173:25  174:7,
*18*  178:*18*, *19*  222:*19*
235:5  274:*18*  300:5,
*13*, 25  301:9, *11*, *16*
302:6, *14*  331:*4*
**degrees**  53:*4*, 6
234:*15*, 25
**delete**  224:4, *13*, *15*,
22  225:9
**deleting**  224:*11*

**delivered**  26:6  79:*24*
116:*10*  168:*10*  171:5,
*18*
**delivery**  85:5  112:*24*
333:*11*
**demand**  200:*1*
**demonstrate**  136:*10*
**denominator**  204:*15*
**Dep**  340:*1*
**department**  57:22
58:24  59:2, 6
**depend**  92:*2*, 5
162:*18*  163:2*1*
220:*15*
**depending**  312:*13*
**depends**  66:8  87:7
129:25  204:*24*
**depicted**  322:*15*
**deployed**  31:5  63:*24*
64:*1*, *3*, 5  145:*3*
**deployment**  63:*15*
**Deponent**  340:*1*
**deposed**  6:2*1*  9:*3*
20:*15*, *16*
**depositing**  201:*11*
**DEPOSITION**  1:*14*
2:7  4:*10*  5:5  6:*3*, *15*
7:9, *10*  9:2*1*, *24*
10:*15*  12:*3*, 6  16:*4*, 6,
*16*, *18*  17:2, *4*  18:*23*
19:9  21:*3*, 5, *11*
220:*4*, 8  227:*18*
233:*23*  319:6  337:*11*,
*12*  338:*1*
**depositions**  6:7, 22,
23  7:7  8:*1*, 2  9:7, *17*
16:9  17:*14*
**Depot**  90:*16*, 20, 23
91:*17*, 2*1*
**derive**  98:*13*
**describe**  105:*24*
147:22  310:5  311:*15*
**described**  63:8
124:*17*  142:*3*, 9
174:6  185:*10*
**describing**  27:7  41:2
102:5
**description**  58:*12*
60:*12*  338:*1*  339:*1*

**descriptive**  292:2*1*
**deserved**  195:*23*
**design**  63:*1*  64:6
89:9  294:25  297:*10*,
*14*  309:2*1*  310:8, *15*
**designated**  230:2
**designation**  155:2
**designed**  116:*14*
192:6
**designing**  62:*3*, *17*, *21*
**detail**  99:*24*  145:2
**detailed**  154:*13*
229:9  292:9  295:*10*
**details**  8:9  141:2*1*
197:*23*
**determine**  47:*18*
48:2  49:*12*  93:*16*, 22
94:*3*, 2*1*  95:20, 25
96:*17*  103:8  106:5
180:2  253:2*1*  256:*15*
299:*15*
**determined**  166:25
168:*1*  288:9, *12*
322:22
**determines**  177:*3*
**detriment**  130:*4*
**develop**  57:9
**developed**  58:7
**development**  62:9
**device**  50:*3*, *12*
**Diego**  54:*11*, 2*1*, *24*
**differ**  82:*10*  117:*3*
**difference**  202:8
304:*10*
**differences**  117:*11*
200:*10*, *13*  202:*1*
**different**  9:20  45:*1*
47:*15*  48:*10*, 25  49:*1*,
*13*  53:*1*  55:*13*  62:25
67:*17*  70:*17*  72:6
75:*13*  77:6  81:*4*
86:*18*  97:9  150:*19*
184:*10*  196:2  201:*2*,
*24*  205:7  218:*24*
219:8  229:*11*  252:9
259:*4*, *10*  266:*11*
308:22  317:5, 6
320:8  321:2*1*, *23*
**differentiator**  27:*4*
134:*1*, *6*, 8, *14*  136:*1*,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 353 of 402
Page ID #:2708
Deposition of John Chandler, Ph.D.                    Ball, et al. v. University of Southern California and 2U Inc.

*6* 137:*4*, *11*, *23*  141:6
142:*1*, *10*, *15*, *21*, *23*
143:*10*, *17*, *20*, *25*
144:*1*, *3*, *11*  170:*23*
203:*15*  229:*12*
**differentiators**
140:*22*  141:*8*  142:*8*
154:*11*
**differently**  32:*11*
35:*16*  182:*8*
**difficult**  58:*10*  189:*5*
**difficulty**  163:*10*
**dig**  270:*1*
**digital**  109:*21*
333:*10*, *15*  334:*13*
**diploma**  202:*13*
**direct**  76:*16*  77:*11*
78:*6*  87:*1*  118:*9*
183:*2*, *3*, *4*, *6*, *15*
184:*6*, *15*, *20*  185:*1*, *6*,
*25*  188:*17*, *24*  189:*2*,
*6*  297:*8*  303:*16*
**direction**  77:*4*
**directly**  78:*2*  186:*9*
193:*20*  249:*22*  283:*4*
314:*5*
**disagree**  229:*24*
**disciplines**  154:*7*
**discount**  79:*15*  80:*13*
**discoverable**  33:*15*
37:*5*
**discuss**  12:*5*  40:*23*
117:*22*  291:*16*
**discussed**  19:*9*  31:*4*
100:*11*  104:*3*  118:*13*
142:*17*  215:*12*
288:*25*  314:*3*  319:*5*
**discusses**  203:*21*
**discussing**  195:*20*
254:*7*  272:*13*  301:*25*
307:*12*
**discussion**  33:*18*
229:*21*  245:*21*, *22*
250:*24*
**Discussions**  30:*19*
**disgruntled**  290:*11*
**display**  48:*3*  51:*15*
90:*7*  123:*23*  178:*10*
242:*2*, *12*  247:*25*
248:*5*  249:*5*, *20*

250:*2*, *4*, *13*, *19*  295:*4*,
*7*  296:*10*  304:*4*
**displayed**  237:*4*
310:*25*  311:*12*
**displaying**  240:*12*
242:*3*
**dissertation**  46:*5*, *10*
47:*5*  48:*24*  50:*8*, *17*,
*25*  98:*14*  324:*22*
333:*3*, *9*, *13*
**distance**  197:*17*
**distinction**  80:*2*
107:*17*
**distinctive**  72:*5*
**distinguish**  80:*11*
**DISTRICT**  1:*1*, *2*
5:*8*, *9*  8:*6*  9:*10*
**districts**  7:*23*  71:*7*,
*10*
**dive**  141:*17*
**diversity**  117:*10*
**divide**  48:*9*
**division**  88:*19*
**Docs**  226:*10*
**doctoral**  197:*2*, *3*, *6*
**doctorate**  118:*15*
140:*4*  181:*4*  234:*22*
**doctor's**  81:*9*
**document**  15:*17*
17:*3*  19:*7*  21:*8*, *14*,
*17*, *22*, *24*  23:*4*  29:*12*
35:*4*  43:*4*, *10*  109:*3*
137:*20*  141:*18*
149:*23*  150:*15*, *20*
152:*16*  167:*2*, *10*, *19*,
*23*  168:*6*  170:*21*
188:*15*  199:*4*  246:*20*
272:*21*  280:*20*
294:*13*  298:*20*
314:*22*  316:*10*, *15*
**documents**  15:*16*
20:*5*  21:*13*, *18*  22:*4*,
*10*, *11*  29:*18*, *21*  30:*8*
33:*14*  73:*5*  134:*20*,
*21*  136:*13*  137:*2*, *7*,
*21*  139:*17*  140:*16*, *18*
167:*21*  190:*15*  191:*6*,
*7*, *10*, *13*  195:*8*
203:*13*

**Dodgers**  84:*10*
**dog**  13:*23*
**doing**  11:*1*  16:*21*, *22*
27:*10*  35:*19*  36:*19*,
*21*  38:*5*  47:*24*  48:*17*
49:*17*  51:*5*  56:*20*
63:*6*  66:*12*  75:*20*
98:*18*  155:*20*  159:*9*,
*17*  189:*1*  252:*21*
324:*5*
**dollars**  91:*1*  177:*25*
295:*17*, *22*
**double-click**  167:*2*
306:*2*, *10*  316:*8*
**dove**  262:*24*
**downstairs**  13:*22*
**dozens**  62:*2*, *11*, *21*
146:*23*
**Dr**  6:*1*  20:*1*, *3*  22:*3*
23:*3*  27:*2*  28:*6*, *7*, *8*
37:*2*  41:*2*  43:*6*
49:*14*  69:*18*  70:*11*
133:*19*  138:*18*, *20*
152:*6*  161:*8*  162:*1*,
*16*  163:*9*, *19*  169:*6*
181:*22*  184:*14*
193:*25*  195:*24*
199:*17*  216:*4*  217:*23*
219:*19*  220:*1*, *9*
221:*14*  226:*7*, *15*, *17*,
*23*  229:*2*, *14*  230:*16*,
*19*  235:*15*  258:*7*
266:*22*, *23*  267:*25*
269:*3*  275:*4*, *8*
286:*23*  287:*3*, *6*
288:*1*  289:*8*  292:*15*
303:*20*  305:*4*, *15*
310:*3*  313:*23*  319:*24*
327:*2*  335:*8*
**draft**  28:*12*, *21*  29:*2*,
*5*
**drafted**  14:*3*
**dramatically**  230:*12*
**drip**  133:*16*  161:*23*
216:*11*  221:*12*
**driven**  104:*23*
**driving**  79:*4*, *6*
162:*13*
**dropped**  162:*24*

**dropping**  254:*22*
**drove**  112:*14*
**due**  41:*8*
**duly**  5:*21*  337:*12*
**duration**  77:*2*
**dynamics**  254:*6*
270:*15*

**< E >**
**earlier**  137:*17*
154:*19*  182:*18*
185:*11*  194:*14*, *19*
196:*9*, *20*  206:*14*
211:*18*  245:*23*
248:*13*  273:*15*
288:*25*  293:*14*  296:*9*
306:*25*  319:*6*
**earliest**  45:*16*  275:*20*,
*25*  284:*9*, *20*  285:*18*
294:*12*
**early**  43:*21*  125:*16*
203:*22*
**Earn**  248:*21*, *23*
**earned**  26:*7*  145:*13*
260:*17*  266:*5*  267:*11*
278:*18*
**easier**  34:*12*  78:*23*
181:*14*
**easily**  175:*12*
**Eastern**  2:*4*  336:*6*
**easy**  311:*14*
**econometric**  101:*18*,
*25*  102:*5*  103:*7*
**econometrics**  51:*22*
101:*22*
**economic**  288:*8*
**economy**  287:*12*, *21*
288:*4*, *5*, *7*, *8*, *10*
**ecosystem**  52:*11*
**ecstatic**  207:*5*
**Ed**  185:*9*
**Ed.D**  140:*3*  157:*20*
180:*15*, *18*, *21*, *25*
181:*1*, *3*, *4*  188:*16*, *19*
189:*7*  197:*14*  218:*12*,
*15*  235:*5*, *8*  267:*5*, *6*
317:*4*, *12*  318:*22*
319:*11*
**edited**  226:*9*

Deposition of John Chandler, Ph.D.

Mitchell, et al. v. University of Southern California and 2U Inc.

**editor** 28:8, *11*
**edits** 28:*13*, *23*
**Education** 20:*9*
25:*15* 26:*3* 45:*15*
93:*6*, *17*, *23* 102:*11*
104:*18* 105:*11*
112:*17* 123:*5*, *13*
125:2, *19* 126:*20*, *22*,
*24* 127:*2*, *7*, *13*, *16*, *20*
132:*24* 136:*16* 137:*5*,
*25* 140:*4* 143:*9*
147:*19* 149:*18* 154:*6*
157:*7* 164:*16*, *17*
175:*23* 193:*18*
199:*18* 200:*9* 201:*2*,
*21*, *25* 202:2 222:*20*
234:*22* 245:*6* 246:*1*
258:*21*, *23* 259:*3*, *22*
261:*10* 262:*8* 273:*21*
279:*23* 280:*1*, *4*, *5*
281:*16* 282:*12*
286:*25* 287:*11*, *22*, *23*
308:*2*, *20*, *25* 311:*10*
323:*19*
**educational** 105:*24*
154:*7* 155:*24* 156:*7*,
*13* 193:*10*
**Education's** 128:*1*
**effect** 4:*13* 98:*20*
**effective** 27:*12* 69:*1*
87:*2*, *8* 90:*2* 98:*3*
100:*24* 101:*20* 103:*1*,
*10* 132:*17* 138:*9*
160:*20* 303:*14*, *23*
**effectively** 26:*15*
131:*8*
**effectiveness** 88:*6*
99:*11* 102:*1* 103:*13*
111:*5* 219:*4*
**effects** 102:*17*
**efficacy** 158:*9*
**efficient** 131:*25*
**effort** 209:*23*
**efforts** 80:*24* 131:*15*
132:*6* 134:*1*
**eight** 153:*25* 241:*5*,
*10*
**either** 28:*20* 53:*10*
71:*23* 72:*17*, *23* 76:*7*
90:*22* 103:*6* 191:*5*

249:*22* 250:*12*
323:*20* 335:*10*
**element** 311:*3*
**elementary** 157:*16*
**Elliot** 28:*6*, *7*, *8* 37:*3*
41:*3*
**e-mail** 26:*7*, *17*
31:*20* 32:*21*, *22* 33:*8*
64:*12* 111:*14* 123:*24*
131:*13* 133:*12*
160:*12*, *17* 161:*4*, *7*,
*22* 162:*2*, *12* 164:*4*, *7*,
*9*, *22* 165:*3*, *7* 183:*25*
186:*17* 187:*2*, *6*
189:*16* 195:*16*
203:*24* 204:*4*, *11*
209:*7* 210:*7*, *11*, *12*,
*24* 211:*3*, *4*, *7*, *20*
216:*6*, *11*, *18*, *20*
218:*5*, *12*, *16* 219:*1*, *2*,
*4* 220:*4*, *6*, *13*, *15*, *24*
221:*8*, *9* 222:*6*, *7*, *10*
223:*3*, *12*, *16*, *20*, *22*
224:*3*, *6* 226:*2* 227:*2*
230:*4*, *5* 231:*8*, *9*, *15*
232:*2* 233:*5*, *6*, *11*
247:*20* 254:*16*
255:*23* 278:*18*
296:*12* 304:*5* 311:*21*
326:*4* 327:*12* 328:*2*,
*5* 329:*2*, *8*, *9*, *13*, *16*
330:*4*, *5*, *9*, *11*, *13*, *17*
**e-mails** 33:*10*, *16*
73:*5* 133:*16* 161:*9*
162:*3*, *17* 163:*25*
164:*12* 183:*22*
189:*14* 204:*10*, *22*
209:*8*, *10*, *25* 210:*4*
211:*6* 215:*20* 216:*24*
218:*20* 219:*18*
220:*10*, *22* 221:*4*, *11*,
*12*, *15*, *18*, *23* 223:*7*, *9*,
*18*, *23*, *25* 224:*9*, *13*,
*15*, *23* 225:*8* 226:*6*, *9*,
*13* 228:*22* 229:*19*, *21*
230:*9*, *12*, *21* 231:*1*, *6*,
*7*, *13*, *16*, *19*, *22* 232:*6*,
*11*, *21*, *24* 278:*5*
296:*11* 301:*23*

302:*10* 311:*20* 326:*2*,
*6*, *14* 327:*24*
**embrace** 52:*4*
**emphasis** 289:*21*
**emphasized** 286:*15*
**emphasizing** 292:*22*
**employed** 100:*23*
160:*8*
**employee** 18:*22*
203:*24* 327:*12*
**employees** 19:*20*, *25*
74:*25* 75:*1*
**employer** 136:*11*
**employers** 136:*2*
**employs** 91:*17*
**encouraging** 160:*20*
285:*12*
**e-newsletter** 211:*25*
**engage** 176:*2* 271:*22*
311:*24*
**engaged** 131:*7* 133:*2*
244:*16* 303:*8*
**engagement** 36:*1*
131:*10* 204:*1* 216:*13*
268:*24* 269:*23*
270:*16*, *20*, *24* 271:*9*,
*15* 329:*4*
**engagements** 89:*2*
**engaging** 205:*24*
255:*10*
**engine** 123:*25*
175:*16* 176:*2* 182:*25*
248:*9* 249:*19* 318:*10*,
*18*
**engineer** 28:*2*
**engines** 123:*23*
**English** 312:*7*
**enjoyed** 145:*19*
**enjoying** 234:*20*
**enroll** 99:*21* 103:*25*
104:*17* 105:*10* 106:*9*
108:*18* 112:*15*
113:*15* 115:*10* 137:*5*,
*24* 139:*12*, *21* 157:*25*
158:*16* 164:*11*
193:*13* 201:*8* 222:*12*
224:*17* 225:*14* 293:*7*,
*20* 323:*18* 332:*12*
**enrolled** 99:*8* 104:*23*
107:*5* 112:*4*, *8*, *11*

115:*19* 116:*23* 120:*7*
136:*15*, *19* 142:*19*
143:*8*, *13*, *15* 144:*2*
159:*12* 160:*22*
188:*19* 205:*9* 233:*7*,
*11* 234:*10*, *19* 323:*21*
324:*1*, *18* 326:*1*, *6*
332:*2*
**enrolling** 133:*6*
157:*9* 161:*23* 202:*3*
244:*18* 324:*3* 332:*22*
**enrollment** 88:*10*
97:*4* 98:*6*, *8*, *16*, *21*
99:*4* 110:*8* 116:*3*
122:*23* 123:*9*, *17*
146:*17* 161:*20* 182:*3*,
*6* 186:*17* 197:*19*
198:*19*, *23* 216:*25*
217:*10* 218:*13*, *21*
219:*9* 292:*17* 322:*3*,
*11*
**enrollments** 102:*14*
182:*3* 188:*15* 189:*14*
217:*5*, *11* 218:*15*
322:*16* 323:*14*
**enrolls** 157:*19*
**ensure** 132:*15*
**ensured** 331:*11*
**ensuring** 131:*10*
**enter** 221:*7* 311:*20*
**entered** 163:*24*
**entering** 221:*8*
**entire** 13:*1* 42:*15*
89:*12* 208:*3* 223:*24*
261:*9* 303:*10* 308:*25*
313:*11* 324:*21*
**entirely** 74:*18* 208:*5*
**entities** 7:*23* 61:*17*
71:*8*
**entitled** 24:*3*
**entity** 76:*12*
**entry** 37:*13*, *20* 38:*15*
**environment** 261:*18*
323:*14*
**equal** 102:*22*
**equally** 286:*25*
287:*3*, *17* 288:*3*
**equivalent** 229:*6*
**Eric** 12:*18*
**ERRATA** 340:*1*

**error** 259:*16* 301:*15,*
*18*
**errors** 28:*24*
**especially** 251:*4*
**ESPN** 48:*4* 84:2, *8*
**ESPN.com** 79:*19*
**ESQ** 3:*8, 16, 17*
**essentially** 57:*23*
88:22 172:*23* 174:*15*
182:*16* 239:*1*
**established** 130:*5*
**estimate** 25:*21* 63:*19*
73:*14* 74:*15, 17, 22*
75:*10, 16* 76:2, *14*
81:*3, 21* 89:22 97:*3,*
*5, 19* 104:22 177:*8*
178:*14* 208:*12*
209:*16* 210:*8* 211:2
213:*16, 22, 25* 241:*18*
243:*17* 244:*3* 247:*3*
251:*19, 25* 255:22
277:*6, 11* 288:*18*
301:*18, 21* 304:*11*
334:*19*
**estimated** 209:*3*
301:*15*
**estimates** 71:*23* 72:*6,*
*9, 18* 73:3, *8, 10, 18,*
*22* 75:*6, 9, 14* 76:*10,*
*24* 77:*12, 13, 22* 78:*1*
96:22 98:*12* 102:*20*
178:*13* 301:*19*
**Estimating** 61:*14*
70:*19* 71:*12*
**et** 5:*6* 317:*21* 340:*1*
**ethos** 112:*17*
**evaluate** 139:*6*
**evaluated** 30:*24*
52:7 222:*13*
**evaluating** 26:*23*
**evening** 90:*21*
**event** 86:*5, 7, 20*
182:*23*
**events** 83:*23* 86:*19,*
*21, 22*
**eventually** 225:*14*
**Everest** 5:*13*
**evidence** 135:*7*
139:*16, 19* 140:*9, 23*
164:*8* 205:*23* 237:*14*

**286:***1* 288:*15* 301:22
302:22 303:2, *11, 16*
**exact** 39:*1* 172:*6*
247:2 269:*15* 297:*5*
**Exactly** 72:*20*
118:*18* 184:*21*
226:22 230:22 232:*9*
241:*3* 246:*23* 261:*19*
299:*16* 322:*21*
**EXAMINATION**
5:*23* 305:*12*
**examined** 5:*22*
**example** 47:*9* 50:*7*
66:*21* 76:*20, 21* 77:*9*
79:*17* 80:*1* 81:*15*
82:*14* 90:*15* 97:*1*
101:*11* 102:2 104:*16*
106:*15, 17, 21* 135:2,
*15, 16, 25* 136:*14*
140:*12* 154:*3, 4*
158:*24* 161:*3* 176:*13*
200:*10* 258:*15* 259:*8*
260:20 263:*11, 13*
264:*5* 266:*21* 269:*9*
274:2 282:*4* 311:*7*
**examples** 47:*21* 57:*3*
76:*5* 105:*9* 106:*3, 6*
142:*16* 143:*13, 19, 22*
241:*5* 250:*3* 259:*20*
260:*1, 3, 22* 261:*5*
266:*3, 18* 267:*16*
276:*7, 15* 279:*8*
286:*6* 333:*22*
**exceeded** 200:*1* 207:*4*
**Excel** 73:*7*
**excellent** 327:*14*
**exception** 56:*8*
**excerpts** 16:*16*
**excited** 149:*2*
**exclusively** 55:*14, 15*
**excuse** 34:*9* 38:*3*
41:*14* 117:*14* 162:22
174:20 210:22
219:*19* 262:*11*
**executed** 133:*12*
**execution** 30:*20*
**exercise** 279:*6*
**exhibit** 21:*1, 4, 5, 10*
22:*24, 25* 27:*18* 34:*3,*
*4, 10* 35:*5* 36:*10*

**37:***14* 38:*15* 39:*21*
41:*13, 14, 16* 42:25
43:2, *12* 108:*25*
109:*1* 122:*18* 131:*1*
144:*21* 146:*5* 149:*11*
150:*1, 7* 153:*23*
155:*23* 165:*15, 22, 23*
166:*13* 169:*11, 13, 25*
170:2, *4, 7* 173:*15*
181:*6, 19* 182:*2*
190:2, *4* 196:*23*
216:*5* 217:*19* 247:*24*
258:*4* 273:*19* 314:*15*
316:*6, 17* 321:*11*
326:*16* 327:*4* 338:*1*
339:*1*
**exhibits** 34:*18* 92:*13*
166:*5* 305:22
**exist** 139:*9* 245:2
247:*10* 256:*19*
304:*12*
**existed** 283:*6* 289:*1,*
*15*
**existence** 15:*11*
**exists** 57:22 97:*18*
283:*23* 303:2
**expect** 15:2 74:*12*
75:*21* 157:*11* 175:*19*
191:*9* 212:*24* 217:*24*
252:*11* 270:*21*
274:*19, 25*
**expectation** 238:*5*
**expected** 9:*25* 11:*13*
74:*10, 20* 177:*13, 15*
**expenditure** 296:2
**expenses** 294:*17*
**expensive** 172:*17*
**experience** 8:*12*
53:*18, 19* 122:*24, 25*
123:*1* 124:*6, 9, 11, 17,*
*22* 126:*19* 152:22
157:*3* 177:*20* 185:*8*
229:*4* 230:*1* 252:*21,*
*25* 301:*25*
**experimentation** 52:*1,*
*4, 19*
**Experiments** 98:22
102:*24, 25* 103:*7*
**expert** 7:*17* 21:*11*
32:*5* 43:*7* 65:*16, 19,*

**23** 66:*3, 5, 13, 19, 23*
67:2, *23* 68:*1, 3, 5, 10*
70:*17* 108:*21, 23*
109:*1* 203:*5* 338:*1*
**expertise** 67:*9* 97:*25*
109:*19*
**experts** 15:*8, 10*
203:*6*
**EXPIRES** 340:*1*
**explain** 25:*13* 44:*11*
57:*15* 110:*15* 124:*21*
145:*1* 248:*4*
**explained** 249:*6*
**explaining** 162:*3*
**exports** 77:*25*
**expose** 89:*15*
**exposed** 25:*23* 47:*4*
51:*7* 70:*20, 23* 71:*14*
73:*15* 78:*15, 16* 79:*1*
82:*1, 5* 83:*20* 95:*21*
96:2, *7* 97:*1, 8, 14, 21*
130:*6* 144:*7* 146:*22*
147:*3* 225:*17* 236:*1,*
*5, 7, 24, 25* 244:*9*
249:*12* 277:*17* 278:*1,*
*2, 6, 16, 25* 279:2
299:*10* 300:*9* 301:*5*
302:*3, 19* 308:*16, 17*
324:*19* 325:*3* 329:*24*
331:*8, 21* 332:*14, 23*
334:*21*
**exposure** 49:*22*
71:*15* 72:*11, 19*
73:*11, 13* 74:*15*
96:22 158:*25* 266:*6*
277:*8* 300:*4* 303:*5, 6*
313:*1, 14, 15, 18*
314:*2* 330:*6, 11*
331:*3* 333:*16* 334:*11,*
*15* 335:*1*
**exposures** 51:*9*
75:*16* 98:*16* 330:*17*
**extensive** 116:*1*
133:*12* 141:*23* 300:*4*
331:2
**extensively** 160:*10*
**extent** 22:*14* 44:*4*
96:*11, 12* 140:*11*
200:*3* 303:*15* 330:*15*
**extraordinary** 165:*1*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 356 of 402
Page ID #:2711

Deposition of John Chandler, Ph.D.
Favell, et al. v. University of Southern California and 2U Inc.

**extremely** 115:5
189:5 213:9 223:10
287:13 289:9
**eyes** 237:23 279:3

< F >
**face** 279:24
**Facebook** 48:5
83:13 164:2 206:23
209:17 212:14 213:4,
7 214:3, 8 215:11
251:5 252:9 253:25
254:4, 23 256:13
263:17, 18, 19, 21, 24
277:23 279:8, 22, 25
280:3, 19, 22, 24
281:1, 6, 24 282:13,
17 283:6, 23 285:2,
10, 13, 18, 23 327:25
**facet** 66:20
**face-to-face** 56:17
**facets** 60:24 67:18
**facilitate** 126:23
**fact** 9:6 17:20
111:22 116:21
117:19 137:22 143:5
153:12 193:19
196:25 217:12
272:18 273:4 303:12
326:4 334:7
**factor** 94:4 139:11
156:22, 24 157:8
207:5
**factors** 102:10
111:18 157:24
288:20
**Faculty** 205:10
**Fair** 9:5 18:16
19:15, 17 20:19, 24
38:1 39:17, 18 52:22
82:7 94:20 96:19
104:15 109:15
155:12 189:24
193:16 194:18
199:20 202:25
231:11 259:17
260:23 264:15, 18
273:3, 5 275:22
277:1, 19, 20 283:7
299:2, 3 315:23

323:7 324:8, 14
332:4 334:24 335:2
**fairly** 142:3
**fairness** 129:18
**fall** 51:25 56:7 69:4
266:4
**falls** 22:17 172:15
173:10 184:13
267:10
**false** 130:3, 10
**familiar** 127:16
**family** 164:14
**fan** 315:4
**far** 221:9 284:8
**farfetched** 223:3
314:4
**fashion** 18:21 20:20
51:23
**faster** 21:24
**fatigue** 88:14 89:24
90:2, 14 91:15
**FAVELL** 1:2 5:6
316:19 340:1
**Favell's** 16:6, 16, 17
**favorite** 214:25
**favorited** 215:3, 8
**favorites** 214:15
**features** 89:9
**February** 55:23
**federal** 127:15
**feed** 47:13 48:4
176:20 268:22
270:23 315:18
**feeds** 257:13
**feel** 15:4 120:20, 21
127:11 278:11
292:25
**feels** 291:2
**fell** 106:8 271:14
**felony** 14:23
**felt** 132:11 220:20
**field** 46:13
**fielded** 61:22 63:25
116:15
**fielding** 62:17, 21, 24
**figure** 65:8 107:10
305:18
**file** 34:20 168:10
**filed** 15:18 194:3

**files** 73:7
**filing** 4:3
**fill** 44:25 64:10
83:19 164:20
**filling** 64:15 133:3
**Film** 268:14, 20, 21
**filters** 84:18
**filthy** 145:21
**filtration** 83:25
**financial** 174:13
201:11
**find** 90:16, 18 99:16
155:11 156:22, 24
179:22 180:18 226:5,
12, 25 250:20 260:2
261:4 282:21 283:4,
5, 21 294:13
**finding** 180:21
**fine** 35:23 128:14
241:4
**finer** 332:9
**finish** 10:19, 21
160:14, 19, 21 163:17
187:8 231:20
**finished** 222:25
225:12 274:18
323:25
**finishing** 324:2
**firm** 23:14 25:2
35:13, 21 71:20
76:25 101:14 172:20
319:16
**firms** 60:7, 9 61:1, 4
62:6 71:25 72:13
75:5 87:11, 21
100:25 172:19
252:24 315:20
**firm's** 35:9
**first** 7:18 21:1
23:21 24:8, 20 28:12
35:13 36:5, 9, 12, 13,
14 37:14 38:7 53:19
58:9 59:13 69:17
70:3, 15, 17 71:11
82:18, 20 112:19
132:5 142:6 151:18,
25 152:3, 17 153:9,
16, 18 167:14 173:24
198:13 203:17
222:10 224:10 239:6

242:9 251:10 265:12
266:21 279:11
282:14, 19 283:11
289:24 290:22
306:22 317:18 327:8
**first-year** 118:10
**fiscal** 294:10, 15, 16
**fit** 102:20
**five** 6:7, 9 7:12 9:16
37:11 58:10 224:7
266:11 267:18
**five-year-old** 44:12
**flavor** 187:24
**flew** 56:16, 17
**flexibility** 112:24
**flies** 215:17
**Flipping** 146:1
**flow** 76:22 77:2
**focus** 93:5 94:19
142:5 143:3 216:22
235:2 251:10
**focused** 11:22 48:22
67:15 71:6 79:7
117:13 154:6 157:3
177:19 196:25
262:22
**Focusing** 71:11
205:15 269:8
**fold** 79:21 80:12, 14
82:3 84:4
**folks** 178:19 271:22
312:4
**follow** 10:18 252:14
315:11, 14
**followed** 89:12
153:4 195:18 216:17
251:22, 23 252:2, 5
**follower** 315:19
**followers** 214:19
251:14, 17, 20 253:1,
9 254:24 255:8
256:16 258:12, 14
260:12, 15, 22, 25
266:25 267:17, 20
268:20 269:2, 24
270:5, 7, 22 273:7
315:7, 22
**following** 109:19
173:16 238:14

252:*17*  253:*16*  254:*3*
335:*15*
**follows**  5:*22*  279:*11*
**follow-up**  15:*14*
  305:*9*
**font**  311:2, *14*
**foot**  319:*14*
**footnote**  149:*22*
  199:*1*  261:7  279:*15*
  282:2, *6, 7, 9, 16, 19*
**force**  4:*13*
**forestry**  118:*14*
**forget**  11:*21*  326:12
**forgetting**  12:*19*
**forgive**  103:2*1*
  137:*18*  196:8, *20*
**form**  4:*6*  11:*11*
  31:*15*  32:2, *21*  52:*23*
  67:4  73:*4*  76:*23*
  85:20  87:4, *23*  92:*23*
  96:*24*  97:*16, 19*
  102:5  103:*11*  104:2*0*
  105:*13*  111:*17*
  135:*20*  138:*1*  140:*14*
  143:*11*  145:*17*
  151:*14*  152:*13*
  153:*14*  156:9  157:*10*
  158:*19*  159:*24*
  161:*14*  164:*25*
  170:*25*  175:7  179:*14*
  180:9  184:*24*  185:*16*
  186:*19*  192:*3*  199:2*1*
  202:6  205:*4*  206:*18*
  207:*11*  208:*16*
  210:*20*  211:*1*  212:*19*
  213:5  214:2*1*  217:2
  221:*1*  222:*16*  226:*4,
  19*  227:*7, 13*  228:5
  229:*1, 23*  230:*10*
  233:*14, 24*  239:*20*
  250:6  251:*18*  254:*10*
  262:*19*  265:9  275:*23*
  276:5  278:*10, 14*
  280:7  281:*8*  287:*5,
  25*  288:*23*  290:*1*
  291:*23*  292:*3, 18*
  293:9, *22*  298:9, *19*
  300:*15*  302:*25*
  303:*24*  309:*24*
  310:*10*  312:9  313:2*0,*

*25*  318:*19*  323:*11*
  324:*13*  328:2*0*
  330:*19*  331:*24*
**formal**  115:*18*
  116:*10*
**formality**  21:2
**format**  72:*22*  73:*1*
  181:2*0*
**formats**  327:*24*
**former**  20:*8*  216:*19*
  276:7
**forms**  114:2*1*  301:*24*
  334:*3, 8*
**forth**  14:*8*  109:6
  144:*23*  337:*11*
**forward**  196:*17*
  227:6  319:*15*
**found**  24:*24*  115:9
  260:*3*  314:*4*
**four**  6:*25*  7:*4*  27:*18,
22*  34:8  92:*11*
  109:*14*  127:*24*
  190:*12*  206:2*1*  260:*1,
21*  298:*25*
**fraction**  96:6  104:*22*
  105:7  189:*8*  212:9
  213:*22*  216:*25*  238:*1*
  244:5  247:*11*  253:*15,
17*  268:2*0*  272:2
  277:6, *12*  295:*12*
  297:*8*  299:*12, 13*
  320:*15*
**framework**  123:*12*
**frantically**  84:*17*
**fraud**  80:*20*  129:7
**fraudulent**  128:*5, 16*
  141:2*4*  145:*14*
  194:*14, 19, 23, 24*
  195:*4*  236:*1, 17, 24*
  238:*12*  258:*17*
  259:*12*  262:*13*  277:*7,
12, 15, 18*  294:*19*
  296:2*1*  300:*9*  331:*8,
22*
**free**  88:*22*  120:2*0*
**freezing**  149:*5*
  150:*16*  171:2*1*
**frequency**  75:*24*
  89:*13, 14, 20, 22, 23*

92:2, *5, 11*
**fresh**  225:*23*
**friendly**  127:*8*
**full**  35:9  72:2
  222:2*0*
**full-length**  7:*9*
**fully**  7:*15*  9:*13*
**fun**  215:*17*
**functions**  88:2*1*
**fund**  201:*12*
**funnel**  25:*14*  88:2
  99:*5*  131:9  132:*23*
  161:2*0*  162:*19*
  163:2*1, 23*  187:5, *7*
  220:*17*  222:*9*  234:*11*
**furnished**  8:7
**FURTHER**  4:5, *9*
  157:*4*  227:2*1*  249:6
  305:*6*  335:9  337:*15*
**Furthermore**  141:*23*
**FY**  297:*11*

**< G >**
**gain**  306:*3*
**Gallagher**  20:*10*
  195:*19*  203:*24*
  327:*13*
**game**  91:*12*
**gardens**  83:*12*
**gather**  22:9  238:2*1*
**gathered**  50:2*0*
  238:2*0*
**gathering**  73:8  265:5
**gears**  92:*15*
**GED**  202:*13*
**general**  31:9  38:*16*
  77:*1*  83:6  119:8, *10*
  202:2  205:*13*  265:*4*
  288:*11*
**generally**  7:2*1*  47:*23*
  56:*13*  78:*11, 25*  82:*4*
  84:*14, 22*  85:*12*
  86:*17*  87:*10*  93:*12*
  94:*3*  97:*7*  102:*14*
  117:*15*  123:8, *12*
  124:*14*  132:2, *8, 21*
  142:*22*  144:*12*
  158:*13*  159:*25*
  160:*24*  161:*19*
  179:*15, 19*  192:*4*

199:*25*  231:*25*
  232:*15*  237:*24*
  250:*14*  270:*15*  312:*6*
  334:*1*
**generate**  88:*25*  188:7
**generated**  67:*16*
  77:*15*  80:2*1, 22*
  207:*3*  208:*1*  269:*16*
**generating**  32:*5*
  82:*22*
**generation**  112:*19*
**generically**  181:*3*
**Genius**  268:*11*
**geographies**  77:*14*
**geography**  74:7
  289:*3, 4, 15*
**geometrical**  44:*1*
**Gerber**  17:*5*  18:2, *13*
  27:2  152:7  162:*1, 16*
  219:*19*  220:*1, 9*
  221:*14*  226:*17, 23*
  229:*14*  230:*16, 19*
  319:*24*
**Gerber's**  20:*1*  161:*8,
11*  163:*19*  226:8, *15*
  229:2
**germane**  193:2*0*
**getting**  57:*23*  64:*9*
  75:2*1*  155:*19*  179:*25*
  192:*23*  257:6  271:*13*
  296:5  299:*18*
**give**  9:*25*  16:*13*
  39:*1*  48:*18*  59:*24*
  61:8  64:*3*  76:5  77:8
  96:*25*  102:2  104:2*1*
  105:6, *9*  141:*14, 17*
  142:*16*  161:*25*
  168:*15*  176:*15*
  178:*12*  211:2*0*
  241:*17*  243:*23*
  259:*25*  267:*16*
  282:*16*  301:*3, 19*
  302:*11*  305:*25*
  333:*22*
**given**  6:7  8:2  24:6
  30:*5*  49:*10*  51:*15, 16,
18*  52:*11*  74:*3, 7, 12*
  76:*15*  77:*13, 23*
  78:*16*  97:*25*  109:*14*
  114:2*0*  140:*12*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 358 of 402
Page ID #:2713

Deposition of John Chandler, Ph.D.    Ferrell, et al. v. University of Southern California and 2U Inc.

