Anna Haac (*pro hac vice*)
Shilpa Sadhasivam (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue N.W.,
Suite 1010
Washington, DC 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*ahaac@tzlegal.com*
*ssadhasivam@tzlegal.com*

Annick M. Persinger (SBN 272996)
Sabita J. Soneji (SBN 224262)
Emily Feder Cooper (SBN 352951)
**TYCKO & ZAVAREEI LLP**
10880 Wilshire Boulevard, Suite 1101
Los Angeles, CA 90024
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
*apersinger@tzlegal.com*
*ssoneji@tzlegal.com*
*ecooper@tzlegal.com*

Eric Rothschild (*pro hac vice*)
Tyler Ritchie (*pro hac vice*)
Chris Bryant (*pro hac vice*)
Madeline Wiseman (SBN 324348)
**NATIONAL STUDENT LEGAL
DEFENSE NETWORK**
1701 Rhode Island Avenue N.W.
Washington, DC 20036
Telephone: (202) 734-7495
*eric@defendstudents.org*
*tyler@defendstudents.org*
*chris@defendstudents.org*
*madeline@defendstudents.org*

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| IOLA FAVELL, SUE ZARNOWSKI, MARIAH CUMMINGS, and AHMAD MURTADA, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA,<br><br>Defendant. | Case No. 2:23-cv-00846-GW-MAR; Case No. 2:23-cv-03389-GW-MAR<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DR. JOHN CHANDLER UNDER FED. R. EVID. 702** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................ 1

II.    FACTUAL BACKGROUND ...................................................... 2

III.   LEGAL STANDARD UNDER *DAUBERT* AND RULE 403 ...................... 3

IV.    ARGUMENT .............................................................................. 5

    A.   Record evidence supports Chandler's opinion that 2U, on USC's behalf, employed a sophisticated marketing strategy consistent with marketing best practices, which USC does not challenge. ................. 6

        i.   Chandler's report explains how the marketing funnel moves prospective student-consumers along the enrollment journey from interest in a program to enrollment. .......................... 6

        ii.  2U's marketing strategy ensured that every student who ultimately enrolled in the online MAT and OCL programs did so only after passing through a marketing funnel that emphasized USC Rossier's rankings. ................................... 8

    B.   Marketing principles and record evidence support Chandler's exposure opinions, including his ultimate opinion that all or nearly all students who matriculated in USC's online programs were exposed to the fraudulent rankings. ...................................... 11

        i.   Students who enrolled in USC Rossier would have been exposed to the rankings through 2U's marketing emails. ............ 12

        ii.  USC Rossier websites included rankings information in areas that would have exposed students in the marketing funnel to the numerical ranking ...................................... 17

        iii. Chandler's opinion that enrolled students would have been exposed to rankings via channels besides emails and websites is based on record evidence and bolsters his exposure opinion. ............................................ 21

V.     CONCLUSION .......................................................................... 23

i

# TABLE OF AUTHORITIES

CASES

*Accord Karpilovsky v. All Web Leads, Inc.*
    No. 17 C 1307, 2018 WL 3108884 (N.D. Ill. June 25, 2018) ...................................20

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*
    738 F.3d 960 (9th Cir. 2013) ............................................................................3

*Alves v. Riverside County*
    No. EDCV192083JGBSHKX, 2023 WL 2983583 (C.D. Cal. Mar. 13, 2023)........21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*
    568 U.S. 455 (2013) .........................................................................................4

*Boyer v. City of Simi Valley*
    No. 19-CV-00560, 2024 WL 993316 (C.D. Cal. Feb. 13, 2024)...................................4

*City of Pomona v. SQM North Am. Corp.*
    750 F.3d 1036 (9th Cir. 2014) .......................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*
    509 U.S. 579 (1993) .........................................................................................3

*Droplets, Inc. v. Yahoo! Inc.*
    No. 12-cv-03733-JST, 2021 WL 11701485 (N.D. Cal. Nov. 29, 2021)...................19

*Edwards v. First Am. Corp.*
    798 F.3d 1172 (9th Cir. 2015) .........................................................................4

*Elosu v. Middlefork Ranch Inc.*
    26 F.4th 1017 (9th Cir. 2022).......................................................... 11, 16, 17

*Gen. Elec. Co. v. Joiner*
    522 U.S. 136 (1997) ......................................................................................16

*Georgian v. Zodiac Grp., Inc.*
    No. 10-CIV-60037, 2011 WL 13214041 (S.D. Fla. June 24, 2011).........................20

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*
    No. 19-MD-02913-WHO, 2022 WL 1814440 (N.D. Cal. June 2, 2022) ...................2

*In re NFL's "Sunday Ticket" Antitrust Litig.*
   No. ML 15-02668 PSG, 2024 WL 2165676 (C.D. Cal. May 13, 2024) ................3, 4

*In re PFA Ins. Mktg. Litig.*
   696 F. Supp. 3d 788 (N.D. Cal. 2021) ................................................................5

*JH Kelly, LLC v. AECOM Tech. Services, Inc.*
   605 F. Supp. 3d 1295 (N.D. Cal. 2022) ....................................................... 11, 16

*Le v. Zuffa, LLC*
   2024 WL 195994 (D. Nev. Jan. 18, 2024) ........................................................4

*Lincare Holdings Inc. v. Doxo, Inc.*
   No. 8:22-CV-2349-VMC-AEP, 2024 WL 243646 (M.D. Fla. Jan. 23, 2024) ..........20

*Lytle v. Nutramax Lab'ys, Inc.*
   __ F.4th __, No. 22-55744, 2024 WL 3915361 (9th Cir. Aug. 23, 2024)..................4

*McCrary v. Elations Co. LLC*
   No. EDCV 13–0242 JGB, 2014 WL 12589137 (C.D. Cal. Dec. 2, 2014) ..............16

*Messick v. Novartis Pharm. Corp.*
   747 F.3d 1193 (9th Cir. 2014) ........................................................................3

*Montera v. Premier Nutrition Corp.*
   No. 16-cv-06980-RS, 2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) ......................20

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*
   No. 2:21-cv-05262-SPG-E, 2023 WL 6194385 (C.D. Cal. Sept. 7, 2023)..................4

*Ono v. Head Racquet Sports USA, Inc.*
   No. CV134222FMOAGRX, 2016 WL 6647949 (C.D. Cal. Mar. 8, 2016)....... 22, 23

