UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
## [FOR PUBLIC VIEW]
CIVIL MINUTES - GENERAL

| Case No. | CV 23-846-GW-MARx | Date | November 13, 2024 |
|---|---|---|---|
| Title | *Iola Favell et al v. University of Southern California, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

None Present                                          None Present

**PROCEEDINGS:** IN CHAMBERS - FINAL RULINGS ON DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO EXCLUDE OPINIONS & TESTIMONY OF PLAINTIFFS' EXPERT WITNESS JOHN CHANDLER [144]; DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO EXCLUDE OPINIONS & TESTIMONY OF PLAINTIFFS' EXPERT WITNESS SARA NEHER [145]; and DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO EXCLUDE OPINIONS & TESTIMONY OF PLAINTIFFS' EXPERT WITNESS J. MICHAEL DENNIS [146]

Attached hereto is the Court's Final Rulings on Defendant's Motions [144, 145, 146]. The Court DENIES USC's *Daubert* motions to exclude the expert report and testimony of Dr. John Chandler, Sara Neher, and Dr. J. Michael Dennis.

*This ruling is filed under seal because certain materials related to the underlying motions were filed by the parties under seal. **Within five days of the date of this order**, the parties shall email the Courtroom Deputy Clerk with a joint document reflecting: (1) proposed redactions to be made to the version of the ruling that will be posted to the public docket; and (2) correcting any inadvertent citations to sealed material such that all citations are to publicly docketed material. The Court will unseal the ruling without redactions if such request is not timely made, or if the parties inform the Courtroom Deputy Clerk that they do not wish for any portion of the ruling to be redacted.*

:

Initials of Preparer    JG

*<u>Iola Favell et al. v. University of Southern California et al.</u>*; Case No. 2:23-cv-00846-GW-(MARx); *<u>Iola Favell et al. v. University of Southern California et al.</u>*; Case No. 2:23-cv-03389-GW-(MARx); Final Rulings on Defendant's: (1) *Daubert* Motion to Exclude Dr. John Chandler, (2) *Daubert* Motion to Exclude Sara Neher, (3) *Daubert* Motion to Exclude Dr. J. Michael Dennis

Before the Court are three *Daubert* motions brought by Defendant University of Southern California to exclude the expert report and testimony of Plaintiffs' experts Dr. John Chandler, Sara Neher, and Dr. J. Michael Dennis.[1]  Because identical versions of the three *Daubert* motions were filed in both of the consolidated cases in this matter, the Court issues this combined ruling for both – *Iola Favell et al. v. University of Southern California et al.*, Case No. 2:23-cv-00846-GW-(MARx) (C.D. Cal.) ("*Favell I*") and *Iola Favell et al. v. University of Southern California et al.*, Case No. 2:23-cv-03389-GW-(MARx) (C.D. Cal.) ("*Favell II*").  The Court has considered the motions, Plaintiffs' opposition briefs, USC's reply briefs, and the oral argument presented at the November 7, 2024 hearing.  For the reasons stated herein, the Court **DENIES** all three motions.

I.  **Background**

The three instant *Daubert* motions arise at the juncture of class certification in this putative class action alleging higher education rankings fraud.  Both the factual and procedural history of these consolidated cases have been detailed in previous rulings.  *See Favell I*, Docket Nos. 63, 101; *Favell II*, Docket No. 86.  For convenience, the Court will reiterate herein some general background and add additional details germane to evaluating the admissibility of the three challenged expert witness reports and concomitant testimony.

Plaintiffs Iola Favell, Sue Zarnowski, Mariah Cummings, and Ahmad Murtada

---

[1] The following abbreviations are used throughout this ruling.  The first listed docket number refers to the docket in *Favell I* and the second refers to the docket in *Favell II*.

- Expert Report of Dr. John Chandler ("Chandler Report"), Docket Nos. 144-1, 132-1.
- USC's *Daubert* Motion to Exclude Dr. John Chandler ("Chandler Mot."), Docket Nos. 144, 132.
- Plaintiffs' Opposition to *Daubert* Motion to Exclude John Chandler ("Chandler Opp."), Docket Nos. 152, 140.
- USC's Reply in Support of *Daubert* Motion to Exclude John Chandler ("Chandler Reply"), Docket Nos. 159, 146.
- Expert Report of Sara Neher ("Neher Report"), Docket Nos. 145-2, 133-2.
- USC's *Daubert* Motion to Exclude Sara Neher ("Neher Mot."), Docket Nos. 145, 133.
- Plaintiffs' Opposition to *Daubert* Motion to Exclude Sara Neher ("Neher Opp."), Docket Nos. 154, 141.
- USC's Reply in Support of *Daubert* Motion to Exclude Sara Neher ("Neher Reply"), Docket Nos. 158, 145.
- Expert Report of Dr. J. Michael Dennis ("Dennis Report"), Docket Nos. 146-1, 134-1.
- USC's *Daubert* Motion to Exclude J. Michael Dennis ("Dennis Mot."), Docket Nos. 146, 134.
- Plaintiffs' Opposition to *Daubert* Motion to Exclude J. Michael Dennis, ("Dennis Opp."), Docket Nos. 151, 139.
- USC's Reply in Support of *Daubert* Motion to Exclude J. Michael Dennis ("Dennis Reply"), Docket Nos. 161, 148.