172:*15, 16*  193:*8*
236:*8*  250:*2*  252:*13,
18*  256:*16*  300:*3*
307:*6*  331:*2*  337:*13*
**gives**  174:*24*  217:*7*
**giving**  247:*2*
**glance**  82:*17*
**glean**  65:*7*  254:*9*
**gleaned**  114:*22*
**gleaning**  113:*7*
**global**  267:*5*
**GlobalEdExecs**  267:*2*
**Gmail**  211:*10*
**go**  9:*17*  18:*10*  20:*25*
21:*21*  22:*23*  34:*17*
39:*20*  47:*9, 10, 25*
53:*17*  69:*9, 24*  70:*2,
4*  71:*15*  81:*2, 19*
84:*2, 8*  90:*15*  101:*4*
102:*14*  111:*21*
130:*14, 16, 25*  141:*11,
12, 15, 21*  144:*3, 20*
146:*4*  149:*3*  150:*1,
15*  151:*20*  157:*5*
163:*1, 17*  165:*19, 25*
167:*20*  168:*3, 23*
169:*7*  176:*14*  188:*14*
204:*25*  208:*11*  216:*4*
222:*22, 24*  224:*20*
225:*4, 7*  233:*2*
235:*14*  241:*20*  249:*2*
254:*11*  261:*20*
267:*13*  268:*10*
269:*21*  273:*12*  279:*5*
297:*2*  299:*21*  304:*15*
306:*15, 16*  307:*24*
312:*20*  314:*20*
321:*10, 13*  327:*10*
328:*22*  330:*23*  331:*1*
333:*4*
**goal**  61:*19*  233:*16*
234:*2*
**goals**  145:*10*
**goes**  85:*10*  87:*22*
102:*13*  166:*10*
192:*24*  242:*5*  287:*10*
**going**  7:*14*  9:*17*
30:*7*  38:*14*  40:*18*
48:*16*  49:*20*  53:*17*
69:*25*  77:*8*  79:*18*

81:*7, 8*  82:*14*  91:*20*
100:*3*  105:*17*  132:*23*
136:*24*  149:*7, 8*
153:*23*  158:*24*
164:*13*  165:*14*
168:*21*  169:*24*  176:*3*
193:*24*  207:*9*  219:*16*
224:*20*  247:*18*
256:*24*  257:*1, 5, 11*
280:*13, 21*  281:*22*
282:*22*  306:*16, 21*
308:*14*  310:*25*  316:*7*
318:*24*  321:*14*  322:*5*
323:*8*  326:*11, 13, 15*
327:*7*  328:*19*  336:*3*
**gold**  52:*2*
**Good**  6:*1, 2*  13:*25*
34:*22*  89:*7*  151:*5*
165:*17*  168:*21*
224:*21*  257:*4, 10, 22*
265:*25*  329:*2*
**good-looking**  48:*6*
**goods**  201:*3*
**Google**  111:*17*
114:*20*  172:*13*  174:*1,
5, 12, 16*  175:*1*  176:*1,
12, 14, 21, 24*  177:*14,
19*  178:*1, 11, 12*
179:*11*  192:*20*
226:*10*  248:*9, 16*
250:*16*  309:*17*  317:*2,
4*
**Google's**  176:*11*
177:*2, 8*
**government**  7:*22*
71:*8*  127:*15*
**graduate**  43:*21*  93:*5,
6*  94:*6*  109:*23*
110:*12*  113:*9, 10, 15*
115:*12*  116:*3, 12*
117:*4, 6, 12, 16*  119:*1,
6, 12, 15, 17*  120:*5, 7*
132:*24*  136:*16*
137:*25*  139:*24*
142:*14*  157:*6*  164:*16*
175:*22*  188:*5*  199:*23*
222:*19*  233:*7, 11*
234:*10, 25*  253:*19*
287:*1, 4, 16, 22*  308:*2*
**graduated**  115:*6*

**graduates**  156:*20*
251:*7*
**grammatical**  28:*24*
215:*4*
**graph**  186:*21*
**graphical**  249:*6*
**Great**  14:*15*  15:*15*
23:*12*  27:*14*  42:*24*
57:*17*  99:*24*  108:*12*
181:*25*  190:*23*
194:*11*  201:*15*
207:*22*  220:*3*  229:*3,
25*  235:*22*  245:*24*
257:*18*  297:*1, 17*
**greater**  145:*2*
**green**  187:*19*
**ground**  9:*18*
**group**  88:*20*  113:*3*
160:*3, 6, 18, 19*
**groups**  70:*24*  155:*14*
156:*12*
**guess**  6:*25*  10:*7*
24:*2, 10*  31:*25*  86:*25*
90:*19*  204:*18*  228:*23*
229:*5, 6*  233:*21*
242:*6*  292:*10*  301:*10*
306:*24*  307:*18*  309:*9*
312:*7, 25*  316:*13*
317:*8*  318:*4, 8, 17*
325:*11, 20, 25*  333:*10*
334:*9*
**guessing**  23:*24*
**guess-the-next-word**
44:*18, 19*
**guide**  193:*9*
**guy**  90:*8*

**< H >**
**half**  12:*10*  167:*14*
210:*12*  232:*1*
**halfway**  122:*7*
**Hamilton**  275:*12*
**hamstring**  50:*23*
**hand**  337:*21*
**handful**  63:*23*  140:*2*
187:*20*
**happen**  83:*18*  222:*10*
**happened**  41:*6*
118:*24*  127:*19*  240:*2*

263:*10, 16*  264:*22*
324:*10*
**happening**  85:*15*
189:*11*  201:*20*
266:*23*
**happens**  117:*19*
**happy**  23:*24*  31:*7*
37:*5*  92:*10*  165:*18*
200:*6*  206:*15*  253:*14*
256:*25*  263:*20*
280:*10*
**hard**  36:*24*  75:*15*
91:*10*  127:*3, 10*
138:*24*  145:*23*
167:*22*  189:*2, 3, 9*
250:*17*  268:*7*
**harder**  90:*11*
**HARDY**  3:*11*
**Harvest**  38:*23, 25*
**harvesting**  209:*8*
**hashtag**  261:*11*  267:*3*
**head**  118:*2*  137:*16*
166:*23*  188:*2*  208:*21,
25*  209:*15, 21*  280:*10*
**headed**  90:*1*
**headers**  297:*4*
**heading**  69:*5*
**hear**  101:*13*  120:*14*
145:*23*  147:*22*
**heard**  15:*10*  44:*15*
101:*10*  228:*7*  271:*17,
19*
**heart**  268:*5*
**heavy**  252:*12*
**held**  2:*8*
**help**  28:*10*  49:*8*
58:*8*  111:*10*  132:*18*
134:*5*  156:*20*  173:*23*
175:*21*  179:*20*  318:*5*
322:*8*
**helped**  116:*15*
135:*14*  254:*9*  265:*22*
**helpful**  116:*7*  144:*19*
265:*15*
**helping**  63:*1*  111:*4*
**helps**  280:*16*
**hereinbefore**  337:*11*
**hereunto**  337:*20*
**hide**  178:*7*
**hierarchy**  288:*6, 13*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 359 of 402

Deposition of John Chandler, Ph.D.    Page ID #:2714    Flo Rida, et al. v. University of Southern California and 2U Inc.

**high** 100:*13, 14, 17, 19* 177:*20* 201:*13* 202:*12* 203:*25* 207:*17, 21* 211:*19* 231:*17, 21* 232:*5, 12, 19, 20* 235:*12* 270:*20, 24*

**higher** 25:*15* 81:*10* 102:*11* 107:*21* 123:*12* 147:*19* 148:*14* 172:*20* 185:*9* 193:*18* 195:*2, 6, 12* 196:*2* 213:*19* 232:*16* 255:*5* 258:*21, 23* 259:*3* 286:*25* 287:*11, 21* 297:*3* 323:*19*

**highest** 118:*3, 21* 163:*23* 180:*11* 184:*12* 206:*4, 6* 207:*4* 208:*6, 8*

**highlight** 207:*25*

**highlighting** 140:*21* 327:*14*

**highly** 67:*10* 105:*17* 118:*15* 136:*8* 139:*2* 204:*6* 230:*25*

**hired** 148:*17, 19*

**hiring** 147:*5*

**historical** 100:*2*

**history** 58:*1* 155:*23* 156:*7, 11, 16* 172:*17*

**hit** 76:*19* 82:*16* 120:*17* 224:*1, 4* 238:*1* 323:*16*

**hitting** 84:*17* 88:*3*

**hoc** 113:*18*

**hockey** 318:*23* 325:*22*

**hold** 53:*4* 83:*11* 262:*4* 289:*16*

**holding** 102:*21*

**holds** 190:*25*

**hole** 295:*20*

**HOLLY** 3:*17*

**home** 13:*21* 90:*16, 20, 23* 91:*17, 21* 92:*12*

**homepage** 246:*12, 14* 308:*24* 309:*15*

**hope** 110:*5*

**Hopefully** 305:*16* 322:*8*

**hour** 12:*10* 70:*1* 215:*18* 257:*20*

**hourly** 27:*19*

**hours** 12:*14* 13:*2* 14:*17* 30:*10* 38:*17* 56:*17* 92:*11*

**household** 81:*17, 20* 334:*2*

**human** 176:*11*

**hundred** 48:*18* 72:*25* 232:*14*

**hundreds** 49:*5* 67:*20*

**hundred-year** 156:*6, 11*

**hypotheses** 65:*14*

**hypothetical** 157:*15, 21* 158:*1, 6, 13* 165:*2* 176:*8* 185:*11, 18* 186:*4, 15* 222:*18* 247:*19* 302:*9* 313:*6, 17* 314:*3*

**hypotheticals** 308:*11, 13*

**< I >**

**I.D.s** 50:*2*

**ice** 318:*23*

**idea** 31:*9* 44:*9* 92:*8* 179:*10* 271:*14*

**ideal** 89:*15* 265:*20*

**ideally** 179:*25*

**identical** 181:*19*

**identifiable** 50:*1*

**identification** 21:*6* 23:*1* 34:*5* 43:*3* 109:*2* 150:*8* 161:*1* 165:*24* 169:*14* 170:*5*

**identified** 168:*5* 169:*8* 307:*6*

**identifier** 49:*24* 50:*12*

**identify** 254:*21*

**identity** 149:*17*

**ignorant** 165:*8*

**ignore** 90:*10, 25*

**ignores** 48:*20* 90:*8*

**illustrate** 204:*5* 247:*14* 260:*16* 267:*7* 290:*7*

**illustrated** 326:*3*

**illustrating** 246:*13* 276:*9* 285:*14* 297:*17*

**imagery** 242:*15*

**images** 211:*9, 11, 12, 13, 15* 249:*10, 14*

**imagine** 82:*15* 138:*25* 158:*6* 159:*9* 189:*6* 212:*8* 227:*25* 228:*3, 7, 8, 13, 14, 16, 18*

**immaterial** 206:*10*

**immediately** 222:*21* 238:*3* 324:*10*

**impact** 66:*23* 90:*5* 95:*12* 102:*21* 131:*14* 132:*5, 11, 19* 133:*7* 138:*4* 203:*7* 233:*10* 234:*2* 304:*11* 334:*19*

**impair** 14:*18*

**imperfections** 217:*21*

**implicit** 155:*19*

**importance** 94:*17, 18* 138:*14, 21* 152:*11, 20* 286:*15*

**important** 10:*17* 94:*4, 22* 102:*12* 103:*24* 106:*2, 6, 17, 23* 111:*23* 112:*23* 113:*2, 5, 22, 24* 114:*3, 9* 115:*5, 9* 134:*12, 15, 22* 135:*8, 9, 10, 13* 139:*4* 147:*24* 152:*24* 153:*8* 155:*11, 16* 156:*22, 25* 157:*8, 12, 24* 190:*20* 203:*20* 287:*13* 289:*9* 303:*9*

**impossible** 11:*5* 101:*12* 188:*21* 269:*15* 332:*1, 12*

**imprecisely** 245:*23*

**impression** 77:*13* 80:*20* 81:*9* 82:*23* 83:*24* 84:*19, 21* 85:*1* 195:*15* 197:*16* 269:*1*

**impressions** 77:*15, 17* 78:*5* 80:*12* 81:*4*

82:*10, 12* 83:*1, 5, 7* 84:*12, 15* 85:*6, 13* 86:*10* 87:*12* 250:*17* 269:*4, 16* 316:*1*

**impressive** 210:*16* 328:*13*

**improbable** 213:*9*

**improve** 58:*8* 60:*23* 89:*1*

**improved** 126:*24*

**improves** 44:*4, 5*

**improving** 61:*20* 125:*7* 312:*17*

**impulse** 201:*5*

**impulsively** 201:*18*

**inability** 28:*25*

**inaccurate** 194:*17, 20, 25* 195:*14, 21* 196:*4*

**inaudible** 167:*17* 187:*13* 203:*11* 208:*7* 221:*10* 252:*10*

**inbound** 186:*1*

**incentive** 194:*4*

**include** 77:*21* 100:*2, 5* 102:*19* 185:*10* 189:*2* 191:*16* 209:*15* 238:*14* 243:*15* 297:*19* 319:*3, 15* 335:*16*

**included** 78:*1* 105:*3, 22* 121:*25* 133:*15* 134:*17* 175:*2* 185:*25* 215:*13* 220:*21* 221:*15* 227:*16* 228:*24* 229:*13, 15, 21* 289:*5* 295:*8, 13, 24* 296:*3, 7* 299:*14* 308:*6* 330:*10*

**includes** 109:*25* 183:*21* 243:*11, 13* 287:*22* 304:*6*

**including** 123:*22* 206:*21*

**inclusion** 227:*19* 228:*1, 11, 17* 229:*17*

**incoming** 118:*10* 287:*9* 288:*22*

**incomplete** 194:*17, 21, 25* 195:*13* 196:*3*

**inconsistent** 197:*20*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 360 of 402
Page ID #:2716
Deposition of John Chandler, Ph.D.    Flo Rida, et al. v. University of Southern California and 2U Inc.

**incorporated** 26:4
89:10 104:6
**increase** 98:3 198:18,
23
**incredibly** 111:23
**independent** 293:1
**indicate** 204:20
**indicated** 184:14
**indicates** 164:9
182:24 210:6
**indication** 174:24
**indicative** 316:1
**indicator** 287:14, 24
289:10
**indicators** 99:13
289:11, 13, 17
**indices** 65:14
**indirect** 299:11
**indirectly** 294:15
**individual** 44:7 48:3
49:22, 23 98:16
158:2, 11 161:1
162:17 243:16 315:7
325:13 333:16, 18
334:16, 20
**individually** 57:13
242:7
**individuals** 27:18
64:9 74:22 260:13,
15, 21 267:18 288:11
334:5
**industry** 110:2
133:14
**inevitably** 10:23
13:23
**infer** 138:8 144:11
180:22 192:5, 17
303:7 321:6
**inferences** 105:5
159:5 189:3
**inferring** 138:14
**infinite** 178:25 200:3,
6
**inflated** 107:7, 11, 20
198:18, 22 199:12
**inflation** 108:8, 16
129:1
**influence** 66:24 67:1,
8 86:21 106:11

139:9 177:18 310:15
311:2, 4
**influenced** 105:19
111:18
**influences** 60:7 66:17
**influencing** 27:13
**Informal** 111:7, 12
112:5, 7 113:16, 20
114:16 115:17
116:10 120:4
**information** 14:19
25:19, 24 36:23 48:8,
21 50:1 51:13 59:5
61:6 62:6 65:15
71:20 74:16 75:13,
21 77:21 95:13 97:9,
18, 21 98:15 100:2
102:19 104:24
105:23 108:16 113:7
115:8 118:19 135:5
141:25 159:3 162:4
164:6 165:4, 7
167:14 182:24 183:7
188:4 197:12, 23, 24
202:24 204:6 207:2
219:18 221:6, 16, 20
222:14 223:5 224:3,
19, 21 225:11, 13
227:3, 15 230:17
237:13, 23 238:14, 16,
19, 22 242:3 243:11,
14 247:16 252:23
258:8 275:5, 14
292:7 295:11 297:19
299:7 302:13 310:18,
24 311:19 317:5
319:25 323:21, 23
329:5, 17 330:5, 10
339:1
**initial** 28:17 176:20
220:10, 22 222:7
312:16 317:13
**initiating** 15:18
**initiatives** 297:18, 19
**Inner** 268:10
**in-person** 56:14
197:2
**inserted** 260:10
**insight** 299:9 334:9

**insights** 33:2 67:16
88:25
**Instagram** 83:13
101:3 254:1, 4 255:4,
5, 7, 11, 17, 20
**instance** 26:24 27:2
31:20 36:24 37:10
61:7 68:24 74:11, 16
75:7, 17 76:11 84:16
99:4 100:1, 7 101:2
102:11 111:20 139:1
158:23 160:12 164:1
172:16 180:24
211:10 217:8 230:13
231:19 234:16, 22
248:12 295:21
317:24
**instances** 307:11
**instant** 32:25
**institution** 118:20
154:6, 23 155:10
202:15 234:15
**institutions** 25:15
147:16, 19 148:9, 12,
14
**instruction** 11:14
112:25
**instructor** 53:23 57:8
**instrument** 63:3, 4
**intended** 149:3
152:10
**intending** 137:18
194:9
**intentional** 130:3
198:12, 15
**interacted** 86:23
159:2 255:20
**interacting** 87:9
176:11
**interaction** 86:5, 12,
14, 15 87:2
**interactions** 204:21
268:18, 23
**interactive** 85:23
**interest** 162:10
203:25 327:14
328:14
**interested** 29:17
133:2 164:13 179:21
190:25 191:2 202:3

205:11 209:9 214:10
224:16 253:4 337:18
**Interesting** 115:7
**internal** 33:2
**Internet** 238:24
239:4 242:21 243:2,
5 264:20
**interpret** 92:25
186:21
**interpretation** 180:10,
20
**interpreted** 163:22
**interpreting** 301:2
**interrupt** 120:12, 20
**intersection** 60:4
**interview** 147:18
158:17 159:7
**interviewed** 15:24
147:11
**interviews** 147:14, 21
**invasive** 64:18 68:24
69:1
**inventory** 249:22
**investing** 267:8
**investment** 266:8
**invoice** 36:1, 22 39:6,
7, 24 40:8, 15 41:8, 9
42:1, 5
**invoices** 22:14 34:4,
8 35:7, 10 36:17, 20
41:15 338:1
**involve** 58:15
**involved** 32:12, 16
62:20 63:11, 13
**involvement** 110:7,
11, 16
**involves** 290:14
**IOLA** 1:2 5:6
**isolation** 99:12
**issue** 81:19
**issued** 36:2 39:7, 24
41:20, 23 42:1
**issuing** 41:24
**item** 153:9 234:12
**items** 22:15, 18
124:12 190:12
191:17, 19 294:24
295:8
**iterating** 95:4

Deposition of John Chandler, Ph.D.

McDonnIell, et al. v. University of Southern California and 2U Inc.

**iterations** 55:*13*
**it'll** 11:*24*
**its** 72:*10* 76:8
 103:*23* 117:22, *23*
 131:*15* 132:*11*
 145:*10* 155:*3* 171:2
 181:*20* 193:6 197:*1,*
 *13, 19* 198:23 233:*4,*
 *7* 251:*2, 3* 282:*13*
 285:*12* 286:*15* 289:*1*
 293:*16, 21* 303:22
**Ivy** 118:*5*

**< J >**
**Jamie** 29:*8, 9, 11, 20*
 266:22
**January** 23:*17* 24:*7,*
 *9, 11* 39:*11, 16*
 274:*23* 285:*3* 313:*3*
**Jey** 290:*16*
**Joanna** 17:*4*
**JOB** 1:*24* 106:*17*
 131:*25* 135:*15* 144:*4*
 148:*15*
**JOHN** 1:*15* 2:7 5:5
 21:*12* 257:*3* 310:*3*
 336:9 337:*10* 338:*1*
 340:*1*
**join** 285:*12*
**joined** 226:*18*
**joke** 146:*7*
**Jones** 20:5 128:*23*
 195:*10, 11* 259:5
**journal** 45:9
**journey** 122:22, *25*
 123:*1, 9, 16* 146:*17*
**journeys** 123:*11*
 268:*14, 19, 21*
**Julie** 286:*24* 290:*16,*
 *17* 291:*10*
**July** 9:7 36:2 41:*21*
 42:2, *16* 43:22 240:8,
 *17* 251:*15, 16, 21*
 274:*16*
**jump** 17:*10* 133:*23*
 149:8 169:*22* 190:*3*
 192:*21* 215:*20*
 247:*23* 273:*11*
 299:*19*

**jumping** 193:*4*
 235:*15*
**June** 40:9 240:*14*
**jurat** 335:*16*
**justification** 287:7
**Juul** 6:*17, 24* 7:7, 8,
 *10, 16* 8:5, *20* 24:*20*
 70:*12, 16, 19, 22, 23*
 71:*14, 20* 72:9, *17, 23*
 73:*23* 75:*1, 8* 76:7
**Juul's** 70:*21* 71:*4, 9,*
 *19* 72:*17, 24* 73:*23*
 75:*1, 4*

**< K >**
**keep** 11:*23* 13:*24*
 31:*11* 112:*21* 224:*11*
 257:*5, 17* 284:*8*
**kept** 33:*3*
**key** 27:*3* 99:*12*
 134:*1, 5, 8, 14* 136:*1,*
 *5* 137:*3, 11, 23*
 140:*21* 141:*6, 8, 25*
 142:*7, 10, 15, 21*
 143:9, *17, 20, 24*
 144:*1, 3, 10* 149:*16*
 151:*6, 13, 17, 18, 23*
 152:*3* 153:*12, 17, 24,*
 *25* 154:*10, 11, 17*
 155:22 156:8 170:*23*
 203:*14, 15* 229:*12*
**keyword** 171:*25*
 172:2, *16, 17* 173:2, *6,*
 *8, 15, 17, 24* 175:2, *4*
 177:*24* 178:*18*
 179:*10* 180:*15*
 182:*24* 191:*23* 192:*5,*
 *13* 309:*18* 316:*20*
 317:9, *11* 318:*6, 16*
 319:*1, 6, 17* 320:*2, 3,*
 *11* 321:*7*
**keywords** 30:*11, 13,*
 *15, 25* 31:*8, 12, 17*
 32:*14, 17* 33:*14, 18*
 172:*5, 9* 176:*17, 22,*
 *25* 179:*3, 8, 18*
 180:*12, 16* 191:*8, 16*
 248:9 319:*22* 320:*7,*
 *10, 13, 14, 16, 17*
 321:*2*

**kind** 41:*4* 44:*24*
 52:*4* 61:*10* 64:*24*
 84:*1* 89:*1, 23* 95:*1*
 98:*19* 101:7 102:*8*
 111:*16* 118:*5* 136:*3*
 147:*23* 155:*20* 157:*4*
 162:*10* 171:9 174:*13*
 176:*18* 179:*15* 180:*1*
 182:*13, 16* 183:*12*
 186:*15* 209:*1* 213:*23*
 247:*13* 249:*3* 256:*19*
 257:*12* 263:*20* 267:*3*
 310:*24* 311:*13, 20*
 317:*25* 322:22 326:*2*
**kinds** 75:*14* 99:*12*
 101:*15* 124:*10*
 254:*18*
**knew** 227:*1, 5* 230:*8*
 308:*14* 313:7, *9*
**know** 8:*4* 10:5, *8*
 15:*3, 11* 27:2 28:*14*
 30:*17* 32:9 35:*15, 18*
 37:*1* 41:*1* 42:*19, 22,*
 *23* 44:*12* 45:7 47:*24*
 48:7 63:*19* 66:*16*
 68:*23* 73:*17* 75:7
 76:*16* 79:*12, 17*
 80:*19* 81:*8, 20* 82:*18*
 83:*15* 84:*16* 85:*18*
 86:*13, 20, 22* 87:*10,*
 *17, 19* 88:*1* 90:*15*
 91:*11, 13, 16, 19*
 92:*24* 93:9 94:*25*
 98:*11* 103:*16, 18*
 105:*14* 106:*1* 110:*25*
 111:*20* 117:*6* 118:*5,*
 *6, 22* 120:*24* 121:*2*
 128:*10, 14, 15* 129:*9*
 130:*2* 134:*24* 135:*23*
 136:*23* 140:*1* 142:*20*
 143:*12, 21* 148:*21, 24*
 157:*13* 158:*15* 162:*6*
 166:*3, 21* 167:*4*
 171:*1* 176:*5* 182:*19*
 183:*2* 184:*16, 21*
 186:*6* 187:*4, 7, 10, 18*
 188:*18, 21, 22* 190:*21,*
 *23* 192:*22* 195:*5*
 202:*24* 204:*9, 13, 15*
 207:*14, 18, 24* 208:*24*

 209:*13, 14, 25* 210:*3*
 211:*7* 212:*2, 5, 20*
 213:*13* 215:*7* 217:*6*
 221:*21* 222:*17*
 224:*25* 226:*23*
 228:*12* 229:*20, 25*
 230:*3* 233:*18, 20*
 234:*23* 235:*6, 10, 11,*
 *18* 242:*8* 244:*22*
 248:*25* 250:*11, 18*
 252:*8* 253:*8* 257:*3*
 260:*20, 24* 267:*17*
 268:*17* 269:*15* 270:*3*
 274:*14, 16, 21* 275:*4,*
 *7* 276:*25* 277:*2, 14,*
 *16, 24* 280:*2, 19*
 283:*1* 286:*8* 287:*2*
 290:*2, 15, 16* 293:*4*
 294:*20* 295:*16, 19*
 297:*5* 309:*14, 20*
 318:*20* 319:9, *10, 11*
 320:*23* 322:*10* 323:*5,*
 *8, 16* 326:*5, 10* 328:*3*
 329:*15*
**knowing** 87:*1*
 157:*23* 158:*3* 315:*7*
 323:*1*
**knowledge** 58:*5*
 165:*11* 270:*13* 292:*9*
**known** 107:6 134:*16*
**KPIs** 99:*13*
**Kristen** 12:*18*

**< L >**
**L.L.P** 3:*11*
**label** 189:22 217:*16*
**Labs** 6:*17* 7:*10* 8:*20*
**lack** 58:*4* 155:2
 202:*12*
**laid** 312:*13*
**land** 178:*15* 236:22
 237:*23*
**landed** 164:2 235:*24*
**landing** 100:*14*
 165:9 184:*1* 222:*21*
 249:*3* 314:*5*
**language** 44:*2, 15*
 45:*3* 58:6 69:*20*
 98:5 99:7 328:*15*

Deposition of John Chandler, Ph.D.

Savell, et al. v. University of Southern California and 2U Inc.

**large** 28:*3* 44:2, *15*
46:*14* 91:*17* 189:8
236:*13* 287:8 288:*14*,
*16*, *19*, *21* 297:8, *13*
311:*14*
**largely** 177:4 226:*9*
**larger** 97:22 160:*6*
**largest** 127:*18*
**late** 127:*12*
**law** 35:8 172:*18*, *20*
177:*23*
**lawsuit** 15:*18* 194:*3*
**lawyer** 9:*19* 48:6
**lawyers** 25:6 129:*11*
**lawyer's** 11:22
**lead** 161:*18*, *19*
258:22
**leaders** 155:*24* 156:7,
*14*
**leadership** 89:*3*
**leading** 153:*19*
**leads** 99:7, 8
**League** 118:5
**learn** 112:*13* 133:*3*
148:*1* 239:*13* 253:22
**learning** 46:6, *11*, *12*,
*16* 49:8 50:*16*
244:*16* 312:*17*
**leave** 61:7, 8
**leaving** 61:*9*
**led** 98:*3*
**Lee** 266:22, *23*
**Lee's** 267:*25*
**left** 142:*19* 310:2*0*,
*25* 312:6, *15*, *20*
**left-hand** 310:2*0*
311:*16*, *18* 312:4, 5
**LEGAL** 3:*4*, *23* 7:2*0*
129:2, 7, *20*, 22, *23*
130:*12*
**lens** 61:*19*
**lesser** 96:*11*
**letters** 147:*9*, *20*
**level** 49:*18*, *21*, *23*
50:*11* 58:4 66:*16*
98:*15* 99:*15*, *17*
117:*4* 203:25 302:*11*
304:*1* 333:*16*, *18*
334:*14*

**levels** 99:2 139:*9*
163:*23* 328:*14*
**lever** 175:*11*
**leveraging** 131:*12*
**lifetime** 61:*15*
**lift** 92:*1*
**light** 51:*3* 194:*19*
195:*13*
**liked** 267:*25*
**likes** 268:*4* 270:*12*,
*18* 271:*1*, 5 315:*24*
**limitations** 237:2*1*
245:*1* 247:2, *10*
**limited** 104:2 198:*6*
200:*4* 237:*21* 292:2*0*
315:*11*
**limiting** 261:*14*
**line** 294:*24* 295:8
329:*16* 339:*1*
**linear** 53:2*4*
**linguistically** 80:*17*
**link** 172:*12* 188:*6*
214:*16* 239:*12* 308:8
**LinkedIn** 61:8
105:*22*, *23* 135:*4*, *17*,
*23* 143:*23* 251:*4*
252:*9* 254:*1*, 2 256:*4*,
*12* 263:*25* 273:*13*, *17*,
*20* 274:*12*, *13*, *22*
275:*19*, *21* 276:*4*, *8*,
*10*, *13*, *19*, *22* 277:*23*
279:*6*
**links** 185:2*0*, *21*, 22
215:8 317:*14*
**LISA** 1:*23* 2:8 5:*13*
200:*16* 337:7, *23*
**list** 9:*6* 17:*13*, *17*
18:*6*, *10*, *15* 21:*17*
29:*16* 31:*11*, *12*, *16*,
*21* 83:*18* 113:22
147:*10* 152:*1*, *3*, *9*, *23*
153:*8*, *18*, *24* 174:*8*,
*10* 176:2*0* 189:*17*
198:*6* 204:*11* 208:2*0*
218:*6* 222:*14* 241:*5*
258:2*3* 272:8 316:2*0*
**listed** 6:22 8:*12*, *19*,
*23* 17:*3* 18:*1* 20:5
22:*15* 27:*18* 53:2*0*
59:*17* 109:*9* 124:*12*

**levels** 151:*17* 155:22
173:*24* 175:2 191:*17*
243:8
**listing** 18:*11* 149:*15*
151:22 152:22 173:*4*
187:*2* 317:*19*
**listings** 173:5 317:*24*
**lists** 22:*4* 153:*5*
190:*12* 274:22 321:2
**literally** 304:2*1*
**literature** 312:*3*
**litigation** 8:*21* 68:*18*
172:*19*
**little** 8:8 9:20 12:*14*
24:5 34:*12* 40:*13*, *14*
42:6 49:*19* 61:8
66:*1* 69:*16*, *25* 70:*12*
79:*13* 110:7 113:*18*
134:*4* 142:7 146:*15*
149:5 163:*9* 171:22
190:8 194:*13* 203:*10*
207:*15* 231:5 232:*9*
248:7 253:*24* 256:22
257:2 270:*1* 274:2*1*
296:*24* 297:2 317:*10*
**live** 101:*12*
**Ln** 340:*1*
**loaded** 129:*18*
**local** 101:*4*
**located** 13:*13*
**location** 106:*12*, *23*
113:*4* 117:*13* 322:*19*
**log** 49:*18*, *21* 83:*23*
98:*15* 99:*15*, *16*
334:*14*
**logged** 83:22
**long** 44:2*1* 65:22
83:*18* 198:*1* 224:25
280:2 282:*23* 288:25
289:*14* 305:*17*
**longer** 90:2 239:7
**longest** 146:*11*
**look** 6:*19* 18:*9*, *10*,
*17* 19:*13* 22:23
25:*17* 27:*15* 36:5
37:5 40:*1* 47:*11*
69:7 79:*9* 96:*16*
127:22 141:2*0* 144:*3*
146:5 149:*10* 150:*1*
154:*13* 165:2*1* 167:*3*

**levels** 173:*14*, *22* 189:*13*
190:*15* 191:*15*
192:*25* 196:22
218:*25* 219:2, 8
223:5 224:*23* 225:2*3*
227:2*0* 242:7 257:*10*
261:7 263:2*0* 266:2
270:*17* 274:5 279:7,
*8*, *15* 281:*9* 282:2, 6
284:*15* 294:*9* 304:8
308:*18* 312:*4*, *16*, *17*,
*23* 316:*18* 324:*23*
334:*16*
**looked** 16:5 17:*3*, *23*
18:2*0*, *23* 19:*5*, *9*, *20*,
*25* 26:*11*, *16* 95:*10*
120:*1* 137:22 140:*9*
153:6 191:22 196:*10*
207:*23* 218:*11*
219:*10* 226:*1*, *14*
239:*4* 248:*13* 263:*3*
275:2*0* 278:2, 5
279:2 284:22 296:*4*
303:6 329:*12*
**looking** 16:*15*, *17*, *21*
19:8 27:5 28:*16*
29:2*0* 31:*3* 36:*11*, *20*
43:*11* 44:*3*, *13*, *23*
45:*15* 51:7 65:*10*
74:*10* 75:23 77:*1*, 2
84:*9* 90:8 99:5, 6
100:7 102:8 104:*4*
122:5 125:*4* 131:2
138:*3* 140:2*0* 160:*3*
177:2*1* 178:*17*
179:*16*, *25* 182:*1*
186:*16* 209:*19* 217:*3*
225:8 227:22 230:7
231:*18* 243:5 254:*18*
255:*15* 256:*10* 258:7
261:*9*, *12* 262:*14*
264:2 274:2 275:*3*
281:2, *14* 299:5, *23*
302:*1* 309:9 311:*16*
316:*17* 320:*18* 322:*4*,
*10* 331:*13*
**looks** 40:*1*, *12* 46:*13*
109:*12* 153:25 187:*9*
189:*19* 327:22

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 363 of 402
Page ID #:2718
Deposition of John Chandler, Ph.D.    Maxwell, et al. v. University of Southern California and 2U Inc.