*Primiano v. Cook*
   598 F.3d 558 (9th Cir. 2010) ....................................................................4, 12

*Spintouch, Inc. v. Outform, Inc.*
   2022 WL 17363902 (C.D. Cal. Sept. 28, 2022)................................................3

*Townsend v. Monster Beverage Corporation*
   303 F. Supp. 3d 1010 (C.D. Cal. 2018)........................................................21

*U.S. v. Medtronic, Inc.*
   2024 WL 4002842 (C.D. Cal. July 22, 2024) ................................................4

iii

*United States v. Rahm*
    993 F.2d 1405 (9th Cir. 1993) .........................................................................20

**RULES**

FED. R. EVID. 702 .......................................................................................3, 4

# I.    __INTRODUCTION__

For over a decade, USC Rossier participated in the U.S. News & World Report's Best Graduate Schools of Education survey and ranking process. During that time, USC Rossier falsified survey data to obtain a higher ranking from U.S. News than it would have received had it submitted accurate data. USC Rossier and 2U, the online program manager that provided USC with marketing and recruiting services, featured these fraudulently procured rankings across emails, websites, social media platforms, paid advertisements, and printed media marketing copy—all directed at prospective students. None of these facts are seriously in dispute.

Dr. John Chandler, Plaintiffs' marketing expert witness, offers opinions in this case about USC Rossier students' exposure to the rankings, which Defendant USC now moves to exclude. Dkt. 144[1] ("Motion" or "Mot."). USC does not challenge Dr. Chandler's qualifications. Nor does USC seek to exclude Dr. Chandler's opinions regarding general marketing principles or the specifics of the extensive, multichannel marketing strategy 2U and USC employed, which featured USC's fraudulent rankings as a key differentiator.

Rather the thrust of USC's arguments against Dr. Chandler is "quantitative," not qualitative, namely that he is unable to *exactly* quantify and identify which specific students were exposed to which specific websites, emails, or other marketing materials containing USC Rossier's fraudulent ranking based on data like email open rates and log-level site traffic data. But *Daubert* does not require the type of quantitative exactness Defendant demands.

The extensive nature of 2U and USC's marketing campaign ensured the fraudulent rankings were prominently featured across various channels, times, and stages spanning the entire enrollment journey (all opinions USC does not seek to

---

[1] In this response, "Dkt." refers to the docket in *Favell v. Univ. of S. Cal.*, No. 2:23-cv-00846-GW-MAR.

1

1  exclude)—such that Dr. Chandler is able to draw on his 25 years of marketing
2  experience and knowledge to reliably conclude and opine that "all or nearly all students
3  at USC Rossier in the MAT and OCL programs during the period of ranking
4  manipulations were exposed to the fraudulent rankings." Dkt. 144-1, Chandler Rep. ¶
5  14.

6          For the reasons discussed below, the Court should thus deny the Motion in its
7  entirety.

8  **II.    FACTUAL BACKGROUND**

9          Dr. John Chandler is a professor of marketing at the University of Montana.
10  Chandler Rep. ¶ 1. He also holds affiliations with Universidad ORT Uruguay and the
11  University of San Diego, where he is a visiting professor of marketing and adjunct
12  professor, respectively. *Id.* ¶ 1. In addition to his academic roles, Chandler has worked
13  in analytics and data science for 25 years with a focus on digital marketing, including
14  extensive work in every marketing channel he addresses within his report. *Id.* ¶¶ 1, 7, 9,
15  14. He also has experience working in student recruiting for higher education
16  institutions. Chandler Rep. ¶ 56; Dkt. 144-2, Chandler Dep. 123:13-126:18 (noting work
17  related to online student recruiting both in the private sector and while at the University
18  of Montana). Chandler has been admitted as an expert in the field of digital marketing
19  and marketing reach. *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 19-
20  MD-02913-WHO, 2022 WL 1814440, at *18–19 (N.D. Cal. June 2, 2022).

21          Chandler applies his expertise in this case to explain (1) digital marketing
22  practices related to student recruitment for online graduate programs; (2) the stages of
23  the student recruitment and enrollment "customer journey" through the "marketing
24  funnel;" (3) the marketing channels and strategies relevant to online recruitment; and
25  (4) USC Rossier's application of these principles. *See* Chandler Rep. p. 3.

26          Chandler offers 10 opinions in his report, which may be categorized as either (1)
27  marketing opinions or (2) exposure opinions. Chandler's marketing opinions—

28                                                    2

opinions 1, 2, 3, 4, 5, and 10—address 2U and USC's actions in the context of marketing practices and principles. For example, Chandler opines that 2U and USC Rossier "engaged in a sophisticated, multichannel marketing strategy," that "featured the rankings across various channels, times, and stages of the marketing funnel," including "extensive email marketing campaigns," which used rankings as "a key differentiator." *Id.* ¶ 14.

Chandler's exposure opinions—6, 7, 8, and 9—discuss the reach of marketing materials containing rankings information. *Id.* ¶ 14. The thrust of Chandler's exposure opinions is that all or nearly all of the students who ultimately enrolled in USC Rossier's MAT or OCL online programs between 2017 and 2022 were exposed to rankings through email, websites, or other marketing materials and sources due to the nature of 2U's marketing practices and the process students went through when applying to and enrolling in these programs.

## III. <u>LEGAL STANDARD UNDER *DAUBERT* AND RULE 403</u>

"The Ninth Circuit has emphasized *Daubert*'s guidance that FRE 702 'should be applied with a 'liberal thrust' favoring admission.'" *In re NFL's "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG, 2024 WL 2165676, at *2 (C.D. Cal. May 13, 2024) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)). Courts thus "begin from a presumption that expert testimony is admissible." *Spintouch, Inc. v. Outform, Inc.*, 2022 WL 17363902, at *2 (C.D. Cal. Sept. 28, 2022).

Rule 702 allows admission of expert opinions based on "scientific, technical, or other specialized knowledge" when they would "help the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). "The inquiry into the admissibility of expert testimony is a 'flexible one' in which

'[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*, No. 2:21-cv-05262-SPG-E, 2023 WL 6194385, at *1 (C.D. Cal. Sept. 7, 2023) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). "In evaluating expert testimony, the trial court is a gatekeeper, not a fact finder. The judge is supposed to screen the jury from unreliable nonsense opinions but not exclude opinions merely because they are impeachable." *Id.* (cleaned up and citations omitted).