("Plaintiffs") allege that Defendant University of Southern California ("USC") engaged in a scheme to artificially inflate the U.S. News & World Report ("US News") ranking of USC's Rossier School of Education ("USC Rossier") by submitting incomplete data to US News – and then marketed that fraudulent ranking to the public. *See generally* Second Amended Complaint ("SAC"), *Favell I*, Docket No. 67; First Amended Complaint, *Favell II*, Docket No. 58.[2]

USC is a private nonprofit university that offers undergraduate and graduate degree programs, including through USC Rossier. SAC ¶ 23. US News calculates its annual Best Education Schools rankings in part using data sent by graduate education schools who choose to participate in the rankings. *Id.* ¶ 55. US News develops and provides instructions to participating institutions to ensure that they consistently collect and report data. *Id*. To determine its rankings, US News employs a specific methodology which assigns weights to eleven criteria based on their perceived importance to determining academic quality. *Id.* ¶ 56. Relevant here, "student selectivity" accounts for 18% of the school's total score and is comprised of three objective sources of admittance data: (1) the school's doctoral acceptance rate (6%); (2) mean GRE quantitative scores (6%); and (3) mean GRE verbal scores (6%). *Id.*

Throughout the relevant period (2009 through 2021), US News has required schools to submit the data used in its rankings, including student selectivity data, from all the school's education doctoral programs. *Id.* ¶ 60. The methodology does not distinguish between data from in-person and online programs. *Id.* ¶ 57. However, an internal investigation conducted by USC's outside counsel, Jones Day, determined that USC had submitted student selectivity data *only* for USC Rossier's highly selective, in-person PhD program – but *not* from its less-competitive EdD program. *Id.* ¶ 59. The less-competitive EdD program was offered online after 2015 in collaboration with 2U, a company that offers technology platforms for online programs and provides advertising and recruiting for those online programs. *Id*. ¶¶ 2, 6. From the 2009 rankings to the 2010 rankings, USC Rossier's reported acceptance rate dropped forty percentage points (from 50.7% to 10.5%) and its ranking rose 16 places (from #38 to #22). *Id.* ¶¶ 50, 58-61.

US News also began publishing a specialty ranking of online master's degrees in education in 2013. *Id.* ¶ 69. USC Rossier's online Master of Arts in Teaching program ranked #44 that year. *Id.* USC did not participate in those rankings in at least 2014 and 2016, nor did the program appear

---

[2] Because the factual allegations (the first 171 paragraphs) in the SAC in *Favel I* and FAC in *Favel II* are identical, the Court will hereinafter cite to the SAC in *Favel I* for simplicity.

2

on certain of the publicly available US News lists in 2015, 2017, 2018, 2019, 2020, or 2021. *Id.*

Plaintiffs allege that USC, knowing the importance of the rankings on prospective students' school choice, heavily marketed USC Rossier's rapidly rising ranking to the public to boost enrollment in the online programs. *Id.* ¶¶ 76, 78. USC orchestrated this scheme, Plaintiffs allege, through its submission of false/incomplete data and then promoted the resulting ranking knowing that it was misleading. *Id.* ¶ 77. According to Plaintiffs, USC regularly touted USC Rossier's ranking (and that USC Rossier was "top-ranked") in press releases, on social media, on the Rossier Website, and in other promotional materials. *Id.* ¶¶ 83-88. In these advertisements, USC did not disclose that USC Rossier was ranked lower or not ranked at all in US News' online master's degrees in education rankings, or that the data submitted to US News was incomplete or inaccurate. *Id.* ¶¶ 88-90. The named Plaintiffs saw and relied on USC's advertisements in different locations over different periods of time. *Id.* ¶¶ 127, 139, 149, 157.

Class discovery closed on August 27, 2024. USC filed the instant *Daubert* motions seeking to exclude three of Plaintiffs' expert witnesses on September 13, 2024. The Court issued a tentative ruling on the motions and heard oral argument on November 7, 2024. *See* Docket Nos. 168-169. Plaintiffs' motion for class certification is scheduled to be filed by December 2, 2024 and noticed for hearing on January 30, 2025.

## II. <u>Legal Standard</u>

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" each of the following requirements are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert opinion bears the burden of establishing admissibility by a "preponderance of proof." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) ("*Daubert*"); *see also* Fed. R. Evid. 702.

When evaluating the admissibility of expert testimony under *Daubert*, "the district court judge must ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). For the relevancy prong, expert testimony must be "relevant to the task at hand," *Daubert*, 509 U.S. at 598, meaning that it "logically advances a material aspect of the proposing party's case," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). The expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 590). For the reliability prong, *Daubert* delineated a non-exclusive list of factors that courts may consider when assessing the reliability of expert testimony:

> (1) whether the theory or technique can be and has been tested;
>
> (2) whether the theory or technique has been subjected to peer review and publication;
>
> (3) the known or potential error rate;
>
> (4) the existence and maintenance of standards controlling the technique's operation;
>
> (5) whether the theory or technique is generally accepted in the relevant scientific community.