**Los**  3:*15*
**lose**  178:*10*
**losing**  160:*25*
**lost**  178:*3*  293:*10*
**lot**  16:*13*  39:*15*
48:*20*  75:8  88:*1*
90:*10*  146:2  176:*19*
196:*10*  201:*19*
244:*14*  256:*22*
257:*11*  311:*12*
321:*16*
**lots**  57:*12*
**loves**  222:*19*
**low**  112:*22*  207:*18*
231:*9*
**lower**  99:2  107:*12*
148:*12*  231:*22*  256:*1*
329:*11*  330:*16*  335:*1*
**lowest**  217:*9, 12, 13*
256:*5*
**luck**  69:*10*
**lucre**  145:*21*
**lunch**  165:*18*  168:*24*
169:*7*

**< M >**
**machinations**  83:*18*
**Machine**  242:*20, 24*
**magazine**  81:7
**magazines**  81:*2, 7, 8,*
*15*
**mailed**  64:*19*
**mailing**  222:*14*
**main**  50:7  88:*21*
188:*1*
**maintain**  31:*11*
216:*12*
**maintaining**  296:*11*
**maintenance**  294:*25*
296:*1*  297:*9*
**major**  118:*12*
**majority**  185:*5*
**making**  64:*25*  74:*21*
91:*23*  97:*22*  105:*5*
132:*14*  144:*9*  158:*8*
227:8  244:*7*  292:*16*
293:*19*
**managed**  309:*2*
**management**  37:*21*
38:*3, 5*  59:2, 5

**manipulated**  129:*14*
175:*14*
**manipulation**  198:*12,*
*15*  199:*11*
**manipulations**  300:*9*
331:*8*
**manufacturer**  47:*10*
**mapping**  123:*11*
**March**  39:*7, 12, 16*
55:*24*  281:*15, 23*
282:*5*  283:*11, 17*
284:*4, 9, 16, 24*  285:*7,*
*19, 23*  286:*10*  309:*9*
**marginal**  231:*10*
**MARIAH**  1:*4*
**MARK**  3:*16*  305:*21*
**marked**  18:*18*  21:6
23:*1*  34:*4, 10*  37:8
43:2  109:*1*  150:8
165:*24*  169:*11, 14*
170:*5*
**market**  111:*11*
175:*24*
**marketer**  142:2
319:*4*
**marketers**  27:6
66:*11*  74:*25*  80:*13*
86:*18*  88:5  91:*13*
98:*23*  99:9  100:*13*
104:5  110:*1*  137:*13*
193:*12*  216:*12*
303:*13*
**marketing**  8:*20*
25:*13, 14, 17, 20*  26:*1,*
*4, 5, 9, 16*  27:*1, 11*
30:*15, 16, 18, 21, 24*
31:5  47:3  48:*19*
49:*4, 22*  50:*22*  51:*11*
52:*3, 7, 8, 10, 19*  53:*5,*
*7, 10, 14*  54:5, *7, 19,*
*22*  55:*1*  56:*25*  57:*1,*
*2, 3*  58:*13, 15*  59:*1, 7,*
*8, 11, 15, 16, 18*  60:*4,*
*6, 22, 61:*13*  62:7
66:*10*  67:*25*  68:*5, 10*
70:*21*  71:*4, 9, 14, 19*
72:*5*  73:*15, 16*  74:*3,*
*6*  75:*16*  77:*14*  79:*2*
81:*13*  86:2  87:*20, 23*
91:*12*  92:*18*  94:*10,*

*13, 25*  95:7  96:*10, 23*
98:*2, 15, 21*  99:*1, 11*
100:*1, 24*  101:*19*
102:*1, 9, 18, 19, 21*
103:*1, 13*  104:*4, 7, 10*
105:*3*  109:*21*  110:*1,*
*2, 20, 23*  111:*3, 5, 6, 8*
112:9  115:*11*  116:*18*
117:*22*  118:*7, 17, 23*
119:*14*  123:*4, 21, 23,*
*24*  124:*1, 2, 7, 14, 18,*
*25*  125:*4, 5*  126:*13,*
*14*  131:*8, 9, 15, 24*
132:*6, 11, 13*  133:*12*
134:*1, 9, 13, 23*  138:*7,*
*8, 10, 16*  141:*24*
142:*2, 25*  144:*25*
145:*14*  146:*22*  147:*6,*
*9, 16, 23*  148:*2, 12, 13*
149:*13, 15*  150:*2, 7,*
*10*  151:*11, 22*  154:*14*
155:*4*  158:*9, 10*
160:*9, 24*  161:*7, 23*
162:*15*  165:*23*
166:*17, 22*  167:*5*
168:2  169:*8, 12, 13,*
*17*  170:*4, 11, 15*
171:*2, 4, 11, 17, 24*
172:*3, 10, 11*  175:*10*
179:*16*  181:*8, 18, 20*
183:5  185:*14*  187:*25*
188:*10*  189:*1*  190:*4,*
*7*  191:*21, 22*  193:*3*
196:*10, 11*  203:*3, 5,*
*13*  214:5  216:*6, 17,*
*20, 23*  217:8  219:*5,*
*11*  220:*5, 6*  228:*19*
229:*4, 8*  230:*1, 4, 5,*
*24*  231:2  232:*3, 21*
248:*1, 5, 6*  249:*4, 5*
250:*2, 4, 13, 15, 23*
252:*22*  262:*24*  263:*4*
266:*7*  270:*14*  278:*12*
294:*5, 8, 10, 12, 17*
295:*1, 5, 6, 7, 13*
296:*12*  297:*8*  299:*5,*
*7*  301:*24, 25*  302:*20*
303:*7, 10, 22*  304:*5*
317:*16*  319:*16*

320:*12*  324:*5, 18*
325:*3*  338:*1*  339:*1*
**marking**  76:*11*  86:2
88:6  170:8
**marriage**  337:*17*
**MaryAnne**  290:*24*
**mask**  91:*12*
**master's**  45:*22*  53:*11*
54:*17*  110:*17*  119:*20,*
*21, 23*  121:*15*  140:5
173:*19*  182:*4, 6*
186:*16*  217:*10*
234:*17, 20*  248:*22, 23*
322:*11, 17*
**MAT**  173:*17*  174:*20*
178:*17*  180:7  192:2
235:*4, 7*  248:*14, 21*
300:7  331:*6, 21*
332:*13*
**M-A-T**  173:*17*
**match**  172:6
**matching**  254:*15*
255:*23*
**material**  50:*15*
103:*24*  126:*20*  206:*3,*
*9*
**materials**  15:*13*
17:*14, 17, 21*  26:*16*
27:8  28:*17*  29:*16*
31:3  92:*17*  95:*7, 10*
104:*4, 7*  117:*22*
118:*8, 17*  138:*10*
141:7  142:9  147:*9*
155:*4*  171:*3*  175:*10*
185:*14*  196:*11*  203:*3*
221:*10*  222:*24*  295:2
297:*22*
**mathematical**  46:*3*
**mathematics**  45:*17,*
*22*
**matriculate**  302:2
313:*16*
**matriculated**  25:*22*
301:*5*
**matriculating**  128:*3*
262:*10*
**matter**  5:6  6:*13*
14:9  15:*8, 18*  23:*22*
24:8  43:*23, 25*  68:9

Case 2:23-cv-00846-GW-MAR Document 144-2 Filed 09/13/24 Page 364 of 402
Page ID #:2710

Deposition of John Chandler, Ph.D.

Bell, et al. v. University of Southern California and 2U Inc.

77:6 193:15 226:24
309:21 337:19
**matters** 8:3 31:2
68:12, 14 70:13 77:4
**maximize** 177:15
179:11
**maximized** 131:14
132:5
**May-June** 40:19
**McKinsey** 75:7
**MDL** 7:20
**mean** 19:6 26:1, 12
31:19 63:19, 25 64:5
65:5 67:3, 5 73:1
78:14 87:9, 14 94:7
95:23 103:6 106:15,
24 108:1 129:23
131:23 132:19, 21
161:19 163:22 173:1,
3 175:14 182:17
183:17, 21 185:3
187:8 188:18 195:3
203:9, 17 206:25
207:8 225:21 230:23
231:14 232:11 234:2
235:1 237:3, 7
240:18 263:3 265:14
266:17 298:2 301:3,
8 302:8 304:1, 21
314:15 325:7 331:20
**meaning** 92:22 93:8
129:19
**meanings** 62:25
**means** 13:10 32:9
57:14 64:1 71:2
78:25 129:10 183:6
212:7 287:21 288:16,
19
**meant** 66:22 107:19
129:12 151:3, 4, 16,
24 186:20 194:23, 24
208:8
**measure** 46:23 52:19
78:24 88:6 98:25
99:10 102:1 113:24
127:3 219:4 268:23
302:22
**measured** 101:15
**measurement** 51:11

81:13
**measures** 99:3 100:6
**measuring** 52:2, 8
60:24 111:5
**Mechanical** 64:13
**mechanism** 184:2
**media** 26:8, 18
47:13 51:11, 20
52:18 61:4 75:24
77:25 80:9 81:1
96:17 98:18 102:4
123:24 125:5 131:13,
14 250:22, 25 251:1,
4, 9 252:8, 13, 21, 22
253:1, 20, 22, 25
254:14 256:11, 14, 23
257:13 260:17
263:11 266:5, 9
267:9, 11 271:18
278:18 286:12 304:4
333:14, 15, 24 334:3,
8, 12, 20
**medical** 177:24
**medication** 14:16
**medium** 89:16
**meet** 12:16 122:7
202:15
**meeting** 12:5, 13
13:6, 8, 9 40:23
162:25
**meetings** 33:24
36:25 67:21 171:10
**Melessa** 275:12
**memory** 163:18
197:9 217:22 280:11
**mental** 153:20
**mention** 15:11 137:6
165:10 170:16 179:3
194:3 203:14 220:13
246:9 281:7 302:21,
24 308:6
**mentioned** 8:15 13:1
98:18 99:18 102:24
110:6 120:6 121:13
126:11 127:9 142:8
143:23, 24 154:19
169:21 193:2 216:11
249:18 256:4 261:24
280:5 295:3 296:9

**mentions** 121:21
171:8 290:21
**merely** 77:12 214:10
260:16 263:5 267:7
292:12
**merits** 71:2
**mesothelioma** 172:18
173:3
**message** 32:23 89:17
95:21 103:1 134:23
149:16 151:13, 18, 23
153:12, 17 154:17
155:22 156:8 159:23
164:24 165:3 203:15
204:24 205:2 208:13
210:18 214:5 232:22
267:3 269:2, 10, 17,
22 270:4, 8, 16, 19, 22
271:10 272:1 278:9
279:1, 22 281:15
285:11
**messages** 32:22
33:17 47:17 151:7,
17 152:3 153:25
154:11 158:9 160:11
247:20 254:18
258:15 266:7 267:13
270:10 271:10, 13
275:21
**messaging** 32:25
190:22, 24 191:2
**met** 12:17 15:24
**metadata** 168:9
**method** 183:9
**methodology** 52:5
**methods** 100:16
112:25 300:4 331:3
334:19
**metric** 88:7 173:12
197:4 291:25 292:2
**metrics** 87:11 177:5
204:20 329:18
**Mh-hm** 19:11
**Microsoft** 62:2 64:7
125:12, 16
**Microsoft's** 125:14
**middle** 55:23 56:18
163:11 311:13
**Middlebury** 45:17

**million** 74:2 77:15
81:6 204:18 206:21
**millions** 47:25
**mind** 11:24 34:16
126:8 163:14 166:1
167:1 178:5 263:6
319:8 326:18
**mini** 187:23
**mining** 61:2 271:18,
19
**Minneapolis** 13:14
**Minnesota** 13:15
**minute** 39:3 309:19
312:24
**minutes** 165:19
166:1 257:20 304:16,
21
**MIS** 59:5
**misinformation** 259:6
**misleading** 130:3, 10
**misremembering**
17:1 217:17 218:8
**misreported** 203:2
**misrepresent** 137:9
**misrepresentation**
193:19
**missing** 65:2
**Missoula** 56:16
**misstate** 137:19
**misstatement** 228:11
**mistaken** 309:6
**mistakes** 186:12
**mix** 51:11, 20 52:18
98:18 102:4 148:11
**model** 44:5, 15 45:3
98:18, 20 102:16, 20
111:3 288:8
**modeling** 49:11
50:24 51:2, 5, 12, 20,
21 52:18 61:12, 13
101:23 102:4, 6
103:7 324:22
**models** 44:3, 17
101:18, 25
**modern** 25:13
**modes** 333:11
**modifications** 28:20
176:8
**modified** 104:7

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 365 of 402
Page ID #:2720

Deposition of John Chandler, Ph.D.    Bidwell, et al. v. University of Southern California and 2U Inc.

138:*11*
**modifier** 183:*3*
**moment** 146:*6*
168:*15*, *18* 169:*16*
170:*3* 174:*6* 191:*22*
205:*16* 261:*2* 279:*6*
305:*7* 314:*24* 326:*19*
**money** 64:*14* 157:*18*
172:*20*, *23* 177:6
288:*9* 296:*11* 297:*18*
299:*12*
**monitoring** 63:*15*
64:*21* 99:4 254:*14*
**Montana** 56:*4*, *6*, *9*,
*15*, *17* 57:5 58:*19*
59:*3*, *9*, *11*, *14* 60:*16*
110:8, *13* 112:*16*
113:*14* 115:*12* 116:*2*,
*19*, *24* 117:*20*, *21*
118:*19* 120:7 123:*2*,
*10* 124:*5*, *20* 146:*21*
154:*20* 155:*1*, *14*
202:*9* 253:*18* 254:*24*
255:8 293:*6*, *15*
294:*1* 303:*21*
**Montana's** 57:*21*
98:8 206:*16*
**Montevideo** 55:*6*, *8*
56:*16*
**month** 24:*9* 38:*4*
40:*2*, *4*, *12* 42:*15*
76:*15* 82:*18*, *20*
**Monthly** 174:2, *23*
**months** 24:*11* 267:*23*
**morning** 6:*1*, *2*
**mouse** 85:*9*
**move** 34:*3* 41:*12*
42:*25* 69:*9* 92:*9*
108:*23* 109:*5* 131:*3*
132:*22* 141:*13*
165:*14* 168:*22*
169:*25* 171:*19*
194:*12* 216:*5* 235:*16*
238:*9* 241:*20* 245:*5*,
*25* 250:*22* 259:*19*
281:*12* 283:*15* 284:*7*
289:*19* 310:*20*
312:*21* 326:*13*
**moved** 245:*17*
**movements** 85:*9*

**Moving** 40:*7* 133:*8*
149:*1* 162:*10* 198:*9*
294:*5*
**multichannel** 131:*7*
**multilevel** 99:*14*
**multiple** 11:*4* 33:*22*
46:*19* 48:*13* 108:*4*
207:*10* 227:*14*
234:*14*, *25* 240:*5*
271:*4* 281:*21* 290:*15*
313:*22* 322:*2* 325:*18*
331:*11*, *16* 334:*2*
**multiples** 257:*13*
**multiplier** 81:*19*
**multiply** 177:*12*
**multitouch** 47:*1*
51:*6* 98:*13* 158:*24*
333:*5*, *8*, *12*
**municipalities** 74:*21*
**municipality** 74:*12*,
*15*
**MURACO** 1:*23* 2:*9*
5:*13* 337:*7*, *23*
**MURTADA** 1:*4*
290:*23* 291:*4*, *17*
**mutual** 201:*12*

**< N >**
**Nadia** 275:*4*
**name** 12:*18* 18:*24*
20:*10*, *11*, *12* 35:*9*, *14*
45:*8* 86:*1* 101:*8*
340:*1*
**named** 17:*4* 290:*4*
291:*4*
**names** 188:*1*
**narrow** 24:*5* 67:*24*
**nascent** 176:*21*
**NATIONAL** 3:*4*
140:*20* 148:*10*
**nationally** 118:*16*
119:*24*
**nationwide** 74:*8*
**natural** 174:*11*
175:*9*, *13* 185:*22*, *23*
**nature** 73:*24* 74:*1*
181:*5* 269:*1* 297:*23*
298:*2*
**navigate** 187:*15*

189:*10*
**navigated** 183:*18*
**navigation** 185:*6*
**navigational** 187:*12*,
*14*
**near** 82:*15* 299:*18*
323:*6*
**nearly** 97:*3* 137:*21*
191:*7* 225:*16* 300:*6*
302:*7* 331:*5*
**near-universal** 331:*12*
**necessarily** 163:*25*
229:*6* 315:*16*, *25*
318:*14*
**need** 9:*12* 11:*2* 18:*6*
49:*15* 91:*5* 163:*18*
166:*23* 172:*6* 221:*7*
224:*20* 235:*16*
243:*17* 257:*3* 281:*9*
304:*21* 307:*24*
314:*25* 316:*7*, *9*
**needed** 165:*5*
**needing** 257:*7*
**negative** 90:*5* 139:*1*
**Neither** 16:*12* 84:*25*
266:*5* 268:*14* 292:*11*
**neon** 325:*6*, *7*, *8*, *14*
**net** 147:*12*
**netting** 212:*15*
**NETWORK** 3:*4*
**never** 15:*3* 20:*20*
30:*2* 107:*10* 178:*5*
210:*18* 222:*13*
224:*23*
**New** 2:*9* 78:*18*
88:*11* 165:*14* 175:*24*
176:*24* 186:*4* 203:*22*
204:*1*, *5* 207:*25*
286:*16* 327:*17* 337:*3*,
*5*, *8*
**News** 129:*15* 148:*10*,
*22* 149:*18* 179:*4*
192:*14* 195:*1*, *6*
197:*6* 205:*3*, *18*
208:*4*, *8*, *9* 220:*14*
239:*12*, *15* 258:*23*
271:*23* 291:*21* 308:*3*,
*7* 309:*7* 311:*9*

**newsletter** 204:*13*
209:*13* 211:*24* 212:*2*,
*12* 327:*24*
**newspaper** 79:*22*
**night** 6:*11*, *14* 7:*11*
42:*1*
**nine** 224:*9*, *13*, *15*
313:*15* 331:*1*, *14*, *18*,
*19* 332:*5*
**ninth** 299:*25*
**nitty-gritty** 66:*16*
**No.2:23-cv** 1:*5*
**Noguera** 195:*19*
**nonaddressable**
333:*20*, *23* 334:*1*
**nonbranded** 179:*17*
**nonvideo** 178:*7*
**nonwork** 217:*12*
**normal** 182:*12*
316:*12* 323:*13*
**Northern** 8:*6* 9:*10*
113:*4*
**Northwest** 126:*1*
**notable** 212:*13*
**Notary** 2:*9* 5:*21*
337:*7* 340:*1*
**note** 16:*25* 36:*17*
41:*7* 223:*21* 239:*8*
**noted** 5:*16* 6:*21*
42:*13* 146:*2* 239:*5*
292:*21* 336:*5*
**notes** 34:*1* 257:*11*
**not-for-profit** 145:*8*
**notice** 6:*19* 21:*3*, *5*,
*10* 79:*9* 188:*16*
338:*1*
**noticed** 179:*2* 264:*2*
**noting** 39:*22* 193:*6*
**November** 240:*13*
**nuances** 81:*12*
**number** 8:*22* 39:*23*
50:*18*, *21* 70:*19*, *21*
71:*13* 72:*1* 74:*2*
75:*25* 76:*16*, *17*
77:*17* 78:*15* 79:*1*
81:*5*, *11*, *16*, *25* 82:*5*,
*12* 83:*1* 88:*11* 89:*4*,
*15* 93:*1* 95:*20* 96:*25*
97:*5*, *13*, *20* 105:*21*
107:*4* 114:*2* 115:*2*, *3*,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 366 of 402
Page ID #:2721
Deposition of John Chandler, Ph.D.    Mitchell, et al. v. University of Southern California and 2U Inc.

5  127:24  128:*11*
*131:5  133:23  137:7*
*141:5, 20, 22  149:16,*
*18  151:5, 13, 23*
*152:4  153:12, 17*
*160:13  173:16*
*208:15  211:3  212:16,*
*20  213:6, 11, 17*
*235:10  243:12, 24*
*244:4, 12, 23  247:5*
*250:17  252:16*
*258:22  260:14*
*267:19  268:2, 4*
*269:4, 16  270:7, 11*
*278:24  281:23*
*282:23  289:15  297:6,*
*15  299:9  301:4*
*309:10  311:8, 11*
*313:15  315:7, 24*
*316:1, 19  318:7, 11*
*329:10, 12  331:1, 14,*
*18, 19  332:5*
**numbers** 8:7  9:*12*
*44:20, 21  50:2*
*150:19  181:21*
*197:19  208:22*
*218:19  219:10*
*232:10  270:17*
*312:18*
**numeral** 109:*13*
**numerical** 65:*12*
*94:12  95:6  97:5*
*179:7  192:19  239:10*
*240:24  241:17*
*245:14, 17  247:3*
*298:11  301:3, 19*
*307:9, 12, 19*
**numerically** 215:*14*
*252:1*
**NW** 3:*6*

**< O >**
**oath** 4:*12*  228:*10*
*229:15*
**object** 11:*11*  17:*11*
*18:3, 4  52:23  67:4*
*76:23  85:20  87:4*
*92:23  97:16  103:11*
*104:20  105:13*
*120:13, 15  135:20*

*138:1  140:14  143:11*
*151:14  152:13*
*153:14  156:9  157:10*
*158:19  159:24*
*161:14  164:25*
*170:25  179:14  180:9*
*184:24  185:16*
*186:19  199:21  202:6*
*205:4  206:18  207:11*
*208:16  210:20  211:1*
*212:19  213:5  214:21*
*217:2  221:1  222:16*
*226:4, 19  227:7, 13*
*228:5  229:1, 23*
*230:10  233:14, 24*
*239:20  250:6  251:18*
*254:10  262:19  265:9*
*275:23  276:5  278:10*
*280:7  281:8  287:5*
*288:23  290:1  291:23*
*292:3, 18  293:9, 22*
*298:9, 19  300:15*
*302:25  303:24*
*318:19  328:20*
*330:19*
**Objection** 17:*6*
*26:20  32:2  63:12*
*65:9  120:22  121:1*
*145:17  175:7  192:3*
*200:14, 19, 24  290:13*
*309:23  310:9  312:8*
*313:19, 25  323:9, 10*
*324:12  331:23*
*332:17*
**objections** 4:*6*  10:*16*
*11:20  122:13*
**objects** 11:*12*
**obligations** 56:*2*
**obviously** 8:*8*
**occasions** 6:*6*
**occur** 302:*2*
**occurred** 298:*16*
**occurrence** 261:*13*
**occurring** 308:*7*
**OCL** 140:3, *12*
*141:1, 3  180:15, 18*
*188:16, 19  192:2*
*218:12, 15  267:6*
*300:7  331:6, 21*

*332:14*
**October** 9:*8*  168:*7*
**offended** 225:*20*
**offer** 109:*19*  177:*25*
*193:21  194:9  230:20*
*263:9*
**offered** 92:*3*  100:*21*
*110:18  135:2  139:25*
*140:8  174:15  196:13*
*287:25*
**offering** 68:*8*  140:*1*
*178:14  194:5  195:25*
*196:5, 14  198:3, 6, 13,*
*21, 24  199:7, 13*
*200:2  259:7  263:15*
*264:16  276:3, 6, 18,*
*21, 23  285:21  286:1*
*293:1  331:14*
**office** 81:*9*
**officer** 4:*11*
**officers** 251:*7*
**oftentimes** 312:*3*
**Oh** 6:*15*  35:*17*
*41:13  80:9  112:7*
*136:8  178:5  199:5*
*217:15  240:10*
*301:14  314:19*
**okay** 6:*9, 12, 18*  7:*1*
*8:10, 18  9:4, 15  10:4,*
*12  11:9, 18, 25  12:1,*
*7, 11, 24  13:4, 12, 19,*
*25  14:7, 11, 15, 21, 25*
*15:5, 21  16:2, 11, 19,*
*24  17:19  18:8  19:4,*
*18, 23  20:2, 13, 18, 24*
*21:21  22:8, 22  23:9,*
*16  24:12, 16, 23, 25*
*25:4, 8  26:10, 17*
*27:14  28:9  29:7, 22*
*30:4  31:23  32:19*
*33:7, 11, 23  34:2, 24*
*35:12  36:8, 16  37:12,*
*19, 25  38:6, 13, 20, 24*
*39:5, 10, 14, 19  41:11,*
*19  42:3, 8, 18, 24*
*43:17  44:6  45:5, 10,*
*14, 20  47:8  50:13*
*51:1  52:13  53:3, 8*
*54:9, 18  55:3, 19, 25*
*56:23  57:6  58:16, 21*

*59:19, 23  60:10, 18*
*62:13  64:20  65:4, 24*
*68:7, 16, 20  69:22*
*72:16, 21  73:9, 21*
*76:3  77:7  79:3*
*81:22  82:9  83:3*
*84:24  85:25  86:6, 8,*
*24  92:15  93:3, 14, 20*
*94:1, 15  95:18*
*100:22  101:17*
*102:23  103:3, 19*
*104:14, 25  105:8*
*106:14, 20  107:2, 16*
*108:5, 7, 13, 22  109:7,*
*11, 17  110:5, 21*
*113:12  114:12, 18*
*115:15, 22  116:20*
*117:1  118:25  120:3,*
*10  122:17  123:14, 19*
*124:15  126:6, 9*
*127:21  129:5, 17*
*130:13  131:22*
*135:12  136:22*
*137:14  138:17*
*140:25  141:4, 10*
*143:1, 4  145:11*
*146:13  148:16, 25*
*150:13, 22  151:1, 19*
*152:5, 18  153:2, 22*
*154:25  155:8, 21*
*157:21  159:10*
*163:16  165:13  166:7,*
*10, 12, 15, 20  167:8,*
*18, 24  168:12, 17*
*170:14  178:16  179:1,*
*9  180:4  181:6, 21, 25*
*182:1, 10  187:17*
*188:13  189:12, 18, 24*
*190:3, 19  191:11, 20,*
*21  192:11  193:23*
*194:11  198:8  199:5,*
*9, 16  200:7  202:25*
*205:14  208:10*
*209:24  213:12  214:1,*
*12  216:3, 9  217:24*
*218:3, 10, 17  219:6*
*225:25  227:10  232:4*
*233:1  234:7  235:13,*
*20, 21, 22  236:20*
*237:5, 10  238:8*

239:25  240:20  241:2,
9, 19  242:19, 22
243:3, 20  245:3, 11,
19  246:5, 15  247:22
249:25  250:10, 21
253:7  255:24  256:3,
9, 20  258:6  259:11,
17  260:5, 11, 19
261:16, 23  263:2, 8,
23  264:14  265:1, 13,
16  267:15, 21  269:7,
13  271:8, 21  272:4,
17, 24  273:10  274:6
275:2, 10, 18  276:17
277:4  279:4  280:19
281:11, 19  282:10
283:9, 14  284:1, 14,
19  285:16  286:11
289:6, 18  293:3, 13
294:3  295:14  296:13
297:20, 21  298:14, 23
299:4  300:17  302:15
306:14, 19  307:15
308:9  309:4  311:25
312:22  313:5  314:10,
16, 19  316:4, 11
318:2, 13  319:18
321:9  322:3, 7, 24
324:7, 16  325:10, 11,
19  328:17  329:6, 14,
20  330:14  332:8, 25
334:6, 22, 23  335:3,
11
**old**  225:19
**once**  18:18  22:2
59:12  89:25  113:15
135:24  142:18
144:23  164:9  176:23
235:24
**ones**  44:16  69:21
100:20  126:7  152:24
169:23  171:12
174:14  180:6  188:1
201:9  204:2  249:9
260:6, 8  290:5
321:15
**oneself**  319:8
**one-time**  143:14
**one-year**  111:23
112:12  114:23  115:4

**online**  46:6, 11, 16, 24
47:2, 10  49:9  50:16
54:14, 16  55:11, 15,
17  56:6, 10  78:21
80:8, 10, 18, 23, 24
83:4  88:14  90:9, 11
91:7  93:23  96:18
101:2  109:23  110:11,
19  113:1  123:5, 22
124:4, 6, 14, 18  125:2,
18  126:11, 19, 22, 24
127:2, 7, 13, 15, 20
128:4  131:14  136:16
139:24  140:12
142:13  143:8  144:24
157:20  159:13  162:7
169:12, 13  170:4, 8
174:20  175:22
177:22, 23, 24  193:14
197:2, 14  198:19
201:24  202:4  212:17
222:12  224:18  235:2,
5, 8, 9, 25  236:23
237:12  238:13  241:6,
22  243:22  244:21
246:3, 6  248:14, 21,
22  262:12  264:4, 9,
17  278:5  280:22, 23
281:1, 6  286:2, 12, 14
304:23  309:2  310:19
317:3, 12  318:3, 22
319:11  339:1
**online's**  285:22
**onward**  276:15
**oOo**  4:19
**open**  44:16  204:22
211:3, 4, 19  212:6
223:18, 19, 22  231:21
329:1
**opened**  19:7  186:4
210:12  211:7, 14
223:15  224:1  328:4
330:6, 13
**open-ended**  114:8
121:12, 20, 22, 25
**opening**  34:16
211:16  212:10  225:8
329:9
**operated**  187:22, 24

**opine**  293:5
**opining**  145:12
**opinion**  96:5, 23
131:5  132:5, 7, 8
133:11, 22, 23  134:7
141:5, 20, 22  142:1
195:25  196:6  198:3,
14, 21, 24  199:7, 13
200:2  225:15  233:19
263:9, 15  264:16
265:6  276:3, 18, 21,
23  277:16  285:21
287:15, 19  292:16, 24
299:25  301:1, 13
302:18  313:13, 15
331:1, 13, 15, 18, 19,
25  332:5, 11, 20
**opinions**  14:9  17:18
68:9, 11  99:25  131:4
141:16  193:22  194:7,
10  196:12, 14  198:5,
6  292:19  299:21, 23
330:24
**opportunities**  83:2
235:25  236:5, 16, 23
244:13  247:15, 21
254:21
**opportunity**  79:16
80:15  82:13  83:20
85:3  101:21  147:22,
25  155:15  176:17
222:6  248:8  277:22
**opposed**  184:21
256:24  308:1
**opposing**  265:18
**opt**  161:12  221:17
222:7  223:7
**opted**  162:4
**optimal**  89:13, 14, 20,
22  92:2, 5, 11
**optimality**  90:1
**optimization**  123:25
175:16
**opt-in**  162:9, 14
**opting**  161:16
221:19, 22  222:2
**option**  110:19
111:23  112:12
114:23  115:4  222:3

**opt-out**  222:3
**opts**  221:8
**order**  22:24  152:10,
16, 20  157:13  158:15
165:7  172:24  193:9
197:9  208:24  211:6
221:5  310:24  325:8
**ordered**  152:2
**ordering**  152:23
153:8
**ordinary**  33:4
**Oregon**  126:2
**organization**  33:1
289:14
**original**  29:2, 5
181:20
**ORT**  55:8  56:24
**oughts**  127:12
**outcome**  27:6  337:18
**outcomes**  60:24  62:7
**outgrowths**  44:19
**outline**  28:15, 17
41:1, 2
**outlined**  300:4  331:3
**out-of-home**  76:11
77:5  78:7  79:5, 12
80:3  333:25
**outside**  315:22
**overall**  102:17
236:14  271:13
**oversaw**  145:1
**overseeing**  64:22
**overstrong**  278:12
**overview**  149:13, 15
151:22  203:13
**overviews**  161:8
**overwritten**  226:11
**owned**  187:21

**< P >**
**p.m**  130:19, 22
163:4, 7  169:1, 4
215:23  216:1  257:24
258:2  291:9  304:25
305:3  326:21, 24
336:3, 5, 6
**Pacific**  125:25
**packaged**  201:3
**page**  9:19  36:2, 9, 25
37:14  38:14  39:6, 20

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 368 of 402
Page ID #:2723
Deposition of John Chandler, Ph.D.                    Bartell, et al. v. University of Southern California and 2U Inc.