Furthermore, when considering expert opinions in the context of class certification, the Ninth Circuit cautions courts that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Lytle v. Nutramax Lab'ys, Inc.*, __ F.4th __, No. 22-55744, 2024 WL 3915361, at *12 (9th Cir. Aug. 23, 2024) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). "A court is merely to decide whether a class action is a suitable method of adjudicating the case." *Id.* (quoting *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015)).

Although USC cites the unpublished case *Boyer v. City of Simi Valley*, No. 19-CV-00560, 2024 WL 993316, at *1 (C.D. Cal. Feb. 13, 2024), for the proposition that amendments to Fed. R. Evid. 702 in 2023 created a more exacting standard for expert proof, the standard has not changed. Rather, "the amendment merely 'codified what was already the prevailing understanding of Rule 702's requirements." *U.S. v. Medtronic, Inc.*, 2024 WL 4002842, at *9 (C.D. Cal. July 22, 2024) (quoting *Le v. Zuffa, LLC*, 2024 WL 195994, at *5 (D. Nev. Jan. 18, 2024)); *see also In re*, 2024 WL 2165676, at *3. *Boyer*, moreover, was not a class action and was decided shortly prior to trial. At class certification, the Ninth Circuit has made clear that "there is no requirement that the [expert] evidence relied upon by Plaintiffs to support class certification be presented in an admissible form at the class certification stage." *Nutramax*, 2024 WL 3915361 at *7.

4

## IV.    <u>ARGUMENT</u>

USC's motion to exclude does not challenge Chandler's qualifications or the marketing opinions that he offers. Instead, USC seeks to exclude only Chandler's exposure opinions, namely that all or nearly all students who enrolled in Rossier's online MAT and ED OCL programs were exposed to the fraudulent U.S. News rankings by email, USC's websites, or other marketing channels. However, USC does not engage in the relevant question at hand—whether this Court should admit and consider Dr. Chandler's opinions when analyzing the propriety of class certification. The evidence that underlies his opinions is common to the class and the type of evidence that courts consider at the class certification stage. *See, e.g., In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 816–17 (N.D. Cal. 2021) (finding classwide exposure where "common evidence suggests that defendants' marketing and training activities were highly orchestrated and centrally controlled" such that the court could "infer that the proposed class members were exposed to the same misrepresentations and omissions that flowed from defendants' centrally controlled marketing and training activities"). Likewise, Dr. Chandler's opinions apply equally to all putative class members. This commonality plainly supports class certification here.

As a merits question—which is not yet before this Court—Plaintiffs intend to offer Dr. Chandler's marketing opinions, which USC does not challenge, to assist the jury in understanding how the various pieces of evidence in this false advertising case fit into an overall marketing campaign and strategy that USC used to promote USC Rossier's rank through a sophisticated, multichannel approach. This brief begins with Chandler's unchallenged marketing opinions, from which his exposure opinions flow: 2U, on behalf of USC, employed marketing best practices to ensure that every student who enrolled in the online MAT and OCL programs did so only after passing through the 2U marketing funnel.

5

Next, this brief addresses the record evidence—including 2U's 30(b)(6) deposition testimony and marketing materials from both 2U and USC—which provides ample support for the jury to find that USC fraudulently misrepresented USC Rossier's rank to the class as a whole such that, if the misrepresentation is also found to be material (it was), reliance can be inferred. Dr. Chandler's exposure opinions support such a finding.

> **A.    Record evidence supports Chandler's opinion that 2U, on USC's behalf, employed a sophisticated marketing strategy consistent with marketing best practices, which USC does not challenge.**

USC does not seek to exclude the following testimony of Dr. Chandler discussed in this Section A, which helpfully explains—drawing on his wealth of experience with and knowledge of general digital marketing principals and campaigns—the extent and nature of 2U and USC's marketing of USC Rossier's fraudulent ranking as part of a sophisticated, multichannel marketing strategy.

> **i.    Chandler's report explains how the marketing funnel moves prospective student-consumers along the enrollment journey from interest in a program to enrollment.**

The marketing funnel is a framework that helps an entity selling a product to guide consumers from first learning about a product through the point of purchase. Chandler Rep. ¶ 21. The classic framework moves the potential purchaser from awareness to interest to desire and, ultimately, to action. *Id.* ¶ 22. The funnel is a visual representation showing how the number of prospective purchasers decreases at each stage, with actual customers making up the final and smallest number of individuals:



Chandler Rep. ¶ 22.

Marketers who sell online graduate programs employ the marketing funnel to guide students through the "enrollment journey." *Id.* ¶ 55. The marketing funnel for recruiting students proceeds in the following stages:

- Awareness: At this stage, "institutions aim to capture the attention of potential students and inform them about the existence and benefits of their programs," ¶ 59, which they do through, among other things, digital media, ¶¶ 60-61.

- Interest: At this stage, "[i]nstitutions employ personalized communication strategies to maintain and heighten this interest." ¶ 64. At this stage, they send tailored emails that highlight important selling points about the program. ¶ 64.

- Consideration: At this stage, students begin to dig deeper into a program's specifics. Institutions use tailored emails, online consultations, and targeted digital advertising to continue to deliver their messaging at even more depth. ¶¶ 67-68.

- <u>Application:</u> At this stage, students submit an application to the program. ¶ 69. The institution's primary goal is facilitating the submission of applications. ¶ 70.

- <u>Decision:</u> At this stage, an admitted student makes their decision about whether to accept an offer of admission. ¶ 72. Institutions send direct mailers, use personalized follow-ups, and provide in-person and virtual events. ¶¶ 73-74.