*See Daubert*, 509 U.S. at 593-594. The Advisory Committee's Notes on the 2000 amendment to Rule 702 lists additional factors relevant to the reliability inquiry that courts have considered, both before and after *Daubert*:

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
>
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 Advisory Committee Notes (internal citations and quotation marks omitted).

The evidentiary standard announced in *Daubert* applies to motions to exclude expert testimony proffered in support of class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) ("in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*.") Citing to both *Ellis* and *Sali*, the Ninth Circuit recently addressed the depth of the *Daubert* inquiry at the class certification phase:

> [W]hether a "full" or "limited" *Daubert* analysis should be applied may depend on the timing of the class certification decision. If discovery has closed and an expert's analysis is complete and her tests fully executed, there may be no reason for a district court to delay its assessment of ultimate admissibility at trial. By contrast, where an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit. This still requires determining whether the expert's methodology is reliable, so that a limited *Daubert* analysis may be necessary, but the more full-blown *Daubert* assessment of the results of the application of the model would be premature.

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024).[3]

Determining admissibility under Rule 702 is within the sound discretion of the district court, *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 158 (1999), to which the Ninth Circuit gives "broad discretion," *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). *See also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). "Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one," *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014), which does not require "trial judges to mechanically apply the *Daubert* factors," *Hankey*, 203 F.3d at 1168. *See also Hangarter*, 373 F.3d at 1017.

The district court's role when considering the admissibility of expert testimony is that of "a gatekeeper, not a fact finder." *City of Pomona*, 750 F.3d at 1043. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is

---

[3] Here, the Court has already scheduled and the parties have completed a certain amount of discovery regarding class action and *Daubert* issues. *See* Docket Nos. 113, 133.

right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). That is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In the end, "[c]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge," *City of Pomona*, 750 F.3d at 1044, because "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology," *Daubert II*, 43 F.3d at 1318.

### III. Discussion

#### A. Chandler *Daubert*

##### 1. Summary of Opinions

Dr. John Chandler submits a 95-page report explaining digital marketing practices in the context of student recruitment for graduate programs, the stages of a prospective student's journey through the "marketing funnel," what marketing strategies are typically deployed for student recruitment, and how USC Rossier applied these principles in its marketing strategy. *See generally* Chandler Report. The first portion of Dr. Chandler's report expresses extensive opinions on marketing practices, the enrollment journey, and the comprehensive marketing strategy that USC and 2U deployed to market USC Rossier. *Id*. ¶¶ 16-205. The second part of Dr. Chandler's report discusses the exposure – *i.e.*, the reach – of USC Rossier's marketing materials containing the allegedly fraudulent ranking information. *Id*. ¶¶ 206-224. In the end, Dr. Chandler's bottom line conclusion is: "Given the extensive and varied exposure methods outlined above, I can state with a reasonable degree of scientific certainty that all or nearly all students at USC Rossier in the MAT and OCL programs during the period of ranking manipulations were exposed to the fraudulent rankings. The pervasiveness of these rankings across multiple touchpoints ensured their near-universal reach." *Id*. ¶ 14(9).

##### 1. Qualifications

USC does not challenge Dr. Chandler's qualifications. The Court has reviewed Dr. Chandler's qualifications as set forth in his report and determines that there is no independent basis to find him unqualified to offer his proffered expert report and testimony. Dr. Chandler is a professor of marketing at the University of Montana who holds a master's degree in mathematics and a doctorate in statistics and has worked in analytics and data science for 25 years with a focus

6

on digital marketing. Chandler Report ¶¶ 1-12. The Court notes, too, that Dr. Chandler has previously been admitted as an expert in the field of digital marketing and marketing reach. *See In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *18-19 (N.D. Cal. June 2, 2022). The Court therefore finds Dr. Chandler qualified for the purposes of offering his proffered marketing and exposure opinions in this case.

2. <u>Relevance</u>

USC does not challenge the relevance of Dr. Chandler's opinions, other than arguing that certain aspects of his testimony would not be helpful to the jury because they concern commonsense matters. The Court has read Dr. Chandler's report and understands the opinions expressed therein. The Court finds that Dr. Chandler's expert opinions would be relevant to class certification because, if admitted, they relate to the commonality of the putative class's claims and thereby advance a material aspect of Plaintiffs' case. *Daubert II*, 43 F.3d 1311 at 1315.