40:7  41:12, 13  59:25
62:15  79:22  80:21
83:16, 22  84:9, 17
85:16, 17  87:16
105:24  109:5, 8
146:4  149:11  150:15,
18, 23  151:3  165:9
171:24  173:16
178:24  180:15  182:1,
2  183:9  184:1, 23
185:15  186:10
188:14  189:7, 9
190:18  196:23
205:17  206:3, 4, 7, 14,
15  207:3, 4, 15, 17, 19
208:1, 6, 8, 22  214:14
218:2  219:24  222:22
227:22  235:25
236:23  237:3, 12, 17,
22  238:1, 4, 7  239:15
240:11  241:14
242:18  243:7, 10, 12,
16, 18, 25  244:10
245:5, 16  246:16, 17
247:17, 21, 23  249:3,
8, 13  251:23  261:6
265:12  273:18
274:14, 16  275:1, 9
279:24, 25  280:3, 19,
24  281:1, 3, 6  282:20,
21  283:3, 4, 21, 25
284:13  299:25
306:16  308:5, 18, 19,
22, 23  309:22  310:14,
16  311:3, 5, 13
312:13, 14  313:11
314:1, 6  316:18
321:22, 24  323:17
335:15  338:1  339:1
**pages**  19:8  100:14
105:22  135:5  136:12
176:21  207:21
236:11, 13, 21  237:20
238:13  239:1  241:7,
10, 12  242:2, 5
243:14, 25  244:14, 25
245:2  246:22, 25
247:7, 8, 10  257:12
264:23  275:19  278:5

281:10, 13  306:22
307:3, 5  320:8
**paid**  41:9, 10, 16
146:8  172:12  173:5
174:10, 14, 19, 21
175:5, 10, 19, 25
178:21  182:22
183:21, 24  184:12
185:20  186:17  187:1,
11, 15  189:14, 16, 19
216:24  218:5, 12, 20
220:13  231:3, 6, 7, 13
232:6  317:24  326:4
**pandemic**  55:15
127:3, 20
**paper**  43:16, 19, 24,
25  45:6, 12  46:9
64:18  68:24  69:18
89:20  187:13
**papers**  69:17  89:6
**paradigm**  51:10
**paragraph**  144:20, 22
146:6, 18  149:10
150:11  151:21
153:16  193:1  194:15
196:22  198:9, 10
203:1, 4, 18, 21
215:21  216:10
219:16  227:21  233:2
235:14, 16, 23  238:10
241:21  242:1, 10, 11
244:1  245:21  258:11
259:19  262:1, 2, 6
266:2  269:8, 14
272:5, 25  273:11, 18
274:3, 11  275:4, 11
277:5  279:12, 18, 22
280:21, 25  281:14
282:11  283:11, 16
284:3, 15, 22  285:1, 6,
9  286:13  289:19, 20
291:8  294:4, 22
299:6, 8, 20, 24
301:13  311:8  312:23
327:9, 11, 22  330:23
**paralegal**  42:22
**paraphrasing**  220:20
308:12
**parenthetical**  208:6

**part**  17:14, 23  32:3,
4  54:20, 23  58:13, 24
61:1  62:7, 18  63:18,
22  68:18  104:24
112:16, 21  119:7
121:22  123:4  125:14
126:18  134:9, 22
142:6  153:24  155:16
156:17  157:12
161:21  164:24
167:12  170:11
171:16  182:22
184:10  191:6  197:14
221:12  242:18
274:25  283:24  290:4
303:9  304:7  306:22
311:4  319:5  333:20
**partially**  55:17
288:12
**participants**  178:8
**participate**  110:24
155:15
**participated**  53:13
62:2  67:20  110:19,
22  126:13  147:13
**particular**  30:11
36:22  39:2  48:22
50:24  58:23  66:16
68:1  82:6  85:17
93:4  96:22  97:2, 15
103:9  107:5  125:18
133:1  134:6  136:14
138:22  144:10
149:12, 23  150:11, 14
152:10  154:14
159:12, 21, 22  192:12,
25  194:6  198:4
205:2  214:4  237:17
240:11  243:4, 7, 8, 10,
18, 25  244:24  246:25
253:22  261:5  262:16
266:15  269:5  270:3
273:7  274:4, 12
277:15  278:1  301:1
302:18, 20, 23  310:7
315:10, 12, 14  334:8
**particularly**  58:5
65:18  100:25  112:18
292:12

**parties**  4:3  15:23
71:21  76:8  337:16
**partner**  13:22  28:2
**parts**  65:2  140:8
187:10  189:8
**party**  102:6  117:24
**pass**  79:8
**passed**  89:25
**paste**  261:20
**pattern**  160:24
**Paul**  3:23  5:11
21:19, 25  34:15
168:13  217:18
305:24
**pause**  52:14  76:19
122:11  134:3  145:23
**pay**  64:14  172:20, 24
176:3  177:7, 17, 25
188:7  248:10  266:6
267:12  315:20
**paying**  42:20  176:6
209:18
**payment**  41:18  231:1
**PDF**  19:7  316:19
**peer**  45:13
**peer-reviewed**  45:11
68:22  69:6  123:16
**people**  11:4  26:24
27:10, 19, 22  47:25
51:18  57:22, 24  58:1
61:7  64:14  65:2
67:10  69:2, 20  72:1,
23  73:15  74:2, 7
75:3, 19  76:14  77:17
78:15, 19, 21, 22  79:1
80:5, 14  81:16, 25
82:5  85:9  90:10
91:13, 20  92:25  96:2
97:20  99:3  105:22
112:18  132:22  143:4,
12, 14, 22  147:11
148:11, 13  155:20
161:20  162:4, 13
172:4  177:21  179:20
180:21  182:12
183:15  185:7  186:14,
22  187:8, 9  189:1, 10
201:14, 17, 18  202:11
206:1, 13, 17  207:8,
16  209:5, 19  210:17

**Exhibit 2**
**472**

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 369 of 402
Page ID #:3724
Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

211:*3, 6, 14, 15, 21*
213:*10*  228:*14*
232:*13*  237:*14*  238:*4*
249:*2*  252:*23*  253:*2,
3, 4, 15*  255:*19*
259:*21*  261:*1*  271:*25*
272:*8, 16, 19, 23*
276:*19, 22*  285:*12*
291:*3*  310:*16, 18, 19,
22*  311:*14, 20*  312:*2,
14*  315:*8, 22*  321:*4*
323:*16*  329:*12*  334:*2*
**people's**  117:*10*
**percent**  48:*18*  72:*25*
74:*6*  77:*22*  184:*8, 11*
186:*18*  187:*12*
189:*20, 23*  202:*11*
210:*17*  211:*5*  212:*6,
10*  218:*6*  232:*1, 14,
17*  234:*16*  235:*12*
255:*3, 6, 7, 21*  256:*2,
8*  301:*12*  326:*4*
328:*4*  329:*1, 9*
330:*15*
**percentage**  253:*9*
254:*23*
**Perfect**  9:*15*  73:*14*
155:*7*  211:*21*  306:*4*
316:*11*
**perfectly**  329:*10*
**perform**  14:*12*  49:*15*
68:*13, 15*  108:*20*
**performance**  44:*5*
46:*24*  52:*8, 20*  60:*22*
89:*1*  99:*1, 12*  100:*6*
102:*13*  105:*1, 2*
125:*4, 7*  160:*7*  173:*7,
8*  303:*25*  304:*3, 9, 11*
**performed**  25:*18*
35:*25*  41:*24*  68:*17*
72:*24*  140:*19*  147:*15*
175:*1*  254:*9*  261:*4, 8,
17*  298:*24*
**performing**  38:*2*
74:*21*  100:*14, 15, 18,
19*  180:*12*
**performs**  45:*4*  95:*3*
173:*11*
**period**  30:*23*  39:*11*
40:*9, 19*  54:*6, 8*  56:*2*

72:*3*  74:*13*  78:*17*
83:*17*  140:*8*  196:*16*
207:*23*  210:*2*  222:*13*
226:*3*  230:*7*  243:*10,
19*  252:*4*  255:*11, 12,
19*  270:*11*  273:*24*
275:*25*  280:*4*  300:*8*
302:*3*  303:*11, 18*
331:*7*
**periods**  262:*23*
273:*16*  296:*4*
**person**  13:*8*  38:*2, 4*
55:*14, 18*  56:*8, 12*
75:*19*  80:*22*  83:*19*
85:*15*  113:*1*  126:*15*
148:*17, 18, 19*  164:*3*
179:*24*  186:*4*  188:*19,
23*  202:*2, 4*  211:*7*
235:*9*  248:*16*  267:*25*
274:*22*  334:*20*
**personal**  91:*7*
**personalized**  133:*16*
**personally**  49:*25*
62:*20*  292:*1, 4*
**persons**  193:*8*
**perspective**  138:*6*
228:*19*  329:*23*
**perspectives**  229:*11*
**persuasive**  28:*21*
319:*17*
**pertain**  109:*22*
**pervasiveness**  331:*10*
**Pg**  340:*1*
**Ph.D**  1:*15*  2:*8*  5:*5*
21:*12*  46:*2*  53:*12*
57:*20*  197:*13*  235:*8*
**Ph.D.s**  57:*23*
**philosophical**  160:*4*
200:*5*
**Phoenix**  123:*6*
125:*22*
**phone**  90:*19*  111:*13*
**phrase**  59:*21*  92:*22*
137:*11*  175:*2*  176:*5*
227:*18*  239:*9, 18*
271:*17*
**phrases**  176:*6*
**phrasing**  251:*22*
**physical**  118:*15*

**physically**  64:*19*
**pick**  128:*9*  157:*14*
**picked**  40:*13*  117:*17*
264:*24*
**picking**  111:*13*
**picture**  72:*1*  211:*21*
217:*7*
**piece**  37:*6*  48:*19*
67:*15*  74:*3*  76:*10*
79:*1*  96:*22*  126:*17*
130:*11*  134:*13*
302:*20*  334:*20*
**pieces**  75:*13*  295:*10*
301:*22*
**pixels**  249:*9*
**place**  64:*13*  84:*18*
90:*23*  171:*11*  237:*25*
238:*2*  293:*19*  294:*1*
**placement**  106:*17*
157:*4, 8*  309:*13, 14,
15, 17, 21*  310:*6, 14*
**places**  45:*1*  47:*22*
83:*12*  97:*9, 17*
100:*12*  132:*10*
134:*24*  135:*1*  187:*7*
197:*12*  202:*14*
225:*10*  298:*21*  303:*2*
**Plaintiff**  3:*5*  198:*11*
291:*5*
**Plaintiffs**  1:*6*  15:*23,
25*  16:*10, 21*  107:*22*
194:*16*  199:*11*  290:*5,
20*
**plaintiff's**  15:*10*
21:*11*  23:*14*  35:*11*
**plan**  75:*24*  150:*2, 7,
10*  151:*12*  162:*15*
165:*23*  166:*17, 22*
167:*5*  168:*2*  169:*12,
14, 17*  170:*5, 8, 15*
171:*17, 24*  181:*8, 20*
190:*4, 8*  191:*21, 22*
193:*3*  216:*24*  219:*11*
262:*24*  263:*4*  338:*1*
339:*1*
**planned**  30:*18*  149:*9*
193:*6*
**planning**  30:*17*
111:*3*  126:*14*

**plans**  66:*10*  100:*1*
125:*5*  169:*8*  171:*4,
11*  196:*11*  320:*12*
**platform**  252:*8, 13,
15*  253:*22*  277:*22*
**platforms**  77:*25*
252:*5*  253:*25*  254:*14,
15*  256:*15*  267:*9*
**play**  27:*22*  29:*9*
44:*18*  287:*8*  288:*20*
**plays**  288:*14*
**please**  5:*17*  48:*15*
235:*17*  330:*2*  335:*14*
**plot**  188:*23*  218:*24*
**point**  13:*24*  37:*11*
52:*18*  89:*25*  90:*4*
105:*14*  112:*22*  127:*5*
140:*13*  154:*15*
156:*19*  177:*1*  193:*16*
211:*18*  239:*16*  244:*7*
256:*16*  309:*12*  323:*6*
324:*21, 24*  325:*15*
332:*9*
**points**  44:*24*  47:*3,
15*  48:*10*  49:*13*
112:*14*  204:*4*  206:*22*
217:*8*  324:*24*  328:*7,
11*  331:*11*
**policy**  33:*9*
**politics**  69:*20*
**pop**  90:*22*
**Poplar**  315:*18*
**pops**  318:*17*
**popular**  252:*7, 23*
**population**  74:*16*
97:*23*  142:*13*
**populations**  112:*20*
**pop-up**  61:*8*
**portal**  187:*19*  188:*6*
**portals**  187:*24*  188:*3,
12*
**portion**  128:*2*  197:*1*
208:*4*  244:*8*  262:*9*
294:*21*  295:*16*  296:*6,
14, 15, 19, 23*  297:*16*
299:*15*
**portions**  294:*18*
**position**  288:*6*
289:*16*  328:*24*

**positioning** 218:*19*
**positive** 91:*25*
**Posselt** 286:*24* 287:*3*
288:*1* 289:8
**Posselt's** 287:*6*
**possibility** 98:*17*
139:*20*
**possible** 73:*20* 90:*3*
98:*22* 102:*20* 129:9
132:*17* 139:8, *10, 15*
175:*18* 186:9 191:*14*
208:7 222:*11* 223:*1*
225:5 251:*19, 25*
293:*12* 312:*19*
334:*14*
**possibly** 276:9
**post** 30:*23* 127:*3*
212:*15* 213:4, *7*
258:8 268:*1* 274:*4,
12* 279:*12, 13* 280:22
281:2 282:*17, 21, 25*
283:*11, 15, 19* 284:2,
*9, 16, 21, 23* 285:2, *10*
**postage** 295:2
**posted** 207:2 275:5,
*13* 276:3 282:*13*
286:*14* 287:2 315:8
**poster** 315:*12*
**posting** 274:22
276:*19, 22*
**posts** 61:*4* 251:9, *11*
258:*13* 263:*11, 22*
273:*17* 281:*24*
282:*13* 285:*18*
**potential** 95:8 133:8
134:*10* 136:2 142:*24*
202:7 206:*12* 208:*12,
19* 237:2 296:*10*
332:*21*
**potentially** 205:*10*
209:*3, 20* 213:*17*
277:*18* 316:*23*
**PowerPoint** 73:2
77:*19* 153:6
**practice** 73:*16* 77:*1*
95:2, *3* 152:*21* 153:*4,
10* 188:*25* 195:*17*
216:*17*
**practices** 8:*20* 10:*18*
25:*13* 71:4 94:*11*

109:22 128:2 131:*25*
132:*13* 145:*15, 20*
146:*23* 147:4, *23*
170:*12* 229:8 230:*24*
262:9 265:7 285:*23*
303:8
**practicing** 133:*13*
**practitioner** 67:22
**precalculus** 53:*24*
**precise** 247:5 301:*3,
19* 329:*10*
**precisely** 75:*16*
244:*3* 275:7
**precision** 16:*23* 36:6
97:*20* 127:*11* 151:*15*
197:*10* 212:*21*
214:*23* 255:*13*
**predated** 230:6
**predictable** 230:*25*
**prefer** 243:2
**Prep** 268:*11*
**prepare** 12:2
**prepared** 70:*16* 72:9
73:*23* 207:*12*
**preparing** 27:*23*
155:*24* 156:7, *13*
**presence** 220:*10*
230:*21* 246:*13*
265:*10* 315:*24*
**PRESENT** 3:*22*
12:*25* 13:*5, 16* 32:*18*
55:*4* 193:6
**presentation** 168:*3*
181:*18*
**presentations** 73:2
77:*19* 153:7
**presented** 206:*16*
320:*11*
**presenting** 193:*12*
**president** 146:*21*
147:6
**presumably** 168:6
174:*24* 224:22
313:*10*
**presume** 184:9
**pretty** 47:*12* 96:*14*
208:7
**prevalent** 126:*23*
127:8

**prevent** 84:*19* 247:2
254:*21*
**previous** 84:*20*
261:6 272:*12* 285:*25*
296:9
**previously** 243:*23*
**price** 37:*1, 9, 17, 22*
112:22
**primarily** 41:6
101:*1* 123:*3* 126:*15*
**primary** 98:*25* 113:6
138:2, *15*
**primed** 180:*1*
**principal** 157:*16*
**principally** 57:2
**print** 26:8 81:*1*
124:*1* 131:*13* 295:*1*
334:*1*
**prior** 6:6, *22* 9:*16*
137:*19* 264:*17* 265:7,
*12* 276:*4, 20, 22*
294:*10*
**private** 31:*14, 18, 24*
61:*17*
**probability** 61:*14*
177:8, *12*
**probably** 26:*21*
31:*14* 58:9 63:*23*
66:8 71:2 76:*12*
92:*24* 156:*23* 166:*24*
168:*20* 178:*23* 192:9
197:8 219:*1* 255:6
257:*10* 265:*19, 25*
302:*11* 323:8
**problem** 80:*18*
120:*19* 166:2 254:*12*
271:6 304:22
**proceed** 5:*18* 9:*23*
**process** 11:*24* 30:*16*
32:*4* 41:*1* 48:*1*
50:*14* 62:*18* 132:22
133:*17* 134:*18* 138:*5*
156:*17* 161:*17* 164:6
176:22 221:5, *24*
222:5 231:*20* 314:9
**prod** 160:*14*
**produce** 22:*10* 28:*17*
42:*12* 65:*14*
**produced** 22:*20* 34:8

41:2 221:*10* 232:*25*
**producing** 75:5
**product** 22:*15, 18*
32:*4* 47:*17* 48:*23*
89:8, 9 90:*22* 92:*3*
292:5
**Production** 21:*13*
40:22 181:9 223:*18*
226:*13* 243:*11*
248:*18* 290:*4* 294:*13*
**products** 8:*21* 49:2
70:*20, 22, 23* 89:*17*
200:*11* 201:*1, 24*
**professional** 124:*9,
11, 17, 22* 142:*1*
**professionally** 49:*3*
98:9
**professor** 53:*14*
54:*11* 55:5 58:*18*
142:2 286:*24*
**professors** 146:7
**profile** 105:*23* 135:5,
*18, 23* 176:*15* 274:*14*
275:*1, 9* 282:*23*
283:*21, 25* 315:*14*
**profiles** 252:*10*
275:*20*
**profit** 145:*18*
**profited** 145:*1, 9*
**profits** 145:*13*
**program** 29:*24*
53:*11* 54:*14, 16* 94:6
108:*19* 110:*17, 20, 23*
111:*11, 22* 117:6, *17,
18* 118:*14* 120:8
128:*4* 136:*16* 140:2,
*6, 12* 141:*1* 142:*19*
157:5, *20* 159:*13*
162:5, *7* 177:*21*
179:22, *25* 180:8, *25*
181:*1, 4* 182:7
186:*16* 188:*20*
190:*24* 192:6 197:*15*
212:*18* 218:*12, 15*
223:*12* 224:*16* 225:*1*
244:*17* 251:2 259:*4,
10* 262:*12* 267:5, *6*
286:*18, 23* 307:2
322:*12, 17* 331:7, *21*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 371 of 402
Page ID #:2726

Deposition of John Chandler, Ph.D.    Cockrell, et al. v. University of Southern California and 2U Inc.

**programmatic** 249:*23*
**programming** 190:*21*
**programs** 109:*24*
110:*12* 118:*17*
119:*13, 15, 17* 123:*5*
126:*12* 139:*24* 140:*2,
7, 20* 180:*18, 21*
188:*5* 192:*10* 197:*13*
198:*20* 199:*23*
258:*24* 287:*1, 4, 17*
293:*16* 300:*8* 309:*2*
317:*4, 5, 6, 13* 318:*22*
332:*13, 14, 23*
**project** 37:*21* 38:*3, 5*
39:*2*
**projects** 39:*2*
**prominent** 118:*7*
237:*25*
**prominently** 311:*11*
**promise** 155:*19*
257:*15, 18*
**promote** 175:*24*
209:*18* 251:*2* 270:*10*
273:*20* 294:*18*
295:*17* 296:*20*
315:*21*
**promoted** 315:*18*
**promoting** 294:*22*
**promotion** 297:*7*
**prompting** 187:*8*
**proper** 49:*10, 15*
107:*23*
**properly** 28:*25*
**property** 69:*3*
**proportion** 25:*22*
74:*5* 104:*16*
**proposition** 134:*10*
**proprietary** 177:*4*
**prospecting** 219:*17*
**prospective** 26:*6*
27:*13* 93:*16, 22* 94:*5,
23* 97:*14* 112:*4, 10*
115:*19* 131:*11* 132:*1*
133:*16* 134:*11, 17*
136:*5* 138:*25* 142:*24*
143:*3, 5, 14* 144:*12,
15* 157:*2* 161:*22*
179:*13* 180:*7, 17*
192:*6* 203:*7* 204:*10,
12* 205:*8, 19, 22*

209:*7* 210:*1, 5, 11, 25*
212:*17, 22, 25* 213:*2,
3, 7, 10, 14, 21, 23*
214:*5, 9* 215:*9, 12*
216:*13, 15, 18* 220:*11,
23* 221:*3, 7* 223:*15*
227:*2* 234:*21* 241:*11,
15* 243:*24* 244:*6, 9,
12, 23* 247:*6, 11, 14*
251:*17, 24* 252:*2, 12,
17* 253:*5, 10, 17, 21*
254:*3, 5, 17, 19, 25*
255:*9, 21* 256:*17*
260:*23, 25* 272:*1, 3*
276:*9* 277:*21* 278:*16,
24* 293:*25* 299:*9, 13*
301:*4* 319:*8* 328:*2*
331:*17, 20* 332:*1, 6,
21*
**provide** 125:*19*
299:*8* 334:*9, 25*
335:*1*
**provided** 9:*1* 115:*16*
**providers** 125:*2*
**provides** 324:*9*
**providing** 177:*20*
**proxy** 99:*3*
**psychological** 65:*20*
66:*6* 67:*6, 19*
**psychologically** 67:*8*
**psychology** 60:*5*
67:*25*
**Public** 2:*9* 5:*21*
60:*6* 61:*17* 337:*7*
340:*1*
**publications** 69:*7, 11*
**published** 68:*21*
**publisher** 125:*15*
249:*23*
**publishers** 80:*24*
249:*20*
**publisher's** 83:*8*
**pull** 162:*20* 282:*25*
**Pullias** 258:*16, 20, 21*
259:*13*
**pulling** 73:*3*
**punch** 90:*18*
**purchase** 47:*20*
61:*14* 87:*25* 88:*3*
90:*25* 91:*8* 172:*5*

176:*17, 25* 177:*2*
201:*2, 5, 14, 17, 18*
231:*8* 234:*11* 248:*8*
249:*22* 253:*3* 323:*17*
**purchased** 51:*18*
91:*8* 172:*18* 209:*10*
216:*19* 234:*12*
249:*19* 253:*5* 319:*1,
7* 320:*16* 333:*17*
**purchasers** 70:*19, 21*
71:*13*
**purchasing** 176:*9*
209:*9* 296:*11*
**purpose** 179:*19*
216:*20*
**put** 20:*25* 26:*17, 18*
66:*10* 77:*20* 86:*18*
87:*24* 135:*17* 156:*24*
157:*2* 207:*1* 217:*19*
235:*17* 258:*3* 260:*22*
273:*13* 292:*7* 297:*18*
319:*7, 14* 320:*2*
332:*9*
**puts** 306:*1*
**putting** 64:*7* 67:*21*
135:*22* 295:*9*

**< Q >**
**qualified** 68:*2, 4, 10*
230:*20*
**qualifiers** 78:*12*
**qualitative** 74:*10*
100:*12* 131:*19, 21*
132:*6, 9*
**quality** 64:*24* 151:*8*
154:*18* 177:*20*
207:*19, 21*
**Qualtrics** 64:*8*
**quantification** 100:*21*
288:*16*
**quantify** 100:*18*
244:*11* 252:*16* 272:*2*
278:*24* 300:*18*
**quantitative** 73:*24,
25* 74:*4* 75:*11* 76:*4,
6* 95:*19, 23* 96:*13, 16,
21* 97:*11, 18* 131:*19*
132:*7*
**quantity** 38:*16*

**quarter** 204:*18*
206:*21*
**query** 172:*7* 282:*24*
**question** 4:*7* 10:*6,
19, 22* 11:*11, 13, 15,
21, 23* 15:*1* 17:*8, 9*
31:*10* 44:*22* 52:*15*
62:*17* 86:*4* 107:*13,
15* 121:*2, 5, 6, 12, 21,
22* 122:*3* 136:*24*
143:*2* 144:*18* 146:*14*
160:*1* 163:*12, 13*
191:*11, 12* 193:*25*
196:*9, 15, 18* 206:*12*
207:*1* 208:*18* 218:*23*
219:*13, 14* 228:*6*
234:*3, 6* 242:*6* 247:*4*
256:*22* 263:*14*
265:*22* 267:*4* 279:*20*
285:*25* 289:*24* 292:*1*
293:*11* 296:*9, 17*
298:*4* 300:*20* 301:*2*
310:*2* 318:*4* 320:*6*
326:*13* 330:*1* 333:*1*
**questioning** 291:*24*
**questions** 9:*25* 10:*15*
15:*15* 17:*12* 22:*12*
35:*3* 53:*1* 65:*1*
92:*13* 113:*16* 115:*19*
133:*20* 148:*1* 256:*23*
258:*10* 305:*6, 9, 16*
314:*21* 315:*2, 6*
335:*5, 9*
**quick** 122:*11*
**quickly** 35:*1* 69:*8*
120:*18* 165:*21*
208:*19, 21* 209:*21*
246:*18* 272:*22*
**quite** 17:*8* 149:*8*
186:*11* 230:*18* 231:*9,
23* 252:*1, 19* 273:*25*
295:*5* 329:*2*
**quotation** 328:*9*
**quote** 149:*17* 219:*19*
259:*12* 283:*1* 289:*7*
327:*14*
**quote/unquote** 307:*20*
**quotes** 204:*4* 286:*23*
**quoting** 220:*7* 329:*18*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 372 of 402
Page ID #:2727

Deposition of John Chandler, Ph.D.    Maxwell, et al. v. University of Southern California and 2U Inc.

**< R >**

**R-1** 118:20 154:20
155:2, 10, 18
**radio** 75:19, 21, 23
333:25
**raised** 308:12
**ran** 30:21 145:1
148:11
**random** 50:2
**randomized** 52:1
**range** 213:24 232:18
253:1 256:2, 6
264:25
**ranges** 264:21
**rank** 170:23 174:5
176:4 179:12 195:1,
6 198:18, 22 199:12
258:23 311:9 317:20,
21
**ranked** 92:19, 22
93:8, 18, 24 94:13, 18
95:6 104:8 105:17
107:21 114:1 118:3,
12, 15 119:11, 24
135:17, 23 136:9
139:2 148:6, 12, 14,
18 149:17 151:17
170:17 171:15 174:1
179:4, 7 180:24
192:14, 18 195:12
239:9, 11, 14, 18
240:9, 17, 25 245:14,
18 248:24 261:13
298:8, 12, 18 307:13,
20, 21 308:1, 5
309:10 320:4, 13, 18
321:2
**ranking** 25:19, 23, 25
27:3 96:3 97:8, 15,
21 104:19 105:12, 22
106:2 113:20 117:23
118:18 119:5, 14, 25
120:6 121:13, 25
128:25 134:22 136:1,
17, 19, 20 137:3
139:12 142:18
145:14 148:23
149:16 151:23
164:24 165:3, 7, 8, 10

170:16 171:25 172:2,
25 173:3, 18 177:2,
18 178:15 179:3, 5, 7,
10 191:23 192:13, 19
194:19 195:22 196:1,
6 203:2, 14, 20 204:6
219:18 220:10
221:15 224:2 225:11
227:3, 15 229:13, 15
230:17, 21 233:4
237:4, 23 238:7
239:10, 18 240:13, 25
242:3, 12 245:14, 17
246:9, 13 247:16
251:3 259:13, 21
261:13 269:9 270:4
271:23 275:6, 15
277:15, 18 281:17
282:5, 13 286:16
290:22 292:14
297:19 298:7, 17
299:10 300:8 302:13
304:9, 11 308:6
309:8 311:17 317:9,
18 318:6 320:11
321:1 329:4 330:10
331:7
**ranking-related**
237:12 297:24
**rankings** 26:2, 12
27:11 31:2, 4 37:15
94:3, 12, 22 95:6, 12,
22 103:24 104:6, 7, 8,
10, 24 105:4, 17, 19
106:16, 22 108:2
118:16 128:6, 17
129:12 133:25
134:12, 16 135:1, 3, 5,
8 137:23 138:4, 8, 12,
15, 19, 21 139:22
141:6, 24 142:9, 14,
23 143:9, 16, 17, 19,
23 144:7 148:10
151:12 160:10
170:22 171:2 172:14,
22 173:6, 11, 15
175:5, 6 178:18
180:15 197:21 203:7,
22 204:1 205:18, 24
207:25 220:5, 21

225:17 229:22
230:15 232:22 236:1,
15, 17, 24 237:24
238:12, 14 239:6
241:6 244:10 251:8
258:17 259:6, 8
262:13 264:22
265:11 266:4, 16
273:20 275:22 276:8,
10 277:7, 13, 22
278:9, 17 280:5, 18
281:7 285:11 286:2
287:7, 13, 24 289:9,
21, 25 290:3, 8, 17, 18
291:3, 12, 21, 25
292:2, 4, 6, 11, 16, 20,
23, 25 293:2, 5, 15, 19
294:2, 19, 23 295:8,
13, 18, 25 296:3, 7, 21
298:11 299:14
300:10 301:6 302:3,
21, 24 303:9, 12, 22
304:7 307:9, 12, 19
308:8, 17 309:18
316:21 317:11, 25
318:7 320:3, 12, 18
327:17 329:24 330:5
331:9, 10, 22 332:3,
15, 23
**ranks** 103:9 148:22
261:13 307:6 320:4
**rant** 91:4
**rare** 90:5
**rate** 37:2, 23 102:12
202:10 204:15
211:20 212:6 231:13
232:1, 7, 20 250:12,
18 301:15, 19 329:1
**rates** 27:19 204:22
223:18, 19 231:17, 21,
23 232:12, 14, 16, 20
250:20
**ratings** 103:24 107:6
108:17
**reach** 17:17 46:22
49:7 66:11 74:6
76:10 77:11 78:1, 4,
7, 8, 11, 13, 14, 19, 21,
22, 23, 25 79:14, 25
80:16 81:10, 24, 25

82:11, 23 84:11, 14,
25 85:6 87:13 96:17,
18 131:14, 18 176:1
195:11 331:12
**reached** 74:3 77:23
78:20 79:11 82:19
84:3 86:9 96:10
154:20 155:2 167:4
213:8 214:4 302:7
**reaching** 17:24
78:19 132:1
**reactions** 212:15
**read** 16:3 20:4 22:7
28:16, 19 87:20
109:18 110:3 131:6
133:11, 25 141:22
144:23 146:11, 19
149:14 151:21 152:6
167:22 174:9 181:14
182:5, 8 193:5
194:15 196:25 198:1,
11 203:5 215:5
216:11, 16 219:17
233:3 235:24 237:16
238:11 250:25 251:6
258:11, 21 262:7
266:3 269:15, 21
272:6 277:6 282:12
286:21 287:11 289:8,
21 291:10, 11, 20
294:14 300:3 302:23
310:18, 22, 23 312:6
331:2 340:1
**reading** 16:9 128:25
133:19 152:12, 14
195:16 197:17 215:1
220:8 262:3
**Reads** 340:1
**ready** 180:1 222:24
**real** 58:9 122:10
127:10 201:4
**realized** 238:2
**really** 10:17 73:12
88:20 95:1 101:22
114:4 121:10 133:7
146:8 159:17 162:9
163:24 187:14
209:15 234:20 268:6
302:17 306:21
**re-ask** 279:19

**Exhibit 2**
**476**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 373 of 402
Page ID #:2726
Deposition of John Chandler, Ph.D.    Howell, et al. v. University of Southern California and 2U Inc.

**reason** 10:5  15:1
120:6  136:19  218:18
219:7  244:15  262:16
268:7  340:1
**reasonable** 96:1
142:12  143:6  144:5
300:5, 16  302:5
331:4
**reasons** 114:9
116:23  158:16
**recall** 9:13  10:8
14:18  16:21, 23
18:14  20:22  31:8
40:19  42:4  101:8, 10
121:20  128:11  141:2
151:15  170:18
190:17  196:19
197:22  214:22
220:18, 19  223:19
255:13  264:12  280:9
281:5  286:9  308:10,
11
**recap** 7:14
**receive** 40:21  112:25
161:3, 9, 12  162:4, 17
164:4  185:20, 22
220:11  221:3, 9, 18,
22, 23  223:23  224:6
234:24  258:12, 15
268:21  315:11
318:23, 24
**received** 41:18  48:4
51:14  74:13  76:9
117:23  128:10
135:25  147:7  160:17
163:25  164:22  165:3
195:2, 22  207:22
223:8  234:14  244:14
315:6  317:4  326:2
**receives** 202:17
**receiving** 160:19
164:12  211:8  221:6
222:10  223:6, 12, 25
311:21  326:6  330:11
**reception** 89:7
**Recess** 70:7  130:20
163:5  169:2  215:24
257:25  305:1  326:22
**recipient** 94:19

**recognize** 23:3  267:5
322:1
**recollection** 24:4, 21
42:6  125:21  188:11
197:11  208:25
214:23  226:20  229:2
230:17  231:14, 17
255:1  262:20  264:19
280:17  297:11
**recommendations**
189:4
**reconfirm** 253:14
**record** 5:2, 16  7:2
11:6  50:4  70:4, 5, 9
85:1  86:15  130:16,
18, 21  137:6  163:2, 3,
7  168:24, 25  169:4
181:17  215:22  216:1
225:22  240:22
257:23  258:2  304:16,
24  305:3  307:18
326:20, 24  335:13
336:3  337:13
**recorded** 5:4
**records** 22:13  251:1
**recruit** 145:3
**recruited** 128:4
262:17
**recruiting** 110:9, 11
111:10  122:22
123:17  124:4  286:16
297:7
**recruitment** 109:23
123:22  124:6, 13, 18
125:24  128:1  132:16
255:16  262:9
**redesign** 295:24
**refer** 71:1  172:14, 22
173:7  242:11  243:2
314:25
**reference** 95:11
103:9  137:2  170:21
179:7  187:18  192:14
214:14  246:8  298:18
309:7
**referenced** 100:17
166:16  190:16
245:23
**references** 92:18

190:9
**referencing** 199:8
**referral** 188:8
**referred** 7:19  80:19
96:3  140:3  169:18
170:24  242:23  298:6,
8  329:2
**referring** 100:8
150:3, 11  182:17, 23
183:18, 23  184:4
245:15, 20  272:11
**refers** 327:17
**reflect** 35:24  129:13
138:11  225:23  292:7,
13
**reflected** 41:15
190:22  243:25
294:21
**reflecting** 33:17
**reflects** 38:18  279:22
325:2
**refresh** 84:17  163:18
197:8  280:11, 17
**regardless** 173:8
174:12  315:19
330:12
**regional** 140:20
**regularly** 113:14
**relate** 333:12
**related** 30:15  31:1, 3
33:15  61:3, 13  63:14
70:18  71:4, 8  72:6
89:13  95:15  99:17
115:25  116:19
117:18  122:22
124:13  127:20
197:13  294:17  297:9,
13  318:25  330:17
333:13  337:16
**relates** 124:4  193:22
286:18
**relating** 258:8  307:2
**relation** 108:21
**relations** 60:6
**relationship** 162:11
222:2
**relationships** 52:3
**relative** 49:12  94:18
207:6, 13  211:19
236:14

**relatively** 91:17
213:18  225:2  231:16,
21  232:2, 5, 20  254:2
270:17, 19, 24
**Relativity** 29:24
30:3, 6, 9, 12
**release** 203:22
250:16
**released** 270:9
327:17
**relevant** 40:22  99:24
123:22
**reliable** 241:14
292:12
**reliance** 130:11
**relied** 17:17, 22
104:18  130:7
**relies** 130:4
**relinquishing** 167:24
**rely** 203:18
**relying** 171:8  226:15
**remain** 165:8  222:9
**remainder** 327:22
**remained** 138:9
303:9
**remember** 16:15, 17
18:11  20:11, 12
24:13  30:2  45:8
54:25  113:7  126:5
128:13  152:12, 14
162:1, 16, 20  166:18
187:25  197:9  217:14,
24  220:12  226:21
232:9  240:1, 4  241:3
256:6  263:18  264:6
297:3
**remembering** 224:10
**remessaging** 216:18
**remind** 10:25  208:20
**reminders** 160:19
**REMOTE** 1:14  2:7
3:2
**remove** 80:24
**removed** 281:25
282:14, 25  283:2
**repeat** 219:12
**Repeated** 289:21
**repeatedly** 229:14
**repeating** 251:8
**replies** 19:12

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 374 of 402
Deposition of John Chandler, Ph.D.                                    Page ID #:2720
Correll, et al. v. University of Southern California and 2U Inc.