- <u>Enrollment:</u> At the final stage, institutions focus on helping students complete the necessary administrative tasks; marketing is typically not a part of this stage. ¶¶ 75-76.

ii.     **2U's marketing strategy ensured that every student who ultimately enrolled in the online MAT and OCL programs did so only after passing through a marketing funnel that emphasized USC Rossier's rankings.**

2U applied the funnel. Its 2015 marketing plan displays its marketing funnel for Rossier's online programs, which Dr. Chandler discusses in depth as an example of 2U's sophisticated marketing efforts over the years:



PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DR. JOHN CHANDLER
*Favell, et al., v. Univ. of S. Cal.*, Nos. 2:23-cv-00846-GW-MAR; 2:23-cv-03389-GW-MAR

1    Chandler ¶¶ 91-102.

2      As 2U's 30(b)(6) witness explained, 2U's "marketing and recruiting [admissions

3 team] would be communicating with prospective students who [had] identified

4 themselves as potentially interested in the program after they have either filled out [an

5 interest form] or started an application and [keep] communicating with them until they

6 either exit the funnel or apply to the program." Dkt. 144-3, Gerber Dep. 152:5-12. To

7 the extent a prospect did not enter 2U's marketing funnel though a "2U-powered

8 channel"—which a majority did—but instead went directly to USC, the prospect would

9 still be included in 2U's marketing funnel. Gerber Dep. 49:18-50:21 (explaining the

10 general process, her expectation that most individuals would arrive through a "2U-

11 powered channel," and noting that if an individual came directly to USC, 2U would

12 request the information so that they would be "included in the overall prospect

13 funnel"). There was no way to enroll in the online MAT or OCL programs without

14 passing through the 2U marketing funnel.

15      Once in the funnel, prospective students received a series of tailored email

16 messages—known as a "drip" email campaign. Gerber Dep. 109:9-16. A prospective

17 student's status in the student enrollment journey determined the types of emails they

18 received; 2U crafted a distinct series of messages for a "prospect" drip, a "started app"

19 drip, a "submitted app" drip, and a "reengagement" drip (to those whose engagement

20 had stalled). Gerber Dep. 109:4–111:5; 111:10-11 (noting use of similar program for

21 OCL and MAT programs).

22      The content was designed to appeal to prospective students both as they entered

23 and moved down the funnel, regardless of where they entered. As 2U's corporate

24 representative explained, individuals who entered the "prospect pool," either through

25 filling out a request for information or starting an application, were placed into a drip

26 email campaign, with the key difference between the two groups being which email in

27 the drip campaign they received. Gerber Dep. 109:17-110:115 (explaining that the drip

28

9

1  email campaign is customized/individualized based on where an individual is in the
2  funnel). For example, those who filled out a request for information would receive the
3  "prospect drip," and those who started an application would receive the "started app
4  drip."

5        These email campaigns highlighted Rossier's U.S. News ranking—which 2U's
6  corporate representative characterized as "definitely a leading differentiator," or selling
7  point—early and often. Gerber Dep. 106:6-9. Far from equivocating, 2U's corporate
8  representative repeatedly indicated the importance of including rankings throughout
9  email campaigns to prospective students. She testified that she "believed" rankings
10 information was included in initial campaign emails, and that it "would surprise [her]"
11 if it was not part of both the initial and subsequent emails. Gerber Dep. 113:13–114:1.
12 Further, rankings were "an absolute inclusion" in paid emails because 2U considered it
13 "a key differentiator that we would want to communicate to the prospective student
14 when we developed [Rossier's marketing] copy." Gerber Dep. 108:15–109:3; 105:14-17
15 ("Q: [D]id any of the paid e-mail campaigns that 2U ran ever mention USC Rossier's
16 U.S. News & World Report ranking? A: I believe so, yes."). Gerber "[could not] think
17 of a reason why [2U] would remove [USC Rossier's U.S. News ranking]" from the
18 emails before 2022, when USC Rossier withdrew from the rankings; instead, she
19 clarified that it was 2U's practice to update rankings information in email copy only as
20 "new information" became available. Gerber Dep. 113:9-11.

21       And, as discussed more fully below, email was just one of several channels 2U
22 and USC used to market the online programs to prospective students in the marketing
23 funnel.

24
25
26
27
28

10

1      **B.    Marketing principles and record evidence support Chandler's**
2      **exposure opinions, including his ultimate opinion that all or nearly**
        **all students who matriculated in USC's online programs were**
3      **exposed to the fraudulent rankings.**

4      Like the marketing opinions that USC does not seek to exclude, Dr. Chandler's

5  exposure opinions are based on sufficient facts and data. Although the original email

6  text and individual, log-level tracking data are not available,[2] Dr. Chandler can still

7  provide evidence-grounded exposure opinions that rely on his decades of marketing

8  experience and the available evidence in this case. *See e.g.*, *Elosu v. Middlefork Ranch Inc.*,

9  26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience

10  can serve as the requisite 'facts or data' on which they render an opinion."); *JH Kelly,*

11  *LLC v. AECOM Tech. Services, Inc.*, 605 F. Supp. 3d 1295, 1315 (N.D. Cal. 2022)

12  ("Because [expert] claims that he relied on project documents . . . to support his opinion,

13  the Court finds that, at least at this stage . . . expert opinion is based on sufficient facts

14  to meet the standard of FRE 702(b).").

15      As noted above, all students who matriculated in the online MAT and OCL

16  programs passed through the marketing funnel. Record evidence thus supports Dr.

17  Chandler's conclusion that all students who matriculated at USC Rossier received emails

18  containing rankings. Chandler Rep. ¶ 213 ("Gerber has testified that it would be in

19  keeping with 2U's practices to include the rankings [in 2U's email campaign] and she

20  believes they did. I concur with those beliefs based on my marketing experience and

21  my review of the materials in this case—the fraudulent rankings were central to the

22  marketing strategy of the programs. Therefore, I can say with a reasonable degree of

23

24

25  ---
    [2] 2U did not maintain historical versions of marketing content, instead upating old
26  content to meet present needs. *See* Gerber Dep. 183:1-10 (discussing historical
    marketing copy). In addition, the absence of log-level records does not allow for site
27  traffic figures tied to identified emails. Chandler Rep. ¶ 215.

28                         11

1  scientific certainty that the fraudulent rankings were disseminated to all or nearly all

2  matriculating students via these welcome emails.").

3          Further, 2U and USC included rankings in other marketing copy that targeted

4  prospective students in the funnel. Chandler Rep. ¶ 14(9) ("I can state with a reasonable

5  degree of scientific certainty that all or nearly all students at USC Rossier in the MAT

6  and OCL programs during the period of ranking manipulations were exposed to the

7  fraudulent rankings. The pervasiveness of these rankings across multiple touchpoints

8  ensured their near-universal reach."); *see also Primiano*, 598 F.3d at 565 ("Lack of certainty

9  is not, for a qualified expert, the same thing as guesswork.") (internal citation omitted).