3. <u>Reliability</u>

USC does not challenge Dr. Chandler's opinions on general marketing principles or the specifics of the extensive marketing strategy 2U and USC implemented with regard to USC Rossier. Instead, USC challenges the exposure/reach aspects of Dr. Chandler's opinions. The crux of USC's argument is that Dr. Chandler has no *quantitative* basis to opine that all or nearly all prospective students were exposed to fraudulent rankings through emails and/or other means. Specifically, USC argues that, contrary to Dr. Chandler's assertion, not all prospective students were added to a drip email campaign; instead, such emails were sent only to individuals who opted in or requested information about USC Rossier. Chandler Mot. at 4. In addition, USC argues that just because a prospective student received an email from USC does not mean that the student was exposed to a ranking representation – *i.e.*, just because students received an email does not mean they opened it. *Id.* at 5. At the hearing, USC also argued that Dr. Chandler was not provided with exemplars of the actual emails 2U sent because such records were not preserved, meaning even if USC and 2U deployed an extensive marketing strategy, Dr. Chandler does not know to what rankings representations students may have actually been exposed.

USC further contends that Chandler does not have reliable site traffic data to substantiate an opinion that the vast majority of students visited the USC Rossier website and were exposed to a ranking representation. *Id*. On a more fundamental level, USC argues that Dr. Chandler's opinion that it is "commonsense" to assume students visited the USC Rossier website is

7

unsupported speculation, which is nonetheless inadmissible because expert opinions on commonsense matters would not be helpful for the jury. *Id*. at 5-6. Finally, USC contends that Dr. Chandler's opinions concerning exposure to "other channels" is also not supported by any facts or data and is similarly unhelpful to the jury because it is simply a common understanding of how the internet and social media work. *Id*. at 7.

The Court first observes that Dr. Chandler's report extensively details the marketing strategy that USC and 2U deployed on behalf of USC Rossier, including specific opinions on how the marketing strategy was designed to move interested students through the marketing funnel from "awareness" to "enrollment." His report specifically examines numerous aspects of USC Rossier's marketing campaigns, including email marketing, website marketing, social media marketing, and internet search optimization. At least with regard to the social media and website channels, Dr. Chandler includes specific examples of USC marketing its numerical US News ranking for USC Rossier. However, Dr. Chandler has not examined the actual emails USC and 2U sent as part of this marketing strategy because those emails (or exemplars of those emails) were not preserved and therefore not disclosed during class discovery. Therefore, Dr. Chandler does not know how (or how often) rankings representations were actually displayed in those emails. Without this, and without comprehensive website traffic data, Dr. Chandler acknowledges that his opinions must be expressed qualitatively, not quantitatively. Chandler Report ¶¶ 213, 215. The issue becomes, then, whether Dr. Chandler's opinion that "all or virtually all" students were exposed to rankings information is a supportable qualitative position.

To arrive at his exposure conclusions, Dr. Chandler relies heavily on testimony from 2U's 30(b)(6) representative, Dr. Joana Gerber. The Court has reviewed Dr. Gerber's deposition transcript, as well the arguments both USC and Plaintiffs make about her testimony. *See* Deposition Transcript of Dr. Joana Gerber ("Gerber Dep. Tr."), Docket No. 144-3. To be sure, Dr. Gerber's testimony is far from a direct confirmation that the fraudulent rankings were in fact included in USC's drip email campaigns. Dr. Gerber testified that USC Rossier's US News ranking was "definitely a leading differentiator," that she "believed" the rankings information was included in initial emails, that it "would surprise" her if it was not in the initial and subsequent emails, and when asked directly if any of the paid email campaigns included the rankings she said, "I believe so, yes." *See* Gerber Dep. Tr. 105:8-113:14. Nonetheless, the Court agrees with Plaintiffs that the thrust of Dr. Gerber's testimony and Dr. Chandler's report is that 2U orchestrated

8

an extensive marketing strategy designed to move all prospective students through the marketing funnel. The Court also agrees with Plaintiffs that Dr. Chandler's opinions are the result of extensive review of record evidence, including Dr. Gerber's testimony, and that USC's placement of rankings on the USC Rossier website and in social media further supports his exposure conclusions.

At the early juncture of class certification, the Court is satisfied that Dr. Chandler's ultimate opinion – *i.e.*, that it would have been virtually impossible for a student to enroll without exposure to a fraudulent ranking – are supported by his expertise, comprehensive examination of general marketing strategies, and a review of record evidence in this case indicating that 2U and USC centrally controlled an extensive marketing strategy. *See In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 817 (N.D. Cal. 2021) ("That defendants' marketing and training activities were highly uniform and centrally controlled is sufficient for the Court to infer that these activities had the effect of making it highly likely that members of the proposed subclass heard or saw or were otherwise exposed to the same representations or omissions."). As the Ninth Circuit has stated,

> Rule 702's sufficient facts or data element requires foundation, not corroboration. Consistent with the court's gatekeeping function, Rule 702 instructs a district court judge to determine whether an expert had sufficient factual grounds on which to draw conclusions. Although a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered, Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage.

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025-26 (9th Cir. 2022) (citations, quotation marks, and brackets omitted). While Dr. Chandler is not able to offer at this juncture a quantifiable number of students exposed to fraudulent rankings – an issue that might make the specific contours of his testimony subject to a later motion in limine – the Court does not find too great of an analytical gap between the record evidence and his exposure opinions. The core of USC's argument goes to the weight of Dr. Chandler's opinion and the identified shakiness of Dr. Gerber's testimony, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also City of Pomona*, 750 F.3d at 1044.