**report** 6:*16* 12:*4, 9*
14:*2, 4, 8* 16:*25*
17:*13, 16, 20* 18:*9, 19*
20:*6* 25:*11* 27:*16, 24*
28:*1, 8, 18, 22* 29:*3, 6*
32:*5* 33:*15* 40:*22, 24*
41:*1, 5, 20, 25* 53:*2*
71:*1, 2, 5, 7, 8, 11*
78:*9* 88:*2* 95:*11*
96:*15* 104:*3* 105:*15*
108:*21, 24* 109:*1*
122:*18* 128:*24*
130:*25* 141:*12* 146:*3*
148:*23* 149:*11, 19*
151:*3, 16, 20* 166:*17*
169:*9, 18, 20, 21*
171:*19* 179:*4* 192:*15,
21* 195:*1, 6, 10*
196:*25* 197:*5, 7, 17,
24, 25* 198:*2* 215:*21*
216:*5* 220:*14* 227:*23*
240:*3* 241:*1* 244:*8*
247:*24* 261:*25*
262:*22* 276:*14*
291:*21* 299:*1, 22*
306:*7* 308:*3, 7* 315:*1*
316:*24* 326:*16* 338:*1*
**Reported** 1:*22*
129:*15* 132:*11*
195:*21* 197:*12, 18*
217:*1*
**reporter** 5:*12, 17*
10:*13, 25* 120:*11*
122:*10* 145:*22*
200:*18* 326:*17*
**Reporting** 5:*14*
107:*24*
**reports** 9:*2* 70:*17*
129:*16* 146:*11*
148:*10* 239:*12, 15*
**repository** 29:*13, 19,
23*
**reposted** 272:*7, 9*
273:*1*
**reposts** 315:*25*
**represent** 44:*20*
170:*20* 187:*13* 286:*4*
295:*7* 324:*17*

**representation** 44:*2*
171:*15* 237:*15*
307:*23, 25* 312:*2*
**representative** 226:*24*
230:*2*
**represented** 153:*21*
197:*13* 216:*24*
306:*25* 307:*18* 320:*7,
10*
**represents** 322:*18*
**reproduced** 218:*24*
**reproduction** 167:*21*
**Request** 21:*12* 22:*11*
42:*11* 83:*16* 191:*18*
221:*19* 222:*13* 223:*5*
311:*19* 323:*20*
**requested** 21:*18*
22:*4* 164:*5* 339:*1*
**requesting** 183:*25*
323:*22*
**require** 164:*7*
**required** 49:*18*
**requirement** 164:*10*
**requisite** 58:*5*
**rereview** 14:*2*
**research** 37:*10, 15*
64:*12* 89:*8, 21* 94:*21*
95:*15* 112:*1* 118:*21,
22* 154:*5, 23* 155:*10,
16, 20* 191:*2* 201:*15,
19* 289:*1* 310:*17*
**researched** 88:*13*
**researcher** 29:*11*
191:*15*
**researchers** 258:*22*
**researching** 261:*3*
**reserved** 4:*7*
**reshare** 168:*16*
**residence** 13:*20*
**residents** 70:*25*
**resist** 101:*21*
**resonate** 156:*8, 12*
**resonated** 159:*20, 23*
254:*19*
**resonating** 111:*9*
159:*6*
**resource** 287:*13*
289:*9*
**respect** 16:*20* 60:*8*
72:*10* 211:*23* 244:*19,

22* 263:*10* 278:*4*
309:*17* 329:*8* 332:*5*
**respectfully** 229:*24*
**respective** 4:*3*
**respects** 159:*17*
**respond** 91:*5*
**responded** 220:*14*
**respondents** 64:*19*
**responding** 158:*21*
**response** 10:*1* 22:*10*
**responses** 114:*21*
121:*6, 25* 318:*17*
**responsible** 126:*15*
**rest** 203:*21*
**result** 145:*13* 173:*1,
4* 174:*22* 178:*20, 21*
196:*3* 266:*8*
**resulting** 116:*22*
**results** 62:*10* 63:*5*
64:*22* 65:*6, 7, 11*
89:*4* 172:*16, 21, 25*
173:*10* 174:*11, 14*
175:*9, 13* 178:*24*
261:*14, 22* 317:*14*
318:*8, 12*
**retail** 185:*8* 200:*11*
201:*1, 6, 16* 323:*13*
**retailer** 88:*10*
**retailer's** 87:*15*
**retain** 33:*10* 319:*25*
**retained** 23:*14*
**retargeting** 90:*7*
**retention** 33:*8* 116:*3*
**retweet** 268:*6, 15*
**retweeted** 215:*8*
259:*21* 272:*16, 19*
**retweeting** 266:*23*
**retweets** 214:*16*
268:*2, 11* 270:*11, 18*
271:*1* 315:*25*
**Reveal** 30:*2*
**review** 18:*6* 19:*16*
21:*8, 22* 22:*6* 35:*4*
43:*4, 10* 45:*13* 71:*18*
109:*3* 134:*19* 141:*18*
150:*20* 161:*7* 167:*10,
19, 23* 199:*4* 202:*23*
246:*20* 250:*8* 272:*21*
280:*20* 314:*22*
316:*15*

**reviewed** 12:*4* 15:*12,
17, 19* 20:*20* 41:*3*
137:*21* 139:*17*
140:*15, 18* 169:*18*
170:*10* 195:*9* 207:*19*
**reviewing** 12:*9*
20:*22* 131:*24*
**reviews** 28:*13*
**revised** 41:*4*
**revisited** 86:*10*
**right** 9:*11* 13:*14*
15:*3* 37:*17* 38:*8*
57:*7* 79:*11* 84:*3*
91:*12, 19* 100:*20*
107:*11* 108:*22*
116:*25* 130:*24* 149:*1*
158:*5* 167:*20* 170:*19*
184:*22* 187:*5* 192:*2*
207:*7* 222:*22* 224:*6*
228:*20* 234:*9* 242:*10*
257:*9* 262:*4* 272:*14*
281:*4* 304:*23* 306:*6,
14, 20* 310:*25* 312:*6,
21* 316:*7* 318:*24*
321:*17* 325:*24* 326:*8*
327:*1, 6* 335:*6*
**right-hand** 317:*25*
**road** 79:*7* 108:*9*
**Robertson** 29:*8, 11*
31:*21* 32:*7, 17* 33:*13*
37:*3, 11* 191:*15*
**Rockies** 113:*4*
**role** 27:*23* 29:*9*
63:*4* 67:*12* 90:*1*
104:*10* 105:*6* 109:*25*
123:*23* 126:*12*
146:*19* 193:*7* 287:*8*
288:*14, 16, 19, 21*
**rolled** 184:*3*
**Roman** 109:*13*
**room** 176:*19*
**Rossier** 20:*9* 26:*3*
93:*17, 23* 94:*23*
95:*21* 96:*4* 104:*1*
105:*11, 20* 106:*9*
107:*5* 108:*17* 128:*1*
129:*14* 131:*6* 132:*25*
133:*1, 2* 134:*2*
135:*11* 136:*15* 137:*5,
25* 139:*21, 25* 140:*1,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 375 of 402
Page ID #:2730
Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

*8*, *19* 142:*14* 143:*8*
144:*25* 145:*3* 154:*5*,
*12* 157:*19* 158:*17*
159:*13* 161:*10*
164:*17* 169:*12* 170:*8*,
*17* 174:*7*, *18*, *20*, *21*
178:*19* 179:*18* 180:*7*
182:*7* 185:*12*, *19*
188:*6* 193:*13* 195:*21*
197:*5*, *20* 202:*19*
212:*17* 214:*11*, *20*
222:*12* 225:*7* 232:*22*
233:*4*, *12* 234:*13*
235:*3*, *7*, *24* 236:*22*
237:*12* 238:*13*
239:*17* 241:6, *22*
243:*22* 244:*20*, *21*
245:6 246:*1*, *2*, 6
248:*22* 251:*8*, *21*, *23*
252:*3*, *14* 253:*16*
258:*13* 259:*4*, *22*
261:*10*, *11* 262:*8*
264:*4*, *8*, *9*, *17* 265:*3*,
*4* 266:*16* 267:*9*
269:*9* 270:*19* 271:*11*
275:*14*, *22* 279:*23*
280:*1*, *3*, *4*, *18*, *22*, *24*
281:*1*, 6, *7*, *16* 282:*5*,
*12* 285:*10*, *22* 286:*1*,
*2*, *15*, *25* 294:*23*
297:*23* 300:*7* 308:*19*
311:*9*, *24* 326:*7*
331:6
**Rossier.com** 265:*2*, *3*
**Rossier.USC.edu**
207:*21* 240:*24*
246:*12*, *21* 265:*11*
308:*21*, *23* 313:2

**Rossieronline.USC.edu**
164:*3* 183:*11* 207:*20*
239:*22* 240:*12*
245:*16* 307:2 309:*1*
**Rossieronline.USC.edu**
**/apply** 186:*7*
**Rossier's** 132:*16*
161:*4* 196:*1* 235:*20*
**Rothschild** 12:*20*, *21*
**rough** 81:*20* 213:*25*

**roughly** 13:*1* 30:*10*
202:*11* 204:*19* 206:*5*
218:*25* 219:2
**round** 147:*18*
**rounding** 38:*25*
**rounds** 39:*3*
**row** 36:*25* 56:*19*
297:*12*
**rub** 155:*19*
**rude** 11:*1*
**rules** 9:*18* 10:*24*
139:*17*, *20*
**run** 101:*3*
**running** 75:*25*
146:*10*
**runs** 55:*22*

**< S >**
**S(Cont'd** 339:*1*
**sake** 315:*5*
**sale** 47:2, *7* 88:*4*
201:*16*
**sales** 8:*20* 88:*11*
98:*4* 323:*15* 325:*5*
**salient** 204:*7*
**San** 54:*11*, *21*, *23*
**sandwiched** 217:*15*
**sane** 56:*21*
**Sarah** 290:*15*, *18*
**sat** 222:*23*
**saturate** 90:*3*
**save** 222:*23*
**saved** 256:*22*
**saw** 8:*11* 47:*22*
48:*3*, *19* 72:2 74:*23*
79:*16* 84:6 85:*1*, *18*
86:*13* 92:*18* 104:*18*
117:*3* 134:*25* 142:*9*
210:*18* 211:*21* 213:*3*,
*7* 216:*23* 237:*1*, *15*,
*16* 271:*25* 277:*7*, *12*,
*15* 278:*8* 279:*1*
285:*18* 316:*24*
325:*13*
**say(as** 149:*14*
**saying** 11:*22* 107:*11*
136:*18* 149:*17*
153:*15* 162:*16*
220:*19* 227:*25* 228:*2*,
*3*, *8* 240:*9*, *17* 288:2

303:*1* 307:*8* 312:*3*
323:2 328:*13* 329:*1*
**says** 41:*8* 57:*8*, *9*
131:6 133:*11* 141:*22*
144:*23* 151:*7* 174:*1*
182:*4* 183:*4* 228:*11*,
*16* 258:*21* 288:*14*
289:*8* 291:*10* 311:*9*
328:*4*
**scale** 106:*7* 256:*19*
294:*5*
**scanned** 208:*19*
**scenario** 223:2
**scenarios** 302:*1*, *9*
**Schedule** 22:*3*, *6*
**school** 7:*23* 20:*9*
26:*3* 71:*7*, *10* 93:6,
*17*, *23* 94:*24* 96:*4*
104:*17* 105:*11*, *17*
106:*16*, *22*, *23* 107:6
108:*17* 115:*12*
116:*12* 118:*4* 119:*1*,
6 120:*5* 128:*1* 136:*9*,
*16* 137:*5*, *25* 139:*2*, *7*
143:*9* 149:*17* 154:*5*
157:*9*, *17* 164:*17*, *24*
170:*16*, *17* 174:*8*
175:*23*, *25* 177:*22*, *23*,
*24* 202:*3*, *5*, *12*, *19*
214:*20* 222:*12*
232:*23* 233:*13*
234:*21* 235:*3*, *8*
245:6 246:*1*, *2*
248:*24* 253:*20*, *23*
259:*22* 261:*10* 262:*8*
266:*16* 271:*11*
273:*21* 274:*23*
279:*23* 280:*1*, *3*, *5*
281:*16* 282:*12*
288:*25* 294:*23*
308:*20*, *25* 311:*24*
**schools** 93:*5* 123:6
126:*1* 127:*19* 202:*17*
293:*16* 308:2 311:*10*
**school's** 139:*12*
196:*1* 275:*14*, *22*
**science** 45:*9* 49:*4*
54:*17*
**sciences** 46:*3* 59:*5*

**scientific** 142:*12*
143:*7* 144:6 278:*7*
300:6, *13*, *25* 301:*9*
302:6, *11* 331:*4*
**scientist** 124:*24*
**scientists** 91:*18*
**scope** 127:*24* 262:2,
*5*, *7*, *14*
**score** 84:*10*
**scores** 62:*11* 89:*21*
204:*11*
**scratch** 320:*5* 331:*15*
333:*21*
**screen** 150:*4* 190:*5*
242:*17* 246:*7*, *11*, *22*
260:*9* 263:*21* 264:*3*,
*10*, *19*, *21* 265:*5*, *12*
266:*11* 267:*22*
272:*15* 275:*25* 279:*9*,
*17*, *21* 306:2 307:*1*
309:6 314:*17* 321:*18*
**screwing** 35:*17*
**scroll** 21:*16* 34:*25*
69:*16* 146:*9* 166:*24*
167:*11* 178:*25*
203:*10* 245:*8* 261:6
272:*20* 274:*10*, *20*
280:*10*, *13* 296:*24*
305:*22* 317:*23* 320:*8*
321:*14*, *25* 327:*7*, *21*
**scrolled** 19:*8* 263:*19*
271:*12*
**scrolling** 43:*8*
181:*16* 214:*13*
306:*20*
**sea** 127:6, *11*, *18*
**sealing** 4:*4*
**search** 32:*14* 33:*14*
50:*8*, *9* 87:*18* 123:*23*,
*25* 146:*20* 164:*18*
172:*3*, *7*, *10*, *11*, *12*, *15*,
*17*, *21*, *25* 173:*4*, *5*
174:*2*, *7*, *10*, *11*, *14*, *19*,
*21*, *23* 175:*1*, *9*, *11*, *13*,
*15* 176:*2*, *9* 177:*3*, *10*,
*14*, *20* 178:*1*, *20*, *21*,
*24* 179:*16*, *17* 180:*3*,
*24*, *25* 182:*22*, *25*
184:*12* 185:*20*, *21*, *22*,
*24* 186:*15* 187:*11*, *14*,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 376 of 402
Page ID #:2731
Deposition of John Chandler, Ph.D.    Dussell, et al. v. University of Southern California and 2U Inc.

*15* 192:*19* 247:25
248:*4, 7, 9, 17* 249:*4,
18, 19* 250:*1, 4, 12, 15*
260:9 261:*7, 17, 21,
22* 282:*24* 295:*4, 6*
296:*10* 316:*12*
317:*12, 13, 16, 17, 19*
318:*3, 10, 16, 18, 22,
23* 319:*3, 12*
**searched** 31:*12*
170:*20* 178:*19*
179:*13* 180:6 185:*12,
19* 191:*8* 319:*17*
321:5
**searches** 16:7, *22*
47:*14* 48:5 173:2
175:25 248:*12, 13*
261:*4*
**searching** 30:*12, 14*
248:*11* 262:17 263:7
283:22
**seasonal** 102:*17*
**second** 36:25 38:*14*
52:*14* 55:23 71:*1*
76:*19* 81:24 84:*19*
92:16 99:*18* 133:*11*
134:*3* 141:*14, 17*
154:*4* 161:25 174:*21*
178:*23* 196:24
198:*17* 199:5 212:6
216:22 282:22
290:*14* 297:*12*
317:*21*
**seconds** 84:*20*
**section** 17:20 69:*8,
11* 109:*13* 151:6, *11*
171:*23* 216:6 236:*12*
241:25 244:*20*
247:*13* 261:25
262:*21* 280:*11* 291:7
299:*21, 24*
**sections** 220:7
**see** 21:*17* 23:*19*
24:*4* 27:20 35:*1*
37:*1* 39:8 41:*17*
43:9 46:7 53:*21*
60:*3* 76:14 79:8, *16*
80:*1, 15* 82:*13, 19, 21*
83:2, *20* 84:5 85:*3,
10* 89:*19* 90:25

95:*12* 105:*1, 18*
106:*3, 10* 109:*7, 9*
111:*8* 116:*21* 128:7,
*18* 131:*16* 136:*13, 18,
20* 137:*1, 10, 20*
138:2, *7, 15* 142:22
145:5 146:25 149:*6,
20, 22* 150:24 151:9
154:*1, 8* 156:*1* 159:*1,
3* 166:*6, 9, 13, 24*
170:*21* 172:*12*
173:*23* 174:*3* 179:*6*
184:*6* 185:*13* 190:*10*
192:*22* 193:*11* 199:*1,
2* 203:*11* 209:*20*
214:*17* 219:*21*
228:*21* 233:*4, 8*
236:*2, 16* 237:*2*
239:*13* 241:*23*
242:*13* 244:*13*
247:*16* 248:2 251:*6*
258:*18, 25* 261:22
266:*3, 12* 269:*11*
270:7 272:*10* 274:*21*
277:*9, 22* 280:*16, 25*
282:*3, 7* 283:*3* 284:2,
*17* 291:*14* 294:*14*
300:*1, 11* 309:*10*
310:*16, 23* 311:*14, 18*
313:*13* 315:*14* 316:*14*
317:*13, 19, 24* 326:*10*
327:*8, 22*
**seeing** 47:*12, 13*
82:25 91:25 95:*3*
127:6 150:*4, 18*
166:5 190:*5, 17*
191:*3* 273:25 276:*10*
317:*15* 320:*15*
**seeking** 157:*6*
**seen** 20:20 21:*14*
50:*4* 84:5 97:*11*
99:*15, 20* 115:*16*
139:*16, 19* 140:*23*
141:7 164:*8* 165:*6*
190:*18* 209:5 223:*13*
234:*24* 237:*14* 238:*6*
250:*3* 269:*23* 270:*4,
22* 284:*10, 21* 288:*15,
18* 291:*24* 303:*12*

315:*21* 332:2
**sees** 87:22
**selected** 114:2
**selectivity** 197:*4, 19*
**sell** 179:*21*
**selling** 60:*9* 76:*13*
87:*16*
**sells** 75:22
**semantic** 295:*20*
**semester** 56:7, *10, 18*
113:*14* 291:*12*
**send** 81:6 211:*6*
295:2
**sender** 211:*13*
**sending** 42:*21*
111:*14* 231:9 233:*10*
**sense** 63:*1* 67:23
74:*1* 85:24 95:*14*
129:*12, 22, 24* 130:*10*
133:8 134:*14* 139:7
145:*10, 19* 153:*18*
160:*4* 182:*14* 199:22
212:*23* 232:*10*
267:*12* 288:*11*
290:25 318:*21*
**sensible** 132:*15*
**sent** 35:*7, 11* 64:*1*
81:*19* 112:*3* 147:*8*
162:*3* 203:*24* 226:2
231:*19* 233:7 327:*13*
**sentence** 144:22
146:*19* 153:*16*
196:24 203:*17*
216:*21* 227:24 289:7
**sentiment** 328:*18*
**SEO** 175:*16*
**separate** 7:*24* 31:*16*
95:*16* 104:*13* 248:*6*
267:*6*
**September** 168:7
**series** 51:*21* 81:2
98:*19* 101:*23* 238:*15*
242:2
**serve** 318:*7, 11*
**served** 83:*21* 147:5
248:*16* 318:*18*
319:*21* 321:*4*
**server** 83:8, *9, 16*
183:25
**serves** 51:5 174:*12*

**service** 48:*23* 64:*13*
92:*3* 238:*24*
**services** 125:*20*
201:*11*
**serving** 7:*17* 85:*14*
**session** 222:25
257:*16*
**set** 14:*8* 44:*20*
51:*24* 89:*13* 91:*17*
94:*16* 144:*23* 205:*13*
221:*11* 337:*11, 21*
**sets** 46:*14* 109:5
230:*3*
**seven** 258:22
**shape** 144:*24*
**share** 51:22 252:*23*
266:*14*
**shared** 212:*14*
260:*17* 266:*4* 267:*14*
302:*13*
**shares** 266:*4, 11*
**sharing** 47:6 51:*8*
135:5 227:*12* 266:*15,
24* 267:*10* 268:*19*
269:*1, 9* 270:*3*
271:*23* 282:*5* 285:*10*
286:2 292:22
**SHEET** 340:*1*
**shifted** 254:6
**shirt** 47:*9, 11, 14*
79:*18, 19* 84:*3* 87:*16,
24* 88:*10* 91:8, *9*
**shirts** 48:*6* 51:*18*
87:*19*
**SHOOK** 3:*11*
**shopping** 29:*16*
31:*21* 87:24
**short** 7:*11* 215:*19*
257:7 326:*18*
**shortly** 18:9
**shot** 242:*18* 272:16
279:*18, 21*
**shots** 263:*21* 264:*10*
265:5 276:*1* 279:*10*
307:*1* 309:*6*
**shoulders** 155:*19*
**show** 151:*25* 169:*10*
174:*8, 19, 21* 177:*4*
178:*1* 181:*11* 185:7
189:*15* 205:22, *24*

211:*11, 12, 13, 16*
214:*3* 218:*12* 330:*12*
showcases 329:*3*
showed 51:*15*
143:*16* 178:*20*
183:*16* 203:*25*
showing 106:*4*
212:*12* 246:*18*
259:*20* 276:*14*
shown 30:*22* 172:*10*
178:*12* 211:*9* 218:*3*
268:*3, 4* 314:*6*
shows 182:*3* 186:*17*
299:*25*
sic 157:*14*
side 65:*19, 20* 66:*4*
89:*23* 91:*2* 176:*11*
310:*20* 311:*16, 18*
312:*4, 5*
sidebar 317:*25* 318:*1*
sign 267:*1* 325:*6, 7,*
*8, 14*
Signature 340:*1*
signed 4:*11, 13* 24:*6*
251:*21*
significance 310:*6*
significant 219:*9*
294:*17, 20, 24* 295:*8,*
*12, 15, 16* 296:*2, 6, 14,*
*19, 23* 297:*15, 16*
similar 48:*1* 71:*17*
79:*17* 115:*17* 116:*11*
171:*6* 184:*2* 201:*20*
215:*10* 246:*6* 247:*4*
316:*23*
Similarly 1:*5* 37:*20*
51:*17* 81:*1* 105:*21*
160:*8* 177:*11* 180:*14*
199:*10* 233:*3* 237:*21*
243:*21* 265:*2* 275:*3*
simple 111:*16* 288:*8*
Simplicio 12:*18*
22:*13* 24:*15, 17*
42:*21*
simply 10:*9* 99:*4*
161:*17* 182:*20*
185:*12* 268:*19* 269:*1*
330:*10*
simulations 57:*9*

single 136:*14* 137:*2*
161:*4* 331:*20* 332:*21*
sinister 175:*15*
sir 150:*5* 207:*6*
sit 176:*18* 286:*7*
site 99:*6* 149:*8*
159:*3, 5* 161:*18*
179:*22* 204:*21* 207:*4,*
*14, 16* 208:*2, 3, 4*
223:*6* 236:*14* 240:*12,*
*17, 18* 243:*12, 17, 18*
sites 159:*3* 172:*12*
187:*23*
sitting 60:*3*
situated 1:*5*
situation 184:*15*
215:*11* 304:*13*
six 56:*19* 71:*6* 230:*6*
six-month 255:*11, 12*
six-pack 101:*5*
size 81:*20* 204:*19*
311:*2*
sizes 249:*7*
skills 58:*8*
skipping 65:*1*
Sky 118:*4* 119:*5, 11*
Slack 32:*22, 23, 24*
33:*3, 5, 16*
slice 326:*5*
slide 73:*3*
slightly 182:*8*
slipped 247:*19*
slow 122:*13* 190:*8*
307:*24*
small 64:*14* 160:*18*
176:*7* 197:*1* 207:*15*
213:*18* 235:*11*
270:*18*
smaller 160:*19*
smallest 216:*25*
SMITH 3:*17* 157:*14*
158:*15* 159:*1, 4*
smoother 11:*24*
snapshot 324:*9*
snapshots 239:*1, 2*
242:*2*
soccer 325:*22*
social 26:*8, 18* 47:*13*
61:*3* 77:*25* 96:*17*
123:*24* 131:*13*

189:*19* 250:*22, 25*
251:*1, 4, 9* 252:*8, 13,*
*21, 22* 253:*1, 20, 22,*
*25* 254:*14* 256:*10, 14,*
*23* 257:*13* 260:*17*
263:*11* 266:*5, 9*
267:*8, 11* 271:*18*
278:*18* 304:*4*
society 289:*16*
sociology 287:*12*
soda 101:*9*
sole 38:*2, 4*
Solo 63:*23*
solutions 125:*15*
somebody 135:*22*
185:*17*
someone's 66:*18*
Somerville's 204:*4*
somewhat 127:*3*
165:*1*
Sommerville 203:*23*
208:*8* 212:*13* 327:*13*
328:*10, 23* 329:*19*
Sommerville's 210:*15*
soon 47:*12* 164:*5*
306:*1*
sophisticated 98:*25*
131:*7* 132:*15*
sophistication 99:*2*
Sorry 29:*4* 35:*10*
46:*20, 21* 48:*14*
80:*23* 107:*14* 120:*11,*
*17, 23* 128:*13* 154:*3*
171:*21* 178:*5* 200:*15*
210:*22* 219:*12*
239:*21* 242:*11*
254:*11* 256:*21* 271:*3*
279:*16, 24* 281:*20*
293:*10, 23* 294:*4*
299:*21* 300:*19* 307:*7*
310:*3* 313:*23* 320:*3*
327:*10* 332:*18*
sort 7:*21* 8:*25* 23:*7*
25:*13* 26:*9, 25* 28:*25*
29:*16* 31:*1, 5* 37:*8*
48:*1* 49:*1* 62:*17*
63:*8* 65:*15, 19* 66:*6,*
*15* 67:*12, 18, 22, 24*
75:*16* 76:*1* 79:*17*
81:*18* 85:*10* 88:*7, 12,*

*21* 89:*14* 96:*24*
97:*22* 105:*23* 106:*10*
111:*7* 116:*8* 124:*12*
127:*6, 11, 14* 129:*18*
132:*1* 133:*7* 134:*14*
138:*10* 148:*9* 159:*25*
169:*22* 176:*7* 178:*23*
179:*24* 180:*2* 183:*13*
186:*2* 203:*15* 205:*6*
208:*21* 220:*22*
226:*10* 268:*3, 25*
276:*12* 280:*10*
285:*15* 288:*7* 292:*20*
295:*9* 303:*15* 307:*1,*
*6* 308:*15* 309:*7, 13*
312:*5* 316:*25* 317:*3*
318:*6* 319:*20* 323:*13*
324:*9* 329:*21* 330:*7*
Sound 13:*25* 80:*7*
156:*14*
sounds 108:*12*
257:*18, 21* 264:*13*
source 44:*16* 182:*4,*
*11, 12, 13, 15* 183:*1, 2,*
*6* 184:*7* 188:*15, 18,*
*22* 189:*14* 216:*25*
218:*13, 21* 219:*10*
322:*3, 11, 16, 23*
323:*14, 15*
sources 182:*6* 186:*17*
SOUTHERN 1:*8*
5:*7* 127:*25* 262:*7*
290:*12*
space 44:*4, 24, 25*
50:*23* 76:*13* 200:*25*
249:*20* 311:*12*
spanned 255:*14*
speak 144:*14*
speakers 33:*22*
46:*19* 48:*13* 108:*4*
240:*5* 271:*4* 281:*21*
313:*22* 322:*2* 325:*18*
speaking 74:*24*
78:*11, 25* 82:*4* 84:*14,*
*22* 85:*12* 86:*17* 89:*6*
93:*12* 94:*4* 97:*7*
102:*14* 123:*8* 132:*21*
142:*22* 153:*20* 160:*1,*
*25* 177:*5* 179:*15, 19*
183:*24* 185:*7* 199:*25*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 378 of 402
Page ID #:2733

Deposition of John Chandler, Ph.D.                Bell, et al. v. University of Southern California and 2U Inc.

231:25  232:15
237:24

**special** 211:25

**Specialist** 3:23

**specific** 11:14  35:2
52:20  59:7  66:21
71:9  74:2  76:10
96:21  99:11  104:21
105:7  117:18  119:25
129:10  141:1, 2
144:14  163:19
191:18  192:19
197:22  198:24  214:2
236:10, 19  237:19
239:18  240:19
244:22  246:3  250:3
278:23  298:4, 6, 17
307:6, 24  320:4
334:5

**specifically** 12:15
16:15  18:15  23:10
25:9  31:1  36:12
37:5  42:19  46:9, 23
57:25  66:9  71:6
100:7  124:13  128:2
142:21  145:4  173:14
197:5  210:2, 4
239:22  262:9  263:14
283:22  309:2  311:6
313:15

**specificities** 7:20

**specificity** 300:24

**specifics** 133:21

**specify** 192:1

**speculate** 10:8  23:25
24:1  233:15, 17, 22

**speculating** 156:10
232:8

**speculation** 233:20
328:21

**speed** 149:7

**spend** 12:8, 12  30:7
294:8, 10, 12, 22
296:10  299:5, 7

**spent** 39:1  133:18
159:4  294:15, 18
295:12, 17  296:11, 20
299:12

**spirit** 160:1

**split** 47:3  241:15

**spoke** 196:20

**sponsored** 317:7, 14
318:7, 8, 11

**sports** 325:21

**spot** 177:2  179:11

**spring** 56:9

**spur** 231:19

**square** 249:9

**ss** 337:4

**St** 3:6

**staff** 193:7, 8  205:10

**stage** 135:24  162:14,
18  319:11

**stages** 30:15  122:21
131:9

**standalone** 59:18

**standard** 48:17  52:2
152:21  153:4, 9
183:5  232:2  283:24

**standpoint** 173:7
200:5

**stands** 244:15

**Stars** 3:13

**start** 10:20, 22  28:16
31:7  45:16  47:12, 13
70:14  140:17  242:8
262:17  306:13
310:19  312:4, 15, 20
330:1

**started** 36:12  196:19
222:24  225:6  262:23,
25  264:5, 10  265:5

**starting** 59:13  131:5
175:22  215:20
283:10  308:18  323:3,
24

**starts** 227:24  246:16

**State** 2:9  6:16  7:10
8:3, 16  130:1  142:11
153:21  236:5, 6
278:7  300:5, 24
331:4  337:3, 8

**stated** 219:19  221:14
227:14  308:7

**statement** 26:22
130:3, 6, 7, 10  163:20
208:6  227:9  236:19
269:18, 20  278:11
287:7  303:5

**statements** 16:12
97:22  158:7  278:19,
22  287:16  297:24
299:10

**STATES** 1:1  5:8
198:11

**static** 77:5

**stating** 277:20

**station** 75:22, 23

**statistical** 46:6, 11, 12,
16  47:6, 19  48:2
49:8  50:16  58:6
324:22  334:18

**statistics** 46:13
57:22, 24  58:4
101:24  106:18
129:15  195:21

**status** 129:13  154:21
155:18  260:25
269:10  272:7, 9
273:2  287:8, 12, 14,
20, 25  288:4, 5, 10, 12,
21  289:1, 8, 10, 11, 14
315:19

**stay** 149:4  252:24

**stays** 82:24

**steady** 266:8

**steam** 40:13

**stemming** 145:19

**stenographic** 5:16

**step** 63:14  87:25

**steps** 63:8, 11

**stick** 314:24  315:4

**sticking** 325:21

**sticks** 318:24

**STIPULATED** 4:1, 5,
9

**stoplight** 82:15

**store** 90:18  91:22
101:5

**stored** 73:6

**stories** 57:4  61:16

**straight** 185:14

**strategies** 123:21
124:8, 19  125:5
132:16  144:24
146:23  147:4  255:16

**strategy** 94:14
126:14, 17  131:8

**street** 79:4, 6

**stretch** 92:12

**strike** 15:6  20:7
54:4  58:22  64:2
69:23  114:14  119:2
138:19  139:15
143:25  156:3, 4
196:18

**strikes** 153:9

**string** 44:21  261:10

**strongly** 220:20

**struck** 115:3  193:19

**structure** 40:23

**structured** 169:21

**structures** 109:22

**struggling** 32:1

**STUDENT** 3:4
43:21  53:15  97:23
106:4, 7  109:23
114:15  122:22
123:17  130:6  134:11
135:17, 25  136:4, 5,
14, 15, 18  137:3, 10
138:22, 25  139:20
142:13  143:8  144:10,
15, 16  156:15  157:14,
15  158:2, 3, 11
159:12, 19, 21  162:9
164:5, 10, 11  185:11
197:4  204:10  212:22
214:9  220:24  222:11
223:11  233:11
234:19, 21  236:10, 19
237:19  277:15  278:1,
6, 8  302:2  308:13
313:7, 16, 17, 21
314:1, 8  319:8
324:19  331:20  332:1,
12, 21, 22

**students** 25:16, 22
26:7  27:13  57:18
58:8  61:19  93:17, 22
94:5, 23  95:9, 13, 20
96:6, 10  97:1, 8, 13,
14  99:8, 21  100:8, 9
103:25  104:5, 16, 22
105:10, 16, 19  106:2
107:4  108:15  110:12
111:8, 9, 10, 17, 21
112:3, 4, 8, 10, 11, 14,

Deposition of John Chandler, Ph.D.    Mandell, et al. v. University of Southern California and 2U Inc.

19, 23  113:3, 9, 11, 15, 25  114:2, 7, 20, 24  115:2, 4, 9, 20  116:23  117:7, 9, 16  118:10  120:5  124:7  127:1  128:3  131:11  132:1  133:9, 17  134:17, 21, 25  135:2, 8, 10  137:13, 23  139:3, 5, 11  142:14, 17, 20, 24  143:4, 5, 15, 19, 22  144:6, 12  145:3  155:11, 15  156:8, 12, 18, 22, 24  157:2, 3, 11  158:7  160:14, 16  161:3, 9, 22  180:7, 17, 23  188:5  192:7, 18  193:9, 14  197:2, 3, 6  200:9  203:8  204:12  205:8, 9, 19, 22  209:7, 8  210:1, 5, 12, 25  212:17, 25  213:2, 3, 7, 10, 14, 21, 23  214:5  215:9, 13  216:15  220:11  221:3, 7, 22  222:2, 4, 8  223:4, 15  225:4, 16  227:3  233:7  234:9, 10, 14, 17, 24  235:4, 7, 24  236:16  237:6, 11  241:11, 15, 16  243:24  244:6, 9, 12, 16, 23  247:6, 12, 14  251:17, 24  252:2, 12, 17  253:6, 10, 17, 21  254:3, 5, 17, 19, 20, 22, 25  255:9, 21  256:17  260:23, 25  262:3, 10  272:1, 3  276:7, 10  277:7, 12, 21  278:16, 23, 24, 25  286:16  289:22, 25  290:2, 8, 10, 11, 15  291:9  293:19, 25  294:1  299:9, 13  300:7  301:4, 5  311:23  313:16  323:20  326:1, 6, 10  328:3  331:6, 17  332:6
**student's**  135:24

**studied**  88:13  137:22  218:22  226:3  237:13  253:20  273:16, 24  275:21  293:18, 24
**study**  88:16  93:15, 21  94:2, 7, 21  95:20, 24, 25  117:14  140:11  195:7  223:13  254:8, 25  255:1  256:18  269:3  273:6
**stuff**  83:24  146:2
**style**  111:17
**subdivisions**  160:23  161:2
**subgroups**  160:5
**subject**  43:23, 25  82:1  83:24  220:2  286:22  329:15  330:9, 12
**subjects**  109:20
**submit**  43:18  45:6  164:21
**submitted**  43:7, 14, 15, 20  45:8  194:16
**submitting**  323:5
**subparagraph**  262:1, 6
**Subscribed**  336:11  340:1
**subsection**  246:10
**subsequent**  281:10, 13  334:16
**subsequently**  323:21  324:1
**subset**  68:6  101:23, 24  332:6
**substitute**  194:18
**subtle**  67:5
**success**  145:19  156:21
**SUE**  1:2
**sued**  290:11
**suffering**  91:14
**suffers**  90:13
**suggest**  28:19  97:13  99:20  176:22, 24  225:21  291:21  303:21

**suggested**  134:21
**suggesting**  225:19
**Suite**  3:14
**sum**  83:23  209:20
**summary**  51:12, 23  65:14  77:20  131:3  141:16  167:14  182:5  330:24  331:14, 19
**summed**  208:21
**summer**  55:20
**super**  116:7
**supplemental**  6:16
**supply**  199:19, 22  200:1, 3
**sure**  7:2, 15  9:18, 21  11:2  34:13  35:8  59:25  62:15  63:7  64:25  66:22  107:19  116:5  121:3, 8  122:3  134:16  165:2  175:4  189:11  200:23  204:14  208:3, 5  214:22  218:1  227:8  233:25  255:18  262:3  271:19  273:13, 25  280:12  296:16  298:1  307:17  314:12, 25  321:18  322:21  329:22
**surprised**  175:8
**surprisingly**  110:25
**surrounding**  154:14
**survey**  61:23  62:6  63:1, 2, 4, 14  64:6, 8, 9, 10, 16, 17  65:2, 6, 11  68:17, 25  93:15  94:8, 9  95:16  104:13  108:15, 20  111:17, 25  114:8, 16, 25  116:13, 14  121:4, 12, 18, 21, 22  122:1  158:18  159:6
**surveys**  61:6  62:2, 3, 9, 12, 21  63:9, 10, 16, 21  64:18, 21  68:13, 15  100:23  101:15  103:7  111:8, 12  112:6, 7  113:8, 20  114:20  115:17  116:10, 22  120:4

**suspect**  154:24  156:10  167:12  185:24  266:22  323:19  324:6
**suspected**  155:14
**switch**  92:15  240:1, 9  245:14  316:5  326:15
**switched**  239:17  240:4, 24  307:12, 19
**switches**  308:19
**sworn**  4:10, 13  5:21  336:11  337:12  340:1
**syllabus**  57:9
**symbol**  268:3, 5
**synonymously**  184:7
**system**  129:20  163:24  183:12
**systematically**  271:12

**< T >**
**tab**  186:5
**Tabitha**  19:1, 21
**table**  297:12
**tables**  181:12  316:23, 24  320:11
**tabulated**  260:14
**tag**  267:1
**tagged**  181:8, 18
**take**  18:10, 17  22:23  69:2  70:2  76:16  81:16  97:4  111:21  114:13, 19  127:23  130:15  171:11  173:22  215:19  228:9  257:4, 9, 14  304:16  314:14  316:10  326:18
**taken**  5:6  6:3  14:16  34:7  49:22  70:7  130:20  163:5  169:2  215:24  226:10  239:2  257:25  267:22  305:1  326:22
**takes**  239:1  324:25
**talk**  46:10  49:18  52:9  80:15  81:23  85:12  88:1  92:10  119:14, 21, 24  200:23  228:14  250:14, 15

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 380 of 402
Page ID #:2736
Deposition of John Chandler, Ph.D.                    Mitchell, et al. v. University of Southern California and 2U Inc.