10          i.      **Students who enrolled in USC Rossier would have been**
11                  **exposed to the rankings through 2U's marketing emails.**

12          As discussed above, all prospective students who expressed an interest through

13  either requesting information about or applying to USC Rossier were included in the

14  marketing funnel and thus began receiving tailored email messages. Every student who

15  ultimately matriculated passed through to the end of the funnel, receiving emails

16  throughout the process. 2U's corporate representative testified that given 2U's

17  practices, she believed these emails included the fraudulent rankings—because "the

18  rankings were central to the marketing strategy of the programs." Chandler Rep. ¶¶

19  212-13. This is consistent with Chandler's marketing experience about how such a key

20  differentiator would be disseminated. Chandler Rep. ¶ 213. Nor does USC seek to

21  exclude Dr. Chandler's opinions that the use of rankings in 2U and USC's marketing

22  efforts was a key differentiator that was strategically placed and prominently featured

23  across various channels, times, and stages of the marketing funnel, such that the

24  fraudulent rankings were highly visible and influential throughout the marketing and

25  recruitment process. *Id.* ¶ 14.

26          Although USC argues that Dr. Chandler is mistaken in concluding "that every

27  person who started an online application with Rossier was added to drip email

28

1    campaigns" (Mot. at 4), record evidence supports his conclusion. Indeed, USC

2    acknowledges that drip email campaigns were sent to those who requested information

3    about USC Rossier. *Id.* And 2U's representative was clear that the majority of students

4    enter 2U's marketing funnel through a "2U-powered pathway." Gerber Dep. at 48:1-

5    49:20. But USC ignores testimony from 2U's representative that <u>all</u> "prospects" entered

6    2U's marketing funnel and thus would have received drip emails, including direct

7    applies, whose first touch point is a submitted application, rather than a request for

8    information. *See, e.g.*, Gerber Dep. at 47:19-22 (noting that "prospects" refers to any

9    individual who identified an interest in USC Rossier through a request for information

10   or directly to the institution), 49:18-52:8 (explaining that even the relatively small

11   number of prospects who identify themselves through non-2U channels are entered

12   into 2U's "overall prospect funnel"); 53:20–54:11 (explaining that "direct apply" simply

13   means an individual whose first touch point is a submitted application and who would

14   thus be part of the relatively small number of prospects who entered 2U's funnel but

15   "did not come in through a 2U-powered channel"); 110:12-15 (noting that students

16   who submit an application are started on the "submitted apps" drip).

17         The handful of excerpts USC cites from the testimony of 2U's representative

18   weave together distinct discussions with the effect of obscuring the extensive nature of

19   2U's email campaigns and their collective emphasis on rankings. For example, USC

20   highlights 2U's testimony that "not every individual would receive all of these e-mails,"

21   Mot. at 4 (citing Gerber Dep. 109:13-14), but 2U's representative went on to say in the

22   very same sentence that "dependent on their stage [of the funnel], if they had consented

23   to receive information, they would be *put into one of these categories* [of email drip

24   campaigns] and moved through them." Gerber Dep. 109:13-16 (discussing Ex. 104 at

25   0000456). This makes sense; it wouldn't be effective to send an email that says, "Start

26   your application today!" to someone who had already submitted one. Rather, as

27   discussed above, those who started an application would receive the "started app drip"

28

13

1  emails instead of the "prospect drip" emails, but that is a distinction without a difference
2  as both categories of emails included, according to 2U, the fraudulent rankings.

3         USC's attempt to discredit Dr. Chandler's exposure opinions based on email
4  open rates also falls flat. Nor does USC's focus on whether a student opted in or
5  unsubscribed to the email campaigns make any sense given the record facts. Any
6  prospective student who requested information effectively opted in to the USC Rossier
7  email campaigns. *Id.* at 114:7-10. As 2U's representative testified, had the prospective
8  student merely done nothing after requesting such information, they would have
9  continued to receive emails. *Id.* at 109:20-110:2. And anyone who received these emails
10 must necessarily have opened them to unsubscribe. *Id.* at 114:7-10.

11        That not every individual would have opened every email does not render Dr.
12 Chandler's exposure opinions unreliable[3]—in fact, the marketing funnel and general
13 email marketing practices are designed to account for that reality. By design and
14 definition, a significantly larger number of people entered the marketing funnel than
15 matriculated to USC Rossier. For example, a 2U internal marketing document shows a
16 reach of 45,000 individuals at the prospect level for a yield of 480-590 applications. *See*
17 Chandler Rep. ¶ 95. And those individuals most likely to move through the funnel are
18 those most interested in USC Rossier's programs—and therefore most motivated to
19 engage with marketing materials by opening emails. *See* Chandler Depo. 224:15-17
20 (noting that to avoid rankings, a student would have to delete without opening the initial
21 and subsequent emails—and yet be interested enough to apply and enroll). Precisely
22 because not every recipient opens every email, marketing best practice is to repeatedly
23 include key indicators in materials, with the goal of eventually ensuring message
24 saturation.

25

26 _____
27 [3] Chandler notes that a review of certain data suggested that "welcome" emails had a
   59.4% open rate, but noted that the figure was unreliable. Chandler Rep. ¶ 212.

28                                      14

1    Nor is USC correct that Plaintiff Favell undermines the reliability of Chandler's
2    exposure opinions. *See* Mot. at 5. To the contrary, Favell testified that she received
3    immediate emails and calls upon expressing interest in USC Rossier, which 2U's
4    representative testified would have included the fraudulent rankings, although Favell
5    did not specifically recall that fact. Dkt. 144-4, Favell Dep. 106:17-18; Gerber Dep.
6    113:13–114:1. Her testimony thus confirms 2U's aggressive use of email drip campaigns
7    and receipt of the same. Favell Dep. 106:17-18. Moreover, Favell *did* specifically recall
8    seeing the rankings on USC's website and the US News website, Favell Dep. 113:11-
9    16, which is consistent with Chandler's opinion that students also would have seen the
10   rankings on USC's websites, and further supports that Chandler's opinion is not
11   speculative. Finally, Favell believed she may have seen additional advertisements
12   promoting USC's ranking when looking at other websites, Favell Dep. at 115:21-116:10,
13   which again is consistent with Dr. Chandler's conclusion that students who enrolled in
14   USC's online programs were exposed to the rankings through channels besides email
15   and websites, and in particular that students who completed the enrollment journey
16   necessarily would have been exposed.