For the foregoing reasons, the Court **DENIES** USC's motion to exclude the expert report and testimony of Dr. Chandler.

9

### B. Neher *Daubert*

1. Summary of Opinions

Sara Neher submits a 13-page expert report explaining a model she constructed to project the US News ranking USC Rossier would have received if USC had submitted accurate data. *See generally* Neher Report. US News publishes its methodology each year, including the relative weights of the various factors that underlay its rankings, with each school receiving an assigned rank based on its overall score on a 100-point scale. *See* Docket Nos. 145-1, 158-21, 158-22.

Neher begins her reconstructed model with the data published by US News. First, Neher's model standardizes the data in each category using z-scores, which are multiplied by the relative weights published by US News and added together to create a total for each school. *Id.* ¶ 32. Then, the total is indexed such that the top score always equals 100. *Id*. The critical component – and the factor USC most vigorously challenges – is what Neher does to account for the information US News does not release. Neher acknowledges that she does not have access to information US News does not make publicly available, including the number of faculty with awards, the number of doctoral students who submitted a GRE score, the overall score for the lowest ranked 25% of schools, and the process for applying a logarithmic transformation to the student-faculty ratio. *Id*. ¶¶ 24, 27-28.

To account for this unavailable information, Neher calculates what she labels a "hidden-data constant" by comparing how much her model's raw score (using the publicly available data) deviates from the school's actual US News ranking. *Id*. ¶ 33. This, Neher reports, "captures the difference between what our model is able to calculate as the indexed score and what US News reports as the final score." *Id*. Then Neher replaces the data USC Rossier actually submitted to US News with accurate data USC should have submitted, based on an internal report from USC's Director of Institutional Research who was instructed to investigate the matter. *Id*. ¶¶ 33, 36-42. After generating a new overall score for USC Rossier using this information, Neher applies the hidden-data constant to account for the information she cannot recreate. *Id*. ¶ 33.

The result led to a dramatic decrease in USC Rossier's ranking. Under Neher's model, USC Rossier's rank would have dropped from 15 to 48 in 2018; from 10 to 34 in 2019; from 12 to 61 in 2020; from 11 to 63 in 2021; and from 11 to 64 in 2022. *Id.* ¶ 43.

2. Qualifications

Neher is a partner at Kennedy & Company Higher Education Strategies, a higher education

consulting firm. Neher Report ¶ 4. Neher has an MBA and has worked in higher education for more than twenty years, including academic leadership positions at two business schools. *Id.* ¶ 5. Neher has experience consulting higher education clients about their US News rankings, including constructing models like the one she submits in this case, and has also been part of the submission of data to US News for multiple schools. *Id.* ¶¶ 5-6, 22.

USC challenges Neher's qualifications on the grounds that she does not have the training, experience, or specialized knowledge to qualify as an expert in statistical modeling. Neher Mot. at 19. In addition, USC argues that she has never worked for or been trained by US News and has never before tried to replicate US News's model; instead, she knows only what US News publicly discloses. *Id.* On a broader level, USC argues that replicating US News's ranking model is not a field of expertise. As USC sees it, absent insider knowledge about US News's rankings, it is not possible to reliably replicate US News's ranking at all – and any attempt to do so is "a pure guessing game." *Id.* at 19-20.

The Court will begin by addressing USC's argument that US News rankings can only be reliably reconstructed by US News itself, or by using insider knowledge of US News rankings. As indicated earlier, US News keeps certain aspects of its methodology proprietary. At the hearing, Plaintiffs indicated that they sought certain information and cooperation from US News during class discovery, but that such efforts were not ultimately fruitful. Whatever might be the case, the Court declines USC's invitation to announce a rule – especially in a discretionary evidentiary ruling – that the *only* way to reliably prove rankings fraud is to use (or, more likely, to misappropriate) insider knowledge of US News's proprietary methodology. The Court is not convinced that any attempt to do so is necessarily a "pure guessing game" that categorically forecloses Neher's proffered reconstructed rankings. This is especially true considering that Plaintiffs have identified other consulting firms and academic research that attempt to reconstruct US News rankings. *See* Neher Opp. at 12-13.

That Neher has extensive experience working in higher education consulting, and in particular with creating models of US News rankings for higher education institutions, is a sufficient foundation to qualify her to offer her proffered opinions. USC's arguments might well be a preview of its cross-examination, but they are not grounds to find Neher unqualified to offer opinions in this case.

       3. <u>Relevance</u>

11

USC does not challenge the relevance of Neher's opinions. Plaintiffs intend to rely on Neher's opinions primarily for constructing a classwide damages model. *See* Neher Opp. at 10-11. Specifically, Plaintiffs plan to use Neher's adjusted ranking calculations in conjunction with, and as a predicate for, the range of rankings that their separate economics expert, Dr. J. Michael Dennis, will use in a conjoint survey (which is itself subject to a *Daubert* motion from USC and discussed *infra*). The Court has read Neher's report and understands the opinions expressed therein. The Court finds that Neher's expert report and testimony would be relevant to class certification because, if admitted, they would relate to establishing a damages model capable of measuring classwide damages. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). As such, Neher's report and testimony would advance a material aspect of Plaintiffs' case. *Daubert II*, 43 F.3d 1311 at 1315.