256:*11*, *12*  273:*19*
286:*13*  306:*21*
327:*11*

**talked**  26:*25*  27:*3*
33:*24*  75:*11*  83:*25*
104:*6*  116:*11*  124:*20*
142:*7*, *18*  143:*15*
146:*1*, *15*  147:*15*
175:*10*  194:*13*
198:*17*  222:*18*
233:*22*  243:*22*  248:*7*
276:*8*  280:*18*  289:*12*
290:*8*  293:*14*  302:*8*,
*16*  303:*3*  309:*13*, *16*
333:*5*

**talking**  9:*9*  11:*5*
19:*1*  29:*23*  60:*1*
66:*9*, *10*, *25*  78:*6*
82:*4*  85:*13*  98:*6*
100:*13*  105:*16*
111:*13*, *14*  112:*5*
121:*15*  134:*25*  135:*3*
143:*12*  145:*18*
146:*16*  148:*3*  149:*12*
162:*2*  173:*10*  182:*17*
203:*1*  206:*23*  235:*19*
236:*12*, *25*  241:*21*
270:*25*  271:*7*  272:*6*
273:*13*  275:*11*
278:*17*  279:*17*  282:*8*
290:*9*, *10*, *17*, *18*
294:*7*  301:*23*  313:*14*
321:*19*  333:*7*

**talks**  78:*9*  105:*2*
**tallied**  211:*17*  277:*8*
**tally**  284:*8*
**target**  127:*6*
**targeted**  334:*4*
**tasks**  45:*4*  64:*15*
**taught**  55:*13*, *14*, *17*
56:*14*, *16*  57:*9*, *19*
59:*8*, *10*, *12*  60:*11*, *13*,
*20*

**teach**  54:*5*, *7*, *19*, *22*
56:*8*, *10*, *12*, *25*  57:*4*
58:*13*  59:*4*, *16*, *18*
60:*17*

**teacher**  157:*22*  192:*9*
**teaching**  21:*25*
44:*17*  53:*18*, *19*, *23*

56:*1*, *3*, *5*  57:*22*, *24*
140:*5*  173:*20*, *25*
174:*7*, *18*  178:*18*, *19*
192:*9*  217:*10*  234:*20*
248:*22*, *24*

**team**  63:*22*  126:*18*
177:*10*
**teams**  63:*18*  148:*13*
**tease**  36:*24*  160:*5*
**tech**  83:*18*
**technical**  163:*10*
**technically**  183:*24*
**technician**  5:*12*
**technique**  126:*23*
**techniques**  48:*2*
49:*11*  51:*21*, *24*
52:*25*  103:*14*  110:*2*
160:*9*  175:*16*, *17*
201:*19*

**technological**  316:*25*
**technologies**  85:*8*
**technology**  46:*25*
50:*23*  88:*19*  329:*23*
**tedious**  225:*3*
**telephone**  13:*9*
**television**  333:*25*
**tell**  17:*12*  34:*25*
35:*5*  36:*12*, *19*  37:*6*,
*9*, *16*  61:*9*  69:*8*
70:*11*  85:*6*  90:*20*
95:*8*  97:*25*  104:*15*
106:*11*, *15*, *19*, *21*
143:*6*  151:*24*  158:*21*
159:*22*  205:*18*  213:*2*
223:*14*  231:*12*
233:*18*  241:*11*  243:*6*,
*9*  244:*4*  246:*23*
247:*5*, *11*  254:*8*
261:*3*  271:*24*  274:*3*,
*11*, *15*  275:*13*  279:*13*
321:*3*  326:*1*, *9*  330:*3*
334:*10*

**telling**  57:*4*  61:*16*
**tells**  98:*20*  248:*18*
**ten**  84:*9*, *11*, *15*
86:*10*, *11*  141:*21*, *22*
165:*25*  173:*3*  200:*1*
256:*8*  257:*19*
**tend**  171:*5*  201:*14*

310:*22*
**tends**  130:*2*  278:*12*
**tens**  209:*10*, *19*
210:*6*  212:*24*  213:*1*
295:*22*
**tenth**  173:*4*
**term**  28:*11*  59:*21*
63:*25*  79:*22*  92:*22*
93:*8*, *11*, *18*, *24*
107:*11*  128:*16*, *20*, *21*,
*22*  129:*6*, *19*  134:*5*
155:*3*  161:*19*  173:*9*
183:*5*  194:*19*  239:*14*
287:*22*  301:*8*  320:*3*
**terminology**  78:*3*
137:*12*  155:*6*
**terms**  25:*12*  40:*19*
44:*12*  47:*16*  50:*15*
52:*6*, *7*  59:*25*  62:*3*
63:*9*  67:*1*  76:*4*
79:*13*  86:*2*  101:*7*
106:*8*  110:*6*  112:*14*
114:*24*  117:*10*
121:*18*  124:*3*  145:*21*
173:*11*  179:*12*, *24*
180:*2*, *5*  192:*19*
197:*6*, *21*  200:*8*
218:*20*  232:*6*  293:*7*
302:*18*  321:*5*
**test**  65:*13*
**tested**  62:*9*
**testified**  5:*22*  7:*4*
230:*16*  261:*2*  319:*24*
**testifying**  228:*10*
**testimony**  6:*14*  8:*11*,
*24*  9:*1*  16:*4*  18:*20*
20:*21*, *23*  78:*10*
137:*19*  152:*6*  161:*8*,
*12*  163:*19*  194:*5*
226:*8*, *15*, *21*, *25*
229:*3*  230:*20*  307:*1*,
*16*  327:*21*  337:*13*
**Testing**  63:*4*
**Text**  61:*2*  172:*11*
226:*12*  232:*24*
248:*10*, *15*, *17*, *19*, *21*,
*25*  319:*21*
**text-based**  65:*12*
**texts**  249:*10*

**Thank**  5:*25*  12:*21*
15:*15*  55:*10*  107:*16*
122:*2*, *5*  144:*17*, *19*
167:*8*  245:*24*  265:*15*
279:*4*  305:*5*, *14*
335:*7*
**Thanks**  155:*8*
**theoretically**  139:*14*
209:*5*  334:*14*
**therapy**  118:*15*
**thing**  26:*9*  29:*1*
31:*6*, *25*  65:*15*  76:*1*
84:*1*  85:*11*  88:*12*
113:*22*  115:*25*
153:*15*  178:*6*  183:*14*
186:*24*  203:*16*
207:*24*  234:*1*  266:*1*
323:*3*, *4*, *22*  325:*13*
**things**  17:*23*  26:*8*
28:*15*, *23*  33:*25*  60:*9*
61:*3*, *14*  65:*3*, *13*
67:*1*  75:*23*  82:*2*
96:*17*  98:*21*  99:*5*
101:*16*  102:*16*  106:*7*
113:*6*, *23*  115:*13*
127:*9*  135:*4*  152:*22*
164:*7*  177:*11*  181:*4*
195:*9*  201:*3*, *10*
202:*12*  204:*21*
206:*24*  235:*17*
288:*24*  289:*1*  296:*8*
305:*23*  307:*13*, *24*
311:*2*  315:*8*
**think**  6:*20*  7:*13*, *24*
8:*7*, *11*  13:*1*  17:*2*
19:*17*  20:*4*  24:*7*
26:*25*  31:*13*  44:*24*
49:*19*  52:*13*  62:*23*,
*24*  63:*13*  66:*2*, *8*
67:*11*  68:*23*  69:*19*
73:*18*  74:*24*  76:*25*
77:*9*  80:*9*  86:*3*  87:*7*,
*10*  89:*19*  90:*13*  91:*2*
92:*24*  94:*25*  95:*5*
96:*14*  98:*11*  105:*14*
106:*24*  115:*1*  121:*19*
122:*19*  127:*14*  130:*9*
133:*18*, *20*  135:*22*
136:*3*, *5*, *23*  137:*7*
138:*6*, *23*  139:*3*, *8*, *10*,

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 381 of 402
Page ID #:2736

Deposition of John Chandler, Ph.D.                    Merkell, et al. v. University of Southern California and 2U Inc.

14 140:*3* 142:*8, 16*
148:*1* 155:6, *13*
156:*3, 13, 16, 21, 23*
157:7 158:*1, 5, 20, 23*
159:5, 25 160:*23*
171:*16* 178:*3* 180:22
182:*12, 13* 186:*20*
189:*21* 190:*1, 20, 23*
193:*17* 194:*24* 195:*3*
198:*17* 200:*15, 25*
201:6, *10, 22* 202:7
212:*1* 215:*3* 217:6
218:6, *8* 219:*1, 3, 7,*
*14* 221:*2, 21, 25*
222:*1, 3, 17* 223:*1, 4,*
*10* 225:5 229:5
230:8, *11, 19* 232:15
242:*8* 249:5 253:*11*
262:*23* 263:*5* 264:*7,*
*18* 266:*18* 270:*15*
272:*11, 15* 276:6
284:*13* 285:25
288:*24* 290:*14* 292:*4,*
*6, 11, 19* 297:*11*
304:*17* 305:24
309:*16* 314:7 322:*7,*
*8* 324:*14* 325:*1*
326:*3* 328:*23, 25*
329:*3* 333:2

**thinking** 27:*11*
47:*11* 86:25 100:*20*
105:*19* 132:*23, 24, 25*
136:7 187:*5* 220:9
319:*10*

**thinks** 319:*16*

**third** 39:20 40:7
71:5, *21* 76:7 102:6
117:*23* 123:20 124:*3*
155:*22* 178:*23*
190:22

**THIS____DAY** 340:*1*

**thorough** 16:9

**thought** 35:*14* 89:*3*
94:*12, 17* 135:*14*
149:7 151:2 181:*13*
212:*13* 217:15

**thousand** 91:9
177:25 213:*19*

**thousands** 204:*12*
209:*10, 19* 210:6

212:25 213:*1* 269:24
270:5 295:22

**thread** 293:*10*

**three** 6:*23* 7:6, 25
8:25 9:2, *3* 12:*14, 25*
13:2 47:*21* 70:17
74:*13, 22* 75:*10, 17*
88:*21* 119:*12, 17*
133:*24* 141:5 188:*11*
224:7 316:*23* 317:*5,*
*6, 14*

**three-plus** 274:7

**thrown** 58:*3*

**Thursday** 1:*16* 2:2
340:*1*

**tier** 118:*21* 154:*5, 22*
155:*10*

**time** 4:*8* 5:*3* 10:*23*
11:*10* 12:*8, 12* 30:*7,*
*23* 34:*18* 35:*13*
38:*10, 21* 39:*1* 40:*19*
43:*14* 48:*17* 51:*21*
56:*2, 4* 72:*2* 74:*14*
77:*2* 78:*17* 82:*20*
83:*17* 86:*11* 98:*19*
99:*5* 101:*23* 117:*7*
119:*25* 127:*5* 133:*19*
138:*11, 12* 140:*8, 13*
144:*2, 8, 15* 159:*4*
165:*17* 168:*21*
188:*12* 196:*16*
200:*24* 207:*23*
215:*16* 238:*16* 239:*5,*
*16* 243:*10, 19* 246:*14*
247:7 252:*18* 254:*6,*
*15* 256:*16* 257:*10, 14*
262:*21, 22* 263:*1*
267:*8* 269:*25* 270:*11*
273:*8, 16, 23* 274:*23*
275:*25* 296:*4* 297:*24*
298:*5, 13* 302:*4*
303:*10, 18* 305:*5*
309:*12, 16* 324:*10, 11*
335:*8* 336:*5*

**time-consuming** 225:*3*

**timekeeper** 36:*18*

**timeline** 276:*12*

**times** 7:5 9:*3* 32:*16*
58:*10* 74:*4, 9* 75:*3*
77:*18* 84:9 86:*11*

89:*15* 100:*11* 174:*25*
177:*13* 204:*11* 206:*5,*
*6* 227:*14* 298:*7*
331:*16*

**tiny** 122:*14*

**title** 59:*12*

**today** 5:*12, 15* 7:*4,*
*12* 9:*22* 10:*13* 12:*3*
17:*12* 49:*20* 50:*17*
58:*18* 83:6 126:*21*
182:*18* 286:*7*

**Today's** 5:2 11:*24*

**told** 212:*1*

**tons** 207:*16*

**tool** 32:*24* 64:*7, 8*

**tools** 46:*15* 52:*17*
89:*10* 124:*25* 145:2

**top** 92:*19, 22* 93:*8,*
*18, 24* 94:*13, 18* 95:6
103:*9* 104:*8* 118:*2,*
*12* 119:*10* 120:*1, 2*
135:*17, 22* 148:*6, 9,*
*18* 149:*17* 151:*17*
152:*24* 166:*23*
170:*17, 23* 171:*15*
173:*1* 179:*4, 7, 8*
180:*16, 24* 188:*1*
192:*13, 18* 198:*7*
208:*25* 209:*15*
211:*12* 239:*9, 11, 14,*
*18* 240:*9, 17, 25*
242:*18* 245:*14, 18*
248:*24* 249:*8* 257:*20*
260:*8* 263:*6* 274:*20*
280:*9* 298:*8, 11, 18*
307:*13, 20* 308:*1, 5*
310:*19, 25* 312:*4, 20*
320:*3, 13, 18* 321:*1*

**topic** 92:*9* 122:*19*
194:6 198:*4* 205:*24*

**total** 6:*23* 38:*8*
40:*15* 42:*4* 67:*12*
97:*4* 208:*22* 214:*19*
241:*14* 243:*11*
320:*16*

**totality** 102:*9* 138:*7*
324:*23* 325:2

**totally** 122:*8* 217:*23*

**touch** 47:*3, 15* 48:*10*
49:*13* 52:*18* 60:*20*

68:*12* 69:*13, 14*
99:*10, 14, 19, 22*
100:*16* 186:*23* 187:*3*
217:8 218:*16* 324:*24*
325:*15* 331:*11*

**touches** 69:*19*

**tout** 251:*3*

**touted** 259:*13*

**touting** 233:*4*

**town** 117:*20*

**track** 38:*21* 85:9
183:9 186:*3, 11*
333:*16*

**trackable** 211:*5*

**tracked** 76:5 183:*19*

**tracking** 169:*20*
235:*21*

**traditional** 73:*16*
333:*24, 25*

**traditionally** 88:*5*

**traffic** 76:22 77:*1*
184:*4, 8, 11* 189:7
207:22 236:*14* 243:*7,*
*9, 18* 244:*14, 23*
246:24

**trafficked** 207:*14, 16*

**training** 129:*3*

**transacting** 61:*1*
101:*1*

**transaction** 174:*13*
176:*3*

**transactions** 201:7

**transcript** 11:*3* 18:*1,*
*2, 12* 19:16 33:25
219:*24* 340:*1*

**transcripts** 18:*12*
19:*19, 24*

**translate** 77:*16*

**travel** 77:*4*

**trend** 102:*17*

**trial** 4:*8*

**trials** 52:*1*

**trickier** 79:*13*

**tricky** 73:*14*

**tried** 23:*24*

**triggers** 83:*15* 160:*13*

**Trojan** 164:*14*

**true** 33:*18* 39:*12*
85:*22* 87:*10* 90:*12*
93:*4* 129:22 144:*4*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 382 of 402
Deposition of John Chandler, Ph.D.                                    Page ID #:2737 Iovell, et al. v. University of Southern California and 2U Inc.
Page ID #:2737

145:*15*  152:*1*  158:*18*
161:*11*  227:*12*
269:*18, 20*  278:*4*
337:*13*
**truly**  90:*11*  200:*6*
330:*16*
**truthful**  10:*1*
**try**  13:*23*  30:*21*
48:*2, 9*  58:*7*  71:*25*
80:*4*  88:*25*  119:*4*
145:*22*  149:*4*  150:*19*
283:*4*
**trying**  26:*24*  27:*9*
47:*18*  54:*25*  55:*7*
60:*5*  65:*6, 8*  69:*9*
80:*16*  95:*3*  101:*6*
102:*9*  112:*17*  133:*2*
177:*14*  179:*23*  180:*2*
215:*5*  260:*16*  267:*7*
272:*22*  286:*4*  297:*3*
301:*10*  305:*18*  313:*1*
314:*11*
**tuition**  112:*21*
198:*19*  199:*13*
**Turk**  64:*13*
**turn**  89:*2*  91:*10*
99:*6, 8*  111:*3*  178:*9*
191:*9*  305:*11*
**turns**  33:*12*
**Tweet**  258:*20*  259:*8*
266:*15, 24*  268:*21*
272:*12*  315:*10*  316:*1*
**Tweeted**  271:*10*
**Tweeter**  315:*12*
**Tweets**  268:*18, 19*
271:*16*  315:*15, 17, 18,*
*21*
**twice**  22:*2*  59:*12*
**Twitter**  135:*6*
214:*14, 19*  251:*4, 11,*
*23*  252:*7*  253:*10*
254:*1, 4*  255:*25*
256:*1, 11*  258:*8*
260:*18*  261:*18*
262:*17, 21*  263:*7, 11,*
*15, 16*  266:*9, 20, 25*
267:*12*  269:*5*  270:*9,*
*14*  272:*7*  273:*1, 7*
277:*23*  279:*7*  315:*3,*
*5, 10, 18, 20*  327:*25*

**two**  6:*22*  7:*16*  8:*12*
15:*14*  24:*10*  33:*17*
69:*14*  70:*24*  122:*21*
158:*20*  177:*5*  188:*11*
189:*23*  212:*23*  231:*1,*
*3*  232:*1*  248:*6*  268:*3*
290:*11*  291:*3*  304:*8,*
*16, 21*  316:*22*  317:*21*
322:*5*
**two-way**  95:*1*
**two-year**  239:*16*
**Tycko**  23:*10, 13*
25:*1*  35:*9, 20*
**type**  23:*8*  76:*6*  92:*6*
113:*20*  115:*17*
137:*12*  204:*24*
220:*15*  250:*4*  277:*8*
283:*20*  317:*2*  319:*12*
**typed**  164:*16*  186:*5*
**types**  49:*1, 13*  67:*18*
86:*19*  103:*4*  115:*18*
160:*11*  231:*1, 3*
232:*2*
**typically**  32:*20*
55:*22*  64:*11*  81:*18*
89:*1*  100:*15*  102:*6*
172:*14, 22*  175:*9*
182:*15*  183:*3*  185:*17*
193:*8*  223:*4*  239:*11*
288:*6*  310:*19*
**typing**  183:*10*
186:*13*  222:*20*

**< U >**
**U.S**  77:*23*  129:*15*
148:*10, 22*  149:*18*
179:*4*  192:*14*  195:*1,*
*5*  197:*6*  220:*14*
239:*12, 14*  258:*23*
308:*3*  309:*7*  311:*9*
**ultimate**  47:*20*
**ultimately**  25:*21*
112:*10, 15*  148:*17, 19*
160:*21*
**umbrella**  154:*17*
**UMT.edu**  207:*2*
**unable**  99:*16*  246:*23*
278:*23*
**unaided**  101:*8*

**unassigned**  184:*18*
185:*2*  218:*9*
**unclear**  7:*19*  8:*8*
157:*1*  185:*23*  324:*4*
**uncommon**  225:*3*
314:*8*
**uncovering**  111:*25*
**undergoing**  45:*13*
**undergrad**  253:*19*
**undergraduate**  53:*11*
116:*4*  117:*12*  286:*18,*
*23*  287:*16, 23*
**undergraduates**
117:*12*  118:*8*  202:*10*
**undermine**  26:*13*
**underneath**  317:*7*
**underscore**  34:*11*
**underserved**  112:*20*
**understand**  7:*13, 15*
10:*2*  11:*7, 16*  20:*6*
25:*18*  27:*9*  28:*10*
30:*21*  46:*13*  57:*12*
60:*5*  61:*11, 18*  63:*9*
68:*25*  78:*3*  107:*15*
124:*16*  129:*6*  132:*18*
134:*5*  145:*7*  173:*23*
175:*21*  181:*14*
226:*17*  265:*23*
296:*16*  301:*10*  305:*8*
312:*1*  313:*1*  318:*5*
320:*1*
**understanding**  9:*22*
22:*16*  24:*19*  59:*20,*
*24*  86:*4*  102:*12*
123:*11*  127:*1*  128:*23*
132:*13*  139:*23*  161:*6,*
*15*  162:*8*  226:*7*
259:*2*  287:*20, 21, 24*
301:*7*  308:*4*  315:*9*
319:*19*  320:*23*
322:*14, 23*  325:*12*
329:*22, 25*  330:*2, 3*
**understands**  229:*8*
**understood**  10:*10*
44:*8*  72:*7*  93:*18, 23*
107:*13, 19, 25*  108:*1*
**undoubtedly**  215:*12*
**unearthing**  29:*17*
**unemployment**

102:*11, 13*
**unequivocal**  220:*9*
**unethical**  142:*4*
**unfortunately**  113:*18*
244:*11*  247:*15*
278:*23*  301:*17*
**unhelpful**  10:*7*
**uniformity**  44:*1, 3*
**unique**  49:*23*  50:*2,*
*11*
**unit**  37:*1, 9, 16, 21*
**UNITED**  1:*1*  5:*8*
**universally**  92:*21*
93:*2*
**universities**  118:*22*
125:*6*  126:*11*  146:*24*
147:*2*  148:*7*  292:*17*
**UNIVERSITY**  1:*8*
5:*7*  45:*24*  53:*20*
54:*6, 8, 11, 20, 23*
55:*6, 8*  56:*4, 5, 9, 15,*
*24*  57:*5, 21*  58:*19*
59:*2, 9, 11, 13*  60:*16*
98:*7*  110:*8, 13*
112:*16*  113:*13*
115:*11*  116:*2, 18, 24*
117:*8, 21*  118:*19*
120:*7*  123:*2, 6, 7, 10*
124:*5, 19*  125:*22, 23*
126:*1, 2*  127:*25*
145:*8*  146:*21*  148:*18,*
*20, 21*  154:*20*  155:*1,*
*13*  193:*9*  201:*8*
202:*9*  253:*18*  254:*24*
255:*8*  262:*5, 7*
290:*12*  293:*6, 8, 15,*
*20*  294:*1*  303:*20*
**university's**  287:*8*
288:*21*
**university-wide**  116:*4,*
*8*  117:*2*
**unknown**  184:*7, 21*
**unlimited**  199:*19*
**unlucky**  82:*16*
**unmute**  120:*18*
**unpaid**  175:*19*  231:*3*
**unqualified**  287:*25*
**unquantifiable**  247:*16*
**unrelated**  102:*18*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 383 of 402
Page ID #:2738

Deposition of John Chandler, Ph.D.    Campbell, et al. v. University of Southern California and 2U Inc.

**unreliable** 291:*22*
292:*12*
**unstructured** 61:2
**unsubscribe** 222:8
223:*22* 224:*1*
**Unsurprisingly** 254:2
**unusual** 37:*1*
**upcoming** 267:*4*
**update** 84:*18* 230:*16*
**updated** 275:8
**upper** 312:*15*
**upstream** 48:*20*
**urban** 154:6
**urge** 11:*19*
**URL** 100:8 182:*17,
23* 183:*18, 25* 186:5
222:*20* 239:5 240:*19*
243:8 244:*19* 249:*11*
282:*17, 19, 20, 22*
**URLs** 183:*20* 186:*12*
238:*15, 23* 246:8
**Uruguay** 55:9 56:*12,
25* 57:5
**usage** 136:*20* 239:*21*
298:*21*
**USC** 18:22, *25* 19:*20*
20:8 25:*18* 37:*14*
52:*16* 94:*11* 95:*21*
96:*4, 11* 97:*12* 103:8,
*25* 104:*11, 17* 107:5
108:*15, 16* 131:6
134:2, *15* 138:*3*
144:*25* 145:7, *13*
151:7 154:*4, 11*
161:*10* 164:*14*
169:*12* 170:7 171:*18*
178:*19* 179:*17*
193:*13* 194:*16* 195:*1,
6, 12* 197:*1, 12, 18*
198:*18, 22* 199:*12*
202:*19* 203:*24* 212:7,
*17* 214:*11, 20* 216:*14*
222:*12, 19* 232:*22*
233:*4, 12* 235:2
241:*21, 22* 244:*20*
245:6 246:*1* 247:*25*
251:*3* 252:*3* 258:*20*
259:*13, 22* 261:*10, 11*
266:6 269:9 270:*18*
271:*11* 272:7, *9*

273:*1* 275:6, *14*
279:*23* 280:*1, 3, 4, 18,
22, 24* 281:*1, 6, 16*
282:*12* 285:*11, 22*
286:*14* 291:*21*
292:*22, 25* 294:*15*
295:*11* 297:*23* 300:7
303:*17* 308:7, *19*
311:9 326:2 327:*12*
331:6 340:*1*
**USCGlobalEdD** 267:2
**USCRossier** 251:*13*
253:9 258:9, *22*
261:*11* 271:*24*
**USC's** 26:*3* 103:*23*
142:*3* 144:*13* 196:*1*
203:2 216:6 235:*19*
251:*1* 275:*22* 294:5
**use** 28:*11* 33:*1*
38:*22* 49:*11* 52:*17,
24* 57:*3* 64:*12* 69:*20*
73:*17* 76:*16* 97:5
99:*3, 7, 9* 102:*25*
103:*14* 108:8 124:*1*
128:5, *16* 131:*18*
132:*19* 133:*25*
136:*10* 160:*10* 171:2
176:*12* 181:*13*
182:*11, 12* 184:7, *25*
194:*14* 220:5 251:*1*
252:6, *10* 253:*21*
260:7 262:*13* 263:*21*
273:*20* 303:*11, 13, 21*
304:*10* 315:*3* 325:4
334:*18*
**user** 127:8 266:*20*
**users** 212:*14* 213:8
214:*4* 252:*12* 267:*10,
14* 269:5 272:7
273:*1, 8*
**user's** 83:*16* 172:7
**uses** 51:*20* 93:*11*
293:*15*
**usually** 63:*3* 64:6
67:7 80:*19* 90:5
98:*1* 250:*15*
**utility** 292:*16, 20, 25*
293:2, 5, 18, 24*
**utilized** 231:2

**< V >**
**vaguest** 129:9
**validity** 291:*25* 292:2
**valuable** 268:*18*
**value** 61:*15* 73:7
86:*18* 134:*10* 136:*10*
157:*1* 177:*14, 15*
288:9 297:*13* 301:*3*
**values** 73:*19*
**variation** 312:*12*
**varied** 67:*10* 231:*23*
298:*12* 300:*4* 331:*3*
**varies** 89:*16, 17*
139:7 231:*15*
**variety** 30:*14* 62:*25*
88:*18* 117:5 153:6
160:9 165:6 187:6
289:*17* 315:*17*
**various** 96:9 131:*12*
187:*10* 238:*16* 246:8
249:7 256:*10* 273:*16*
274:*1* 279:9 285:*18*
293:*15, 16* 294:8
307:*3*
**vary** 138:*22, 24*
**varying** 328:*14*
**vast** 185:5
**vector** 44:*1, 4, 21*
**vectors** 44:*23*
**verify** 18:7 238:*11*
265:*10* 270:7 295:*4*
**version** 181:7, *9, 10,
15, 19* 215:6 218:*4*
240:*15*
**versus** 5:7 6:*17*
7:*10* 187:*16* 197:*24*
214:9, *10* 241:*15*
254:*19* 298:*17*
325:*22*
**vice** 146:*21* 147:6
**Video** 3:*23* 5:*4, 11*
111:2 178:6, *10*
**VIDEOGRAPHER**
5:*1* 34:*19* 70:5, *8*
130:*18, 21* 162:*22*
163:*3, 6* 168:*15, 18,
25* 169:*3* 215:*22, 25*
257:*23* 258:*1* 304:*24*

305:2 316:9 326:*20,
23* 335:*12* 336:*1*
**VIDEOTAPED** 1:*14*
21:*11*
**view** 86:*20, 21*
182:*20* 196:*3* 206:2,
*15* 207:*15, 17* 243:*4*
254:*3*
**viewed** 92:*17* 134:*22*
311:*3, 5*
**viewing** 80:6
**views** 77:*16* 80:*21*
82:*13* 83:2 205:*17*
206:*3, 14* 207:*3*
208:*1, 22* 315:*10*
**violate** 10:*24*
**virtually** 96:7
184:*25* 221:2 225:*16*
301:*14* 326:5 332:*1,
12*
**visible** 311:*16* 313:*12*
**visit** 183:*1* 207:9
239:*14* 243:*13*
249:*13* 311:22
**visited** 159:*4* 183:8
206:*4, 7* 208:6, *8*
236:*10* 237:*3, 11, 19*
238:*4, 23* 241:*12*
243:*24* 244:*15, 24*
247:6 314:*1* 322:*19*
**visiting** 55:5 85:*16*
87:*15* 187:*10*
**visitor** 161:*18*
**visitors** 99:6 205:*25*
238:*1* 244:*4, 5*
**visits** 83:*10, 14*
204:*21* 206:6, *11*
207:*10* 239:*1* 241:*14*
243:*12*
**visually** 85:*15*
**volition** 267:*14*
**volume** 30:*22* 88:*11*
174:2, *23* 180:*11, 16*
**VP** 116:*17*
**vs** 1:7

**< W >**
**wait** 10:*19, 21* 304:*23*
**waiting** 225:*13*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 384 of 402
Page ID #:2730

Deposition of John Chandler, Ph.D.
Cantrell, et al. v. University of Southern California and 2U Inc.