17    In short, Favell's testimony confirms 2U's and USC's success at saturating the
18   market with its fraudulently procured rank, as do all of Plaintiffs' other experiences. *See,*
19   *e.g.*, Ex 1., Plaintiff Murtada's Interrogatory Resp. No. 4 and Ex. 2, Murtada Dep. 54:11-
20   55:18, 230:6-231:15 (testifying, *inter alia*, that he saw a paid advertisement for USC
21   Rossier touting a US News top 10 ranking, with a link taking him to the USC Rossier
22   website, where he likewise saw advertisements and references to USC Rossier's US
23   News ranking, that he spoke with an admissions counsel, who promoted USC Rossier's
24   rank, and that he received emails from USC Rossier promoting its rank); Ex. 3, Plaintiff
25   Zarnowski's Interrogatory Resp. No. 4 and Ex 4., Zarnowski Dep. 48:10-50:7; 58:22-
26   23, 59:5-60:1; 63:6-14, 284:22-286:9 (testifying that, while researching top EdD
27   programs, she viewed paid search results on Google promoting USC Rossier's US News
28

15

1    ranking, that she saw advertisements promoting USC Rossier's rank on her social

2    media, that she received an email from USC promoting its US News top 10 ranking,

3    that she then visited USC Rossier's website, where she saw the ranking, which she then

4    confirmed via US News's website, and that she also saw the rank on the

5    rossieronline.usc.edu website).

6        USC's view of testimony on email campaigns may differ from Plaintiffs, but USC

7    will have the chance to present that view at trial. USC's interpretation of the evidence

8    does not render Chandler's interpretation wrong or his opinions unsupported, and it is

9    precisely "the job of the fact finder, not the trial court, to determine which [testimony]

10   is more credible and reliable." *City of Pomona v. SQM North Am. Corp.*, 750 F.3d 1036,

11   1043 (9th Cir. 2014). Moreover, even "[i]f incorrect, [expert] opinions can be easily

12   rebutted at trial through cross-examination or other testimony." *McCrary v. Elations Co.*

13   *LLC*, No. EDCV 13–0242 JGB, 2014 WL 12589137, at *15 (C.D. Cal. Dec. 2, 2014);

14   *see also Elosu*, 26 F.4th at 1023–24 (concluding the district courts' concerns about

15   whether the expert's "conclusion conflicted with . . . [other] testimony[,]" *inter alia*, are

16   properly addressed through impeachment before a jury at trial—not exclusion by a

17   district judge at the admissibility stage). In addition, whether an expert "made improper

18   or unsupported assumptions and reached faulty or irrelevant conclusions plainly bear

19   on the weight of his testimony, not its admissibility." *JH Kelly*, 605 F. Supp. 3d at 1318.

20   "Although '[a] court may conclude that there is simply too great an analytical gap

21   between the data and the opinion proffered,' Rule 702 does not license a court to engage

22   in freeform factfinding, to select between competing versions of the evidence, or to

23   determine the veracity of the expert's conclusions at the admissibility stage." *Id.*

24   (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

25       Dr. Chandler reliably opined that all or nearly all students who matriculated in

26   the online MAT or OCL programs were exposed to rankings through emails. Not only

27   are his exposure opinions supported by sufficient facts and a wealth of marketing

28                                          16

experience and knowledge, but his opinions assist "with the basic function of expert testimony: to help the trier of fact understand highly specialized issues that are not within common experience." *Elosu*, 26 F.4th at 1023-24 (9th Cir. 2022) (finding that the district court abused its discretion when it concluded that the expert "report [was] too speculative, that his conclusion conflicted with the [other] testimony, and that he relied too heavily on the testimony of the plaintiffs[,]" and therefore was not "based on sufficient facts or data," because in doing so, "the district court assumed a factfinding role in its analysis").

        **ii.**      **USC Rossier websites included rankings information in areas that would have exposed students in the marketing funnel to the numerical ranking.**

       Chandler's report thoroughly discusses two different USC Rossier websites, one of which USC maintained (www.rossier.usc.edu), and the other of which was maintained by 2U (www.rossieronline.usc.edu). Chandler Rep. ¶¶ 124-160. It also includes historical screenshots of the USC-maintained www.rossier.usc.edu landing page from 2017 to 2022. Chandler Rep. ¶¶ 145-159. As seen in the example below, the U.S. News ranking features prominently:



PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' EXPERT WITNESS DR. JOHN CHANDLER
*Favell, et al., v. Univ. of S. Cal.*, Nos. 2:23-cv-00846-GW-MAR; 2:23-cv-03389-GW-MAR

Chandler Rep. ¶ 145.

As Chandler explained, the decision to place the numerical ranking in a large font with significant negative space around it on the left-hand side and toward the middle of the page is no fluke and reflects the emphasis USC Rossier sought to place on it:

> The placement on a Web page and website design has an influence on what content people see on that page. There's well-established research on the way in which people read information online. Typically, people start at the top left and will move down the left-hand side and then across from there. And so, people tend to read much like we read books. And will see the information kind of in the order it's displayed, going left to right and top to bottom. Things like font size influence whether or not an element of a page is viewed. Colors can influence whether or not part of a page is viewed.
>
> And so, in this case specifically, like the example that we're on here in paragraph 145, the number 15, beneath that it says USC Rossier U.S. News rank for best education schools. And that number 15 is prominently displayed with a lot of white space around it. And kind of toward the middle of page in a large font. Very easy for people to see.
>
> . . . .
>
>  If you knew you wanted to apply, you would presumably click the apply now button. But this entire page would be visible to you.

Chandler Dep. 310:14-311:14, 313:9-12.

USC's partial quote from Chandler's report (and liberal use of ellipses) eliminates important content and context to suggest he somehow concedes that his website exposure opinion is mere "commonsense." *See* Mot. at 6. Not so. Chandler opines that "[s]tudents who were serious about Rossier, who were making progress down the funnel that 2U was focused on promoting, were likely to visit" USC Rossier webpages that contained rankings information, which provided an additional source of exposure.

18

1  Chandler Rep. ¶ 217. Dr. Chandler does recognize that it is "reasonable, *from both a*
2  *marketing and a commonsense perspective*, to assume that the vast majority of matriculating
3  students visited these pages at least once during their consideration process." Chandler
4  Rep. ¶ 208 (emphasis added). "To exclude an expert report simply because it also
5  employs common sense—in addition to expertise—is not supported by the caselaw."
6  *Droplets, Inc. v. Yahoo! Inc.*, No. 12-cv-03733-JST, 2021 WL 11701485 (N.D. Cal. Nov.
7  29, 2021) (internal quotation marks and citation omitted).