4. Reliability

USC argues that Neher's opinions regarding USC Rossier's adjusted US News rankings must be excluded because they are the result of an unreliable methodology. *See* Neher Mot. at 9-12. Specifically, USC argues that the "hidden data constant" Neher calculates varies both school-to-school and year-to-year, resulting in a score that is sometimes close to US News' ranking, but other times is dramatically far off. *Id.* at 1. In other words, USC argues that there is no consistency to the hidden-data constant, so the methodology cannot be reliably used to predict adjusted scores based on different data input. *Id.* at 1-2. What Neher is actually capturing in her hidden data constant, USC argues, is a margin of error between two completely divergent models, not missing data, which is why the margin of error is so inconsistent and unpredictable. *Id.* at 11. Because US News has never released any score for USC Rossier based on the substitute data against which Neher's model could be compared, USC argues that the hidden data constant is just a "fudge factor." *Id.* at 12. That is because, as USC sees it, her methodology uses a backward-looking margin of error based on original data in a ten-metric model to predict the outcome from a forward-looking nine-metric model using different data. *Id.* In the end, USC points out that Neher's model fails to match US News's ranks 72% of the time, including being off by 10 or more places 25% of the time. *Id*. at 16. In addition, USC argues that Neher's model is not testable, has no known error rate, and has not been peer reviewed. *Id*. at 13-17.

Plaintiffs argue that Neher's methodology is reliable, even though it does not exactly replicate the US News rankings, because the adjusted rankings are intended to work in conjunction

12

with their damages expert's conjoint survey which contemplates a range of rankings – *i.e.*, 11-19 for the misrepresented rankings versus 30-59 for the corrected rankings. Neher Opp. at 14. Plaintiffs also argue that Neher's hidden-data constant is the result of a calculation transparently explained in her report, not some value arbitrarily inserted into a calculation. *Id*. at 16. In addition, Plaintiffs argue that Neher's model can be tested and has an acceptable error rate, particularly with replicating the rank of higher-ranked schools like USC Rossier. *Id*. at 19-21.

The Court would begin by observing that neither Plaintiffs nor Neher purport to represent the proffered adjusted rankings model as a perfectly exact replication of the US News rankings. In addition, though USC did not challenge in its moving papers the result of Neher's model – *i.e.*, that USC Rossier's ranking would experience a large decline – it indicated at the hearing that it does challenge Neher's ultimate conclusion that rankings would have dropped. For present purposes, the crux of USC's challenge is how close Neher got in making a rankings prediction. As stated earlier, the Court rejects USC's contention that the only way to prove fraud in the US News rankings is to either use insider knowledge from previous employment at US News or to have US News itself test the alternative data. In addition, it was USC who withheld the corrected data from US News, so it cannot now blame Plaintiffs for not having access to those results.

The Court also disagrees with USC that Neher's methodology cannot be tested. Neher has described the methodology she deploys in her model in transparent and understandable terms, meaning USC and its experts can verify it, test it against different data, and/or critique the application of the hidden data constant. As the Court understands the conjoint survey with which Neher's model will be used, Plaintiffs' damages expert intends to use a band of rankings in which USC Rossier falls, not a particular numerical ranking or comparison to other schools within the rankings. That is to say that the primary focus of the model is on reliably replicating USC Rossier's ranking, the only school at issue in this case, within a range of numerical rankings and without regard to the ranking of other schools.

USC does, however, point to numerous examples where the hidden data constant does not come close to replicating the school's actual US News ranking, and that it also varied year-to-year. The question becomes, then, whether the inconsistencies with the outcome of Neher's model compared to US News's actual rankings are the result of unreliable methodology or instead go to the weight of the evidence. The Court notes that USC does not challenge Neher's replication of the published aspects of US News's methodology, only the methodological step of capturing the

13

"hidden data constant." The Court acknowledges USC's contention that Neher's "hidden data constant" yields varying results as compared to US News's rankings and then applies the "hidden data constant" to the results of a different model – *i.e.*, the adjusted rankings.

However, it is well established that "[c]lass wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019). "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where it is the wrongful acts of the defendant that have created the difficulty in proving the amount of [damages]. The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999) (citations, quotation marks, and alterations omitted). The fact remains that Plaintiffs intend to use Neher's model to show how consumers would react to USC Rossier's adjusted rankings *range*, as compared to being a top-ranked school. With this in mind, the argument USC makes about the exact precision of Neher's estimation cannot carry the weight that USC places upon it. But to be sure, USC has identified several weaknesses of Neher's model which can be subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. The Court cannot and will not consider whether Neher's model is right or wrong; it is satisfied at this juncture that Neher transparently and thoroughly explained her methodology in a way that can be tested and cross-examined. The Court is therefore not convinced that Neher's model is the product of such unreliable methodology as to fail *Daubert*'s gatekeeping standard.