**waived** 4:*4*

**walked** 325:*7*

**walled** 83:*12*

**want** 9:*21* 24:*1*
62:*14*, *15* 90:*16*
92:*15* 94:*16* 124:*16*
131:*3* 141:*15* 142:5
144:*20* 146:5 149:*10*
165:*20* 169:*10*
175:*24* 179:*11*
192:*21* 194:*12*
196:22 207:*25*
208:*11* 216:*4*, *21*
218:*1* 225:7 233:*17*,
*21* 247:*23* 277:*13*
279:5 299:*19*, *21*
302:*17* 304:*18*
305:*20* 307:*17*
314:*14* 315:2 317:*10*
321:*18* 329:*21*

**wanted** 97:6 107:*18*
116:5 121:7 164:*15*
181:*11* 200:*23*
239:*13* 290:7 313:7,
*9*

**wants** 222:*19*

**Washington** 3:7
45:25 53:*20* 54:6, *8*
126:*1*

**wasted** 91:*1*

**way** 25:*14* 26:2, *13*,
*25* 27:*10* 28:*10* 44:*3*
50:*15* 69:*1*, *20* 83:6
85:*18* 86:*25* 87:*1*, *25*
88:2 95:5 100:*12*
104:*8* 105:2, *16*
111:*1* 126:*20* 129:*10*
131:*20*, *21* 135:2
136:*4*, *25* 138:*9*, *13*
142:*17* 143:*16*
145:*12* 150:*19*
157:*23* 158:2 169:*20*
175:*15* 182:*11*, *15*
185:6 186:2 187:*12*
188:*3* 194:*8* 197:*18*,
*20* 211:*4* 219:*4*, *9*
229:*9* 230:*24* 243:2
244:*4* 251:22 252:*23*
260:*17* 276:7 285:*14*,
*24* 290:7 292:*21*

**Wayback** 242:*20*, *23*

**ways** 25:*18* 26:*23*
60:5 67:6 71:*17*
96:*9* 97:*19* 98:*25*
104:*4* 106:*3* 158:*21*
159:*8* 165:6 175:*23*
302:*12* 311:*23*
315:*17*

**wealth** 288:*11*

**Web** 47:*14* 80:22
87:*15* 176:*21* 184:*9*
187:*15* 207:*19* 237:*3*,
*17* 238:*13*, *23*, *25*
242:2 244:*10*, *24*
247:7, *17*, *21* 249:*13*
308:5 309:*21* 310:*14*

**website** 45:7 50:*10*
79:*24* 83:*11*, *14*
86:*10* 183:*16*, *17*
184:*10*, *22* 185:7
187:*11* 189:*9* 205:*1*,
*2*, *5*, *12*, *15*, *25* 206:*11*,
*16* 207:*9* 209:6
243:6, *22* 244:*8*
246:2, 7, *24* 264:*3*, *8*,
*9*, *17* 265:*3*, *4*, 7
294:*25* 295:*21*, *24*
296:2, *3* 297:*9*, *13*
308:*14*, *15* 310:7, *15*
327:24

**websites** 131:*13*
187:*21* 206:*10*
208:*23* 235:*20* 247:7
278:*18* 301:*23*
323:*19*

**weeds** 64:*18* 68:*24*
69:*1*

**week** 51:*15* 55:*23*
56:*15* 209:*4*

**weeks** 209:*4*

**welcome** 146:*12*
220:22, *24* 221:*12*, *15*,
*18* 223:8, *12*, *15*, *20*
226:2, 6, *13* 229:*18*,
*20* 230:*12* 231:22

**welcoming** 228:22

**well** 20:7 29:*14*
32:*11* 42:*12* 55:*11*
129:*25* 139:*10* 156:*4*
164:*23* 173:*14*
174:*12* 183:22
184:*18* 185:*8* 201:*17*
204:*8* 205:*11* 220:*12*
224:*4*, *18*, *19* 227:*1*
236:22 238:*9*, *20*
263:*4*, *25* 276:*16*
286:*25* 287:*17* 288:*3*
296:*18* 301:*8* 325:*23*
335:7

**well-established**
310:*17*

**went** 72:*4* 144:*3*
161:*17* 185:*14*, *18*
196:*12* 204:*10* 210:*1*,
*4* 220:22 224:*18*
232:*13* 235:*4*, *8*
246:7 283:*4* 294:22
299:*12* 308:*13* 313:2

**we're** 11:*1* 36:*9*
43:*11* 59:*25* 60:*1*
62:*15* 66:*9* 69:*11*
107:*10* 121:*14*
143:*12* 179:*16*
186:*20*, 22 190:*1*
209:*19* 218:*1* 235:*19*
243:*4* 254:7 257:*4*,
*11* 273:*12* 278:*17*
281:2, *14* 294:5
299:5, *18*, *23* 306:*21*
311:7 320:*15*, *17*

**Western** 117:*20*
118:5

**we've** 18:*18* 69:*25*
122:*19* 124:*20* 142:7
169:*11* 215:*17* 248:7
257:*1* 272:*12* 284:*9*,
*21* 301:22, *24* 303:*3*
316:*20*

**wheel** 192:*23*

**WHEREOF** 337:*20*

**white** 89:*5*, *20* 181:*9*
187:*13* 218:*4* 311:*12*

**wholistic** 133:*8*

**wide** 30:*14* 88:*18*
147:*11* 160:*8* 200:*25*

**wildlife** 58:*1*

**willing** 122:6 172:*24*
177:7

**win** 265:*17*

**winnowed** 147:*10*

**wish** 113:*17*

**withdraw** 219:*14*
234:*4* 298:*3*

**witness** 5:*20* 12:*21*
18:25 21:*23* 43:7
122:*11*, *15* 146:7
166:2, *6* 178:*9*
200:*16*, *21* 257:6, *17*
304:22 335:*6*, *11*
337:*10*, *14*, *20* 338:*1*

**witnesses** 11:*21*

**witness's** 162:*24*

**wonder** 90:*17*

**Wonderful** 34:22
265:*13*, *14*, *19*

**wondering** 291:*1*

**Wood** 27:*25*

**word** 16:7, *22* 28:*24*
44:*20* 64:7 132:*19*
146:*8* 172:6 175:*14*
194:*14* 212:*23*
320:*12*

**words** 36:*18* 44:2, 7
57:*12* 80:*4* 98:*3*
106:6 113:*21* 172:6
194:*20*, *22* 212:*23*
237:*16* 296:*18*
298:*16* 318:*15*
320:*19*

**work** 14:*13* 22:*15*
23:*8* 28:*1*, 5, 7 29:*20*
32:*3* 35:*25* 36:6, *14*,
*21* 37:6 39:*15* 40:*14*,
*20* 41:*24* 44:*17*
48:*17* 50:7 54:*20*, *23*
61:*3*, *17* 63:6 66:*12*
68:*18* 70:*12* 75:*8*
88:*24* 89:*8* 93:*9*
98:*14* 101:*8* 108:*20*
116:*1*, *9*, *17* 123:*4*, *9*,
*10* 124:5, *10* 125:*8*
132:*12* 149:*9* 188:*3*
253:*24* 270:*14*
325:*23*

**worked** 24:*17*, *19*
25:*1*, 5 48:*24* 60:22

62:5, 11, 16  64:17
65:21  71:22  98:7, 9
125:3, 10, 13, 22, 24
148:13  177:10
193:13  201:9, 13
226:9
**working**  24:21  46:25
49:3, 5, 25  50:19
57:19  61:10  62:1
69:17, 18  72:14
98:10  116:2, 6
124:25  126:18
254:13
**works**  51:12  193:17
229:7  270:23  315:10
**world**  83:4  90:7
101:13  127:4  129:15
148:10, 22  149:18
179:4  192:15  195:1,
6  197:7  220:14
239:12, 15  291:21
308:3, 7
**worth**  193:6
**would've**  25:23
187:23  227:15  302:7
**wrap**  304:19
**wrinkle**  87:19
**write**  208:9
**writing**  33:19  89:5
262:21
**written**  31:15  73:4
123:15  203:19
229:19  259:16
266:19
**wrong**  8:13  238:2
290:20
**wrote**  38:10, 11
50:17
**Wyoming**  148:20, 22

**< X >**
**X.com**  261:20

**< Y >**
**Yeah**  44:14  57:17
62:10  78:11  98:5
111:11  115:7  121:17,
24  128:13  158:23
165:21  189:24  200:2

235:21  255:10  257:6
281:22  298:3
**year**  9:12  100:3, 4
111:21  113:15  115:6
171:6  177:11  209:2
226:21  240:4  294:10,
11, 16  295:23
**year-round**  55:21
**years**  45:21  50:20
55:16  56:19  62:12,
22  63:20  66:13
67:17  98:8  125:8
194:16  200:1  218:22,
25  230:6  274:7
294:8
**yesterday**  12:5  13:6
**York**  2:10  337:3, 5, 8
**youthful**  225:23
**Yup**  306:19

**< Z >**
**ZARNOWSKI**  1:2
**Zavareei**  23:11, 13
25:2  35:9
**zero**  186:18  218:6
324:10, 11  326:4
**ZOOM**  2:8  13:9, 11

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 386 of 402
Page ID #:2741
Deposition of John Chandler, Ph.D.    Howell, et al. v. University of Southern California and 2U Inc.

## WORD LIST

**< $ >**
**$15,015.60** *(1)*
**$2,056.50** *(1)*
**$25,000** *(1)*
**$3,987.75** *(1)*
**$50,000** *(1)*
**$53,000** *(1)*
**$773.40** *(1)*

**< 0 >**
**004** *(1)*
**00846-GW-MAR** *(1)*

**< 1 >**
**1** *(13)*
**1,000** *(1)*
**1.12** *(2)*
**1:20** *(1)*
**1:31** *(1)*
**1:34** *(1)*
**1:42** *(1)*
**10** *(10)*
**10,000** *(2)*
**10:00** *(1)*
**10:03** *(1)*
**10:36** *(1)*
**100** *(2)*
**100-year** *(1)*
**1015** *(1)*
**103** *(1)*
**104** *(1)*
**105** *(1)*
**106** *(1)*
**1074** *(5)*
**1075** *(4)*
**1076** *(14)*
**10763** *(1)*
**10764** *(1)*
**1077** *(4)*
**1078** *(16)*
**1079** *(5)*
**108** *(2)*
**1080** *(4)*
**1081** *(5)*
**1081,2015** *(2)*
**1082** *(9)*
**109** *(1)*

**10th** *(2)*
**11** *(4)*
**11:00** *(1)*
**11:12** *(1)*
**11:24** *(1)*
**111** *(5)*
**1129** *(1)*
**115** *(2)*
**116** *(2)*
**12** *(3)*
**12,000** *(1)*
**12:36** *(2)*
**12:48** *(1)*
**122** *(1)*
**125** *(2)*
**126** *(1)*
**127** *(1)*
**129** *(1)*
**12th** *(2)*
**13** *(7)*
**130** *(2)*
**131** *(2)*
**134** *(1)*
**135** *(3)*
**14** *(7)*
**1400** *(1)*
**142** *(2)*
**145** *(1)*
**148** *(1)*
**149** *(1)*
**15** *(10)*
**150** *(1)*
**151** *(3)*
**15th** *(1)*
**16** *(10)*
**160** *(1)*
**165** *(1)*
**166** *(1)*
**167** *(1)*
**168** *(1)*
**169** *(1)*
**16th** *(3)*
**17** *(6)*
**17,000** *(2)*
**17,376** *(1)*
**170** *(2)*
**17-'18** *(1)*
**172** *(2)*
**173** *(2)*

**176** *(1)*
**1761** *(1)*
**1762** *(1)*
**178** *(1)*
**179** *(1)*
**18** *(6)*
**180** *(1)*
**181** *(1)*
**18-'19** *(1)*
**182** *(2)*
**184** *(3)*
**185** *(2)*
**186** *(3)*
**187** *(1)*
**188** *(1)*
**189** *(1)*
**19** *(4)*
**190** *(1)*
**192** *(2)*
**194** *(1)*
**1996** *(1)*
**1998** *(1)*
**1999** *(2)*
**19th** *(1)*
**1st** *(2)*

**< 2 >**
**2** *(7)*
**2,606** *(3)*
**2:23-cv-00846-GW-MAR** *(1)*
**2:31** *(1)*
**20** *(20)*
**200** *(2)*
**200,000** *(1)*
**20005** *(1)*
**2007** *(2)*
**2008** *(2)*
**2009** *(1)*
**201** *(1)*
**2010** *(2)*
**2012** *(2)*
**2013** *(11)*
**2014** *(2)*
**2015** *(9)*
**2016** *(12)*
**2017** *(26)*
**2018** *(17)*
**2019** *(10)*

**2020** *(13)*
**2021** *(9)*
**2022** *(5)*
**2023** *(3)*
**2024** *(23)*
**204** *(2)*
**205** *(2)*
**21** *(4)*
**2121** *(1)*
**21-'22** *(1)*
**21st** *(2)*
**22** *(7)*
**22nd** *(3)*
**23** *(4)*
**24** *(5)*
**25** *(9)*
**250** *(2)*
**250,000** *(5)*
**26** *(2)*
**27** *(2)*
**29** *(3)*
**2U** *(79)*
**2U's** *(11)*

**< 3 >**
**3** *(8)*
**3:32** *(1)*
**3:43** *(1)*
**30** *(7)*
**30(b)(6** *(1)*
**300,000** *(1)*
**305** *(1)*
**30th** *(2)*
**31630** *(1)*
**33** *(1)*
**34** *(2)*
**364** *(1)*
**38** *(1)*
**38,000** *(1)*
**386** *(1)*
**39,000** *(1)*
**396** *(1)*
**398,000** *(1)*

**< 4 >**
**4** *(8)*
**4,4000** *(1)*
**4:34** *(1)*
**4:51** *(1)*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 387 of 402
Page ID #:2742
Deposition of John Chandler, Ph.D.    Brightwell, et al. v. University of Southern California and 2U Inc.

**40** *(3)*
**40,000** *(6)*
**40,000-plus** *(3)*
**409** *(1)*
**42** *(2)*
**42326** *(1)*
**42330** *(1)*
**43** *(2)*
**431** *(1)*
**44** *(1)*
**45** *(2)*
**46** *(2)*
**47** *(5)*
**48** *(1)*
**49** *(4)*

**< 5 >**
**5** *(7)*
**5:48** *(1)*
**5:52** *(1)*
**50** *(3)*
**50,000** *(1)*
**500** *(2)*
**51** *(2)*
**55** *(3)*
**559** *(2)*
**56** *(2)*
**57** *(1)*
**5th** *(1)*

**< 6 >**
**6** *(6)*
**6:19** *(1)*
**6:23** *(1)*
**6:35** *(2)*
**60** *(1)*
**600** *(1)*
**63** *(1)*
**64** *(1)*
**640,000** *(1)*
**66** *(1)*

**< 7 >**
**7** *(3)*
**7:35** *(1)*
**72** *(2)*
**75** *(1)*
**75,000** *(1)*
**750** *(1)*

**< 8 >**
**8** *(3)*
**8,000** *(2)*
**8,598** *(2)*
**80** *(1)*
**84** *(3)*
**891** *(1)*

**< 9 >**
**9** *(5)*
**90** *(1)*
**90067** *(1)*
**94** *(2)*

**< A >**
**a.m** *(5)*
**ability** *(7)*
**able** *(16)*
**absence** *(5)*
**absolute** *(5)*
**Absolutely** *(4)*
**acceptance** *(3)*
**accepted** *(7)*
**accepting** *(1)*
**access** *(14)*
**accessed** *(1)*
**accompanies** *(1)*
**accompany** *(1)*
**accomplished** *(1)*
**account** *(12)*
**accountancy** *(1)*
**accounts** *(2)*
**accurate** *(10)*
**accurately** *(3)*
**accused** *(1)*
**achieve** *(1)*
**achieved** *(2)*
**acknowledge** *(2)*
**acknowledging** *(1)*
**acquire** *(1)*
**acquired** *(1)*
**action** *(4)*
**actions** *(2)*
**activity** *(2)*
**actual** *(9)*
**ad** *(59)*
**added** *(1)*
**addition** *(4)*

**additional** *(3)*
**address** *(5)*
**addressability** *(2)*
**addressable** *(6)*
**addressed** *(1)*
**addresses** *(3)*
**adhered** *(1)*
**adjunct** *(1)*
**adjust** *(2)*
**adjustments** *(1)*
**administer** *(1)*
**administration** *(2)*
**administrative** *(2)*
**admission** *(1)*
**admissions** *(2)*
**admit** *(1)*
**admitted** *(1)*
**adopting** *(1)*
**ads** *(38)*
**adults** *(1)*
**advance** *(1)*
**advanced** *(2)*
**advertise** *(2)*
**advertised** *(2)*
**advertisement** *(11)*
**advertisements** *(10)*
**advertiser** *(8)*
**advertisers** *(14)*
**advertiser's** *(2)*
**advertises** *(1)*
**advertising** *(36)*
**advise** *(1)*
**advising** *(1)*
**affiliate** *(3)*
**affiliates** *(1)*
**affinity** *(1)*
**affirmatively** *(1)*
**affordability** *(1)*
**affordable** *(1)*
**afraid** *(1)*
**age** *(1)*
**agencies** *(9)*
**agency** *(2)*
**agents** *(2)*
**aggregate** *(17)*
**aggregating** *(1)*
**aggregators** *(1)*
**aggressively** *(1)*
**ago** *(8)*

**agree** *(22)*
**AGREED** *(5)*
**agreeing** *(1)*
**Agreement** *(5)*
**ahead** *(9)*
**AHMAD** *(2)*
**Aided** *(1)*
**aisle** *(1)*
**al** *(3)*
**Alaska** *(5)*
**alcohol** *(1)*
**algebra** *(2)*
**algorithm** *(6)*
**algorithms** *(1)*
**allege** *(3)*
**alleged** *(3)*
**allocate** *(2)*
**allow** *(3)*
**allowed** *(4)*
**allows** *(2)*
**alongside** *(1)*
**alum** *(2)*
**alums** *(4)*
**Amazon** *(1)*
**Amber** *(2)*
**amended** *(1)*
**amount** *(6)*
**amounts** *(2)*
**amplifying** *(1)*
**analogies** *(1)*
**analogy** *(2)*
**analyses** *(7)*
**analysis** *(28)*
**analytics** *(8)*
**analyze** *(2)*
**analyzed** *(11)*
**analyzing** *(10)*
**and/or** *(1)*
**Angeles** *(2)*
**angle** *(1)*
**angles** *(2)*
**announcement** *(3)*
**announcements** *(1)*
**annual** *(1)*
**anomalous** *(1)*
**anonymous** *(1)*
**answer** *(35)*
**answered** *(6)*
**answering** *(3)*

Case 2:23-cv-00846-GW-MAR   Document 144-2   Filed 09/13/24   Page 388 of 402
Page ID #:2743
Deposition of John Chandler, Ph.D.                    Bell, et al. v. University of Southern California and 2U Inc.

answers  *(4)*
anticipate  *(3)*
anticipated  *(1)*
anxious  *(1)*
Anyway  *(4)*
apart  *(1)*
Apologies  *(6)*
apologize  *(9)*
Apology  *(1)*
appear  *(14)*
appeared  *(4)*
appearing  *(4)*
appears  *(8)*
appendix  *(5)*
applicabilities  *(1)*
applicants  *(3)*
application  *(29)*
applications  *(2)*
applied  *(10)*
applies  *(4)*
apply  *(29)*
applying  *(4)*
appreciate  *(6)*
approach  *(5)*
approached  *(1)*
approximate  *(1)*
approximately  *(1)*
April  *(4)*
aQuantive  *(5)*
A-Q-U-A-N-T-I-V-E
*(1)*
Archive  *(8)*
area  *(2)*
areas  *(2)*
arrive  *(2)*
arrived  *(2)*
arrow  *(1)*
article  *(10)*
articles  *(5)*
asbestos  *(1)*
aside  *(2)*
asked  *(24)*
asking  *(7)*
aspect  *(4)*
aspects  *(4)*
aspersions  *(1)*
Assaf  *(2)*
assemble  *(4)*
assert  *(1)*

assertion  *(1)*
assess  *(7)*
assessment  *(7)*
assigned  *(1)*
assignment  *(11)*
assignments  *(5)*
assist  *(2)*
assisted  *(1)*
assisting  *(1)*
associate  *(1)*
associated  *(5)*
association  *(1)*
assume  *(6)*
assumption  *(3)*
asynchronously  *(1)*
Atlas  *(3)*
attempt  *(3)*
attempted  *(2)*
attempting  *(5)*
attend  *(1)*
attendant  *(1)*
attending  *(1)*
attention  *(2)*
attitudes  *(4)*
ATTORNEY  *(198)*
Attorneys  *(3)*
attract  *(1)*
attribute  *(1)*
attributed  *(5)*
attributes  *(2)*
attribution  *(14)*
attrition  *(1)*
auction  *(1)*
audience  *(21)*
audiences  *(3)*
August  *(9)*
authoring  *(1)*
authorized  *(1)*
availability  *(1)*
available  *(7)*
availing  *(1)*
Avenue  *(1)*
average  *(5)*
avoid  *(6)*
avoided  *(2)*
avoiding  *(1)*
aware  *(11)*
awareness  *(2)*

< B >
BA  *(1)*
back  *(44)*
background  *(1)*
backing  *(1)*
BACON  *(1)*
bad  *(2)*
ban  *(1)*
banner  *(1)*
bar  *(3)*
base  *(1)*
based  *(40)*
basic  *(1)*
basically  *(3)*
basing  *(5)*
basis  *(8)*
batches  *(1)*
Bates  *(5)*
battery  *(1)*
bear  *(1)*
beautiful  *(1)*
becoming  *(4)*
began  *(14)*
beginning  *(13)*
begins  *(2)*
begun  *(1)*
behalf  *(13)*
behavior  *(42)*
behaviors  *(1)*
belief  *(3)*
believe  *(67)*
believed  *(3)*
believes  *(1)*
bellwether  *(2)*
Ben  *(1)*
beneath  *(2)*
benefitted  *(2)*
Berkeley  *(1)*
best  *(16)*
better  *(9)*
better-paying  *(1)*
beyond  *(6)*
Big  *(6)*
bigger  *(1)*
bill  *(3)*
billboard  *(10)*
billboards  *(1)*
billed  *(1)*
billing  *(2)*

bills  *(1)*
Bing  *(4)*
biology  *(1)*
bit  *(29)*
black  *(2)*
blast  *(1)*
blended  *(1)*
blood  *(1)*
body  *(1)*
bolstered  *(1)*
bones  *(1)*
bookends  *(1)*
bookmark  *(1)*
books  *(1)*
Borrowing  *(1)*
bot  *(1)*
bothered  *(1)*
bottom  *(8)*
bounced  *(1)*
bounces  *(1)*
bound  *(3)*
bounds  *(1)*
bounty  *(1)*
bow  *(1)*
box  *(3)*
boxes  *(1)*
brand  *(7)*
branded  *(1)*
brands  *(2)*
break  *(17)*
breaks  *(1)*
bring  *(3)*
broad  *(5)*
broadly  *(2)*
broke  *(1)*
broken  *(1)*
brought  *(2)*
browser  *(5)*
browsers  *(1)*
BRYANT  *(126)*
Bu  *(1)*
Bud  *(1)*
budget  *(4)*
budgets  *(3)*
Budweiser  *(3)*
build  *(1)*
building  *(2)*
bullet  *(6)*
bulleted  *(1)*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 389 of 402

Deposition of John Chandler, Ph.D.    Page ID #:2744, et al. v. University of Southern California and 2U Inc.

bus  (1)
business  (29)
button  (8)
buy  (3)
buying  (1)
buys  (1)

< C >
cagey  (1)
calculate  (3)
calculated  (2)
calculating  (1)
calculations  (1)
calculus  (1)
CALIFORNIA  (13)
California's  (1)
call  (15)
called  (20)
calling  (1)
Calls  (1)
calm  (1)
campaign  (20)
campaigns  (31)
CAMPBELL  (77)
campus  (2)
campus-wide  (1)
candidates  (2)
candor  (2)
Cantwell  (3)
capabilities  (1)
capacities  (1)
capacity  (2)
Cappella  (2)
capture  (2)
captured  (5)
captures  (11)
capturing  (1)
car  (1)
card  (1)
care  (3)
career  (4)
careers  (1)
careful  (2)
carefully  (1)
carried  (1)
carries  (1)
carry  (1)
cars  (2)
cart  (1)

Case  (69)
cases  (18)
cast  (1)
casting  (1)
casual  (1)
catch  (1)
categories  (2)
category  (5)
caught  (2)
cause  (1)
caused  (3)
cautious  (1)
celebrates  (1)
celebrating  (1)
Center  (3)
CENTRAL  (6)
certain  (17)
certainly  (16)
certainty  (26)
certification  (2)
certify  (2)
cetera  (1)
challenging  (1)
chance  (1)
CHANDLER  (41)
change  (10)
changed  (10)
changes  (5)
channel  (2)
channels  (9)
characteristics  (1)
characterization  (2)
characterizations  (2)
characterize  (1)
charge  (1)
charged  (1)
chart  (2)
charts  (2)
chat  (3)
ChatGPT  (1)
chats  (2)
check  (4)
checked  (1)
checks  (1)
cheesy  (1)
choice  (1)
choices  (1)
choose  (1)
chose  (4)

CHRIS  (9)
circular  (1)
circulation  (4)
citation  (1)
citations  (1)
cite  (3)
cites  (1)
citing  (1)
claimed  (1)
clarification  (3)
clarify  (6)
clarity  (1)
clarity's  (1)
class  (17)
classes  (8)
classroom  (1)
clause  (1)
clean  (2)
cleaned  (1)
cleaner  (1)
clear  (22)
clearly  (1)
click  (23)
clicked  (6)
clicks  (12)
click-through  (16)
client  (3)
clients  (2)
clinical  (1)
close  (5)
closed  (1)
closed-ended  (1)
closely  (1)
closer  (5)
closest  (2)
clothing  (2)
clue  (1)
clumped  (1)
clumpy  (1)
Coca-Cola  (2)
coding  (1)
coffee  (1)
coin  (1)
Coke  (3)
collaboration  (2)
colleague  (1)
colleagues  (1)
collection  (3)
College  (14)

colleges  (4)
colon  (1)
color  (6)
colored  (1)
colors  (2)
column  (2)
columns  (1)
combination  (1)
combined  (3)
combining  (2)
come  (18)
comes  (6)
coming  (5)
comma-separated  (1)
comment  (4)
commentary  (1)
commenting  (1)
COMMISSION  (1)
commitment  (1)
committee  (2)
common  (7)
communicate  (3)
communicated  (1)
communication  (5)
communications  (15)
communications@Ros
sier.USC.edu  (1)
community  (1)
companies  (7)
company  (1)
compare  (2)
compared  (3)
compares  (1)
compelling  (1)
compensation  (1)
competition  (1)
competitive  (3)
competitors  (1)
complaint  (7)
complete  (5)
complicated  (1)
component  (3)
components  (2)
comprehension  (1)
comprehensive  (4)
computer  (1)
computers  (1)
computing  (1)
concept  (2)

conception *(1)*
concepts *(3)*
conceptualization *(1)*
concerning *(1)*
conclude *(1)*
concluded *(2)*
concluding *(1)*
conclusion *(6)*
conclusions *(1)*
conduct *(3)*
conducted *(10)*
conducting *(1)*
confer *(1)*
Conference *(4)*
conferences *(1)*
confers *(1)*
confidence *(1)*
confident *(1)*
confirm *(2)*
conflate *(1)*
conformed *(1)*
conforms *(3)*
confusion *(1)*
conjunction *(1)*
connection *(3)*
connotation *(1)*
conservative *(1)*
consider *(11)*
consideration *(5)*
considered *(8)*
considering *(3)*
consistency *(2)*
consistent *(4)*
constant *(1)*
consultant *(2)*
consulting *(2)*
consumed *(1)*
consumer *(38)*
consumers *(7)*
contact *(2)*
contacted *(3)*
contain *(3)*
contained *(4)*
contemporaneous *(4)*
content *(22)*
contention *(1)*
context *(19)*
continue *(13)*
continued *(3)*

continues *(2)*
continuing *(1)*
continuously *(1)*
Contract *(3)*
contrasted *(1)*
control *(17)*
controlling *(1)*
convenience *(1)*
conversation *(6)*
conversion *(2)*
conversions *(1)*
conveyed *(1)*
convicted *(1)*
cookie *(2)*
cookies *(3)*
copy *(1)*
corant *(1)*
corners *(1)*
corporate *(1)*
correct *(270)*
CORRECTIONS *(1)*
correctly *(6)*
corrupted *(1)*
cost *(5)*
cost-per-click *(2)*
costs *(3)*
counsel *(24)*
counselors *(2)*
count *(6)*
counted *(6)*
counts *(2)*
COUNTY *(1)*
couple *(7)*
course *(14)*
courses *(4)*
coursework *(1)*
COURT *(17)*
Courtney *(5)*
Courtney's *(1)*
covariant *(1)*
covariants *(1)*
cover *(4)*
coverage *(2)*
covered *(1)*
covers *(4)*
crackdown *(1)*
cracks *(1)*
cranking *(1)*
crap *(1)*

crawler *(2)*
create *(3)*
created *(9)*
creating *(2)*
creation *(3)*
creative *(16)*
creatives *(2)*
credential *(1)*
credibility *(2)*
credible *(1)*
credit *(10)*
criteria *(3)*
criterion *(1)*
critical *(1)*
crummy *(1)*
crystal *(1)*
CUMMINGS *(1)*
current *(4)*
currently *(2)*
cursory *(2)*
customer *(5)*
customers *(6)*
cut *(1)*
cutoff *(2)*
CV *(8)*
CVs *(1)*
cycle *(2)*

< D >
daily *(1)*
D'Ambra *(2)*
data *(109)*
data-driven *(1)*
date *(6)*
dated *(5)*
dates *(6)*
Day *(12)*
days *(4)*
DC *(1)*
dead-naming *(1)*
deal *(10)*
dealing *(1)*
deals *(1)*
dean *(7)*
deans *(2)*
death *(1)*
December *(2)*
decide *(2)*
decided *(6)*

deciding *(3)*
decipher *(1)*
decision *(25)*
decisionmaking *(7)*
decisions *(9)*
decks *(1)*
deeply *(2)*
default *(1)*
Defendants *(2)*
DEFENSE *(1)*
define *(4)*
defined *(1)*
definitely *(1)*
definition *(8)*
definitively *(3)*
degree *(26)*
degrees *(5)*
delete *(5)*
deleting *(1)*
delivered *(6)*
delivery *(3)*
demand *(1)*
demonstrate *(1)*
denominator *(1)*
Dep *(1)*
department *(4)*
depend *(5)*
depending *(1)*
depends *(4)*
depicted *(1)*
deployed *(6)*
deployment *(1)*
Deponent *(2)*
deposed *(4)*
depositing *(1)*
DEPOSITION *(32)*
depositions *(10)*
Depot *(5)*
derive *(1)*
describe *(4)*
described *(6)*
describing *(3)*
description *(4)*
descriptive *(1)*
deserved *(1)*
design *(9)*
designated *(1)*
designation *(1)*
designed *(2)*

designing  (3)
detail  (2)
detailed  (4)
details  (3)
determine  (16)
determined  (5)
determines  (1)
detriment  (1)
develop  (1)
developed  (1)
development  (1)
device  (2)
Diego  (3)
differ  (2)
difference  (2)
differences  (4)
different  (38)
differentiator  (26)
differentiators  (4)
differently  (3)
difficult  (2)
difficulty  (1)
dig  (1)
digital  (4)
diploma  (1)
direct  (22)
direction  (1)
directly  (6)
disagree  (1)
disciplines  (1)
discount  (2)
discoverable  (2)
discuss  (4)
discussed  (10)
discusses  (1)
discussing  (5)
discussion  (5)
Discussions  (1)
disgruntled  (1)
display  (19)
displayed  (3)
displaying  (2)
dissertation  (12)
distance  (1)
distinction  (2)
distinctive  (1)
distinguish  (1)
DISTRICT  (6)
districts  (3)

dive  (1)
diversity  (1)
divide  (1)
division  (1)
Docs  (1)
doctoral  (3)
doctorate  (4)
doctor's  (1)
document  (36)
documents  (29)
Dodgers  (1)
dog  (1)
doing  (23)
dollars  (4)
double-click  (4)
dove  (1)
downstairs  (1)
dozens  (4)
Dr  (66)
draft  (4)
drafted  (1)
dramatically  (1)
drip  (4)
driven  (1)
driving  (3)
dropped  (1)
dropping  (1)
drove  (1)
due  (1)
duly  (2)
duration  (1)
dynamics  (2)

< E >
earlier  (18)
earliest  (7)
early  (3)
Earn  (2)
earned  (6)
easier  (3)
easily  (1)
Eastern  (2)
easy  (1)
econometric  (4)
econometrics  (2)
economic  (1)
economy  (8)
ecosystem  (1)
ecstatic  (1)

Ed  (1)
Ed.D  (23)
edited  (1)
editor  (2)
edits  (2)
Education  (70)
educational  (6)
Education's  (1)
effect  (2)
effective  (16)
effectively  (2)
effectiveness  (6)
effects  (1)
efficacy  (1)
efficient  (1)
effort  (1)
efforts  (4)
eight  (3)
either  (13)
element  (1)
elementary  (1)
Elliot  (5)
e-mail  (104)
e-mails  (70)
embrace  (1)
emphasis  (1)
emphasized  (1)
emphasizing  (1)
employed  (2)
employee  (3)
employees  (4)
employer  (1)
employers  (1)
employs  (1)
encouraging  (2)
e-newsletter  (1)
engage  (3)
engaged  (4)
engagement  (12)
engagements  (1)
engaging  (2)
engine  (8)
engineer  (1)
engines  (1)
English  (1)
enjoyed  (1)
enjoying  (1)
enroll  (25)
enrolled  (30)

enrolling  (7)
enrollment  (28)
enrollments  (9)
enrolls  (1)
ensure  (1)
ensured  (1)
ensuring  (1)
enter  (2)
entered  (1)
entering  (1)
entire  (10)
entirely  (2)
entities  (3)
entitled  (1)
entity  (1)
entry  (3)
environment  (2)
equal  (1)
equally  (4)
equivalent  (1)
Eric  (1)
ERRATA  (1)
error  (3)
errors  (1)
especially  (1)
ESPN  (3)
ESPN.com  (1)
ESQ  (3)
essentially  (6)
established  (1)
estimate  (40)
estimated  (2)
estimates  (23)
Estimating  (3)
et  (4)
ethos  (1)
evaluate  (1)
evaluated  (3)
evaluating  (1)
evening  (1)
event  (4)
events  (4)
eventually  (1)
Everest  (1)
evidence  (15)
exact  (5)
Exactly  (11)
EXAMINATION  (2)
examined  (1)

Deposition of John Chandler, Ph.D.                Favell, et al. v. University of Southern California and 2U Inc.

example  (41)
examples  (25)
exceeded  (2)
Excel  (1)
excellent  (1)
exception  (1)
excerpts  (1)
excited  (1)
exclusively  (2)
excuse  (9)
executed  (1)
execution  (1)
exercise  (1)
exhibit  (69)
exhibits  (4)
exist  (5)
existed  (3)
existence  (1)
exists  (4)
expect  (12)
expectation  (1)
expected  (6)
expenditure  (1)
expenses  (1)
expensive  (1)
experience  (22)
experimentation  (3)
Experiments  (4)
expert  (24)
expertise  (3)
experts  (3)
EXPIRES  (1)
explain  (7)
explained  (1)
explaining  (1)
exports  (1)
expose  (1)
exposed  (54)
exposure  (26)
exposures  (4)
extensive  (5)
extensively  (1)
extent  (8)
extraordinary  (1)
extremely  (6)
eyes  (2)

< F >
face  (1)

Facebook  (43)
facet  (1)
face-to-face  (1)
facets  (2)
facilitate  (1)
fact  (16)
factor  (6)
factors  (4)
Faculty  (1)
Fair  (42)
fairly  (1)
fairness  (1)
fall  (4)
falls  (5)
false  (2)
familiar  (1)
family  (1)
fan  (1)
far  (2)
farfetched  (2)
fashion  (3)
faster  (1)
fatigue  (5)
FAVELL  (4)
Favell's  (3)
favorite  (1)
favorited  (2)
favorites  (1)
features  (1)
February  (1)
federal  (1)
feed  (6)
feeds  (1)
feel  (6)
feels  (1)
fell  (2)
felony  (1)
felt  (2)
field  (1)
fielded  (3)
fielding  (3)
figure  (3)
file  (2)
filed  (2)
files  (1)
filing  (1)
fill  (4)
filling  (2)
Film  (3)

filters  (1)
filthy  (1)
filtration  (1)
financial  (2)
find  (19)
finding  (1)
fine  (3)
finer  (1)
finish  (8)
finished  (4)
finishing  (1)
firm  (9)
firms  (15)
firm's  (1)
first  (55)
first-year  (1)
fiscal  (3)
fit  (1)
five  (9)
five-year-old  (1)
flavor  (1)
flew  (2)
flexibility  (1)
flies  (1)
Flipping  (1)
flow  (2)
focus  (7)
focused  (11)
Focusing  (3)
fold  (6)
folks  (3)
follow  (4)
followed  (8)
follower  (1)
followers  (27)
following  (7)
follows  (2)
follow-up  (2)
font  (2)
foot  (1)
footnote  (10)
force  (1)
forestry  (1)
forget  (2)
forgetting  (1)
forgive  (4)
form  (104)
formal  (2)
formality  (1)

format  (3)
formats  (1)
former  (3)
forms  (4)
forth  (1)
forward  (3)
found  (4)
four  (13)
fraction  (21)
framework  (1)
frantically  (1)
fraud  (2)
fraudulent  (25)
free  (2)
freezing  (3)
frequency  (9)
fresh  (1)
friendly  (1)
full  (3)
full-length  (1)
fully  (2)
fun  (1)
functions  (1)
fund  (1)
funnel  (14)
furnished  (1)
FURTHER  (8)
Furthermore  (1)
FY  (1)

< G >
gain  (1)
Gallagher  (4)
game  (1)
gardens  (1)
gather  (2)
gathered  (2)
gathering  (2)
gears  (1)
GED  (1)
general  (10)
generally  (39)
generate  (2)
generated  (7)
generating  (2)
generation  (1)
generically  (1)
Genius  (1)
geographies  (1)

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 393 of 402
Page ID #:2748
Deposition of John Chandler, Ph.D.    Bell, et al. v. University of Southern California and 2U Inc.

geography  (4)
geometrical  (1)
Gerber  (17)
Gerber's  (7)
germane  (1)
getting  (10)
give  (32)
given  (32)
gives  (2)
giving  (1)
glance  (1)
glean  (2)
gleaned  (1)
gleaning  (1)
global  (1)
GlobalEdExecs  (1)
Gmail  (1)
go  (84)
goal  (3)
goals  (1)
goes  (7)
going  (56)
gold  (1)
Good  (14)
good-looking  (1)
goods  (1)
Google  (27)
Google's  (3)
government  (3)
graduate  (45)
graduated  (1)
graduates  (2)
grammatical  (2)
graph  (1)
graphical  (1)
Great  (21)
greater  (1)
green  (1)
ground  (1)
group  (6)
groups  (3)
guess  (30)
guessing  (1)
guess-the-next-word
  (2)
guide  (1)
guy  (1)