8      Dr. Chandler's website exposure opinion is no *ipse dixit*, nor does it fall within
9  common layperson understanding. Rather, his opinion is based on his review of the
10  evidence, a substantial review of the USC websites, significant marketing experience,
11  academic research, and plaintiff testimony. *See generally*, Chandler Rep. ¶ 14
12  (methodology overview); *id.* p. 40-55 (review of USC Rossier's websites); pp. 57-77
13  (review of USC's display, social media, online, and print marketing); pp. 85-90 (list of
14  USC provided documents, USC websites, and academic resources Chandler reviewed
15  to arrive at conclusions). This type of opinion, which combines website design,
16  consumer behavior, and marketing principles, is precisely the type of opinion that
17  courts routinely permit experts to provide because it is helpful to the jury and not within
18  the "areas believed to be within the jurors' common understanding." *United States v.*
19  *Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) ("Our 'proper subject' inquiry has generally
20  focused upon whether the expert testimony improperly addresses matters within the
21  understanding of the average juror."); *Montera v. Premier Nutrition Corp.*, No. 16-cv-
22  06980-RS, 2022 WL 1225031, at *5–*6 (N.D. Cal. Apr. 26, 2022) (admitting expert
23  testimony where expert "synthesized Defendant's internal documents about marketing
24  strategies," general marketing principles, and advertising strategy of defendant,
25  recognizing that courts often admit marketing expert's testimony regarding a company's
26  marketing strategy).

27      *Lincare Holdings Inc. v. Doxo, Inc.*, provides a particularly apt example. No. 8:22-
28

19

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' EXPERT WITNESS DR. JOHN CHANDLER
*Favell, et al., v. Univ. of S. Cal.*, Nos. 2:23-cv-00846-GW-MAR; 2:23-cv-03389-GW-MAR

1    CV-2349-VMC-AEP, 2024 WL 243646, at *3–4 (M.D. Fla. Jan. 23, 2024). In that case,

2    the defendant sought to exclude an expert who offered opinions touching on website

3    design, online marketing, and search engine optimization. *Id.* at *3. The defendant in

4    *Lincare* challenged the expert's qualifications to opine about consumer behavior, his

5    methodology, and whether the opinions themselves were helpful to a jury. *Id.* The court

6    held that the expert's decades of experience in the field qualified him to offer the

7    opinions. *Id.* It also held that his methodology was sound because he "applied his

8    experience to his review of relevant materials, including, among other things, [the

9    defendant's] website, various search engines, and [regulatory agency] reports." *Id.*

10   Finally, the court held that the opinions were helpful to a jury because juries were likely

11   unfamiliar with website design and advertising techniques. *Id.* at *4.[4]

12        None of the cases USC cites in its motion support their argument against Dr.

13   Chandler's website exposure opinion. In *Alves v. Riverside County*, for example, the court

14   excluded expert testimony that consisted only of "an unhelpful recitation of facts

15   viewable on video" punctuated by the expert's own spin. No.

16   EDCV192083JGBSHKX, 2023 WL 2983583, at *11 (C.D. Cal. Mar. 13, 2023). That is

17   not comparable to Chandler's application of his decades of experience to an in-depth

18   review of websites and the record evidence.

19        Similarly, in *Townsend v. Monster Beverage Corporation*, the court excluded an expert's

20

21   [4] *Accord Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884, at *4 (N.D.

22   Ill. June 25, 2018) ("As with [expert's] 'best practices opinion' described above, the basis
     for the 'typical user opinion' is [expert's] considerable experience in the website design

23   industry. He admits he conducted no empirical testing of how typical users … actually
     behaved. But again, [expert] may present expert opinions predicated upon his years of

24   experience in web design."); *Georgian v. Zodiac Grp., Inc.*, No. 10-CIV-60037, 2011 WL

25   13214041, at *3 (S.D. Fla. June 24, 2011) (finding expert qualified to opine about online
     directories and potential confusion they cause where the expert had "ten years of

26   experience in online marketing with a specialty in search marketing strategy" and had

27   "created an online marketing program for a start-up company from scratch").

28
     _____
                                        20

opinion because the expert failed to connect his ultimate opinion (that energy drink consumers were energy drink purchasers) to anything more than his "unsupported speculation." 303 F. Supp. 3d 1010. 1032 (C.D. Cal. 2018). Again, Chandler's ultimate opinion is supported by his experience, a thorough review of the website, and a review of the record evidence.

     **iii.**     **Chandler's opinion that enrolled students would have been exposed to rankings via channels besides emails and websites is based on record evidence and bolsters his exposure opinion.**

In addition to its email and website copy, 2U exposed individuals in the marketing funnel to USC's numerical ranking in a wide variety of ways. It was 2U's practice to also include ranking across other marketing channels: on social media pages, Gerber Dep. 66:5-15, 75:10-18, 142:20-25 (testifying she believed that some social media advertisements for the programs included numerical rank),[5] in webinars, *id.* 115:2-22, through external advertising, *id.* 91:19-92:11, and contextual partnerships, *id.* 97:7-20. It was also 2U's practice to include USC Rossier's fraudulent ranking in talking points prepared for 2U admissions counselors who spoke with prospective students. *Id.* 153:15-25, 155:10–16; *see also id.* 161:10-14 (describing ranking as "one of the key differentiators of the program," which would be part of the education of admissions counselors).

Chandler discusses these additional "other channel" sources of marketing that include references to the rankings in his report. Chandler Rep. ¶¶ 162-199 (reviewing search, print, and social media marketing examples). USC's motion to exclude demonstrates a fundamental misunderstanding of Chandler's opinions regarding these exposures. In support of its effort to exclude Chandler's exposure opinion, USC cites

---

[5] It was part of 2U's marketing strategy to maintain social media accounts (Gerber Dep. 66:5–15), including Facebook (*id.* 68:25–69:7), LinkedIn (*id.* 69:9–16), Twitter (*id.* 69:18–23), Instagram (*id.* 70:9–14), and Google+ (*id.* 69:25–70:7).