For the foregoing reasons, the Court **DENIES** USC's *Daubert* motion to exclude the expert report and testimony of Sara Neher.

### C. Dennis *Daubert*

#### 1. Summary of Opinions

Dr. J. Michael Dennis submits a 55-page report proposing two yet-to-be-conducted choice-based conjoint surveys that would estimate what USC Rossier's tuition prices would have been but for USC's alleged conduct. Dennis Report ¶ 28. Dr. Dennis defines a choice-based conjoint survey as a "standard marketing research technique for quantifying consumer preferences for products and for the component features that make up a product. Conjoint analysis can be used to

14

break down the value of a conceptual feature (*i.e.*, claims about the USC Rossier's credentials) into its component parts (*i.e.*, the claim that USC Rossier is a 'top ranked' program, or more specifically, that it was ranked between 10-15 by U.S. News & World Report in the 2017-2022 time period). Conjoint surveys take advantage of the fact that consumers are profoundly familiar with the task of shopping – comparing products, evaluating them, and making choices. Consumers are accustomed to making choices in their real-world shopping experiences." *Id*. ¶¶ 67-68.

Under Dr. Dennis's surveys, a representative sample of consumers would be selected such that the resulting consumer preferences could be reliably extrapolated to the proposed classes of plaintiffs. *Id*. ¶¶ 33-49. Respondents would be presented with sets of hypothetical graduate school programs described using different characteristics, such as, *inter alia*: (1) school type (public or private); (2) ranking (in bands such as 10-19 and 30-59); (3) and program costs. *Id*. ¶¶ 86, 89, 92, 93. Respondents would be asked to select which of the programs they prefer and whether they would actually be willing to choose the selected program at the indicated cost. *Id*. In the end, Dr. Dennis reports that this "[m]arket simulation will provide a statistically robust estimate of the price premium that reasonable consumers paid, if any, as a result of Defendant's use of the alleged deception to market its programs as highly ranked." *Id*. ¶ 112.

To calculate damages, Dr. Dennis explains:

> Conceptually, the harm experienced by proposed class members (that is, the paid price premium) is the delta between (i) the actual tuition prices paid by class members when the alleged deception was operative versus (ii) the estimated market-clearing price in the but-for world where Defendant did not employ the alleged deception in its advertising, promotions, and marketing. My price premium analysis will estimate the market-clearing price in that but for world. I define the but-for world as a world where the actual U.S. News rankings were in fact between 34 and 64 (corresponding to my fourth level of "30 to 59" for the "Rankings" attribute). In contrast, class members paid program costs when the advertised rankings were between 10 and 15 (*i.e.*, corresponding to my second level of "10 to 19" for the "Rankings" attribute). If Plaintiffs' allegations have merit, the market-clearing prices in the but-for worlds will be lower than the prices paid by class members.

*Id*. ¶ 115. As indicated *supra*, Dr. Dennis's model relies on the results of the adjusted rankings from Neher's models. Finally, Dr. Dennis has proposed his survey design, but has not actually conducted the consumer survey.

2. <u>Qualifications</u>

15

USC does not challenge Dr. Dennis's qualifications. Dr. Dennis is the Senior Vice President of the National Opinion Research Center, which is a survey research organization affiliated with the University of Chicago. *Id*. ¶ 13. Dr. Dennis has worked in survey research for more than 20 years, has authored more than 60 articles, and has been found qualified by numerous courts to provide expert opinions on consumer surveys. *Id*. ¶¶ 6 (collecting cases), 14. The Court has reviewed Dr. Dennis's qualifications as set forth in his report and determines that there is no independent basis to find him unqualified to offer his proffered expert report and testimony in this case. *See id*. ¶¶ 4-17.

    3. Relevance

USC does not challenge the relevance of Dr. Dennis's proffered opinions. Plaintiffs allege that "students paid tuition price premiums that they otherwise would not have" paid but for USC's conduct. SAC ¶ 49. Indeed, Plaintiffs allege they "would not have attended had USC Rossier been ranked in a lower position given the high price tag of the school and/or would not have paid nearly as much." SAC ¶¶ 127, 139, 149; *see also id*. ¶ 157. The Court has read Dr. Dennis's report and understands the opinions expressed therein. The Court finds that Dr. Dennis's expert report and testimony would be relevant to class certification because, if admitted, they would relate to establishing a damages model capable of measuring classwide damages, specifically the price premium class members allegedly paid for the misrepresentation of USC Rossier's US News ranking. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). As such, Dr. Dennis's report and testimony would advance a material aspect of Plaintiffs' case. *Daubert II*, 43 F.3d 1311 at 1315.

    4. Reliability

USC first argues that Dr. Dennis's opinions must be excluded because they rely on Neher's inadmissible opinions. *See* Dennis Mot. at 4-5. As indicated *supra*, the Court would not exclude Neher's opinions, thereby rendering this argument moot.