< H >

half  (4)
halfway  (1)
Hamilton  (1)
hamstring  (1)
hand  (1)
handful  (3)
happen  (2)
happened  (8)
happening  (4)
happens  (1)
happy  (11)
hard  (13)
harder  (1)
HARDY  (1)
Harvest  (2)
harvesting  (1)
hashtag  (2)
head  (9)
headed  (1)
headers  (1)
heading  (1)
hear  (4)
heard  (6)
heart  (1)
heavy  (1)
held  (4)
help  (12)
helped  (4)
helpful  (3)
helping  (2)
helps  (1)
hereinbefore  (1)
hereunto  (1)
hide  (1)
hierarchy  (2)
high  (20)
higher  (25)
highest  (11)
highlight  (1)
highlighting  (2)
highly  (7)
hired  (2)
hiring  (1)
historical  (1)
history  (6)
hit  (7)
hitting  (2)
hoc  (1)
hockey  (2)

hold  (4)
holding  (1)
holds  (1)
hole  (1)
HOLLY  (1)
home  (7)
homepage  (4)
hope  (1)
Hopefully  (2)
hour  (4)
hourly  (1)
hours  (7)
household  (3)
human  (1)
hundred  (3)
hundreds  (2)
hundred-year  (2)
hypotheses  (1)
hypothetical  (17)
hypotheticals  (2)

< I >
I.D.s  (1)
ice  (1)
idea  (5)
ideal  (2)
ideally  (1)
identical  (1)
identifiable  (1)
identification  (10)
identified  (2)
identifier  (2)
identify  (1)
identity  (1)
ignorant  (1)
ignore  (2)
ignores  (2)
illustrate  (5)
illustrated  (1)
illustrating  (4)
imagery  (1)
images  (7)
imagine  (14)
immaterial  (1)
immediately  (3)
impact  (15)
impair  (1)
imperfections  (1)
implicit  (1)

importance  (7)
important  (42)
impossible  (6)
imprecisely  (1)
impression  (11)
impressions  (20)
impressive  (2)
improbable  (1)
improve  (3)
improved  (1)
improves  (2)
improving  (3)
impulse  (1)
impulsively  (1)
inability  (1)
inaccurate  (6)
inaudible  (6)
inbound  (1)
incentive  (1)
include  (14)
included  (26)
includes  (6)
including  (2)
inclusion  (5)
incoming  (3)
incomplete  (5)
inconsistent  (1)
incorporated  (3)
increase  (3)
incredibly  (1)
independent  (1)
indicate  (1)
indicated  (1)
indicates  (3)
indication  (1)
indicative  (1)
indicator  (3)
indicators  (4)
indices  (1)
indirect  (1)
indirectly  (1)
individual  (16)
individually  (2)
individuals  (9)
industry  (2)
inevitably  (2)
infer  (7)
inferences  (3)
inferring  (1)

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 394 of 402
Deposition of John Chandler, Ph.D.                                        Page ID #:2749
                        Campbell, et al. v. University of Southern California and 2U Inc.

infinite *(3)*
inflated *(6)*
inflation *(3)*
influence *(10)*
influenced *(2)*
influences *(2)*
influencing *(1)*
Informal *(10)*
information *(92)*
initial *(7)*
initiating *(1)*
initiatives *(2)*
Inner *(1)*
in-person *(2)*
inserted *(1)*
insight *(2)*
insights *(3)*
Instagram *(10)*
instance *(34)*
instances *(1)*
instant *(1)*
institution *(6)*
institutions *(6)*
instruction *(2)*
instructor *(2)*
instrument *(2)*
intended *(2)*
intending *(2)*
intentional *(3)*
interacted *(3)*
interacting *(2)*
interaction *(5)*
interactions *(3)*
interactive *(1)*
interest *(4)*
interested *(13)*
Interesting *(1)*
internal *(1)*
Internet *(6)*
interpret *(2)*
interpretation *(2)*
interpreted *(1)*
interpreting *(1)*
interrupt *(2)*
intersection *(1)*
interview *(3)*
interviewed *(2)*
interviews *(3)*
invasive *(3)*

inventory *(1)*
investing *(1)*
investment *(1)*
invoice *(11)*
invoices *(9)*
involve *(1)*
involved *(5)*
involvement *(3)*
involves *(1)*
IOLA *(2)*
isolation *(1)*
issue *(1)*
issued *(6)*
issuing *(1)*
item *(2)*
items *(8)*
iterating *(1)*
iterations *(1)*
it'll *(1)*
its *(28)*
Ivy *(1)*

< J >
Jamie *(5)*
January *(9)*
Jey *(1)*
Joanna *(1)*
JOB *(6)*
JOHN *(10)*
join *(1)*
joined *(1)*
joke *(1)*
Jones *(5)*
journal *(2)*
journey *(6)*
journeys *(4)*
Julie *(4)*
July *(13)*
jump *(10)*
jumping *(2)*
June *(2)*
jurat *(1)*
justification *(1)*
Juul *(23)*
Juul's *(9)*

< K >
keep *(8)*
kept *(1)*

key *(46)*
keyword *(33)*
keywords *(33)*
kind *(42)*
kinds *(5)*
knew *(6)*
know *(190)*
knowing *(5)*
knowledge *(4)*
known *(2)*
KPIs *(1)*
Kristen *(1)*

< L >
L.L.P *(1)*
label *(2)*
Labs *(3)*
lack *(3)*
laid *(1)*
land *(3)*
landed *(2)*
landing *(6)*
language *(8)*
large *(15)*
largely *(2)*
larger *(2)*
largest *(1)*
late *(1)*
law *(4)*
lawsuit *(2)*
lawyer *(2)*
lawyers *(2)*
lawyer's *(1)*
lead *(3)*
leaders *(3)*
leadership *(1)*
leading *(1)*
leads *(2)*
League *(1)*
learn *(5)*
learning *(8)*
leave *(2)*
leaving *(1)*
led *(1)*
Lee *(2)*
Lee's *(1)*
left *(6)*
left-hand *(5)*
LEGAL *(9)*

lens *(1)*
lesser *(1)*
letters *(2)*
level *(16)*
levels *(4)*
lever *(1)*
leveraging *(1)*
lifetime *(1)*
lift *(1)*
light *(3)*
liked *(1)*
likes *(6)*
limitations *(4)*
limited *(6)*
limiting *(1)*
line *(4)*
linear *(1)*
linguistically *(1)*
link *(5)*
LinkedIn *(30)*
links *(5)*
LISA *(6)*
list *(35)*
listed *(19)*
listing *(7)*
listings *(2)*
lists *(5)*
literally *(1)*
literature *(1)*
litigation *(3)*
little *(38)*
live *(1)*
Ln *(1)*
loaded *(1)*
local *(1)*
located *(1)*
location *(5)*
log *(7)*
logged *(1)*
long *(10)*
longer *(1)*
longest *(1)*
look *(62)*
looked *(34)*
looking *(69)*
looks *(8)*
Los *(1)*
lose *(1)*
losing *(1)*

lost  (2)
lot  (15)
lots  (1)
loves  (1)
low  (3)
lower  (8)
lowest  (4)
luck  (1)
lucre  (1)
lunch  (3)

< M >
machinations  (1)
Machine  (2)
magazine  (1)
magazines  (4)
mailed  (1)
mailing  (1)
maintenance  (3)
major  (1)
majority  (1)
making  (12)
managed  (1)
management  (5)
manipulated  (2)
manipulation  (3)
manipulations  (2)
manufacturer  (1)
mapping  (1)
March  (18)
marginal  (1)
MARIAH  (1)
MARK  (2)
marked  (13)
market  (2)
marketer  (2)
marketers  (16)
marketing  (294)
marking  (4)
marriage  (1)
MaryAnne  (1)
mask  (1)
master's  (20)
MAT  (13)
M-A-T  (1)
match  (1)

matching  (2)
material  (5)
materials  (31)
mathematical  (1)
mathematics  (2)
matriculate  (2)
matriculated  (2)
matriculating  (2)
matter  (15)
matters  (6)
maximize  (2)
maximized  (2)
May-June  (1)
McKinsey  (1)
MDL  (1)
mean  (61)
meaning  (3)
meanings  (1)
means  (12)
meant  (11)
measure  (12)
measured  (1)
measurement  (2)
measures  (2)
measuring  (4)
Mechanical  (1)
mechanism  (1)
media  (55)
medical  (1)
medication  (1)
medium  (1)
meet  (3)
meeting  (7)
meetings  (4)
Melessa  (1)
memory  (4)
mental  (1)
mention  (13)
mentioned  (23)
mentions  (3)
merely  (6)
merits  (1)
mesothelioma  (2)
message  (41)
messages  (20)
messaging  (4)
met  (3)
metadata  (1)
method  (1)

methodology  (1)
methods  (5)
metric  (5)
metrics  (4)
Mh-hm  (1)
Microsoft  (4)
Microsoft's  (1)
middle  (4)
Middlebury  (1)
million  (5)
millions  (1)
mind  (10)
mini  (1)
mining  (3)
Minneapolis  (1)
Minnesota  (1)
minute  (3)
minutes  (5)
MIS  (1)
misinformation  (1)
misleading  (2)
misremembering  (3)
misreported  (1)
misrepresent  (1)
misrepresentation  (1)
missing  (1)
Missoula  (1)
misstate  (1)
misstatement  (1)
mistaken  (1)
mistakes  (1)
mix  (6)
model  (9)
modeling  (15)
models  (4)
modern  (1)
modes  (1)
modifications  (2)
modified  (1)
modifier  (1)
moment  (13)
money  (9)
monitoring  (4)
Montana  (40)
Montana's  (3)
Montevideo  (3)
month  (9)
Monthly  (2)
months  (2)

morning  (2)
mouse  (1)
move  (30)
moved  (1)
movements  (1)
Moving  (6)
multichannel  (1)
multilevel  (1)
multiple  (20)
multiples  (1)
multiplier  (1)
multiply  (1)
multitouch  (7)
municipalities  (1)
municipality  (2)
MURACO  (5)
MURTADA  (4)
mutual  (1)

< N >
Nadia  (1)
name  (11)
named  (3)
names  (1)
narrow  (2)
nascent  (1)
NATIONAL  (3)
nationally  (2)
nationwide  (1)
natural  (5)
nature  (6)
navigate  (2)
navigated  (1)
navigation  (1)
navigational  (2)
near  (3)
nearly  (7)
near-universal  (1)
necessarily  (5)
need  (19)
needed  (1)
needing  (1)
negative  (2)
Neither  (5)
neon  (4)
net  (1)
netting  (1)
NETWORK  (1)
never  (8)

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 396 of 402
Page ID #:2751
Deposition of John Chandler, Ph.D.                    Maxwell, et al. v. University of Southern California and 2U Inc.

New *(16)*
News *(24)*
newsletter *(6)*
newspaper *(1)*
night *(4)*
nine *(9)*
ninth *(1)*
nitty-gritty *(1)*
No.2:23-cv *(1)*
Noguera *(1)*
nonaddressable *(3)*
nonbranded *(1)*
nonvideo *(1)*
nonwork *(1)*
normal *(3)*
Northern *(3)*
Northwest *(1)*
notable *(1)*
Notary *(4)*
note *(6)*
noted *(7)*
notes *(2)*
not-for-profit *(1)*
notice *(7)*
noticed *(2)*
noting *(2)*
November *(1)*
nuances *(1)*
number *(106)*
numbers *(14)*
numeral *(1)*
numerical *(18)*
numerically *(2)*
NW *(1)*

< O >
oath *(3)*
object *(86)*
Objection *(24)*
objections *(4)*
objects *(1)*
obligations *(1)*
obviously *(1)*
occasions *(1)*
occur *(1)*
occurred *(1)*
occurrence *(1)*
occurring *(1)*
OCL *(16)*

October *(2)*
offended *(1)*
offer *(6)*
offered *(9)*
offering *(27)*
office *(1)*
officer *(1)*
officers *(1)*
oftentimes *(1)*
Oh *(12)*
okay *(393)*
old *(1)*
once *(11)*
ones *(17)*
oneself *(1)*
one-time *(1)*
one-year *(4)*
online *(119)*
online's *(1)*
onward *(1)*
oOo *(1)*
open *(11)*
opened *(10)*
open-ended *(5)*
opening *(5)*
operated *(2)*
opine *(1)*
opining *(1)*
opinion *(54)*
opinions *(18)*
opportunities *(9)*
opportunity *(13)*
opposed *(3)*
opposing *(1)*
opt *(4)*
opted *(1)*
optimal *(7)*
optimality *(1)*
optimization *(2)*
opt-in *(1)*
opting *(4)*
option *(6)*
opt-out *(1)*
opts *(1)*
order *(16)*
ordered *(1)*
ordering *(2)*
ordinary *(1)*
Oregon *(1)*

organization *(2)*
original *(3)*
ORT *(2)*
oughts *(1)*
outcome *(1)*
outcomes *(2)*
outgrowths *(1)*
outline *(4)*
outlined *(2)*
out-of-home *(7)*
outside *(1)*
overall *(3)*
oversaw *(1)*
overseeing *(1)*
overstrong *(1)*
overview *(4)*
overviews *(1)*
overwritten *(1)*
owned *(1)*

< P >
p.m *(18)*
Pacific *(1)*
packaged *(1)*
page *(151)*
pages *(40)*
paid *(40)*
pandemic *(3)*
paper *(12)*
papers *(2)*
paradigm *(1)*
paragraph *(83)*
paralegal *(1)*
paraphrasing *(2)*
parenthetical *(1)*
part *(49)*
partially *(3)*
participants *(1)*
participate *(2)*
participated *(7)*
particular *(68)*
particularly *(5)*
parties *(5)*
partner *(2)*
parts *(4)*
party *(2)*
pass *(1)*
passed *(1)*
paste *(1)*

pattern *(1)*
Paul *(8)*
pause *(5)*
pay *(12)*
paying *(3)*
payment *(2)*
PDF *(2)*
peer *(1)*
peer-reviewed *(4)*
people *(125)*
people's *(1)*
percent *(38)*
percentage *(2)*
Perfect *(6)*
perfectly *(1)*
perform *(5)*
performance *(21)*
performed *(13)*
performing *(7)*
performs *(3)*
period *(33)*
periods *(3)*
person *(29)*
personal *(1)*
personalized *(1)*
personally *(4)*
persons *(1)*
perspective *(3)*
perspectives *(1)*
persuasive *(2)*
pertain *(1)*
pervasiveness *(1)*
Pg *(1)*
Ph.D *(9)*
Ph.D.s *(1)*
philosophical *(2)*
Phoenix *(2)*
phone *(2)*
phrase *(9)*
phrases *(1)*
phrasing *(1)*
physical *(1)*
physically *(1)*
pick *(2)*
picked *(3)*
picking *(1)*
picture *(3)*
piece *(12)*
pieces *(3)*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 397 of 402
Page ID #:2752
Deposition of John Chandler, Ph.D.                    Posselt, et al. v. University of Southern California and 2U Inc.

pixels  (2)
place  (8)
placement  (10)
places  (15)
Plaintiff  (3)
Plaintiffs  (10)
plaintiff's  (4)
plan  (34)
planned  (3)
planning  (3)
plans  (8)
platform  (5)
platforms  (7)
play  (5)
plays  (1)
please  (5)
plot  (2)
point  (23)
points  (13)
policy  (1)
politics  (1)
pop  (1)
Poplar  (1)
pops  (1)
popular  (2)
population  (3)
populations  (1)
pop-up  (1)
portal  (2)
portals  (3)
portion  (15)
portions  (1)
position  (3)
positioning  (1)
positive  (1)
Posselt  (4)
Posselt's  (1)
possibility  (2)
possible  (21)
possibly  (1)
post  (26)
postage  (1)
posted  (8)
poster  (1)
posting  (3)
posts  (10)
potential  (12)
potentially  (6)
PowerPoint  (3)

practice  (10)
practices  (21)
practicing  (1)
practitioner  (1)
precalculus  (1)
precise  (4)
precisely  (3)
precision  (9)
predated  (1)
predictable  (1)
prefer  (1)
Prep  (1)
prepare  (1)
prepared  (5)
preparing  (4)
presence  (5)
PRESENT  (7)
presentation  (5)
presentations  (3)
presented  (2)
presenting  (1)
president  (2)
presumably  (4)
presume  (1)
pretty  (3)
prevalent  (2)
prevent  (3)
previous  (5)
previously  (1)
price  (5)
primarily  (4)
primary  (4)
primed  (1)
principal  (1)
principally  (1)
print  (7)
prior  (11)
private  (4)
probability  (3)
probably  (21)
problem  (6)
proceed  (2)
process  (20)
prod  (1)
produce  (4)
produced  (5)
producing  (1)
product  (10)
Production  (9)

products  (9)
professional  (5)
professionally  (2)
professor  (6)
professors  (1)
profile  (12)
profiles  (2)
profit  (1)
profited  (2)
profits  (1)
program  (63)
programmatic  (1)
programming  (1)
programs  (35)
project  (4)
projects  (1)
prominent  (2)
prominently  (1)
promise  (3)
promote  (9)
promoted  (1)
promoting  (1)
promotion  (1)
prompting  (1)
proper  (3)
properly  (1)
property  (1)
proportion  (3)
proposition  (1)
proprietary  (1)
prospecting  (1)
prospective  (111)
provide  (5)
provided  (2)
providers  (1)
provides  (1)
providing  (1)
proxy  (1)
psychological  (4)
psychologically  (1)
psychology  (2)
Public  (6)
publications  (2)
published  (1)
publisher  (2)
publishers  (2)
publisher's  (1)
pull  (2)
Pullias  (4)

pulling  (1)
punch  (1)
purchase  (21)
purchased  (12)
purchasers  (3)
purchasing  (3)
purpose  (2)
put  (22)
puts  (1)
putting  (4)

< Q >
qualified  (4)
qualifiers  (1)
qualitative  (6)
quality  (6)
Qualtrics  (1)
quantification  (2)
quantify  (6)
quantitative  (15)
quantity  (1)
quarter  (2)
query  (2)
question  (71)
questioning  (1)
questions  (24)
quick  (1)
quickly  (9)
quite  (11)
quotation  (1)
quote  (6)
quote/unquote  (1)
quotes  (2)
quoting  (2)

< R >
R-1  (5)
radio  (4)
raised  (1)
ran  (3)
random  (1)
randomized  (1)
range  (6)
ranges  (1)
rank  (13)
ranked  (61)
ranking  (126)
ranking-related  (2)
rankings  (184)

**Exhibit 2**
Page: 12
**501**

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 398 of 402
Page ID #:2753
Deposition of John Chandler, Ph.D.    Rossier, et al. v. University of Southern California and 2U Inc.

**ranks** *(5)*
**rant** *(1)*
**rare** *(1)*
**rate** *(16)*
**rates** *(12)*
**ratings** *(3)*
**reach** *(40)*
**reached** *(14)*
**reaching** *(3)*
**reactions** *(1)*
**read** *(64)*
**reading** *(10)*
**Reads** *(1)*
**ready** *(2)*
**real** *(4)*
**realized** *(1)*
**really** *(19)*
**re-ask** *(1)*
**reason** *(10)*
**reasonable** *(8)*
**reasons** *(3)*
**recall** *(31)*
**recap** *(1)*
**receive** *(25)*
**received** *(22)*
**receives** *(1)*
**receiving** *(11)*
**reception** *(1)*
**Recess** *(8)*
**recipient** *(1)*
**recognize** *(3)*
**recollection** *(18)*
**recommendations** *(1)*
**reconfirm** *(1)*
**record** *(36)*
**recorded** *(1)*
**records** *(2)*
**recruit** *(1)*
**recruited** *(2)*
**recruiting** *(8)*
**recruitment** *(10)*
**redesign** *(1)*
**refer** *(7)*
**reference** *(11)*
**referenced** *(4)*
**references** *(2)*
**referencing** *(1)*
**referral** *(1)*
**referred** *(10)*

**referring** *(11)*
**refers** *(1)*
**reflect** *(6)*
**reflected** *(4)*
**reflecting** *(3)*
**reflects** *(3)*
**refresh** *(5)*
**regardless** *(4)*
**regional** *(1)*
**regularly** *(1)*
**relate** *(1)*
**related** *(29)*
**relates** *(3)*
**relating** *(2)*
**relation** *(1)*
**relations** *(1)*
**relationship** *(2)*
**relationships** *(1)*
**relative** *(6)*
**relatively** *(12)*
**Relativity** *(5)*
**release** *(2)*
**released** *(2)*
**relevant** *(3)*
**reliable** *(2)*
**reliance** *(1)*
**relied** *(4)*
**relies** *(1)*
**relinquishing** *(1)*
**rely** *(1)*
**relying** *(2)*
**remain** *(2)*
**remainder** *(1)*
**remained** *(2)*
**remember** *(32)*
**remembering** *(1)*
**remessaging** *(1)*
**remind** *(3)*
**reminders** *(1)*
**REMOTE** *(3)*
**remove** *(1)*
**removed** *(4)*
**repeat** *(1)*
**Repeated** *(1)*
**repeatedly** *(1)*
**repeating** *(1)*
**replies** *(1)*
**report** *(97)*
**Reported** *(7)*

**reporter** *(9)*
**Reporting** *(2)*
**reports** *(7)*
**repository** *(3)*
**reposted** *(3)*
**reposts** *(1)*
**represent** *(6)*
**representation** *(6)*
**representative** *(2)*
**represented** *(7)*
**represents** *(1)*
**reproduced** *(1)*
**reproduction** *(1)*
**Request** *(10)*
**requested** *(4)*
**requesting** *(2)*
**require** *(1)*
**required** *(1)*
**requirement** *(1)*
**requisite** *(1)*
**rereview** *(1)*
**research** *(20)*
**researched** *(1)*
**researcher** *(2)*
**researchers** *(1)*
**researching** *(1)*
**reserved** *(1)*
**reshare** *(1)*
**residence** *(1)*
**residents** *(1)*
**resist** *(1)*
**resonate** *(2)*
**resonated** *(3)*
**resonating** *(2)*
**resource** *(2)*
**respect** *(11)*
**respectfully** *(1)*
**respective** *(1)*
**respects** *(1)*
**respond** *(1)*
**responded** *(1)*
**respondents** *(1)*
**responding** *(1)*
**response** *(2)*
**responses** *(4)*
**responsible** *(1)*
**rest** *(1)*
**result** *(8)*
**resulting** *(1)*

**results** *(22)*
**retail** *(6)*
**retailer** *(1)*
**retailer's** *(1)*
**retain** *(2)*
**retained** *(1)*
**retargeting** *(1)*
**retention** *(2)*
**retweet** *(2)*
**retweeted** *(4)*
**retweeting** *(1)*
**retweets** *(7)*
**Reveal** *(1)*
**review** *(26)*
**reviewed** *(14)*
**reviewing** *(3)*
**reviews** *(1)*
**revised** *(1)*
**revisited** *(1)*
**right** *(47)*
**right-hand** *(1)*
**road** *(2)*
**Robertson** *(9)*
**Rockies** *(1)*
**role** *(17)*
**rolled** *(1)*
**Roman** *(1)*
**room** *(1)*
**Rossier** *(140)*
**Rossier.com** *(2)*
**Rossier.USC.edu** *(8)*

**Rossieronline.USC.edu** *(8)*
**Rossieronline.USC.edu /apply** *(1)*
**Rossier's** *(4)*
**Rothschild** *(2)*
**rough** *(2)*
**roughly** *(7)*
**round** *(1)*
**rounding** *(1)*
**rounds** *(1)*
**row** *(3)*
**rub** *(1)*
**rude** *(1)*
**rules** *(4)*
**run** *(1)*
**running** *(2)*

Case 2:23-cv-00846-GW-MAR    Document 144-2    Filed 09/13/24    Page 399 of 402
Page ID #:2754
Deposition of John Chandler, Ph.D.    ...ell, et al. v. University of Southern California and 2U Inc.

runs (1)

< S >
S(Cont'd (1)
sake (1)
sale (5)
sales (5)
salient (1)
San (3)
sandwiched (1)
sane (1)
Sarah (2)
sat (1)
saturate (1)
save (1)
saved (1)
saw (33)
say(as (1)
saying (20)
says (19)
scale (3)
scanned (1)
scenario (1)
scenarios (2)
Schedule (2)
school (81)
schools (8)
school's (4)
science (3)
sciences (2)
scientific (11)
scientist (1)
scientists (1)
scope (5)
score (1)
scores (3)
scratch (3)
screen (27)
screwing (1)
scroll (23)
scrolled (3)
scrolling (4)
sea (3)
sealing (1)
search (96)
searched (10)
searches (9)
searching (6)
seasonal (1)

second (27)
seconds (1)
section (18)
sections (1)
see (130)
seeing (16)
seeking (1)
seen (32)
sees (1)
selected (1)
selectivity (2)
sell (1)
selling (3)
sells (1)
semantic (1)
semester (5)
send (3)
sender (1)
sending (4)
sense (24)
sensible (1)
sent (12)
sentence (8)
sentiment (1)
SEO (1)
separate (6)
September (1)
series (6)
serve (2)
served (6)
server (4)
serves (2)
service (4)
services (2)
serving (2)
session (2)
set (11)
sets (3)
seven (1)
shape (1)
share (3)
shared (5)
shares (2)
sharing (16)
SHEET (1)
shifted (1)
shirt (11)
shirts (3)
SHOOK (1)

shopping (3)
short (4)
shortly (1)
shot (4)
shots (7)
shoulders (1)
show (19)
showcases (1)
showed (5)
showing (5)
shown (8)
shows (3)
sic (1)
side (11)
sidebar (2)
sign (5)
Signature (1)
signed (2)
significance (1)
significant (15)
similar (12)
Similarly (14)
simple (2)
Simplicio (5)
simply (8)
simulations (1)
single (5)
sinister (1)
sir (2)
sit (2)
site (21)
sites (3)
sitting (1)
situated (1)
situation (3)
six (3)
six-month (2)
six-pack (1)
size (3)
sizes (1)
skills (1)
skipping (1)
Sky (3)
Slack (6)
slice (1)
slide (1)
slightly (1)
slipped (1)
slow (3)

small (8)
smaller (1)
smallest (1)
SMITH (5)
smoother (1)
snapshot (1)
snapshots (3)
soccer (1)
social (36)
society (1)
sociology (1)
soda (1)
sole (2)
Solo (1)
solutions (1)
somebody (2)
someone's (1)
Somerville's (1)
somewhat (2)
Sommerville (7)
Sommerville's (1)
soon (3)
sophisticated (3)
sophistication (1)
Sorry (36)
sort (85)
Sound (3)
sounds (4)
source (24)
sources (2)
SOUTHERN (5)
space (8)
spanned (1)
speak (1)
speakers (10)
speaking (28)
special (1)
Specialist (1)
specific (40)
specifically (30)
specificities (1)
specificity (1)
specifics (1)
specify (1)
speculate (6)
speculating (2)
speculation (2)
speed (1)
spend (10)

spent  (11)
spirit  (1)
split  (2)
spoke  (1)
sponsored  (5)
sports  (1)
spot  (2)
spring  (1)
spur  (1)
square  (1)
ss  (1)
St  (1)
staff  (3)
stage  (4)
stages  (3)
standalone  (1)
standard  (8)
standpoint  (2)
stands  (1)
Stars  (1)
start  (17)
started  (9)
starting  (8)
starts  (2)
State  (16)
stated  (4)
statement  (14)
statements  (8)
STATES  (3)
static  (1)
stating  (1)
station  (2)
statistical  (12)
statistics  (8)
status  (25)
stay  (2)
stays  (1)
steady  (1)
steam  (1)
stemming  (1)
stenographic  (1)
step  (2)
steps  (2)
stick  (2)
sticking  (1)
sticks  (1)
STIPULATED  (3)
stoplight  (1)
store  (3)

stored  (1)
stories  (2)
straight  (1)
strategies  (9)
strategy  (5)
street  (2)
stretch  (1)
strike  (14)
strikes  (1)
string  (2)
strongly  (1)
struck  (2)
structure  (1)
structured  (1)
structures  (1)
struggling  (1)
STUDENT  (77)
students  (251)
student's  (1)
studied  (11)
study  (19)
stuff  (2)
style  (1)
subdivisions  (2)
subgroups  (1)
subject  (9)
subjects  (1)
submit  (3)
submitted  (6)
submitting  (1)
subparagraph  (2)
Subscribed  (2)
subsection  (1)
subsequent  (3)
subsequently  (2)
subset  (4)
substitute  (1)
subtle  (1)
success  (2)
SUE  (1)
sued  (1)
suffering  (1)
suffers  (1)
suggest  (8)
suggested  (1)
suggesting  (1)
Suite  (1)
sum  (2)
summary  (11)

summed  (1)
summer  (1)
super  (1)
supplemental  (1)
supply  (4)
sure  (44)
surprised  (1)
surprisingly  (1)
surrounding  (1)
survey  (39)
surveys  (28)
suspect  (7)
suspected  (1)
switch  (6)
switched  (5)
switches  (1)
sworn  (6)
syllabus  (1)
symbol  (2)
synonymously  (1)
system  (3)
systematically  (1)

< T >
tab  (1)
Tabitha  (2)
table  (1)
tables  (4)
tabulated  (1)
tag  (1)
tagged  (2)
take  (24)
taken  (16)
takes  (2)
talk  (22)
talked  (32)
talking  (51)
talks  (2)
tallied  (2)
tally  (1)
target  (1)
targeted  (1)
tasks  (3)
taught  (13)
teach  (14)
teacher  (2)
teaching  (22)
team  (3)
teams  (2)

tease  (2)
tech  (1)
technical  (1)
technically  (1)
technician  (1)
technique  (1)
techniques  (12)
technological  (1)
technologies  (1)
technology  (4)
tedious  (1)
telephone  (1)
television  (1)
tell  (49)
telling  (2)
tells  (2)
ten  (12)
tend  (3)
tends  (2)
tens  (6)
tenth  (1)
term  (27)
terminology  (3)
terms  (37)
test  (1)
tested  (1)
testified  (5)
testifying  (1)
testimony  (25)
Testing  (1)
Text  (11)
text-based  (1)
texts  (1)
Thank  (16)
Thanks  (1)
theoretically  (3)
therapy  (1)
thing  (23)
things  (43)
think  (156)
thinking  (12)
thinks  (1)
third  (12)
THIS___DAY  (1)
thorough  (1)
thought  (10)
thousand  (3)
thousands  (10)
thread  (1)

three (27)
three-plus (1)
thrown (1)
Thursday (3)
tier (4)
time (88)
time-consuming (1)
timekeeper (1)
timeline (1)
times (20)
tiny (1)
title (1)
today (15)
Today's (2)
told (1)
tons (1)
tool (3)
tools (5)
top (74)
topic (5)
total (11)
totality (4)
totally (2)
touch (22)
touches (1)
tout (1)
touted (1)
touting (1)
town (1)
track (6)
trackable (1)
tracked (2)
tracking (2)
traditional (3)
traditionally (1)
traffic (14)
trafficked (2)
training (1)
transacting (2)
transaction (2)
transactions (1)
transcript (8)
transcripts (3)
translate (1)
travel (1)
trend (1)
trial (1)
trials (1)
trickier (1)

tricky (1)
tried (1)
triggers (2)
Trojan (1)
true (17)
truly (3)
truthful (1)
try (13)
trying (28)
tuition (3)
Turk (1)
turn (9)
turns (1)
Tweet (8)
Tweeted (1)
Tweeter (1)
Tweets (8)
twice (2)
Twitter (41)
two (27)
two-way (1)
two-year (1)
Tycko (5)
type (13)
typed (2)
types (10)
typically (18)
typing (3)

< U >
U.S (17)
ultimate (1)
ultimately (6)
umbrella (1)
UMT.edu (1)
unable (3)
unaided (1)
unassigned (3)
unclear (5)
uncommon (2)
uncovering (1)
undergoing (1)
undergrad (1)
undergraduate (7)
undergraduates (3)
undermine (1)
underneath (1)
underscore (1)
underserved (1)

understand (36)
understanding (32)
understands (1)
understood (9)
undoubtedly (1)
unearthing (1)
unemployment (2)
unequivocal (1)
unethical (1)
unfortunately (5)
unhelpful (1)
uniformity (2)
unique (3)
unit (4)
UNITED (2)
universally (2)
universities (7)
UNIVERSITY (72)
university's (2)
university-wide (3)
unknown (2)
unlimited (1)
unlucky (1)
unmute (1)
unpaid (2)
unqualified (1)
unquantifiable (1)
unrelated (1)
unreliable (2)
unstructured (1)
unsubscribe (3)
Unsurprisingly (1)
unusual (1)
upcoming (1)
update (2)
updated (1)
upper (1)
upstream (1)
urban (1)
urge (1)
URL (16)
URLs (5)
Uruguay (4)
usage (3)
USC (112)
USCGlobalEdD (1)
USCRossier (6)
USC's (11)
use (50)

user (2)
users (10)
user's (2)
uses (3)
usually (7)
utility (7)
utilized (1)

< V >
vaguest (1)
validity (2)
valuable (1)
value (11)
values (1)
variation (1)
varied (5)
varies (5)
variety (10)
various (15)
vary (2)
varying (1)
vast (1)
vector (3)
vectors (1)
verify (5)
version (9)
versus (12)
vice (2)
Video (6)
VIDEOGRAPHER (24)
VIDEOTAPED (2)
view (10)
viewed (4)
viewing (1)
views (11)
violate (1)
virtually (8)
visible (2)
visit (6)
visited (19)
visiting (4)
visitor (1)
visitors (5)
visits (9)
visually (1)
volition (1)
volume (6)
VP (1)

vs  *(1)*

**< W >**
**wait**  *(3)*
**waiting**  *(1)*
**waived**  *(1)*
**walked**  *(1)*
**walled**  *(1)*
**want**  *(43)*
**wanted**  *(12)*
**wants**  *(1)*
**Washington**  *(6)*
**wasted**  *(1)*
**way**  *(75)*
**Wayback**  *(2)*
**ways**  *(17)*
**wealth**  *(1)*
**Web**  *(23)*
**website**  *(48)*
**websites**  *(9)*
**weeds**  *(3)*
**week**  *(4)*
**weeks**  *(1)*
**welcome**  *(17)*
**welcoming**  *(1)*
**well**  *(35)*
**well-established**  *(1)*
**went**  *(20)*
**we're**  *(34)*
**Western**  *(2)*
**we've**  *(16)*
**wheel**  *(1)*
**WHEREOF**  *(1)*
**white**  *(6)*
**wholistic**  *(1)*
**wide**  *(5)*
**wildlife**  *(1)*
**willing**  *(3)*
**win**  *(1)*
**winnowed**  *(1)*
**wish**  *(1)*
**withdraw**  *(3)*
**witness**  *(22)*
**witnesses**  *(1)*
**witness's**  *(1)*
**wonder**  *(1)*
**Wonderful**  *(4)*
**wondering**  *(1)*
**Wood**  *(1)*

**word**  *(12)*
**words**  *(17)*
**work**  *(51)*
**worked**  *(25)*
**working**  *(18)*
**works**  *(5)*
**world**  *(19)*
**worth**  *(1)*
**would've**  *(4)*
**wrap**  *(1)*
**wrinkle**  *(1)*
**write**  *(1)*
**writing**  *(3)*
**written**  *(7)*
**wrong**  *(3)*
**wrote**  *(3)*
**Wyoming**  *(2)*

**< X >**
**X.com**  *(1)*

**< Y >**
**Yeah**  *(19)*
**year**  *(17)*
**year-round**  *(1)*
**years**  *(18)*
**yesterday**  *(2)*
**York**  *(4)*
**youthful**  *(1)*
**Yup**  *(1)*

**< Z >**
**ZARNOWSKI**  *(1)*
**Zavareei**  *(4)*
**zero**  *(5)*
**ZOOM**  *(3)*