1   *Ono v. Head Racquet Sports USA, Inc.*, No. CV134222FMOAGRX, 2016 WL 6647949

2   (C.D. Cal. Mar. 8, 2016). But instead of supporting exclusion, a comparison with *Ono*

3   illustrates why Chandler's opinion meets *Daubert*'s requirements.

4         In *Ono*, the plaintiff filed a class action against a tennis racket manufacturer

5   because he purchased a racket that he believed a professional tennis player used after

6   watching the tennis player compete in a tournament. *Id.* at *2. The plaintiff

7   acknowledged that he had not interacted with any of the advertising and made a spur-

8   of-the-moment purchase because he believed that a particular player used the racket.

9   *Id.* The plaintiff's sports marketing expert provided a declaration that identified general

10  marketing principles and offered general observations about the role of things like press

11  releases, marketing expenditures, and the raw number of social media fans and video

12  views—but failed to connect any of this information to the alleged deceptive advertising

13  at issue. *Id.* at *16 n.10. Instead, supported only by "broad generalizations from general

14  marketing and advertising principles," he opined that a large percentage of consumers

15  who purchased the rackets had been exposed to the racket company's "marketing and

16  advertising messages." *Id.* The court understandably found the expert's opinion

17  unpersuasive.

18        Chandler's opinion that students who enrolled in USC's online MAT and OCL

19  programs were also exposed to the rankings through channels besides email and

20  websites stands in stark contrast. Unlike the *Ono* expert, Chandler does not simply

21  review general marketing principles, identify a collection of general 2U/USC marketing

22  efforts, and conclude that a large percentage of individuals who enrolled in USC's MAT

23  and OCL programs were exposed to rankings advertising. Instead, Chandler's "other

24  sources" exposure opinion provides additional support to his additive email and website

25  exposure opinions. And those additive opinions stand firmly on the unchallenged

26  marketing explanations and opinions Chandler has provided.

27        Chandler does far more than provide a general overview of general marketing

28

                                          22

principles. Rather, he describes how general marketing principles apply to online
graduate student recruiting, analyzes the available information to determine that 2U
followed marketing best practices, including emphasizing ranking, and—unlike the
spur-of-the-moment racket purchaser in *Ono*—that 2U's marketing strategy ensured
that those individuals who purchased the 2U/USC product (that is, enrolled in the
online MAT or OCL program) could do so only after passing through 2U's marketing
funnel. Because Chandler's "other sources" exposure opinion does not stand alone, it
should not be analyzed alone.

Because of Chandler's knowledge of marketing principles and 2U's adherence to
marketing best practices that ensured every student who enrolled in the MAT and OCL
programs did so only after passing through 2U's marketing funnel, Chandler can opine
that all or almost all USC Rossier students were exposed to the fraudulent rankings
through emails, and that those who may not have been exposed through emails were
likely exposed through website copy. *See, e.g.*, Chandler Rep. ¶ 224. Any additional
opportunities for exposure only serve to further solidify Chandler's ultimate opinion
that all or almost all students who matriculated in the online MAT or OCL programs
were exposed to rankings.

## V.  <u>CONCLUSION</u>

Chandler's exposure opinions withstand scrutiny under *Daubert* because they are
grounded in a review and analysis of record evidence helpfully understood with the
benefit of Chandler's extensive marketing experience and expertise. After discussing
marketing principles and reviewing evidence from the record to opine that 2U followed
marketing best practices when it moved students through its marketing funnel and to
enrollment, Chandler thoroughly reviewed evidence of marketing that involved
rankings and analyzed that evidence in the context of his observations and unchallenged
opinions about 2U's marketing practices to reach his exposure opinions. The crux of
his exposure opinions is that it would have been virtually impossible for a student to

1  enroll in USC's online MAT or OCL programs without being exposed to the rankings.

2  Chandler's exposure opinions are reasoned and reliable, not mere *ipse dixit*.

3          For all the reasons discussed above, USC's motion to exclude Chandler's

4  exposure opinions should be denied.

5

6  Dated: October 1, 2024                    Respectfully submitted,

7                                            */s/  Annick M. Persinger*

8                                            Annick M. Persinger (SBN 272996)
                                             Sabita J. Soneji (SBN 224262)
9                                            Emily Feder Cooper (SBN 352951)
                                             **TYCKO & ZAVAREEI LLP**
10                                           10880 Wilshire Boulevard, Suite 1101
                                             Los Angeles, CA 90024
11                                           Telephone: (510) 254-6808
                                             Facsimile: (202) 973-0950
12                                           *apersinger@tzlegal.com*
                                             *ssoneji@tzlegal.com*
13                                           *ecooper@tzlegal.com*

14                                           Anna Haac (*pro hac vice*)

15                                           Shilpa Sadhasivam (*pro hac vice*)
                                             **TYCKO & ZAVAREEI LLP**
16                                           2000 Pennsylvania Avenue N.W., Suite 1010
                                             Washington, DC 20006
17                                           Telephone: (202) 973-0900
                                             Facsimile: (202) 973-0950
18                                           *ahaac@tzlegal.com*
                                             *ssadhasivam@tzlegal.com*
19

20                                           Eric Rothschild (*pro hac vice*)
                                             Tyler Ritchie (*pro hac vice*)
21                                           Chris Bryant (*pro hac vice*)
                                             Madeline Wiseman (SBN 324348)
22                                           **NATIONAL STUDENT LEGAL
                                             DEFENSE NETWORK**
23                                           1701 Rhode Island Avenue Northwest
                                             Washington, DC 20036
24                                           Telephone: (202) 734-7495
                                             *eric@defendstudents.org*
25                                           *tyler@defendstudents.org*
                                             *chris@defendstudents.org*
26                                           *madeline@defendstudents.org*

27                                           *Counsel for Plaintiffs and the Proposed Class*

28                                                      24

1

<u>**CERTIFICATE OF COMPLIANCE**</u>

2          The undersigned, counsel of record for the Plaintiffs, certifies that this brief

3    contains 6,949 words which complies with the word limit of L.R. 11-6.1.

4

5    Date: October 1, 2024                              */s/  Annick M. Persinger*

6                                                       Annick M. Persinger

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' EXPERT WITNESS DR. JOHN CHANDLER
*Favell, et al., v. Univ. of S. Cal.*, Nos. 2:23-cv-00846-GW-MAR; 2:23-cv-03389-GW-MAR