USC next argues that Dr. Dennis's opinions must be excluded under Fed. R. Evid. 702(b) because they are based on insufficient facts or data. *See id*. at 5-9; Dennis Reply at 2-4. USC argues that higher education does not operate in normal supply-and-demand conditions because of the impact of other economic incentives, including scholarships, fellowships, and grants. Dennis Mot. a 5-6. In addition, USC argues that universities address scarcity through selective admissions, not tuition price. *Id*. at 5. USC's argument, then, is that Dr. Dennis has no evidence

justifying his assumption that the market value of an education from USC Rossier is anything other than what USC Rossier decides to charge. USC has made this same argument in other cases in this District, which Chief Judge Gee has rejected:

> Due to the unusual nature of the "product" USC offers, USC's argument is, essentially, that the fair market value of a USC education is whatever USC decides to charge. Although a jury may find this argument persuasive, it is not a basis to prevent Plaintiffs from attempting to prove fair market value on a different theory. Given USC's own evidence that tuition is essentially unmoored from ordinary market forces, the Court concludes that [Plaintiffs' expert's] decision to consider only students' willingness to pay, and not other, unidentified supply-side forces, does not justify exclusion of his opinion.

*In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128, 1148-49 (C.D. Cal. 2023). In a separate but similar case, Chief Judge Gee also rejected the notion that a conjoint survey is inappropriate in the higher education context. *See In re Pepperdine Univ. Tuition & Fees Covid-19 Refund Litig.*, No. 20-cv-4928-DMG-(KSx), 2023 WL 6373845, at *3 (C.D. Cal. Sept. 26, 2023) ("The Court therefore concludes that a conjoint analysis is a reasonable method for measuring value in the higher education context.").

Relatedly, USC also argues that Dr. Dennis has no evidence supporting his assumption that USC Rossier's tuition responded to US News rankings. Dennis Mot. at 6-9. USC relies on a report from its expert witness to argue that there is no empirical analysis showing that tuition for EdD programs is affected by changes in school rankings. Indeed, USC argues that USC Rossier's tuition actually increased after USC decided to withdraw USC Rossier from the US News rankings. *Id*. at 8. However, Dr. Dennis explains that his survey design:

> Already and will consider further numerous real-world, supply-side factors for the MAT and EdD programs at issue, so that my surveys will accurately measure the price premium attributable to the alleged deception, *i.e.*, the intersection between demand-side factors (willingness to pay) and supply-side factors (willingness to sell), to determine the actual effect of the alleged deception on market price. The actual real-world tuition pricing of the MAT and EdD services sold during the class period reflects the actual number of units sold, the costs of delivering the services, the costs for advertising, and marketing, and margin, among other supply-side factors. I have taken into account the fact that these products are sold in a competitive market. Further, I have taken into account the fact that the quantity supplied of Defendant's and competitors' products is a known fact and is fixed as a matter of history.

17

Dennis Report ¶ 82.

At this juncture, this Court agrees that the real-world and market realities evidence upon which USC relies speak to the weight of Dr. Dennis's analysis – which certainly could persuade a jury – but are not supportable reasons for excluding Dr. Dennis's expert report and testimony. *See In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d at 1149 ("A reasonable factfinder may very well find this real-world evidence of the value of an online-only USC education more persuasive than Dr. Singer's analysis. But this contrary evidence is not a basis to exclude Dr. Singer's opinions."); *Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) ("One reasonable assumption – that can be cross-examined, rebutted, and argued over – is the use of historical supply-side data."). In the end, Dr. Dennis's proposed conjoint survey would be helpful in establishing classwide damages by attempting to value the alleged price premium class members purport to have paid because of USC's alleged misrepresentations to US News.

Finally, the fact that Dr. Dennis's survey has not been fully developed or implemented does not warrant exclusion at this juncture. As noted earlier, "where an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit. This still requires determining whether the expert's methodology is reliable, so that a limited *Daubert* analysis may be necessary, but the more full-blown *Daubert* assessment of the results of the application of the model would be premature." *Nutramax*, 114 F.4th at 1031. In *Nutramax*, the Ninth Circuit indicated that potential errors in how an unquestionably experienced expert would execute a conjoint survey did not defeat class certification. *Id*. at 1033 ("The speculative possibility that [the expert] might slip up in executing his model, standing alone, is insufficient to defeat class certification."). The Court notes that Dr. Dennis extensively details the structure of his survey and has considerable experience executing similar surveys. And as just examined, the Court is satisfied at this juncture that Dr. Dennis is qualified and has proposed a reliable methodology. Accordingly, there is no basis to exclude Dr. Dennis's proposed conjoint survey. However, the Court will not preclude USC from bringing a later *Daubert* challenge to Dr. Dennis's final report and testimony after his conjoint survey has been fully executed.

For the foregoing reasons, the Court **DENIES** USC's *Daubert* motion to exclude the expert report and testimony of Dr. J. Michael Dennis **WITHOUT PREJUDICE.**

## IV. Conclusion

Based on the foregoing discussion, the Court **DENIES** USC's *Daubert* motions to exclude the expert report and testimony of Dr. John Chandler, Sara Neher, and Dr J. Michael Dennis.